## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **THE DISTRICT OF COLUMBIA** | : | |
| A Municipal Corporation | : | |
| One Judiciary Square | : | |
| Washington, D.C.  20001 | : | |
| | : | |
| Plaintiff, | : | **Civil Action No. 06-2105 (PLF)** |
| | : | |
| | : | |
| | : | |
| **LARRY ABRAMSON and** | : | |
| **CAROLINE NEWMAN** | : | |
| 6419 Barnaby Street, N.W. | : | |
| Washington, D.C.  20015, | : | |
| | : | |
| Parents and next friend of S.A., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

### ADMINISTRATIVE RECORD

Attached is an index and the record of the administrative proceedings at issue in this action.  Page numbers may be found in the bottom left-hand corner of the page. Although Defendants' Exhibits 16-21 were not admitted into evidence during the hearing, they have been included in this administrative record.

Respectfully submitted,

LINDA SINGER
Acting Attorney General for the
  District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/ *Edward P. Taptich*_____
EDWARD P. TAPTICH (012914)
Section Chief
Equity Section Two

/s/ *Veronica A. Porter*_____
VERONICA A. PORTER (412273)
Assistant Attorney General
Civil Litigation Division
Equity Section Two
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C.  20001
(202) 724-6651 (phone)
(202) 727-3625 (facsimile)
veronica2.porter@dc.gov

**February 23, 2007**

**District of Columbia v. Abramson, et al., 06-2105**

**Index**

| | **Page** |
|---|---|
| 1. Certification of Record | 1 |
| 2. Hearing Officer's Decision, 9/14/06 | 2-15 |
| 3. Eig's letter to Student Hearing Office, 9/7/06 | 16-17 |
| 4. Eig's letter to Student Hearing Office, 8/21/06 | 18-19 |
| 5. Due Process Complaint Notice, 5/23/06 | 20-26 |
| 6. DCPS Scheduling Memorandum, 5/23/06 | 27-30 |
| 7. DCPS response to Due Process Complaint Notice, 6/5/06 | 31-32 |
| 8. Hearing Notice, 6/19/06 | 33 |
| 9. Eig's letter to Student Hearing Office, 7/5/06 | 34-35 |
| 10. Hearing Notice, 7/11/06 | 36 |
| 11. Eig's letter to Student Hearing Office, 7/12/06 | 37-38 |
| 12. Eig's letter to Student Hearing Office, 7/19/06 | 39-40 |
| 13. Eig's letter to Student Hearing Office, 7/21/06 | 41-42 |
| 14. DCPS Motion for Continuance, 7/28/06 | 43 |
| 15. Hearing Officer's Interim Order, 8/8/06 | 44 |
| 16. Hearing Notice-1, 8/8/06 | 45 |
| 17. Hearing Notice-2, 8/8/06 | 46 |
| 18. DCPS, Exhibit 1, Due Process Complaint Notice, 5/23/06 | 47-53 |
| 19. DCPS, Exhibit 2, Due Process Complaint Disposition, 6/6/06 | 54-56 |
| 20. DCPS, Exhibit 3, USDE letter to schools, 7/27/05 | 57-59 |
| 21. DCPS, Exhibit 4, CARE Center letter to Eig, 5/4/06 | 60 |
| 22. DCPS, Exhibit 5, CARE Center letter to Eig, 5/23/06 | 61 |
| 23. DCPS, Exhibit 6, Eig letter to CARE Center, 5/8/06 | 62-63 |
| 24. DCPS, Exhibit 7, DCPS fax to Eig, 6/5/06 | 64-66 |
| 25. DCPS 5-day disclosure letter, 8/1/06 | 67-68 |
| 26. Eig's 5-day disclosure letter, 7/31/06 | 69-70 |

27. Eig's Exhibit 1, Due Process Complaint Notice,
    5/23/06                                               71-75
28. Eig's Exhibit 2, Student Enrollment Form,
    1/4/06                                                76-83
29. Eig's Exhibit 3, CARE Center letter to Eig,
    5/4/06                                                   84
30. Eig's Exhibit 4, Eig letter to CARE Center,
    5/8/06                                                85-86
31. Eig's Exhibit 5, CARE Center letter to Eig,
    5/23/06                                                  87
32. Eig's Exhibit 6, Due Process Complaint
    Disposition, 6/6/06                                   88-90
33. Eig's Exhibit 7, Eig letter to DCPS, OGC
    7/31/06                                                  91
34. Eig's Exhibit 8, Neuropsychological
    Reevaluation, 1/2006                                 92-105
35. Eig's Exhibit 9, Treatment Summary and
    Progress Report, 1/27/06                            106-108
36. Eig's Exhibit 10, Dr. Clawson's Report,
    1/26/06                                             109-110
37. Eig's Exhibit 11, Classroom Observation,
    1/23/06                                             111-112
38. Eig's Exhibit 12, Grove School Information          113-127
39. Eig's Exhibit 13, HOD for C.S.                      128-138
40. Eig's Exhibit 14, USDE Memorandum to
    School Officers, 1/27/05                            139-141
41. Eig's Exhibit 15, Questions and Answers,
    March, 2006                                         142-155
42. Eig's letter to DCPS, 8/1/06                            156
43. Eig's Exhibit 16, Private Student Referral
    for Special Education Services, 1/3/06                  157
44. Eig's Exhibit 17, Eig letter to CARE Center,
    3/13/06                                                 158
45. Eig's Exhibit 18, Eig letter to CARE Center,
    4/17/06                                             159-160
46. Eig's letter to DCPS, 9/11/06                           161
47. Eig's Exhibit 19, Grove School Report Card,
    Academic Year, 2005-2006                               162
48. Eig's Exhibit 20, letter from Grove School to
    Defendants, with Comprehensive Service
    Plan, 6/5/06                                        163-186
49. Eig's Exhibit 21, Grove School Progress
    Report, 6/21/06                                         187
50. Defendants' Motion for Summary Decision            188-202
51. DCPS' Opposition to Motion for Summary
    Decision                                            203-208

52. DCPS' Opposition, Attachment A          209
53. DCPS' Opposition, Attachment B          210
54. DCPS' Opposition, Attachment C          211-217
55. DCPS' Opposition, Attachment D          218-246
56. DCPS' Opposition, Attachment E          247-248
57. Defendants' Reply                       249-254
58. Hearing Transcript, 8/8/06              255-284
59. Hearing Transcript, 8/21/06             285-319

# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
#### SPECIAL EDUCATION

In the Matter RE: A▮▮▮▮▮, S▮▮ vs. DCPS

Case Information:  Hearing Dates: 08/08/06 & 08/21/06
Held at: **District of Columbia Public Schools Headquarters**
**825 N. Capitol Street, N.E.**
**Washington, D.C. 20002**
Student Identification Number:  9021977
Student's Date of Birth: ▮▮▮▮/1991
Attending School: **The Grove School**
Managing School:
Hearing Request Date(s) 05/23/2006

## CERTIFICATION OF RECORD

I, **Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting of all letters, pleadings, orders,

exhibits and depositions.

I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this 23rd day of January 2006.

**LEGAL ASSISTANT**
**STUDENT HEARING OFFICE**

1

(In the Matter of SA  DOB: 1/16/91  HOD: September 14, 2006)

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## *State Enforcement and Investigation Division*
### CONFIDENTIAL
## Coles B. Ruff, Jr., Due Process Hearing Officer

| | |
|---|---|
| In the Matter of S A )<br>Date of Birth: 1991 )<br>)<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>)<br>District of Columbia Public Schools )<br>("DCPS" or "District") )<br>Attending School: Care Center )<br>Respondent. )<br>)<br>_____ ) | **IMPARTIAL DUE PROCESS**<br><br>**HEARING OFFICER'S DECISION**<br><br>Hearing Dates: August 8, 2006<br>August 21, 2006<br>Held at: 825 North Capitol St. NE<br>Washington, DC |

Counsel for Student:               Michael J. Eig, Esq.
                                      5454 Wisconsin Avenue #760
                                      Chevy Chase, Maryland  20815

Counsel for DCPS:               Stephanie Ramjohn Moore, Esq.
                                      Office of General Counsel
                                      825 North Capitol St. NE
                                      Washington, DC  20002

## JURISDICATION:

A Due Process Hearing was convened on August 21, 2006, at the headquarters of the District of Columbia Public Schools, 825 North Capitol Street, NE, Washington, DC 20002, in response to a due process complaint submitted by counsel for the student and parent filed May 23, 2006.

The hearing was conducted and this decision was written pursuant to the *Individuals with Disabilities Act* (I.D.E.A.), P.L. 101-476, as amended by P.L. 105-17 and the *Individuals with Disabilities Education Improvement Act of 2004* (I.D.E.I.A.), the Rules of the Board of Education of the District of Columbia and the DC Appropriations Act, Section 145, effective October 21, 1998.

(In the Matter of SA  DOB: ██/██/91  HOD: September 14, 2006)

The parent's counsel assert there is no genuine issue as to any material fact in the record and the parent is entitled to judgment as a matter of law and thus requested an order of summary decision ordering DCPS to place and fund the student at Grove School.

**DUE PROCESS RIGHTS:**

The parent's counsel waived a formal reading of the due process rights.

**SUMMARY OF THE RELEVANT EVIDENCE:**

The parent's counsel submitted the motion for summary decision August 4, 2006. DCPS filed an opposition to the motion August 11, 2006. Parent's counsel filed a response to DCPS' opposition August 16, 2006. The Hearing Officer held oral argument on the motion and opposition August 21, 2006. In rendering this decision on the motion the Hearing Officer considered the motion and the opposition, the representations made on the record by each counsel and the documents submitted in the parties' disclosures (SA 1-15 and DCPS 1-7) which were admitted into the record.

**FINDINGS OF FACT[1]:**

The following facts were undisputed by the parties:[2]

1. The student is age fifteen and has not yet been determined to be eligible for special education services.

2. On January 4, 2006, the student's parents registered the student as a non-attending student with DCPS at the DCPS Central Assessment Referral and Evaluation Center (CARE Center) at Shaw Junior High School to begin the student's assessment for special education services. (SA 2, 16)

3. Until February 27, 2006, the student attended Georgetown Day School (GDS) within the District of Columbia.[3]  (SA 3)

4. The CARE Center staff contacted GDS to schedule a time to observe the student in February 2006; the Care Center staff was advised the student had been withdrawn.

---

[1] The evidence that is the source of the finding of fact is noted within a parenthesis following the finding.

[2] The findings of fact listed here are the extent to which the parties agreed there is no material dispute as to fact. DCPS did not agree to a finding that student was a child with a disability or that the student has a condition that would qualify him as a child with a disability under IDEIA.

[3] The parent counsel represented the student stopped attending GDS shortly after February 11, 2006, when he was hospitalized. The Hearing Officer concluded there was no material difference in the two dates presented as to when the student last attended GDS.

3

(In the Matter of SA  DOB: ███/91  HOD: September 14, 2006)

5.  By letter dated March 13, 2006, the parent's counsel advised DCPS the student no longer attended GDS and had been unilaterally placed by his parents at the Grove School in Madison County Connecticut.  (DCPS 5)

6.  The parent's enrolled the student in a residential placement at the Grove School (Gove) in Madison County, Connecticut, on April 4, 2006.

7.  By letter dated May 4, 2006, Patricia Young, The Director of the Care Center advised parent's counsel that since the student was removed from school in the District of Columbia and was currently attending school in Madison County, Connecticut, the LEA in Madison County would be responsible for providing special education services to the student.  Ms. Young provided contact information for Joanne Paniecek, Director of Special Education in Madison County, Connecticut.  (SA 3, DCPS 4)

8.  At a meeting May 5, 2006, DCPS again advised the parent that DCPS was not obligated to provide student with services under IDEA.  Ms. Young reiterated this position to parents counsel in a letter dated May 23, 2006, and indicated that if the student returned to the DC with an individualized educational program (IEP) DCPS would provide services to the student.  The parent's counsel then filed the current due process complaint.  (DCPS 5, 6)

9.  The student resides in the District of Columbia.

**ISSUE(S):**

1.  Is there no genuine issue of material fact in this matter such that Summary Decision appropriate?
2.  Is DCPS obligated to provide the student FAPE even though he currently attends school in Madison, Connecticut?
3.  Should the parents be reimbursed for unilaterally placing the student in the Grove School?

**CONTENTIONS OF THE PARTIES:[4]**

**DCPS counsel asserted the following:**

1.  The reauthorization of IDEA 2004 significantly changed the obligation of States and LEAs to children with disabilities enrolled by their parents in private schools. The Act now requires the LEAs in which the private schools are located, rather than the LEA's in which the parents and child resides, to conduct child find and

---

[4] The contentions are the arguments made by opposing counsel and do not reflect any findings or conclusions made by the Hearing Officer.

4

provide equitable services to parentally-placed private school children with disabilities.

2. "Child find" includes an eligibility determination when a parent requests that a child be evaluated for and provided special education services.

3. The June 27, 2005, OSEP letter supports this conclusion and elucidates the change in Section 1412 (a)(10)(A) entitled: "Children Enrolled in Private Schools By Their Parents" [5]

4. Consistent with the OSEP letter the Superintendent's directive states parents of students attending a private or religious school outside the District of Columbia should contact the school system where the student's school is located to seek special education services.[6]

---

[5] The US Department of Education Office of Special Education and Rehabilitative Services (OSEP) issued a memorandum dated June 27, 2005, entitled: "Obligations of States and local educational agencies to parentally-placed private school children with disabilities." The memorandum states in pertinent part: "The Obligation of States and LEAs to children with disabilities enrolled by their parents in private elementary schools and secondary schools will change beginning July 1, 2005, the effective date of these provisions in the IDEA of 2004. 20 USC 1412(a)(10) of IDEA 2004: (1) regarding the agency responsible for providing equitable special education and related services to parentally-placed private school children with disabilities, and (2) determining the proportionate amount of Federal funds to be expended by the LEA for such children attending private schools located in their district. IDEA 2004 retains the provision in IDEA that each LEA spend a proportionate amount of the required sub-grants it receives from the SES under 20 USC 1411 and 20 USC 1419 for special education and related services to children with disabilities enrolled by their parents in private elementary schools and secondary schools (20 USC 1412(a)(10)(A)(i) (I). However, under IDEA 2004, to calculate the proportionate amount of the Federal Part B funds, the LEA, after timely and meaningful consultation with representatives of private schools, must conduct a thorough and complete child find process to determine the number of parentally-placed children with disabilities attending private schools located in the LEA. In addition, the obligation to spend a proportionate amount to provide services to children with disabilities enrolled by their parents in private schools now refers to children enrolled by their parents in private elementary schools and secondary schools in the LEA. These are significant changes from current regulations in which the responsibility to conduct child find (344 CFR 300.451) and provide equitable services to parentally-placed private school children rests with the LEA in which the children reside. Therefore, beginning July 1, 2005, each LEA must conduct child find, determine the proportionate share of Part B funds, and provide equitable services to parentally placed private school children with disabilities who attend private schools located in the LEA without regard to where the children reside. This change means the LEAs consult with representatives of the private schools located in the district, thereby eliminating the need for LEAs to contact private school representatives outside of their jurisdiction. The change also means that representatives of private schools have only one LEA to consult with to ensure that children with disabilities enrolled in their schools can participate in IDEA equitable services..."

[6] The DCPS Superintendent issued a directive D 303.1 dated August 1, 2005, which sets out the procedures for the referral to determine Special Education eligibility of student's who are wards of the District of Columbia or who are non-attending DCPS students. In pertinent part the directive states: Student's attending private or religious school located outside the District of Columbia, not funded by DCPS: ...Consistent with the IDEIA 2004, a parent requesting consideration of special education eligibility or a change in services should contact the LEA in the state the school is located (OSEP Letter 05-9 to Chief State School Officers, "Obligations of Sates and local educational agencies to parentally-placed private school children with disabilities." June 27, 2005)

5. The comments of the new IDEA regulations explaining the changes in the law with regard to parentally placed private school students also support the conclusion the LEA where the student attends school is responsible for the eligibility determination and provide special education services under IDEA. [7]

6. In the alternative, if the Hearing Officer concludes DCPS has an obligation to evaluate the student for special education services, the facts indicate DCPS tried to evaluate the student and the student was removed from the jurisdiction and unavailable prior to the expiration of the 120 days following the parental request.

**The parent's counsel asserted the following:**

1. IDEA 2004 did not eliminate the need or an LEA to offer FAPE to all children who reside in the LEA's educational district, even if the child is privately placed by the parents in a school in another jurisdiction.

2. Both federal and local law provide the LEA shall make FAPE available to each child with a disability, ages three to twenty-two, who reside in or is a ward of the District of Columbia.

3. The Act now requires LEAs in which the private schools are located rather than the LEA in which the parent and child reside to conduct child find and provide equitable services to parentally placed private school children with disabilities.

4. This section of IDEA does not deal with a child whose parent wishes to enroll him in a public school system in order to receive a determination of his eligibility for special education and an offer of an appropriate education program and placement.

5. Such a student is entitled to a full panoply of individualized services contemplated in Section 1412(a)(1)-(9) and if so placed by DCPS to the continuing protections of 1412(a)(10)(B).

6. DCPS has said it won't evaluate the student while he attends Grove.

7. If DCPS had provided a placement other than Grove the parent's would have considered that placement but DCPS refused to complete the eligibility process.

8. The parent would have made the student available had DCPS asked for the student to be made available.

9. When a student has been denied FAPE funding of a proper parental placement is the appropriate relief.

10. The parent believes an eligibility determination can be made on the evaluations in the record and the parent requests the Hearing Officer make that determination.

11. Or DCPS can reinstitute the eligibility process while DCPS funds the student at Grove; but DCPS should not be rewarded for a misinterpretation of the law.

12. The parent is requesting DCPS place and fund the student's attendance at the Grove retroactively to his enrollment at Grove on April 4, 2006.

---

[7] Federal Register Vol. 71 No. 156  Monday, August 14, 2006, Pages 46589 - 46596

(In the Matter of SA  DOB: [REDACTED]/91  HOD: September 14, 2006)

**Motion for Summary Decision**

A Motion for Summary Judgment entitles a party to judgment if the pleadings, depositions and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tao v. Freeh,* 27 F. 3d 635 (D.C. Cir. 1994).

Summary judgment should be granted only where there are no genuine issues of material fact, and all inferences must be viewed in a light most favorable to the non-moving party. If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available. *Alyeska Pipeline Serv. Co. v. United States Envtl. Protection Agency,* 272 U.S. App. D.C. 355, 856 F.2d 309, 314 (D.C. Cir. 1988).

The parents contend in their motion that they are entitled to judgment as a matter of law because DCPS failed to conduct the evaluation and eligibility determination of the student after the parents' request. DCPS contends that it was not obligated to provide the student with FAPE because the parents unilaterally placed the student in a private school in Connecticut. DCPS, therefore, contends that the LEA in Connecticut is responsible for providing the student with FAPE.

Based on Findings of Fact above that are undisputed there is no genuine issue of a material fact regarding the student's residence and the parents' request that DCPS determine the student's eligibility. Whether DCPS had an obligation under IDEA to determine the student's eligibility and offer him FAPE, if he is determined to be child with a disability is, therefore, is a question of law and it is appropriate to make a partial summary decision in this matter based on the parties' disclosures, their motion briefs and oral arguments.

**CONCLUSIONS OF LAW:**

IDEIA § 1412 (a)(1) (A) provides:

> "A free appropriate public education must be available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children who have been suspended or expelled from school."

Thus DCPS has a fundamental obligation to provide FAPE to a child with a disability residing in the District of Columbia.[8]

---

[8] This obligation is correspondingly provided for in local regulation: 5 DCMR 3002.1(a).

IDEIA §1414(a)(1) provides:

> "a State educational agency, other State agency, or local educational agency shall conduct a full and individual initial evaluation…before the initial provision of special education and related services to a child with a disability…
> (B) …either a parent of a child or a SEA or other State agency or LEA may initiate a request for an initial evaluation to determine if the child is child with a disability.   (C) …The initial evaluation shall consist of procedures (I) to determine whether a child is a child with a disability…within 60 days of receiving parental consent for evaluation or if the State establishes a timeframe within which the evaluation must be conducted, within such timeframe…[9]

DCPS asserts that the reauthorization of IDEA 2004 changed the obligation of States and LEAs to children with disabilities enrolled by their parents in private schools such that DCPS is not obligated to evaluate the student based on the parent's requests even though the parent and the student reside in the District of Columbia. Rather, DCPS asserts the Act now requires the LEAs in which the private school the student attends is located, in this case Madison, Connecticut, rather than DCPS, conduct the eligibility determination. The Hearing Officer is unpersuaded by this argument.

DCPS cited the June 27, 2005, OSEP letter and the comments of the newly issued federal regulations to support its conclusion.[10]  The letter states in pertinent part "…an LEA must conduct "child find" activities with respect to children placed in a private school when the private school is in the LEA's educational district, even though the child does not reside in the LEA's educational district.  The letter clearly indicates, as the section states that an LEA "child find" obligation now extends to students who attend private schools in its LEA even if the student resides in a different LEA.

The "child find" requirement referenced above, however, is distinct from the requirement of an LEA to provide FAPE to its residents.  IDEA 2004 did not eliminate the need or an LEA to offer FAPE to all children who reside in the LEA's educational district, even if the child is privately placed by the parent's in another jurisdiction.

---

[9] §1414(a)(1) states "The relevant time frame clause shall not apply to a LEA if … the parent of the child repeatedly fails or refuses to produce the child for the evaluation."

[10] Federal Register Vol. 71 No. 156 Monday, August 14, 2006, Page 46593: The comments state in pertinent part: "Comment:  Some commenters requested the regulations clarify which LEA (the LEA of residence or the LEA whether the private… schools are located) is responsible for offering FAPE to children identified through child find under 300.131, so that parents can made an informed decision regarding their children's education.  Discussion:  If a determination is made by the LEA where the private school is located that a child needs special and related service, the LEA where the child resides is responsible for making FAPE available to the child.  If the parent makes clear his or her intention to keep the child enrolled in the private school located in another LEA, the LEA where the child resides need not make FAPE available to the child. … 300.201 already clarifies that the district of resident is responsible for making FAPE available to the child.  Accordingly, the district in which the private school is located is not responsible for making FAPE available to a child residing in another district."

The comments in the newly issued federal regulations suggest a conclusion contrary to what DCPS has asserted. The comment states: "the LEA where the child resides is responsible for making FAPE available to the child…. §300.201 already clarifies that the district of resident is responsible for making FAPE available to the child."[11]

DC Code § 38-2501 provides: DCPS shall assess or evaluate a student, who may have a disability and who may require special education services, within 120 days from the date that the student was referred for an evaluation or assessment.[12]

Routinely in due process hearings determining whether FAPE has been provided the issue of whether there has been a violation of the 120 day requirement under DC Code § 38-2501 is distinguished from an alleged violation of the "child find" requirement.[13]

The "child find" provisions of the Act require an LEA to identify, locate, and evaluate students who are in need of special education services. In the case of a parental request for evaluation, the student has already been identified by the parental request, thus obviating the LEA need to identify that student as a possible student with a disability. However, the LEA is then obligated to move forward with the requirement of IDEIA §1414(a)(1) and determine whether the student is in fact a child with a disability. If there was no parental request, then the obligation to identify the student would be a part of the "child find" responsibility of the LEA where the student attends school.

The LEA is still required to offer FAPE to any resident when there is a parent request for the student to be evaluated for services. The LEA must offer FAPE by evaluating the student, convening an eligibility meeting, determining eligibility, developing an IEP if the student is eligible and determining and offering an appropriate placement.

As IDEIA § 1412 (a)(1) (A) clearly states a free appropriate public education must be available to all children with disabilities residing in the State between the ages of 3 and 21 states the LEA. DCPS must offer FAPE to all children who reside in the District. There is no dispute the student and his parents reside in the District of Columbia. Therefore, the Hearing Officer concludes DCPS was obligated to determine the student's eligibility within the required time frame following the parent's request for evaluation.

---

[11] Federal Register Vol. 71 No. 156 Monday, August 14, 2006, Page 46593

[12] DC Code § 38-2501 also states: ( b) If a student is classified as having a disability, as defined in section 101(a)(1) of the Individuals with Disabilities Education Act…DCPS shall place that student in an appropriate program of special education services, and (c) Special education placements shall be made in the following order of priority provided that the placement is appropriate for the student: (1) DCPS schools or District of Columbia public charter schools; (2) Private or residential District of Columbia facilities; and (3) Facilities outside of the District of Columbia.

[13] Pursuant to 34 CFR 300.111 "child find" is defined: States must have in effect policies and procedures to ensure that (i) All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State, and children with disabilities attending private schools, regardless of the severity of tier disability, and who are in need of special education and related services are identified, located and evaluated and (ii) A practical method is developed and implemented to determine which children are currently receiving needed special education and related services.

(In the Matter of SA  DOB: ■■■/91  HOD: September 14, 2006)

DCPS failed to complete the eligibility process within 120 days of the parental request and the Hearing Officer concludes that DCPS' failure to do so was a denial of FAPE.

DCPS asserts in the alternative to its argument that the DCPS is not obligated to provide the student FAPE, that DCPS was unable to proceed with the requirements of DC Code § 38-2501 because the parent's made the student unavailable for evaluation. There is nothing in the evidence presented, other than the student being in an out of state school, to indicate the parent made the student unavailable. There is no evidence DCPS requested the student be made available for evaluation. Therefore, the Hearing Officer is unpersuaded by DCPS' alternative argument.

The parent has requested the DCPS reimburse the parent the cost of attending Grove based upon a denial of FAPE. IDEIA § 1412(a)(10)(C)(i) provides:

> "the LEA is not required to pay for the cost of educating including special education and related services of a child with a disability at a private school or facility if the agency made FAPE available to the child and the parents elected to place the child in such private school or facility."

However, in this instance DCPS refused to continue with the eligibility determination once it became aware the student attended an out of state school. Thus DCPS did not ever offer a placement.

IDEIA § 1412 (a)(10)(C)(ii) provides for reimbursement for private school placement:

> "If the parents of a child with disability, who previously received special education and related services under the authority of public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court of a hearing officer may require the agency to reimburse the parents for the cost of that reenrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior that enrollment"

DCPS refused to continue with the eligibility determination once it became aware the student attended an out of state school. Thus, DCPS did not offer a placement in timely manner. Therefore, the parent's are entitled to reimbursement if the student is in fact a determined to be a "child with a disability." That determination, however, has not yet been made.

In addition to requesting summary decision on the issue of whether DCPS is obligated to determine the student's eligibility based on the parent's request the parent has requested the Hearing Officer conclude based on the record the student meets the criteria for an eligibility determination and that Grove is an appropriate placement for the student.

The Hearing Officer concludes there is a genuine issue of material fact as to whether the student is in fact a child with a disability. The Hearing Officer declines to make a determination as to the student's eligibility. Although the parent has provided in the

record evaluations that indicate the student has a condition which may warrant an eligibility determination, the Hearing Officer does not find the evaluations and the data contained therein sufficiently compelling such that the Hearing Officer would supplant his decision to that of a team of qualified professionals familiar with the student.

Therefore, the Hearing Officer orders below that DCPS promptly complete the eligibility determination for the student and reimburse the parent should the student be determined eligible.

**ORDER:**

1. DCPS shall, within fifteen (15) school days of the issuance of this Order, convene a student evaluation plan (SEP) meeting to determine if any additional evaluations of the student are required to determine the student eligibility for special education services.

2. DCPS shall, within forty-five calendar days of the issuance of this Order, conduct evaluations agreed upon an the SEP meeting and/or conduct reviews of the student's existing evaluations and convene a building level multi-disciplinary team (MDT) meeting to review the student's evaluations and determine the student's eligibility for special education services.

3. If the student is determined eligible DCPS shall develop an individualized educational program (IEP) and discuss and determine placement and shall reimburse the parent for the student's tuition at the Grove School from the date that an eligibility determination should have been made pursuant to DC Code Sec. 28-2501 until such time as the student is provided an appropriate placement. [14]

4. DCPS shall issue a prior notice of placement within five (5) school days of the MDT/IEP meeting if the recommended placement is public and thirty (30) calendar days if the recommended placement is private.

5. If the student is determined to be ineligible DCPS shall issue a notice of ineligibility.

6. Scheduling of the evaluations and the MDT meeting is to be arranged through parent's counsel.

7. The parent shall cooperate and make all efforts to make the student available for DCPS to complete any evaluations that are required to comply with the Order.

---

[14] The parent's request for the student to be evaluated was received by DCPS on January 4, 2006. Pursuant to DC Code 28-2501 the student should have been evaluated and an eligibility determination made by May 4, 2006.

(In the Matter of SA   DOB: ██/91   HOD: September 14, 2006)

8. DCPS will be given a day for a day extension of any of the prescribed time frames in this Order for any delay caused by the student, the parent and/or their representative(s).

9. Based on this Order the hearing scheduled in the matter for September 19, 2006, is unnecessary and will not go forward.


**APPEAL PROCESS:**


This is the final administrative decision in this matter. Appeals on legal grounds may be made to a court of competent jurisdiction within 90 days of the rendering of this decision.

_____
**Coles B. Ruff, Esq.**
**Hearing Officer**
**Date: September 14, 2006**


Issued: _____

(In the Matter of SA   DOB: ▆▆/91   HOD: September 14, 2006)

## In the MATTER OF S▆▆ A▆▆▆▆▆ V. DCPS

## INDEX OF EXHIBITS

| EXHIBIT # | IDENTIFICATION | ADMITTED |
|---|---|---|
| SA 1-15 | Parent's Disclosures | Yes |
| DCPS 1-7 | DCPS Disclosures | Yes |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | * A detailed list of the documents disclosed is contained in the parties' disclosure notices |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

13

(In the Matter of SA   DOB: ████/91   HOD: September 14, 2006)

## In the MATTER OF S██ A▓▓▓▓▓▓, V. DCPS

## RECORD OF PROCEEDING

| DATE | DESCRIPTION |
|---|---|
| 5/23/06 | Request for Due Process |
| | Notice of Pre-Hearing Conference (as applicable) |
| 6/19/06 | Notice of Due Process Hearing |
| | SETS Disposition Form |
| | Transcripts or audio tapes of hearing |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

14

(In the Matter of SA   DOB: ██/91  HOD: September 14, 2006)

# INDEX OF NAMES

## In the MATTER OF S██ A█████ V. DCPS

| | |
|---|---|
| Assistant Superintendent, Special Education (or Director) | |
| Special Education Coordinator | |
| School Psychologist | |
| Regular Education Teacher | |
| | |
| Speech/Language Therapist | |
| Occupational Therapist | |
| Physical Therapist | |
| Private Psychologist | |
| Child and Child's DCPS ID # or SSN (insert ID # or Case Number on each page of the HOD vice child's name) | |
| Child's Parent(s) (specific relationship) | Ms. Caroline Newman (Mother) Mr. Larry Abramson  (Father) |
| Child/Parent's Representative | Michael J. Eig, Esq. |
| School System's Representative | Stephanie Ramjohn Moore, Esq. |
| Parent's Educational Advocate | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

### MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

September 7, 2006

Sharon Newsome
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

**Re: Seth A**
*Via facsimile and first class mail*

Dear Ms. Newsome:

Due to a conflict in schedule, we may have a witness who will be unable to present testimony on the scheduled hearing date for the above-referenced student of Tuesday, September 19, 2006. If this should occur, we would ask that we be able to present his testimony at a different date.

Thank you for your attention to this matter.

Sincerely,

Michael J. Eig

cc:    Stephanie RamJohn-Moore, Esq.
       Mr. and Mrs. Abramson

16

## MICHAEL J. EIG AND ASSOCIATES, P.C.
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX



**To:**  Sharon Newsome

**Fax Number:** (202) 442-5556
**From:** Michael J Eig
**Date:** September 7, 2006
**Time:** 8:37 am

**Total Pages:** 2
(including cover)

**Re:** S██ A█████████

**cc:** Stephanie RamJohn-Moore, Esq.
(202) 442-5098

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read,
copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at
(301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to
us and destroying it. Thank you.

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

---

FACSIMILE (301) 657-3843

---

August 21, 2006

Coles B. Ruff, Hearing Officer
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: S■■■ A■■■■■■
*Via facsimile and first class mail*

Dear Mr. Ruff:

During our oral argument by telephone this morning, you asked if there were anything in the record indicating when the Stixrud Neuropsychological Evaluation (SA-8) was provided to DCPS. I responded that I believed so, but could not find it at the moment. Reviewing the record before you after the call ended, I have found that document, SA-17, one of my letters to DCPS submitting that report on March 13, 2006, and asking if there was anything else the school system needed. The other reports in the record, from Dr. Lance Clawson and Joseph Wilson, L.C.S.W., were personally submitted by the parents.

Thank you for your attention to this matter.

Sincerely,

Michael J. Eig

cc:    Stephanie RamJohn-Moore, Esq.
       Mr. and Mrs. Abramson

18

## MICHAEL J. EIG AND ASSOCIATES, P.C.
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX

**To:** Coles B. Ruff, Hearing Officer
**DCPS - Student Hearing Office**

**Fax Number:** (202) 442-5556
**From:** Michael Eig
**Date:** August 21, 2006
**Time:** 10:50 am

**Total Pages:** 2
(including cover)

**Re:** S

**CC:** Stephanie Ramjohn-Moore, Esq.
202-442-5098

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter School (DCPS or LEA) and/or** parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

  The due process complaint must describe an alleged violation that occurred not more that two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.   INFORMATION ABOUT THE STUDENT:

Student Name: ___Seth A_____     Birth Date: _____, 1991___

Address: _____ Washington D.C. _____

Home School: ___Wilson High School_____

Present School of Attendance: __The Grove School_____

Is this a charter school? __NO_____     (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student: __Larry Abramson and Caroline Newman_____

Address (if different from the student's above): _____same as above_____

Phone/Contact Number: ____see below____     Fax Number (if applicable): ____see below____

SEID DPCN Rev'd 9/30/05

**B.**  **Individual Making the Complaint/Request for Due Process Hearing:**

Name: _Larry Abramson and Caroline Newman_

Complete Address: _____ same as above _____

_____

Phone: (h) _see below_ (w) _see below_ (Fax) _see below_ (e-mail) _____

Relationship to the Student:

☒ Parent          ☐ Legal Guardian          ☐ Parent Surrogate

☐ Self/Student    ☐ Local Education Agency (LEA)  ☐ Parent Advocate

**C.**  **Legal Representative/Attorney (if applicable):**

Name: _Michael J. Eig_

Address: _____ Michael J. Eig and Associates, P.C. _____

_____ 5454 Wisconsin Avenue, Suite 760, Chevy Chase, Maryland 20815 _____

Phone: (w) _301-657-1740_ (Fax) _301-657-3843_ (e-mail) _____

Will attorney / legal representative attend the resolution session?  ☒ Yes          ☐ No

**D.**  **Complaint Made Against (check all that apply):**

☒ DCPS school (name of the school if different from page one) _____
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.**  **Resolution Session Between Parent and LEA:**

I understand that it is my right to have a resolution session to resolve this complaint. I also understand that I may voluntarily waive this right if I choose. (Note: All parties must agree to waive the resolution session to avoid having this meeting.)

☒    I wish to waive the Resolution Session.

**E.**  **Mediation Process:**

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session. Mediation is also available prior to a due process hearing, but mediation may not be used to deny or delay a parent's right to a hearing on parent's due process complaint. Please check all that apply:

☐    I am requesting mediation as an alternative to the resolution session meeting.
☐    I am requesting mediation services **only**.
☐    I do not wish to use a mediator at this time.

SEID DPCN Rev'd 9/30/05                              2

## G.    Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.    What is the nature of the problem, including the facts related to the problem, that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

S█████ is a fifteen-year old young man who is extremely bright, with many cognitive scores in the 99th percentile, who has been diagnosed with Asperger's Syndrome, and who has a history of attention deficit hyperactivity disorder and behavior difficulties. Until recently, he has been a good student, however, he has been exhibiting increasing signs of inattention, anxiety and depression. As the 2005-06 school year progressed, these issues have risen to the forefront, having a great impact on S█████ ability to benefit from his instruction, and causing his educational performance to decline precipitously over the course of a few months. Until March, 2006, S█████ attended Georgetown Day School, but due to the severity of his disability and its recent manifestations, he had to be removed. His parents were, at the time, in the middle stages of the initial IDEA eligibility determination process with DCPS, having registered S█████ as a non-attending DCPS student in January, 2006. The parents advised DCPS of S█████ immediate need for a change in placement from Georgetown Day, and that they were working to identify an alternative. On April 4, 2006, they enrolled S█████ at a therapeutic residential placement at The Grove School in Madison Connecticut, and advised DCPS of this new placement.

Subsequently, DCPS scheduled a Multidisciplinary Team ("MDT") Meeting for May 5, 2006. The parents agreed to attend, in the hope of completing the eligibility determination process and developing an educational program for their son. However, on May 4, 2006, the day before the MDT meeting, the parents, through counsel, received a letter from Patricia Young. By this letter, DCPS stated its position that the school system has no legal obligation to provide S█████ with services under the IDEA. Instead, DCPS advised the parents that, since S█████ is attending a school outside the District, "his case has become the obligation of the state of Connecticut." DCPS repeated this position at the MDT Meeting on May 5, 2006.

The school system's position is based on a misunderstanding of the federal law. The IDEA, which was re-authorized in 2004, discusses and differentiates three categories of children in private schools, who require special education. The parents advised DCPS of their position with respect to these categories, as follows:

- 20 U.S.C. § 1412 (a)(10)(A) deals with "Children enrolled in private schools by their parents."
- 20 U.S.C. § 1412 (a)(10)(B) deals with "Children placed in, or referred to, private schools by public agencies."
- 20 U.S.C. § 1412 (a)(10)(C) deals with "Payment for education of children enrolled in private schools without consent of or referral by the public agency."

The three categories do not overlap.

The first category, which the law refers to as those children entitled to "Equitable Participation" or "Equitable Services," are children in private school at their parents' expense, who are only seeking services additional to their private school academic services – such as tutoring or speech/language therapy – usually supplied at the end of a school day at a nearby public school. Such a student's right to equitable participation for such services

docs entail registration in the public schools, as is clarified in the proposed regulations. This category has seen a change in the responsibility of the local educational agency ("LEA"), between IDEA 1997 and IDEA 2004; the new statute recognizes that after-school services provided to private school students at a nearby public school would be most conveniently provided by the LEA in which the *private school is located* than by the LEA where the *child lives*. That change is clarified by the US Department of Education Memorandum dated June 27, 2005, which the MDT team provided to the Abramson family on May 5, 2006.

However, the re-authorized 2004 IDEA enacted no significant changes to the second and third categories. The statute still requires that the LEA in which the child resides is responsible for proposing a FAPE for this child, regardless of whether he or she is placed in private school by the parents or by the school system. (This requirement is echoed in the local regulations: 5 D.C.M.R. § 3002.1(a) requires that "DCPS shall make a free appropriate public education (FAPE) available to each child with a disability, ages three to twenty-two, who resides in, or is a ward of, the District.") Of course, as the IDEA's language concerning the third category makes clear, the LEA would only be responsible for the cost of any private school tuition if it lacks or fails to offer an appropriate public program.

Thus, by referring S█████ Ab█████████ family to the Madison, Connecticut School District, DCPS violated its obligations under the IDEA. The parents so advised DCPS, and formally requested that DCPS complete the educational planning process and offer S███ an education appropriate to meet his needs. DCPS never responded to this request.

- To the extent known to you at this time, how can this problem be resolved?

As a remedy for this failure, the parents request that S███ be placed and funded at The Grove School in Madison, Connecticut, retroactive his enrollment on April 4, 2006.

- Issues presented:
-
See above.

## H.  Estimated amount of time needed for the hearing:    1 day

Note:  In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time
and will allocate two hours to conduct the hearing. Please indicate if you believe more that two hours will be needed.

## I.  Accommodations and Assistance Needed:

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)  N/A
- Special Communication (please describe the type)  N/A
- Special Accommodations for Disability (please be specific)  N/A
- Other  N/A

23

**J.    Waiver of Procedural Safeguards:**

☐    I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.    Parent Signature and Affirmation:**

I affirm that the information provided on this form is true and correct.

_____                _____
Signature of Parent or Guardian                                              Date

**L.    Signature of Attorney/Legal Representative:**

_____                5-23-06
Legal Representative / Advocate                                          Date

**M.    Signature of LEA Representative (if hearing requested by LEA):**

_____                _____
Representative of LEA                                                            Date

Mail, fax or deliver this complaint notice to:
State Enforcement and Investigation Division
For Special Education Programs (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8ᵗʰ Floor
Washington, DC 20002
Fax number: 202/442-5556

SEID DPCN Rev'd 9/30/05                                          5

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

May 23, 2006

Sharon Newsome
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: Seth A███████
*via facsimile & first-class mail*

Dear Ms. Newsome:

Enclosed please find a due process hearing request for the above-named student.  Please do not hesitate to contact me if you have questions regarding this matter.

Sincerely,

Michael J. Eig

Michael J. Eig

*Enclosure*

cc:   Larry Abramson and Caroline Newman

25

**MICHAEL J. EIG AND ASSOCIATES, P.C.**

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX



| | |
|---|---|
| **To:** | Sharon Newsome |
| | **DCPS - Student Hearing Office** |
| **Fax Number:** | 202-442-5556 |
| **From:** | Michael J. Eig |
| **Date:** | May 22, 2006 |
| **Time:** | 11:36 AM |
| **Total Pages:** | 7 |
| (including cover) | |
| **Re:** | Se█h A█████ |

2006 MAY 23 AM 11:50
DC PUBLIC
SCHOOL SYSTEM

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 442-5693



DISTRICT OF COLUMBIA PUCLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

# Time Sensitive Materials Attached

**Prompt Attention: Attorney: Michael J. Eig, Esq.**
**Parent: Larry Abramson and Caroline Newman**

Telephone Number: **(301) 657-1740**          Pages: **3**
Fax Number: **(301) 657-3843**                Date: **May 23, 2006**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **S____ A_____**
School:  **Attending The Grove School**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 442-5253.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

                                        **Thank You**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally
privileged.  The information is intended only for use of the individual or entity named Above, if you are not the
intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in
reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please
immediately notify us by telephone For return of the original document to us.

# STATE EDUCATION AGENCY
# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

In the Matter of:                                      )          BEFORE A SPECIAL EDUCATION
                                                       )

A▆▆▆▆, S.                                              )
                                     Petitioner        )
                                                       )          HEARING OFFICER
                                                       )
                      Vs.                              )
                                                       )
DCPS                                                   )
**Attending Grove School**                             )          DISTRICT OF COLUMBIA
                                                       )

                         Respondent                    )          PUBLIC SCHOOLS


## SCHEDULING MEMORANDUM

1.      A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **<u>The Student Hearing Office does not schedule or participate in resolution meetings</u>**.

2.      The complaint notice was filed on **May 23, 2006**

3.      The deadline for the resolution meeting is **June 7, 2006** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A.      *<u>Prior Written Notice Not Issued by the Local Educational Agency</u>*.  If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

   1.      An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;

   2.      A description of other options that the IEP Team considered and the reasons why those options were rejected;

   3.      A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

28

Rev'd. 7/6/05

4. A description of the factors that is relevant to the agency's proposal or refusal.

B. Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **June 2, 2006**.

C. ***Deficiency Notice.*** A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D. The deadline for filing a deficiency notice is **June 7, 2006**.

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence. A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice. The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law. The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

29      Rev'd. 7/6/05

```
TRANSMISSION VERIFICATION REPORT
```

```
TIME : 05/24/2006 07:40
NAME : SEID OMPC
FAX  : 2025353215
TEL  : 2024425493
SER.# : BROG5J311077
```

| | |
|---|---|
| DATE,TIME | 05/24  07:39 |
| FAX NO./NAME | 913016573843 |
| DURATION | 00:00:54 |
| PAGE(S) | 03 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 442-5693

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney: Michael J. Eig, Esq.**
**Parent: Larry Abramson and Caroline Newman**

Telephone Number: **(301) 657-1740**
Fax Number: **(301) 657-3843**

Pages: **3**
Date: **May 23, 2006**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: S___ Al_____
School:  **Attending The Grove School**

The Complaint Intake Unit is responsible for providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office.  If you have questions about the attached Notice, please contact the Complaint Intake Unit at (202) 442-5253.  Otherwise, if you have questions about the content of the compliant you should contact your legal counsel for further advice.

**Thank You**

30

State Education Agency for the District of Columbia
State Enforcement and Investigation Division (SEID)
Special Education Programs

S▮▮A▮▮▮▮▮▮▮, DOB: ▮▮▮/1991

     Petitioner,

v.

District of Columbia Public Schools

     Respondent

### District of Columbia Public School's Response to
### Parent's Administrative Due Process Complaint Notice

The District of Columbia Public School (hereinafter "DCPS"), by and through the undersigned Attorney Advisor, hereby provides its <u>Response</u> to the Administrative Due Process Complaint Notice ("Complaint") filed on or about May 23, 2006 on behalf of the parent of S▮▮ A▮▮▮▮▮, DOB: ▮▮▮/1991, pursuant to the Individual's with Disabilities Education Improvement Act (hereinafter "IDEA 04"), 20 U.S.C. §1415(c)(2)(B)(i)(I).[1]  Specifically, DCPS asserts the following:

1.  DCPS denies the allegation it failed to provide a Free and Appropriate Education to this student. Under § 612(a)(10)(A)(ii), Parentally placed children in private elementary and secondary schools who require special education and/or related services are to be served by the local education agency in which the student lives. This is further clarified in the comment section of the Reauthorized IDEA which states: proposed §300.131, regarding

---

[1]  The purpose of the prior written notice requirement of IDEA is to inform parents in writing of an agency's **final** action on a proposal or refusal to initiate or change the identification, evaluation, educational placement or the provision of FAPE (procedural safeguards and special education and related services) to a particular student.  If a team (e.g., MDT or IEP team) cannot reach consensus or if the parents do not attend the team meeting, the public agency must provide the parents with prior written notice of the agency's proposals and/or refusals.  If consensus between the public agency and the parent cannot be reached, prior written notice of proposed or refused actions must be provided to the parents, even if the parents participated in the meeting where the decision(s) was made.  Excerpt of Memorandum from the Office of Special Education for the West Virginia Department of Education, dated June 24, 2005, re:  IDEA 2004 Interim Implementation – Prior Written Notice.

In re S██ A█████████
Response to Due Process Complaint Notice
Page 2

child find for parentally-placed private school children with disabilities, generally would

retain the current requirements in §300.451, but would clarify consistent with the changes

in proposed §300.132 and §300.133, that the provisions governing parentally-placed

private school children with disabilities apply to children who are enrolled in private

schools located in the school district served by LEA. The new statutory requirements in

section 612(a)(10)(A)(ii) of the Act should ensure that parentally-placed private school

children will not be denied the opportunity to receive services that would otherwise be

available to them because of practical obstacles posed when they attend a private school

located *outside* their district of residence. (emphasis added).

Date: June 5, 2006                Submitted by:

                                   *Stephanie Ramjohn Moore*
                                   Stephanie Ramjohn Moore, Esquire
                                   Attorney Advisor
                                   for DCPS as the Local Educational Agency
                                   Office of the General Counsel
                                   District of Columbia Public Schools
                                   Telephone # 202-442-5169
                                   Fax # 202-442-5097/8

### CERTIFICATE OF SERVICE

I, Stephanie Ramjohn Moore, Esq., hereby certify that a copy of DCPS' Response to the

Administrative Due Process Complaint Notice was served on June 5, 2006 on Michael Eig, via

facsimile at 301-657-3843.

                                   *Stephanie Ramjohn Moore*
                                   Stephanie Ramjohn Moore, Esquire
                                   Attorney Advisor

```
TRANSMISSION VERIFICATION REPORT
```

```
                              TIME  : 06/20/2006 09:07
                              NAME  : STUDENT HEARINGS OFF
                              FAX   : 2024425556
                              TEL   : 2024425432
                              SER.# : BROH3J608601
```

```
DATE,TIME             06/20  09:07
FAX NO./NAME          93016573843
DURATION              00:00:16
PAGE(S)               01
RESULT                OK
MODE                  STANDARD
                      ECM
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



**HEARING NOTICE**

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:     Parent (or Representative): __M. EIG__     Fax No.: _(301) 657 - 3843_

LEA Legal Counsel: __S. RAM JOHN - MOORE__

RE:     A_____, S____     and (LEA) DOB: ____/91
        Student's Name

FROM:   **SHARON NEWSOME**
        Special Education Student Hearing Office Coordinator

DATE SENT: ___6/19/06___

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_5/23/06_. Please be advised that the hearing has been scheduled for:

DATE: ___7/21/06___

TIME: _9:00, 11:00, 1:00 or 3:00_

33

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

July 5, 2006

Sharon Newsome
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: S████ A█████████
*Via facsimile and first class mail*

Dear Ms. Newsome:

We hereby request a continuance in the above-referenced student's Due Process hearing, currently scheduled for July 21, 2006, due to our clients' unavailability due to a conflict with a previously scheduled matter. I have contacted and spoken with opposing counsel, and DCPS is available on the following dates:

August 8, 2006
August 9, 2006

If this request is granted, please issue a new hearing notice. Thank you for your attention to this matter.

Sincerely,

Michael J. Eig

cc:    Stephanie RamJohn-Moore, Esq.
Mr. and Mrs. Abramson

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX

| | |
|---|---|
| **To:** | Sharon Newsome |
| | **DCPS Student Hearing Office** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael Eig |
| **Date:** | July 5, 2006 |
| **Time:** | 4:20 pm |
| **Total Pages:**<br>(including cover) | **2** |
| **Re:** | S |
| **CC:** | Stephanie RamJohn-Moore, Esq.<br>202-442-5098 |

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

35

TRANSMISSION VERIFICATION REPORT

```
                                        TIME  : 07/11/2006 10:28
                                        NAME  : STUDENT HEARINGS OFF
                                        FAX   : 2024425556
                                        TEL   : 2024425432
                                        SER.# : BROH3J608601
```

```
    DATE,TIME              07/11  10:28
    FAX NO./NAME           93016573843
    DURATION               00:00:16
    PAGE(S)                01
    RESULT                 OK
    MODE                   STANDARD
                           ECM
```

# District of Columbia Public Schools
## State Enforcement & Investigation Division
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



*✗ REVISED COPY*

#### HEARING NOTICE

| MEMORANDUM VIA: [ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:    Parent (or Representative): _M. EIG_                    Fax No.: _(301) 657 - 3843_

LEA Legal Counsel: _S. RAMJOHN - MOORE_

RE:    _A▓▓▓▓, S▓▓▓_          and (LEA) DOB: _____
       Student's Name

FROM:    **SHARON NEWSOME**
         Special Education Student Hearing Office Coordinator

DATE SENT:    _7/11/06_

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on _____. Please be advised that the hearing has been scheduled for:

DATE:    _8/8/06_

TIME:    _9:00, 11:00, 1:00 ✗ 3:00_

_Con't f_
_?/?/06_

36

# MICHAEL J. EIG AND ASSOCIATES, P.C.

### ATTORNEYS AT LAW
### SUITE 760
### 5454 WISCONSIN AVENUE
### CHEVY CHASE, MARYLAND 20815-6938
### (301) 657-1740

---

#### FACSIMILE (301) 657-3843

July 12, 2006

Sharon Newsome
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: S▮▮▮ A▮▮▮▮▮▮▮
*Via facsimile and first class mail*

Dear Ms. Newsome:

Unfortunately, there was a mis-communication and due to witness unavailability, we can no longer attend the above-referenced student's Due Process hearing, currently scheduled for August 8, 2006. We hereby request a continuance, moving the Due Process hearing to August 9, 2006. I have contacted and spoken with opposing counsel in this matter and DCPS is unopposed to our request.

If this request is granted, please issue a new hearing notice. Thank you for your attention to this matter.

Sincerely,

Michael J. Eig

cc:     Stephanie RamJohn-Moore, Esq.
        Mr. and Mrs. Abramson

## MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX

| | |
|---|---|
| **To:** | Sharon Newsome |
| | **DCPS Student Hearing Office** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael Eig |
| **Date:** | July 12, 2006 |
| **Time:** | 9:20 am |
| **Total Pages:** (including cover) | **2** |
| **Re:** |  |
| **CC:** | Stephanie RamJohn-Moore, Esq. |
| | 202-442-5098 |

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

JUL.12.2006 09:23 3016573843   MICHAEL J EIG & ASSOCIATES   #4402 P.001/002

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

July 19, 2006

Sharon Newsome
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

                                Re: S█h A█████████
                                *Via facsimile and first class mail*

Dear Ms. Newsome:

      After receiving the new hearing notice in the above-named student's case, I spoke with Hearing Officer David Smith and we agreed to keep our originally schedule date of August 8, 2006. We would like to keep the date of August 16, 2006 on the calendar, as well, to see if we need it because of witness availability.

      Thank you for your attention to this matter.

                              Sincerely,

                              Michael J. Eig /SM

                              Michael J. Eig

cc:    Stephanie RamJohn-Moore, Esq.
       Mr. and Mrs. Abramson

2007 JUL 19 PM 4: 21
DC PUBLIC
SCHOOL SYSTEM

## MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX

| | |
|---|---|
| **To:** | Sharon Newsome |
| | **DCPS Student Hearing Office** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael Eig |
| **Date:** | July 19, 2006 |
| **Time:** | 4:14 pm |
| **Total Pages:** | 2 |
| (including cover) | |
| **Re:** | S████ A█████████ |
| **CC:** | Stephanie RamJohn-Moore, Esq. |
| | 202-442-5098 |

2007 JUL 19 PM 4 21
DC PUBLIC
SCHOOL SYSTEM

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

July 21, 2006

David R. Smith, Esq.
c/o Sharon Newsome
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: S███ A██████
*Via facsimile and first class mail*

Dear Mr. Smith:

I am writing to confirm that the Due Process Hearing in this matter will occur on August 8, 2006. If a second day is necessary to complete the hearing-- either because all evidence cannot be taken in one day or due to witness unavailability-- we will go over to a second date mutually acceptable to counsel (but not August 16, 2006).

I also understand the OGC conference room is not available for the hearing. If there is a problem with providing a hearing site, I would suggest the library/conference room in my office, which we can make available all day.

Thank you very much.

Sincerely,

Michael J. Eig

cc:     Stephanie Ramjohn-Moore, Esq.
        Larry Abramson and Caroline Newman

41

## MICHAEL J. EIG AND ASSOCIATES, P.C.
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX

| | |
|---|---|
| **To:** | David R. Smith, Esq. |
| | **c/o Sharon Newsome** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael J. Eig, Esq. |
| **Date:** | July 21, 2006 |
| **Time:** | 11:45 am |
| **Total Pages:** | **2** |
| (including cover) | |
| **Re:** |  |
| cc: | Stephanie Ramjohn-Moore |
| | (202) 442-5097/98 |

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

*Leave as is per Mr. Smith*

## LETTER MOTION FOR CONTINUANCE

District of Columbia Public Schools
State Enforcement & Investigative Division
Special Education Student Hearing Office
825 North Capitol Street, N.E. 8th Floor
Washington, DC 20002

Dear Student Hearing Officer:

This letter is to request a continuance of my due process hearing currently scheduled to take place on _August 8 2006_ for _S___ A_____ . I am unable to appear for the hearing on this date for the following reasons:

_My witness is unavailable as she is an ET-15 10 month employee, and will not be available_

I am available to appear for the hearing on the following dates:

1. ~~August~~ _September 5_   2. _September 7_   3. _September 8_

I attempted to contact opposing counsel to discuss scheduling before proposing these dates. I spoke to _and was not successful_ (opposing counsel) at _____ A.M. / P.M. on _____ (date).

Opposing Counsel ☐ agreed to the continuance ☒ did not agree to the continuance.

**I UNDERSTAND THAT THESE DATES MAY NOT BE AVAILABLE AND THAT THE STUDENT HEARING OFFICE MAY NEED TO RESCHEDULE MY HEARING FOR ANOTHER DATE.**

**I ALSO UNDERSTAND THAT BY REQUESTING A CONTINUANCE I HEREBY WAIVE RIGHTS TO A FINAL DECISION WITHIN 75 DAYS OF FILING THE DUE PROCESS COMPLAINT.**

**FURTHERMORE, I REALIZE THAT THE HEARING MAY GO FORWARD AS SCHEDULED UNLESS I RECEIVE A WRITTEN DECISION FROM THE HEARING OFFICER GRANTING A CONTINUANCE. IF I DO NOT RECEIVE A WRITTEN DECISION GRANTING A CONTINUANCE AND I FAIL TO APPEAR FOR A SCHEDULED HEARING, I UNDERSTAND THAT THE HEARING OFFICER MAY DISMISS MY REQUEST.**

**BY MY SIGNATURE BELOW I CERTIFY THAT I HAVE PROVIDED THE OPPOSING PARTY WITH A COPY OF THIS MOTION AND HAVE ATTACHED PROOF OF SERVICE (FAX CONFIRMATION, COURIER RECEIPT, ETC.)**

Parent/Advocate or Attorney Advisor: _Stephanie Ramjohn Moore_ Date: _July 28, 2006_

Telephone: _202-442-5173_    Fax: _202-442-5098_

Revised 05/23/2006

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

In the Matter of:                              )

_____                        )        BEFORE A SPECIAL EDUCATION

_____                        )

_____                        )        INDEPENDENT HEARING OFFICER
**Petitioner**                                 )
               Vs.                             )
_____DCPS_____                                 )        STATE EDUCATION AGENCY
**Respondent**                                 )

## INTERIM ORDER

ON THIS DAY came on to be heard _Both parties_ 's Motion For Continuance in the above styled cause. After hearing the evidence and argument of counsel, the Motion For Continuance is:

_____ DENIED.

___X___ GRANTED. The hearing is reset for ___9___ (A.M. / P.M. on _8/21/06 & 9/19/06_

**(PLEASE CONFIRM NEW DATE & TIME WITH HEARING COORDINATOR)**

The Hearing Officer finds there is good cause to grant the continuance because:

___✓___ The parties have agreed to this continuance and the parent has waived the right to receive a final decision within 45 days;

_____ Petitioner's legal representative is unavailable.

_____ Assigned DCPS attorney-advisor unavailable. DCPS has / has not made diligent efforts to have an attorney-advisor available;

_____ Witness unavailable. The party has / has not made diligent efforts to secure the witness:

_____ Parent or student unavailable;

_____ Conflict in the schedule of the assigned hearing officer. The Student Hearing Office has / has not made diligent efforts to secure a replacement and no other hearing officer is available;

_____ Insufficient time allotted for the hearing. The time that was allotted is less than / equal to / more than the time requested by the parent;

_____ No hearing room available. The Student Hearing Office has / has not made diligent efforts to secure a hearing room;

_____ Movant did not receive prior notice of the hearing;

___✓___ Other: _Oral argument on motion for Summary decision_

_____ The hearing request was filed on _____. The 45-day deadline for issuance of a final Hearing Officer's Determination is extended for the specific number of days granted by the continuance. The new deadline for issuance of the final decision is _____

SIGNED this date _8/8/06_

_____
**Issue Date**

_____
**Independent Special Education Hearing Officer**

Original to SHO – Hearing File
Copy To:      Parent - C/O: _Eig_
              DCPS - C/O: _Ramjohn Moore_
              Charter School - C/O: _____

Rev't. Dec. 2001

```
TRANSMISSION VERIFICATION REPORT
```

```
TIME  : 08/08/2006 11:26
NAME  : STUDENT HEARINGS OFF
FAX   : 2024425556
TEL   : 2024425432
SER.# : BROH3J608601
```

| | |
|---|---|
| DATE,TIME | 08/08  11:26 |
| FAX NO./NAME | 913016573843 |
| DURATION | 00:00:16 |
| PAGE(S) | 01 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556

X *REVISED COPY*



### HEARING NOTICE

MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:   Parent (or Representative): _M. EIG_____   Fax No.: _____

LEA Legal Counsel: _S - RAMJOHN - MOORE_____

RE:   _A_____, S_____   and (LEA) DOB: _____
         Student's Name

FROM:   __SHARON NEWSOME_____
         Special Education Student Hearing Office Coordinator

DATE SENT: _____8/8/06_____

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on _____. Please be advised that the hearing has been scheduled for:

DATE: ___8/21/06_____          *Con't f*

TIME: ___9:00 Am_____          *8/8/06*

```
               TRANSMISSION VERIFICATION REPORT
```

```
                                  TIME  : 08/08/2006 11:27
                                  NAME  : STUDENT HEARINGS OFF
                                  FAX   : 2024425556
                                  TEL   : 2024425432
                                  SER.# : BROH3J608601
```

```
         DATE,TIME                    08/08  11:27
         FAX NO./NAME                 913016573843
         DURATION                     00:00:17
         PAGE(S)                      01
         RESULT                       OK
         MODE                         STANDARD
                                      ECM
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556

X *REVISED COPY*



### HEARING NOTICE

MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:      Parent (or Representative): M. EIG          Fax No.: _____

LEA Legal Counsel: S. RAMJOHN-MOORE

RE:      A_____, S____          and (LEA) DOB: _____
              Student's Name

FROM:    SHARON NEWSOME
              Special Education Student Hearing Office Coordinator

DATE SENT: _____8/8/06_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_____. Please be advised that the hearing has been scheduled for:

*Con't f*
*8/8/06*

46       DATE: ____9/19/06____

         TIME: 9:00, 11:00, 1:00 σ 3:00

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter School (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. <u>A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).</u>

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- <u>Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice.</u> Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. <u>The Student Hearing Office does NOT schedule resolution meetings.</u>

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A. INFORMATION ABOUT THE STUDENT:

Student Name: S̶ A̶̶    Birth Date: _____ 1991

Address: _____

Home School: __Wilson High School__

Present School of Attendance: __The Grove School__

Is this a charter school? __NO__    (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student: __Larry Abramson and Caroline Newman__

Address (if different from the student's above): _____ same as above

Phone/Contact Number: __see below__    Fax Number (if applicable): __see below__

EXHIBIT
DCPS-01

SEID DPCN Rev'd 9/30/05    1

**B.**  **Individual Making the Complaint/Request for Due Process Hearing:**

Name:  _Larry Abramson and Caroline Newman_

Complete Address: _____ same as above _____

_____

Phone: (h) __see below__  (w) __see below__  (Fax) __see below__  (e-mail) _____

Relationship to the Student:

☒  Parent  ☐  Legal Guardian  ☐  Parent Surrogate

☐  Self/Student  ☐  Local Education Agency (LEA)  ☐  Parent Advocate

**C.**  **Legal Representative/Attorney (if applicable):**

Name:  _Michael J. Eig_

Address: _____ Michael J. Eig and Associates, P.C._

_____ 5454 Wisconsin Avenue, Suite 760, Chevy Chase, Maryland 20815_

Phone: (w)_301-657-1740_  (Fax) _301-657-3843_  (e-mail) _____

Will attorney / legal representative attend the resolution session?  ☒ Yes  ☐ No

**D.**  **Complaint Made Against (check all that apply):**

☒  DCPS school (name of the school if different from page one) _____
☐  Charter school (name of the charter school if different from page one) _____
☐  Non-public school or residential treatment facility (name) _____
☐  Parent

**E.**  **Resolution Session Between Parent and LEA:**

I understand that it is my right to have a resolution session to resolve this complaint.  I also understand that I may voluntarily waive this right if I choose.  (Note: All parties must agree to waive the resolution session to avoid having this meeting.)

☒  I wish to waive the Resolution Session.

**E.**  **Mediation Process:**

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent.  Both parties can request mediation as an alternative to the Resolution Session.  Mediation is also available prior to a due process hearing, but mediation may not be used to deny or delay a parent's right to a hearing on parent's due process complaint. Please check all that apply:

☐  I am requesting mediation as an alternative to the resolution session meeting.
☐  I am requesting mediation services **only**.
☐  I do not wish to use a mediator at this time.

48

### G.    Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.    What is the nature of the problem, including the facts related to the problem, that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

S▩▩ is a fifteen-year old young man who is extremely bright, with many cognitive scores in the 99th percentile, who has been diagnosed with Asperger's Syndrome, and who has a history of attention deficit hyperactivity disorder and behavior difficulties. Until recently, he has been a good student, however, he has been exhibiting increasing signs of inattention, anxiety and depression. As the 2005-06 school year progressed, these issues have risen to the forefront, having a great impact on S▩▩ ability to benefit from his instruction, and causing his educational performance to decline precipitously over the course of a few months. Until March, 2006, S▩▩ attended Georgetown Day School, but due to the severity of his disability and its recent manifestations, he had to be removed. His parents were, at the time, in the middle stages of the initial IDEA eligibility determination process with DCPS, having registered S▩▩ as a non-attending DCPS student in January, 2006. The parents advised DCPS of S▩▩ immediate need for a change in placement from Georgetown Day, and that they were working to identify an alternative. On April 4, 2006, they enrolled S▩▩ at a therapeutic residential placement at The Grove School in Madison Connecticut, and advised DCPS of this new placement.

Subsequently, DCPS scheduled a Multidisciplinary Team ("MDT") Meeting for May 5, 2006. The parents agreed to attend, in the hope of completing the eligibility determination process and developing an educational program for their son. However, on May 4, 2006, the day before the MDT meeting, the parents, through counsel, received a letter from Patricia Young. By this letter, DCPS stated its position that the school system has no legal obligation to provide S▩▩ with services under the IDEA. Instead, DCPS advised the parents that, since S▩▩ is attending a school outside the District, "his case has become the obligation of the state of Connecticut." DCPS repeated this position at the MDT Meeting on May 5, 2006.

The school system's position is based on a misunderstanding of the federal law. The IDEA, which was re-authorized in 2004, discusses and differentiates three categories of children in private schools, who require special education. The parents advised DCPS of their position with respect to these categories, as follows:

- 20 U.S.C. § 1412 (a)(10)(A) deals with "Children enrolled in private schools by their parents."
- 20 U.S.C. § 1412 (a)(10)(B) deals with "Children placed in, or referred to, private schools by public agencies."
- 20 U.S.C. § 1412 (a)(10)(C) deals with "Payment for education of children enrolled in private schools without consent of or referral by the public agency."

The three categories do not overlap.

The first category, which the law refers to as those children entitled to "Equitable Participation" or "Equitable Services," are children in private school at their parents' expense, who are only seeking services additional to their private school academic services – such as tutoring or speech/language therapy – usually supplied at the end of a school day at a nearby public school. Such a student's right to equitable participation for such services

docs entail registration in the public schools, as is clarified in the proposed regulations. This category has seen a change in the responsibility of the local educational agency ("LEA"), between IDEA 1997 and IDEA 2004; the new statute recognizes that after-school services provided to private school students at a nearby public school would be most conveniently provided by the LEA in which the *private school is located* than by the LEA where the *child lives*. That change is clarified by the US Department of Education Memorandum dated June 27, 2005, which the MDT team provided to the Abramson family on May 5, 2006.

However, the re-authorized 2004 IDEA enacted no significant changes to the second and third categories. The statute still requires that the LEA in which the child resides is responsible for proposing a FAPE for this child, regardless of whether he or she is placed in private school by the parents or by the school system. (This requirement is echoed in the local regulations: 5 D.C.M.R. § 3002.1(a) requires that "DCPS shall make a free appropriate public education (FAPE) available to each child with a disability, ages three to twenty-two, who resides in, or is a ward of, the District.") Of course, as the IDEA's language concerning the third category makes clear, the LEA would only be responsible for the cost of any private school tuition if it lacks or fails to offer an appropriate public program.

Thus, by referring S████ A████████ family to the Madison, Connecticut School District, DCPS violated its obligations under the IDEA. The parents so advised DCPS, and formally requested that DCPS complete the educational planning process and offer S████ an education appropriate to meet his needs. DCPS never responded to this request.

> To the extent known to you at this time, how can this problem be resolved?

As a remedy for this failure, the parents request that S███ be placed and funded at The Grove School in Madison, Connecticut, retroactive his enrollment on April 4, 2006.

> Issues presented:

See above.

## H.    Estimated amount of time needed for the hearing:    1 day

Note:    In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time
and will allocate two hours to conduct the hearing. Please indicate if you believe more that two hours will be needed.

## I.    Accommodations and Assistance Needed:

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)   N/A
- Special Communication (please describe the type)   N/A
- Special Accommodations for Disability (please be specific)  N/A
- Other  N/A

**J.**   <u>**Waiver of Procedural Safeguards**</u>:

☐    I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.**   <u>**Parent Signature and Affirmation**</u>:

I affirm that the information provided on this form is true and correct.

_____          _____
Signature of Parent or Guardian                                                          Date

**L.**   <u>**Signature of Attorney/Legal Representative**</u>:

_____          5-23-06
Legal Representative / Advocate                                                          Date

**M.**   <u>**Signature of LEA Representative (if hearing requested by LEA)**</u>:

_____          _____
Representative of LEA                                                                       Date

<div align="center">

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

</div>

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

May 23, 2006

Sharon Newsome
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: S████ A████████
*via facsimile & first-class mail*

Dear Ms. Newsome:

Enclosed please find a due process hearing request for the above-named student.   Please do not hesitate to contact me if you have questions regarding this matter.

Sincerely,

Michael J. Eig

Michael J. Eig

*Enclosure*

cc:    Larry Abramson and Caroline Newman

52

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX

**To:**           Sharon Newsome
                  **DCPS - Student Hearing Office**
**Fax Number:**   202-442-5556
**From:**         Michael J. Eig
**Date:**         May 22, 2006
**Time:**         11:36 AM

**Total Pages:**  7
(including cover)

**Re:**           S█ A██████

53

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



# _Due Process Complaint Disposition_

- This form should be used by the parties to notify the Student Hearing Office about important information concerning the outcome of the resolution meeting.
- Please return to the Student Hearing Office of the District of Columbia Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002, Fax number 202/442-5556.

## A.   STUDENT AND CASE INFORMATION:

Student Name:  S████  A████████        Birth Date: ████ 91

First        MI        Last

SHO Case Number: _____        (if applicable)

## B.   PARENT / GUARDIAN:

Name:  Larry                    Abramson

First                                    Last

Complete Address: ████████████████████
████████████

Phone: _____        _____        _____

Home        Work or alternative phone no.        Fax No. if applicable

## C.   LOCAL EDUCATION AGENCY REPRESENTATIVE:

Full Name:  Kymberly Grafton        Title:  LEA/CRC

Address:

925 Rhode Island Avenue, NW
Washington, DC 20001

Phone:  202-671-0882        202-673-6557

Office        Fax

1

SEID DRN  Rev'd. 6/14/05

EXHIBIT
018-02

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### WASHINGTON, D.C.

__ PUBLIC       ___DPCS CHARTER       __ LEA CHARTER       ___ NONPUBLIC       _X_ PRIVATE/RELIGIOUS

### RESOLUTION MEETING NOTES

Meeting Confirmation Date: [          ]        Meeting Held: 6-6-06

Student: S___ A_____        DOB: [___]-91    School: Grove School

| PARTICIPANTS (Print Name) | PARTICIPANTS (Sign Name) | POSITION |
|---|---|---|
| Kymberly Grafton | | LEA/CRS |
| Patricia Young | | Dir. C.A.R.E. |
| Haylie Iseman, Esq. | | Attorney |
| Larry Abramson | | Father |
| | | |
| | | |
| | | |
| | | |
| | | |

[ ]  Resolved          [X]  Unresolved

The meeting began with introductions.  The parent's complaint is that DCPS failed to complete educational testing, develop an IEP if eligible and locate an appropriate placement for the student. DCPS attempted to complete the educational testing; however, it was brought to DCPS' attention from the school administrator that the student no longer is attending school in Washington, DC.  On May 4 & 23, 2006, Pat Young, Director of the CARE Center wrote a letter to Michael J. Eig, Esq., indicating since the student no longer resides in the District; DCPS has no obligation to the student due to him attending school in the state of Connecticut.  Since he is attending school there, Connecticut would assume this responsibility; should he return to school in the District and is parentally placed and funded at a private and/or religious school, DCPS CARE Center will resume the eligibility/IEP process.  Should he attend a neighborhood school, the neighborhood school would assume responsibility.

As articulated in the parent's letter dated May 8, 2006, the parent's position is that DCPS has a continuing legal obligation to identify all of its students with special needs and to provide each one of FAPE.  The parent is unwilling to accept DCPS' offer and will proceed to due process.  This case is unresolved.

_____    The complaint has been resolved and the parties have reached agreement to the satisfaction of the parent / guardian. The due process complaint notice and the request for a due process hearing should be dismissed and withdrawn. The parties are aware that the agreement may be voided by any party within 3 business days of the date the agreement is signed. The parties have agreed to wait at least 3 business days before filing this form with the Student Hearing Office.

__X__    The resolution session was unsuccessful. The case should proceed to a due process hearing.

_____    The resolution session was unsuccessful. The parties have agreed to try mediation.

_____    The parties mutually agree to waive the resolution session and request mediation and the assignment of a mediator to this case.

_____    The parties mutually agree to waive the resolution session and request that this case proceed to a due process hearing on the merits.

_____    The parent has failed to participate in a resolution meeting as required under the law. A due process hearing should not be scheduled until further notice

## J.    __Signature and Affirmation__:

I affirm that the information provided on this form is true and correct. I also affirm my receipt of the Procedural Safeguards Manual or I have waived my right to receive the Procedural Safeguards Manual.

_____    6/6/06
Signature of Parent/Guardian          Date

_____    6-6-06
Local Educational Agency Representative    Date

**Mail, fax or deliver this form to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

SEID DRN Rev'd. 6/14/05



### UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

## JUN 27 2005

| | |
|---|---|
| **Contact Person:** | |
| Name: | JoLeta Reynolds |
| Telephone: | 202-245-7468 |

OSEP 05-09

## MEMORANDUM

TO:        Chief State School Officers

FROM:    Troy R. Justesen
            Acting Director
            Office of Special Education Programs

SUBJECT:  Obligations of States and local educational agencies to parentally-placed private
            school children with disabilities

The obligation of States and local educational agencies (LEAs) to children with disabilities
enrolled by their parents in private elementary schools and secondary schools will change
beginning July 1, 2005, the effective date of these provisions in the Individuals with Disabilities
Education Improvement Act of 2004 (IDEA 2004). The focus of this memorandum is to provide
guidance to States and LEAs in complying with the following requirements in 20 U.S.C.
1412(a)(10) of IDEA 2004: (1) regarding the agency responsible for providing equitable special
education and related services to parentally-placed private school children with disabilities, and
(2) determining the proportionate amount of Federal funds to be expended by the LEA for such
children attending private schools located in their district.

IDEA 2004 retains the provision in IDEA that each LEA spend a proportionate amount of the
required subgrants it receives from the State educational agency (SEA) under 20 U.S.C. 1411
and 20 U.S.C. 1419 for special education and related services to children with disabilities
enrolled by their parents in private elementary schools and secondary schools (20 U.S.C.
1412(a)(10)(A)(i)(I)). However, under IDEA 2004, to calculate the proportionate amount of
Federal Part B funds, the LEA, after timely and meaningful consultation with representatives of
private schools, must conduct a thorough and complete child find process to determine the
number of parentally-placed children with disabilities attending private schools *located in the*

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202
www.ed.gov

*Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.*



Page 2

*LEA* [emphasis added] (20 U.S.C. 1412(a)(10)(A)(i)(II)). In addition, the obligation to spend a proportionate amount to provide services to children with disabilities enrolled by their parents in private schools now refers to children enrolled by their parents in private elementary schools and secondary schools in the LEA. (20 U.S.C. 1412(a)10)(A)(i)). These are significant changes from the current regulations in which the responsibility to conduct child find (34 CFR 300.451) and provide equitable services to parentally-placed private school children rests with *the LEA in which the children reside* [emphasis added] (34 CFR 300.453).

Therefore, beginning July 1, 2005, each LEA must conduct child find, determine the proportionate share of Part B funds, and provide equitable services to parentally-placed private school children with ~~disabilities where their private schools are located in the LEA, rather than private schools where children~~ reside. This change means that LEAs consult with representatives of the private schools located in the district, thereby eliminating the need for LEAs to contact private school representatives outside of their jurisdiction. The change also means that representatives of private schools have only one LEA to consult with to ensure that children with disabilities enrolled in their schools can participate in IDEA equitable services.

The Department recognizes that States and LEAs may not have accurate data at this time to calculate the proportionate amount of Federal funds consistent with the requirements of IDEA 2004. Therefore, the Secretary is exercising the transition authority under IDEA 2004, which allows the Secretary to take necessary steps for an orderly transition from the current regulatory requirements to the requirements under IDEA 2004 (20 U.S.C. 1400 note) as discussed in the following paragraph:

> The Secretary will allow, for the 2005-06 school year only, States and LEAs to use the best available data to calculate the proportionate amount of their IDEA Part B funds that must be expended on services for parentally-placed private school children with disabilities attending private schools located in their jurisdiction, rather than requiring new child counts of parentally-placed private school children with disabilities by the district of the private school's location. The State must use the same method across all LEAs within the State.

Please note, that this flexibility does not affect the obligation of States and LEAs to meet the child find requirements in 20 U.S.C. 1412(a)(3) to identify, locate, and evaluate parentally-placed private school children with disabilities attending schools located in their area of jurisdiction (20 U.S.C. 1412(a)(10)(A)(ii)). Nor does the flexibility affect the obligation of LEAs to expend the proportionate share of funds for services, including direct services, to parentally-placed private school children with disabilities attending schools located in their area of jurisdiction.

The Department wants to stress that States are bound by all other provisions of IDEA 2004, and until the final regulations are issued, the existing regulations that are not inconsistent with IDEA 2004. For example, IDEA 2004 requires that LEAs, or where appropriate, an SEA, consult with representatives of private schools and representatives of parents of parentally-placed private school children with disabilities regarding:

Page 3

(a) The child find process and how parentally-placed private school children suspected of having a disability can participate equitably, including how parents, teachers, and private school officials will be informed of the process;

(b) The determination of the proportionate amount of Federal funds available to serve parentally-placed private school children with disabilities including the determination of how the amount was calculated;

(c) The consultation process among the LEA, private school officials, and representatives of parents of parentally-placed private school children with disabilities, including how the process ~~will operate throughout the school year to ensure that parentally-placed private school children~~ with disabilities identified through the child find process can meaningfully participate in special education and related services;

(d) How, where, and by whom special education and related services will be provided for parentally-placed private school children with disabilities, including a discussion of types of services, including direct services and alternate service delivery mechanisms; how such services will be apportioned if funds are insufficient to serve all children; and how and when those decisions will be made; and

(e) How, if the LEA disagrees with the views of the private school officials on the provision of services or the types of services, the LEA will provide to the private school officials a written explanation of the reasons why the LEA chose not to provide services directly or through a contract. (20 U.S.C. 1412(a)(10)(A)(iii))

States and LEAs are expected to comply with these consultation requirements beginning July 1, 2005.

The Department anticipates posting a list of "Frequently Asked Questions" regarding the responsibilities of States and LEAs under IDEA 2004 to serve parentally-placed private school children with disabilities. Should you have any questions, please contact your State contact in the Office of Special Education Programs at 202-245-7459 or JoLeta Reynolds, Office of Policy and Planning, Office of Special Education and Rehabilitative Services, at 202-245-7468.

cc:    State Directors of Special Education
       Congressional Staff
       Federal Resource Center
       Regional Resource Centers
       Parent Training Centers
       Protection and Advocacy Agencies
       Section 619 Coordinators
       Private School Associations





## Central Assessment Referral and Evaluations (C.A.R.E.) CENTER

**Office of Special Education**
**(Located at Shaw Junior High School)**
**925 Rhode Island Avenue, NW**
**Washington, DC 20001**
**(202) 671-0882**

Michael J. Eig and Associates, P.C.
Attorneys at Law
5454 Wisconsin Avenue
Chevy Chase, Maryland 20815-6938

May 4, 2006

Dear Mr. Eig:

As you are aware and so noted in your letter dated March 13, 2006, Ms. Kathie Thompson and the C.A.R.E. team were prepared to move forward with the eligibility process within the timeline for case completion for S████ A██████. Ms. Thompson attempted to observe S███ at Georgetown Day School and was informed by the principal at Georgetown Day that S███ was unavailable and had been withdrawn from school. We subsequently found out that S███ was withdrawn on February 27, 2006. In your letter to Ms. Thompson, you indicated "that due to the severity of S████ disability and its recent manifestations, S███ has had to be removed from that school, and is scheduled to begin a therapeutic residential placement at The Grove School in Madison, Connecticut within the next few weeks". In a second letter from you dated 4/17/06, you indicated that S███ began at the Grove School on April 4, 2006. According to IDEA 2004, once S████ parent's decided to withdraw him from Georgetown Day, and enrolled him in the Grove School, his case has become the obligation of the state of Connecticut.

In an effort to support Mr. Abramson and Ms. Newman, S████ parents with this transition, the contact person for the Madison School District in Connecticut is JoAnne Panicek, Director of Special Education 1-203-245-6300.

Sincerely,

Patricia Young
C.A.R.E. Center Director



EXHIBIT

DCPS-04



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

**Division of Special Education**
825 North Capitol Street, N.E., 6ᵗʰ Floor
Washington, D.C. 20002-4232
202-442-4800, fax: 202-442-5518
www.k12.dc.us

May 23, 2006

Michael J. Eig and Associates, P.C.
~~Attorneys at Law~~
5454 Wisconsin Avenue
Chevy Chase, Maryland 20815-6938

Re: S█ A█████

Dear Mr. Eig:

This is in response to your letter of May 8, 2006 to Kathie Thompson, regarding S█ A███████, who is parentally placed in a private school located in the Madison Connecticut School District.   In your correspondence you contend that the D.C. Public Schools' (DCPS) is responsible for assessing S█ and determining whether he is a child with a disability eligible for special education services.

It remains DCPS' position that, consistent with 20 U.S.C. § 1412 and OSEP Letter 05-09 to Chief State School Officers, "Obligations of States and Local Education Agencies to Parentally-Placed Private School Children with Disabilities", June 27, 2005, the Madison Connecticut School District, the school district in which S█ resides, is responsible for assessing S█ determining whether he is a child with a disability eligible for special education services, and, if necessary, drafting an appropriate I.E.P.  If he is determined to be eligible for such services, DCPS will then be responsible for offering him a placement in which he can receive a Free Appropriate Public Education, should his parents desire such a placement.  In this event, please have S█ parents forward a copy of his I.E.P. and their request for placement to me at the following address:  The CARE Center, 925 Rhode Island Ave., NW, Washington, DC 20001.

Sincerely,

*Patricia Young*
Patricia Young
C.A.R.E. Center Director





MICHAEL J. EIG AND ASSOCIATES, P.C.
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301)657-3843

May 8, 2006

Kathie Thompson
C.A.R.E. Center at Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, D.C. 20001

Re: S██b A█████████
*via facsimile and first-class mail*

Dear Ms. Thompson:

I am writing in reference to the Multidisciplinary Team Meeting on May 5, 2006, at
which DCPS repeated its position stated in the letter from Patricia Young, dated May 4, 2006,
that the school system has no legal obligation to provide S██b with services under the IDEA.
Instead, DCPS advised the parents that, since S██b is attending The Grove School in Madison,
Connecticut, "his case has become the obligation of the state of Connecticut." The school
system's position is based on a misunderstanding of the federal law, which I would like to
explain.

As you are no doubt aware, the Individuals With Disabilities Education Act of 1997 was
recently reauthorized as the Individuals With Disabilities Education Improvement Act of 2004,
20 U.S.C. §§ 1400, *et seq.*, which took effect on July 1, 2005. (The federal regulations have not
yet been repromulgated, and continue to implement the 1997 statute. The Department of
Education has issued proposed regulations, which are expected to be finalized very soon.) IDEA
2004 discusses and differentiates three categories of children in private schools, who require
special education, as follows:

- 20 U.S.C. § 1412 (a)(10)(A) deals with "Children enrolled in private schools by
  their parents."
- 20 U.S.C. § 1412 (a)(10)(B) deals with "Children placed in, or referred to, private
  schools by public agencies."
- 20 U.S.C. § 1412 (a)(10)(C) deals with "Payment for education of children
  enrolled in private schools without consent of or referral by the public agency."

These three categories do not overlap.



**MICHAEL J. EIG AND ASSOCIATES, P.C.**
Page 2
May 8, 2006
Re: S███ A███████

The first category, which the law refers to as those children entitled to "Equitable Participation" or "Equitable Services," are children in private school at their parents' expense, who are only seeking services additional to their private school academic services – such as tutoring or speech/language therapy – usually supplied at the end of a school day at a nearby public school. Such a student's right to equitable participation for such services does entail registration in the public schools, as is clarified in the proposed regulations. This category has ~~seen a change in the responsibility of the local educational agency ("LEA"), between IDEA 1997~~ and IDEA 2004; the new statute recognizes that after-school services provided to private school students at a nearby public school would be most conveniently provided by the LEA in which the *private school is located* than by the LEA where the *child lives*. That change is clarified by the US Department of Education Memorandum dated June 27, 2005, which the MDT team provided to the Abramson family on May 5, 2006.

However, IDEA 2004 enacted no significant changes to the second and third categories. The statute still requires that the LEA in which the child resides is responsible for proposing a FAPE for this child, regardless of whether he or she is placed in private school by the parents or by the school system. (This requirement is echoed in the local regulations: 5 D.C.M.R. § 3002.1(a) requires that "DCPS shall make a free appropriate public education (FAPE) available to each child with a disability, ages three to twenty-two, who resides in, or is a ward of, the District.") Of course, as the IDEA's language concerning the third category makes clear, the LEA would only be responsible for the cost of any private school tuition if it lacks or fails to offer an appropriate public program.

Any LEA that refers parents who are seeking a FAPE (whether or not the parents have placed the child privately) to a different LEA is violating its obligations under the IDEA and seriously confusing its legal duty. We therefore respectfully object to the CARE Center's decision to refer S██ A███████ family to the Madison, Connecticut School District, and continue to request that DCPS complete the educational planning process and offer S██ an education appropriate to meet his needs.

If you have any questions regarding this matter, please do not hesitate to contact me.

Sincerely,

Michael Eig

cc:    Dr. Patricia Young, CARE Center Director
      Larry Abramson and Caroline Newman

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              4529
CONNECTION TEL                 913016573843
CONNECTION ID
ST. TIME              06/05 16:40
USAGE T               00'30
PGS. SENT                3
RESULT                OK
```



**Office of the General Counsel**
**9th Floor**
**825 North Capitol St, NE**
**Washington, DC 20002**
**(202) 442-5000**
**Fax (202) 442-5098**

# FACSIMILE

### Date: June 5, 2006

**TO:** Michael J. Eig, Esq.
**CO:** SA
**FROM:** Stephanie Ramjohn Moore, Esq.

**Fax No.:** 301 657-3843
**Tele. No.:** 301-657-1740
**Tele. No.:** 202-442-5173

## No. Pages, Including Cover Sheet:

**COMMENTS:** Prior Notice Response

### CONFIDENTIALITY NOTICE

The information contained in this telefacsimile has been transmitted by an a...
privileged and confidential, intended only for the use of the individual or entity named above. If
the reader of this message is not the intended recipient, you are hereby notified that any


EXHIBIT
...05-07



Office of the General Counsel
9th Floor
825 North Capitol St, NE
Washington, DC 20002
(202) 442-5000
Fax (202) 442-5098

# FACSIMILE

**Date:  June 5, 2006**

**TO:   Michael J. Eig, Esq.**
**CO:   SA**
**FROM: Stephanie Ramjohn Moore, Esq.**

**Fax No.:  301 657-3843**
**Tele. No.: 301-657-1740**
**Tele. No.:  202-442-5173**

## No. Pages, Including Cover Sheet:

**COMMENTS:  Prior Notice Response**

### CONFIDENTIALITY NOTICE

*The information contained in this telefacsimile has been transmitted by an attorney. It is privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, and return the original message to us at the above address via first class prepaid US postage. Thank you.*

65



Office of the General Counsel
9th Floor
825 North Capitol St, NE
Washington, DC 20002
(202) 442-5000
Fax (202) 442-5098

# FACSIMILE

Date:  August 1, 2006

TO:   Michael J. Eig, Esq.                    Fax No.:  301 657-3843
CO:   SA                                      Tele. No.: 301-657-1740
FROM: Stephanie Ramjohn Moore, Esq.           Tele. No.:  202-442-5173

No. Pages, Including Cover Sheet:


COMMENTS:  Disclosure

**CONFIDENTIALITY NOTICE**

*The information contained in this telefacsimile has been transmitted by an attorney.  It is privileged and confidential, intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited.  If this communication has been received in error, please notify us immediately by telephone, and return the original message to us at the above address via first class prepaid US postage. Thank you.*

66



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

*Office of the Superintendent*
**Office of the General Counsel**
825 North Capitol Street, N.E., 9th Floor
Washington, D.C. 20002-4232
202-442-5000  Fax # 202-442-5098
*www.k12.dc.us*

August 1, 2006

Michael J. Eig, Esq.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, MD 20815-6938

**By Email & Facsimile: 301-657-3843**

RE:    S███ A██████
       DOB: ████-91
       **Disclosure Notice**

Dear Mr. Eig:

At the upcoming due process hearing in the above-referenced matter, that is scheduled for August 8, 2006 at 9:00 a.m. and pursuant to 34 C.F.R. 300.509(a)(3), in addition to all documents disclosed by the parent, DCPS may rely upon any of the following witnesses[1] and documents:

### Witnesses

Gayle Amos or her designee, Assistant Superintendent of Differentiated Learning
Marla Oakes or her designee(s), Director of Special Education, Office of Special Education
Principal, or designee, Georgetown Day School (High School)
Pat Young, Director, CARE Center, DCPS
Kathy Thompson, CARE Center, DCPS
Judith Smith, or designee, Director Family Court Monitoring & Mediation, DCPS, Office of Special Education

**Pursuant to 34 C.F.R. 300.509(a)(2) and 5DCMR 3031.1(b), DCPS hereby compels the attendance of the below named individual as a necessary and material witness(es):**

**Larry Abramson & Caroline Newman**

### Documents

**DCPS-01 Due Process Hearing Complaint 5/23/06**

---

[1] **Witnesses may testify by telephone.**

*Children First*

DCPS-02 Due Process Complaint Disposition & Dispute
Resolution Meeting Notes
Consent to Evaluate
DCPS-03 Correspondence from the United States Department of
Education Office of Special Education and Rehabilitative Services 6/27/05
DCPS-04 Central Assessment Referral and Evaluations (CARE) Center
Correspondence from P. Young to M. Eig 5/4/06          24/06
DCPS-05 Central Assessment Referral and Evaluations (CARE) Center
Correspondence from P. Young to M. Eig 5/23/06
DCPS-06 Correspondence from M. Eig to P.Young 5/8/06
DCPS-07 Prior Notice Response 6/5/06

DCPS reserves the right to rely on any documents and/or witnesses disclosed by the parent
that it deems relevant in this case.

DCPS will object to the testimony of any expert witnesses if a curriculum vitae and/or
resume is not provided with the student's 5-day disclosure.

Additionally, DCPS reserves the right to introduce any and all witnesses and/or documents
for the purpose of impeachment and rebuttal.

*In the interest of time and efficiency, DCPS will not physically disclose this document, as it
is believed to be in the possession of the parent/parent's counsel.

If you wish to discuss any aspect of this case further, or have questions, please contact me at
202/442-5173.

Sincerely,

Stephanie Ramjohn Moore, Esq.
Attorney Advisor


CC:     Student Hearing Office

**MICHAEL J. EIG AND ASSOCIATES, P.C.**

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301)657-3843

July 31, 2006

Stephanie Ramjohn-Moore, Esq.
District of Columbia Public Schools
Office of the General Counsel
825 North Capitol Street, NE, 9th Floor
Washington, D.C. 20002

Re: S██ A████████
*Via overnight-mail*

Dear Ms. Ramjohn-Moore:

For the upcoming hearing scheduled for 9:00 AM on August 8, 2006, we will rely on the following documents, copies of which are enclosed:

| | |
|---|---|
| SA -1 | Due Process Hearing Request, 5-23-06; |
| SA -2 | DCPS Registration Documents, 1-06; |
| SA -3 | Letter from Ms. Young to Mr. Eig, 5-4-06; |
| SA -4 | Letter from Mr. Eig to Ms. Thompson, 5-8-06; |
| SA -5 | Letter from Ms. Young to Mr. Eig, 5-23-06; |
| SA -6 | Dispute Resolution Meeting Notes, 6-6-06; |
| SA -7 | Letter from Mr. Eig to Ms. Ramjohn-Moore, 7-31-06; |
| SA- 8 | Neuropsychological Evaluation Report, 3-10-06; |
| SA -9 | Treatment Summary and Progress Report by Dr. Joe Wilson, 1-27-06; |
| SA -10 | Statement by Dr. Lance Clawson, 1-26-06; |
| SA -11 | Classroom Observation by Helen Steinberg, 1-23-06; |
| SA -12 | Information pertaining to The Grove School, undated; |
| SA -13 | C.S. v. DCPS, Hearing Officer's Determination (May 9, 2006); |
| SA -14 | United States Department of Education, Office of Special Education and Rehabilitative Services, Memorandum to Chief of State School Officers (June 17, 2005); |
| SA -15 | Questions and Answers on Serving Children With Disabilities Placed by Their Parents at Private Schools (2006). |

2006 AUG -4 PM 12: 08
DC PUBLIC SCHOOL SYSTEM

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
Page 2
July 31, 2006
Re: S██ A█████████

We will be relying upon the following witnesses or their designees, in person or by teleconference:

1.    Larry Abramson and Caroline Newman, Parents;
2.    Dr. William Stixrud, Psychologist, Stixrud and Associates, P.C., and/or his designee;
3.    Dr. Lance Clawson, Psychiatrist, and/or his designee;
4.    Dr. Joe Wilson, Social Worker and Therapist, and/or his designee;
5.    Bill Cox, Residential Administrator, The Grove School, and/or his designee.

Please be advised that we may also rely on any other documents and witnesses disclosed by DCPS, as well as any other documents and witnesses to which DCPS does not object. We will object to any documents or testimony from witnesses not disclosed in a timely manner in accordance to the IDEA and federal regulations.

Sincerely

Michael J. Eig/SM
Michael J. Eig

*Enclosures*

cc:    Student Hearing Office (*with enclosures*)
       Larry Abramson and Caroline Newman (*with enclosures*)

70

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



MAY 2 3 2006

# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter School (DCPS or LEA) and/or** parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more that two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.  INFORMATION ABOUT THE STUDENT:

Student Name: ___S___ Ab_____     Birth Date: _____ 1991

Address: ___████████████████████████████████5_____

Home School: ___Wilson High School_____

Present School of Attendance: _The Grove School_____

Is this a charter school?  NO_____     (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student:  _Larry Abramson and Caroline Newman_____

Address (if different from the student's above): _____same as above_____

Phone/Contact Number: ____see below_____     Fax Number (if applicable): ____see below____

**EXHIBIT**
**SA-1**

**B.    Individual Making the Complaint/Request for Due Process Hearing:**

Name: _Larry Abramson and Caroline Newman_

Complete Address: _____same as above_____

_____

Phone: (h) _see below_ (w) _see below_ (Fax) _see below_ (e-mail) _____

Relationship to the Student:

☒ Parent          ☐ Legal Guardian          ☐ Parent Surrogate

☐ Self/Student          ☐ Local Education Agency (LEA)          ☐ Parent Advocate

**C.    Legal Representative/Attorney (if applicable):**

Name: _Michael J. Eig_

Address: _____Michael J. Eig and Associates, P.C._____

_____5454 Wisconsin Avenue, Suite 760, Chevy Chase, Maryland 20815_____

Phone: (w) _301-657-1740_ (Fax) _301-657-3843_ (e-mail) _____

Will attorney / legal representative attend the resolution session?    ☒ Yes          ☐ No

**D.    Complaint Made Against (check all that apply):**

☒ DCPS school (name of the school if different from page one) _____
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.    Resolution Session Between Parent and LEA:**

I understand that it is my right to have a resolution session to resolve this complaint. I also understand that I may voluntarily waive this right if I choose. (Note: All parties must agree to waive the resolution session to avoid having this meeting.)

☒    I wish to waive the Resolution Session.

**E.    Mediation Process:**

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session. Mediation is also available prior to a due process hearing, but mediation may not be used to deny or delay a parent's right to a hearing on parent's due process complaint. Please check all that apply:

☐    I am requesting mediation as an alternative to the resolution session meeting.
☐    I am requesting mediation services **only**.
☐    I do not wish to use a mediator at this time.

72

## G.    Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions.  Provide complete details about all the facts supporting your claims.  (You may attach additional pages if needed):

1.        What is the nature of the problem, including the facts related to the problem, that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

S█ is a fifteen-year old young man who is extremely bright, with many cognitive scores in the 99th percentile, who has been diagnosed with Asperger's Syndrome, and who has a history of attention deficit hyperactivity disorder and behavior difficulties.  Until recently, he has been a good student, however, he has been exhibiting increasing signs of inattention, anxiety and depression.  As the 2005-06 school year progressed, these issues have risen to the forefront, having a great impact on S█ ability to benefit from his instruction, and causing his educational performance to decline precipitously over the course of a few months.  Until March, 2006, S█ attended Georgetown Day School, but due to the severity of his disability and its recent manifestations, he had to be removed.  His parents were, at the time, in the middle stages of the initial IDEA eligibility determination process with DCPS, having registered S█ as a non-attending DCPS student in January, 2006.  The parents advised DCPS of S█ immediate need for a change in placement from Georgetown Day, and that they were working to identify an alternative.  On April 4, 2006, they enrolled S█ at a therapeutic residential placement at The Grove School in Madison Connecticut, and advised DCPS of this new placement.

Subsequently, DCPS scheduled a Multidisciplinary Team ("MDT") Meeting for May 5, 2006.  The parents agreed to attend, in the hope of completing the eligibility determination process and developing an educational program for their son.  However, on May 4, 2006, the day before the MDT meeting, the parents, through counsel, received a letter from Patricia Young.  By this letter, DCPS stated its position that the school system has no legal obligation to provide S█ with services under the IDEA.  Instead, DCPS advised the parents that, since S█ is attending a school outside the District, "his case has become the obligation of the state of Connecticut."  DCPS repeated this position at the MDT Meeting on May 5, 2006.

The school system's position is based on a misunderstanding of the federal law. The IDEA, which was re-authorized in 2004, discusses and differentiates three categories of children in private schools, who require special education.  The parents advised DCPS of their position with respect to these categories, as follows:

•        20 U.S.C. § 1412 (a)(10)(A) deals with "Children enrolled in private schools by their parents."
•        20 U.S.C. § 1412 (a)(10)(B) deals with "Children placed in, or referred to, private schools by public agencies."
•        20 U.S.C. § 1412 (a)(10)(C) deals with "Payment for education of children enrolled in private schools without consent of or referral by the public agency."

The three categories do not overlap.

The first category, which the law refers to as those children entitled to "Equitable Participation" or "Equitable Services," are children in private school at their parents' expense, who are only seeking services additional to their private school academic services – such as tutoring or speech/language therapy – usually supplied at the end of a school day at a nearby public school.  Such a student's right to equitable participation for such services

does entail registration in the public schools, as is clarified in the proposed regulations. This category has seen a change in the responsibility of the local educational agency ("LEA"), between IDEA 1997 and IDEA 2004; the new statute recognizes that after-school services provided to private school students at a nearby public school would be most conveniently provided by the LEA in which the *private school is located* than by the LEA where the *child lives*. That change is clarified by the US Department of Education Memorandum dated June 27, 2005, which the MDT team provided to the Abramson family on May 5, 2006.

However, the re-authorized 2004 IDEA enacted no significant changes to the second and third categories. The statute still requires that the LEA in which the child resides is responsible for proposing a FAPE for this child, regardless of whether he or she is placed in private school by the parents or by the school system. (This requirement is echoed in the local regulations: 5 D.C.M.R. § 3002.1(a) requires that "DCPS shall make a free appropriate public education (FAPE) available to each child with a disability, ages three to twenty-two, who resides in, or is a ward of, the District.") Of course, as the IDEA's language concerning the third category makes clear, the LEA would only be responsible for the cost of any private school tuition if it lacks or fails to offer an appropriate public program.

Thus, by referring S██ A████████ family to the Madison, Connecticut School District, DCPS violated its obligations under the IDEA. The parents so advised DCPS, and formally requested that DCPS complete the educational planning process and offer S██ an education appropriate to meet his needs. DCPS never responded to this request.

- To the extent known to you at this time, how can this problem be resolved?

As a remedy for this failure, the parents request that S██ be placed and funded at The Grove School in Madison, Conneticut, retroactive his enrollment on April 4, 2006.

- Issues presented:
-

See above.

## H.  **Estimated amount of time needed for the hearing:**     **1 day**

Note:   In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing. Please indicate if you believe more that two hours will be needed.

## I.  **Accommodations and Assistance Needed:**

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)   N/A
- Special Communication (please describe the type)   N/A
- Special Accommodations for Disability (please be specific)  N/A
- Other  N/A

74

**J.**     **Waiver of Procedural Safeguards:**

     ☐    I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.**     **Parent Signature and Affirmation:**

I affirm that the information provided on this form is true and correct.

_____

Signature of Parent or Guardian           Date

**L.**     **Signature of Attorney/Legal Representative:**

_____    5-23-06

Legal Representative / Advocate           Date

**M.**     **Signature of LEA Representative (if hearing requested by LEA):**

_____

Representative of LEA           Date

<div align="center">

**Mail, fax or deliver this complaint notice to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

</div>

75



**STUDENT ENROLLMENT FORM**
School Year 2005-2006

SCHOOL NAME George Town DMY
STUDENT ID # _____

## STUDENT INFORMATION
*(Print all information)*

**1. Student's Full Legal Name (Last, First, Middle)**
S███ N████ A████

**2. Date of Birth (Month, Day, Year)** ██-91

**3. Country of Birth** USA

**4. Address** ████████ Apt. No. ███

**5. Telephone Number** (███) ███████

**6. Sex (Circle)** (Male) Female

**7. City** WASHINGTON **State** DC **Zip** 20015

**8. Current Grade (Specify)** 9

**9. Social Security Number**

**10. School Last Attended** (if DCPS, name school only) GEORGETOWN DAY School
**Address** 4200 DAVENPORT ST NW
**City** WASHINGTON **State** DC **Zip** 20016

**11. Ethnic Designation** *Not of Hispanic origin
_American Indian or Alaskan Native
_Asian or Pacific Islander
Black*
X White*
Hispanic

**12. Language other than English spoken at home** N/A

**13. School Attending** (if not DCPS) GEORGETOWN DAY SCHOOL
**Address** 4200 DAVENPORT ST NW
**City** WASHINGTON **State** DC **Zip** 20016

**14. Health Insurance Information**
**Provider:** GEHA **Medicaid**
**Policy #:** ID No. 22483426
**Medicaid HMO:** N/A

☐ Advantage
☐ Amerigroup
☐ Chartered
☐ Health Services Children with Special Needs

**5. Special Services Child Receives**
☐ Special Reading Help
☐ Bilingual or ESL Program
☐ Summer School

☐ Student Receives Special Education Services: Y___ N X
☐ Student Has Current IEP: Y___ N X
☐ Advanced Placement

## PARENT INFORMATION

**. Mother or Legal Guardian (Relationship)** Mother
**(Last, First, Middle)** NEWMAN CAROLINE SEARING
**Address (if other than student's)** SAME **Apt. No.**
6419 BARNABY ST NW
**City** WASHINGTON **State** DC **Zip** 20015
**Employer** SMITHSONIAN
**Telephone Number** (202) 633-3016 (w)
**Employer's Address** P.O. Box 37012
H Bldg, Rm. 122 MRC 407, WA 20013

**17. Father or Legal Guardian (Relationship)** FATHER
**(Last, First, Middle)** LARRY ADRAMSON
**Address (if other than student's)** SAME **Apt. No.**
**City** **State** **Zip**
**Employer** NATIONAL PUBLIC RADIO
**Telephone Number** (202) 513-2139 (w)
**Employer Address** 635 Massachusetts Ave, WDC 20001

**RESIDENCY STATUS:** ☒ (D.C. Resident (Student & parent or legal guardian live in D.C.)
☐ Nonresident (Student/or parent live outside D.C.) ☐ Receipt of payment for nonresident tuition attached

## EMERGENCY

**Emergency Contact Person: (other than parent)**
**Address:**
**Relationship:** **Telephone Number: (   )**

In the last three years, have you or your spouse participated in any form of agricultural work? Y (N)
pleted this form and I certify that the information above is accurate. I understand that providing false information for purposes of
ding the government is punishable by law.

*Caroline J. Newman* **Date** 1/4/06
re of Parent/Legal Guardian with Whom Student Lives or Adult Student

### FOR OFFICE USE ONLY

OF ENROLLMENT: _____
ER: _____
**BIRTHDATE VERIFIED WITH:** _____
Free/Reduced Lunch: Y___ N___

Education Services: Y___ N___ **Level of Standardized Assessment:** _____ Student Data in SETS Y___
Boundary Student: Y___ N___ (Citywide Program) Non-Attending Student: _____
zation Complete: Y___ N___
76 (School of attend___

**EXHIBIT SA-2**

*Georgetown Day*
Name of School

# DC RESIDENCY VERIFICATION FORM
(To be completed by Local School Staff Only)

Please refer to the Residency Verification Guidelines when using this form.

I hereby certify that *Caroline S Newman* , S.S. # ▓▓▓▓▓▓▓▓ parent/caregiver
　　　　　　　　　Parent or Caregiver Name　　　　　　　　　(if available)

of *J▓▓▓ A▓▓▓▓▓▓* ; *6419 BARNABY ST. NW, WASHINGTON, DC*
　　Student Full Name　　　　　Current DC Home Address　　　　　2005

*202-686-9212* presented the following document(s) evidencing his/her District of Columbia residency:
Telephone No. (if applicable)

**(A)** Underline One (1) of the following items suffices to establish DC residency.

_____ A pay stub, with an issue date within the past forty-five (45) days, that contains the name of the person enrolling the student, shows his/her current DC home address, and withholding of DC personal income tax for the current tax year; or

_____ Official documentation of financial assistance from the Government of the District of Columbia and issued to the person enrolling the student within the past twelve (12) months, including, but not limited to, Temporary Assistance for Needy Families (TANF), Medicaid, the State Child Health Insurance Program (SCHIP), housing assistance or other programs; or

_____ Supplemental Security Income annual benefits notification issued to the person enrolling the student within the past twelve (12) months and indicating his/her current DC home address; or

_____ A tax information authorization waiver form certified by the DC Office of Tax and Revenue, with the name of the person enrolling the student and evidence of payment of DC taxes for tax year 2003; or

_____ Unexpired official military housing orders showing the student's name, the name of the person enrolling the student, and their current DC home address; or

_____ Proof that the child is a ward of the District of Columbia, in the form of either (a) a letter from a placement agency or a social worker acting on behalf of the Child and Family Services Agency, or (b) a court order; or

_____ Embassy letter, with an issue date after July 1, 2004, showing the name of the person enrolling the student, a statement indicating that the person enrolling the student and the student live on embassy property in the District of Columbia, and an official embassy seal.

**)** Or, in the absence of items listed above, two (2) of the items listed below will suffice as proof of residency in DC. The address and name on each of the below items must be the same.

_____ Unexpired DC motor vehicle registration showing the name of the person enrolling the student and his/her current DC home address;

_____ An unexpired lease or rental agreement with receipts for payment or canceled checks for payment of rent for a period within two (2) months immediately preceding consideration of residency, for the current DC address at which the student actually resides;

_____ An unexpired DC motor vehicle operator's permit or official government issued non-driver identification in the name of the person enrolling the student showing his/her current DC home address; or

_____ One utility bill (only gas, electric, and water bills are acceptable) with the name of the person enrolling the student, current DC home address; and with receipt of payment or cancelled check for payment of the bill. The receipt of payment or canceled check must be from a period within the two (2) months immediately preceding consideration of residency.

**primary caregivers:**
If the person enrolling the student is an other primary caregiver, he/she has provided proof of caregiver status in accordance with the Residency Verification Rules. Other primary caregivers must also establish DC residency, as outlined above.

*[signature]*　　　　　　　*1/4/06*
School Official's Signature　　　　Date



District of Columbia Public Schools
Office of Special Education
The C.A.R.E Center @ Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, DC 20001
(202) 671-0882

**EDUCATIONAL HISTORY**

Student's Name: S____ A_____     Student ID# _____

Student's Date of Birth: _____ / __91__   Current Grade: __9__   Teacher: (multiple teachers)

Private-Religious School: _Georgetown Day School_     DCPS Neighborhood School: _Wilson_

**Part 1: Health Record Review**

A. Vision Screening: __8__ / __1__ / __05__    R 20/400   L 20/400     Glasses: __X__ Yes _____ No
        Date                                              Results

B. Hearing Screening __8__ / __1__ / __05__    R Normal   L Normal     Hearing Aid: _____ Yes __X__ No
        Date                                              Results

C. Indication of Medical Concerns: _____ Yes __X__ No   If yes, explain below:

_____
_____
_____
_____
_____
_____

**Part 2: School History Information**

A. Preschool: _____ Yes _____ No _____ Not applicable after the third grade

B. Schools Attended (K through present)

| School | Grade(s) Completed | School | Grade(s) Completed |
|---|---|---|---|
| Lafayette | (KG –for 6 wks only) | | |
| Janney | KG through 2nd | | |
| Lowell School | 3rd – 6th | | |
| Georgetown Day School | 7th to current 9th | | |

C. List grades with absence of over 20 days/year or loss of credit due to attendance.  _8th_

If indicated in record, list care of absence(s):

In the February of 2005, S____ faced major problems keeping up with school work and refused to go to school for several days. He became extremely depressed and withdrawn and tried to commit suicide by taking 16 Tylenol tablets. He was admitted to Children's Hospital, treated for possible liver damage, and then admitted to the children's psychiatric ward for evaluation. He was at Children's Hospital for two weeks. Because of his extended absence, Georgetown Day School elected not to give S____ grades for this quarter. He graduated on schedule with the 8th grade class.

D. Retention: _____ Yes __X__ No   If yes, grade of retention: _____

**Part 3: Academic Record Review**

A. **General Education Program:** (include synthesis of past classroom performance, classroom accommodations, and general test information) Attach all appropriate documentation.

Since 2nd grade, S____'s teachers have noted that he has difficulty staying on task. They have also had problems dealing with his lack of self-control, and other behavioral challenges. In 4th grade at the Lowell School, S____ began challenging his primary teachers' authority. Efforts to control his problems through behavior management yielded limited success, but new medication and an ADHD diagnosis did seem to help him stabilize and get back on track. In general, S____'s teachers have consistently noted his dislike of physical writing. Allowing S____ to use a keyboard in late 4th and 5th grades offered a partial solution, but S____ still struggled with long-term project management. To this day he seems incapable of taking notes in class, and hence has nothing to study from for comprehensive exams required in high school. In addition to these deficits, S____'s daily homework performance has been well below expectations given his high standardized test scores. Teachers at Georgetown Day School have tried to help S____ organize his homework, but he has been unable to profit from any extra help that has been offered., including intensive tutoring. Beginning in 8th grade, S____'s school performance dropped off sharply. His teachers now repeatedly alert us that he is not performing anywhere close to his ability. He fails to turn in daily homework (sometimes even when he has done it) and regularly misses benchmarks and final deadlines for major essays and projects. He has very little self motivation while simultaneously experiencing

Student's Name: _____    Student's ID# _____

**Part 3: Academic Record Review (continued)**

**B.    Is previous testing being used for consideration for special education services?  If yes, list type of evaluation(s) and date(s) of administration.**

Stixrude and Associates Neuropsychological Evaluation from 1999 has been provided.

C.  IEP for Special Education Services _____ Yes _____ No

| Disability Code(s) | Program(s) |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Completed by: _Caroline Newman + Larry Abramson_____    Date: _1_ , _12_ , _06_



**District of Columbia Public Schools**
**Office of Special Education**
**The C.A.R.E Center @ Shaw Junior High School**
**925 Rhode Island Avenue, NW**
**Washington, DC 20001**
**☏ (202) 671-0882**

**ELIGIBILITY SCREENING**
**PARENT INTERVIEW/QUESTIONNAIRE**

## PART 1: STUDENT INFORMATION

Student's Name: ~~S____ N_____ Ab_____~~     Student ID#: _____

Student's Date of Birth: ___~~____~~___/91   Grade: __9__  Primary Language: __English__

Parent/Guardian Name: __Caroline Newman and Larry Abramson__

Address: ___6419 Barnaby St. NW___

City/State/Zip: __Washington, DC  20015__

Home Phone No.: (202) __686-9212__     Work Phone No.: (202) 633-3016 (Mother)
                                                      513-2439 (Father)

Attending School: __Georgetown Day School__     Neighborhood School: __Wilson__

## PART 2: FAMILY DATA

**Do you have any serious concerns about your child?** ☒ Yes ☐ No   **If yes, explain below:**

Since mid 8ᵗʰ grade at Georgetown Day School, S___ has been in crisis, demonstrating serious organizational, attentional, and behavioral problems at home and school. These behavioral issues have severely affected his ability to succeed in school and have sapped his self-esteem. Over the past 12 months, his grades have dropped from A's and B's to C's and D's. He has great difficulty remembering his homework assignments, can't pace himself for long-term assignments, and regularly misses deadlines at school. Last fall we engaged a tutor to support S___. Her very hands-on effortsonly led to S___ feeling more overwhelmed. His negative reaction to the increased social and academic demands of high school led to several days of school refusal and a general unwillingness to be accountable for his work. His performance decline is continuing despite the fact that S___ teachers all agree he is extremely intelligent and should be doing superior work. At home, S___ seems increasingly moody, depressed, and unable to meet basic expectations.

**Has any other family member experienced school-related problems?** ☐ Yes ☒ No   **if yes, explain below:**

S___ mother and father excelled at school and have advanced academic backgrounds.

**Has the child experienced any traumatic events such as death of a close relative, divorce, family crisis?** ☒ Yes ☐ No   **If yes, explain below:** 2004

In August 2004 S___ mother was diagnosed with breast cancer. She had several surgeries to treat this diagnosis, and of course the treatment regimen created some anxiety at home. She has since recovered, and has an excellent prognosis. S___ never expressed a great deal of concern about his mother's health. However, his problems became more acute shortly after her treatment began. We of course mentioned Mom's health history to S___ therapists and caregivers. After talking with S___, noone thought it was a significant contributing factor.

## Part 3: Medical History

**Did the mother experience any health problems during this pregnancy?** ☐ Yes ☒ No   **If yes, explain below:**

Student's Name: ___S____ A_____    Student ID# _____

Birth weight: __7__ Pounds __4__ Ounces _____ Apgar Score(s) __6__ 1-minute __9__ 5-minute

Did any of the following occur during the birth process:

☐ Premature  ☐ Transfusion  ☐ Caesarean section  ☐ Breech birth  ☐ Prolonged  ☒ Oxygen problem  ☐ Blood Incompatability (RH factor)

**Other birth problems and/or concerns:**

S___ briefly experienced breathing problems immediately after birth.  The problem may possibly have been related to Mother having "meconium stain."  Beyond initial evaluation by pediatric staff during first hours after birth, S___ was deemed completely healthy.

**Did the child have any difficulty learning to eat, sleep, sit, walk, or talk? ☒ Yes  ☐ No  If yes, explain below:**

As an infant, S___ had difficulty learning to breast feed; and as a result had some trouble gaining weight and became dehydrated for a brief period.  He quickly overcame this problem.  He met all other developmental milestones as expected.

☐ Physical defect          ☐ Speech problems
☒ Asthma                   ☒ Headaches
☐ Operations               ☐ Temperature above 104
☐ Frequent colds           ☐ Eye problems
☐ Dietary problems         ☐ Epilepsy
☐ Heart disease            ☐ Frequent sore throats
☒ Allergies                ☐ Serious accidents or injuries
☐ Ear problems             ☒ Other __fainting__
☐ Diabetes

**Describe any of the problems checked above:**

Asthma - mild problems in elementary school
Allergies – allergic to yellowjackets; has been desensitized
Headaches – intermittent
Other/ fainting – was briefly treated for cardiogenic syncope in 4th grade

**Has the child ever been hospitalized? ☒ Yes  ☐ No  How long? _2 weeks_  Age at time: _14_**

**Reason:**

In February of 2004, S___ faced major problems keeping up with school work, and refused to go to school for several days.  He became extremely depressed and withdrawn, and tried to commit suicide by taking 16 Tylenol tablets.  He was admitted to Children's Hospital, treated for possible liver damage, and then admitted to the children's psychiatric ward for evaluation.  He stayed on the ward for 2 weeks.

**Is the child under treatment or on medication at present? ☒ Yes  ☐ No  If yes, explain below:**

S___ currently sees a talk therapist once a week.  He sees a psychiatrist 4 times a year for medication counseling and evaluation.  S___ currently takes 36 mg of Concerta, 400 mg of Wellbutrin (in two doses), and 100 mg of Seroquel daily to address attention, depression, anxiety, and anger management problems.  He has been in various forms of behavior management, talk, and psychiatric therapy since 2nd grade.

**How would you rate the child's general health?**  ☐ Excellent  ☒ Good  ☐ Fair  ☐ Poor

Student's Name: ___S▓▓▓ A▓▓▓▓▓▓▓___    Student ID# _____

## Part 4: Social/Behavioral Characteristics

Please check any of the following behaviors that describes the child:

- [ ] Flexible
- [ ] Outgoing
- [ ] Consistently short attention span
- [ ] Daydreams
- [ ] Cooperative
- [ ] Nightmares
- [x] Temper tantrums
- [x] Unreasonable fears
- [ ] Gets ideas quickly
- [ ] Fantasies
- [ ] Artistic
- [ ] Frequently tells lies
- [x] Avoids homework
- [x] Uncooperative
- [ ] Frequently talks to self

- [ ] Sleepwalking
- [x] Lacks motivation
- [x] Creative
- [ ] Bedwetting
- [ ] Thumb sucking
- [ ] Nail biting
- [ ] Mechanical
- [ ] Overactive
- [ ] Athletic
- [ ] Musical
- [ ] Rocking
- [x] Under-active
- [ ] Self-confident
- [x] Enjoys reading
- [x] Frequently late

- [ ] Doesn't seem to understand questions or directions
- [x] Difficulty making and keeping friends
- [x] Difficulty using numbers
- [x] Lacks self-control
- [x] Frequent sudden changes in mood
- [x] Excessive inconsistency in behavior
- [ ] Needs constant approval or reassurance
- [ ] Unusually aggressive towards others
- [x] Difficulty completing tasks and activities
- [x] Difficulty with organization
- [ ] Avoids reading
- [ ] Difficulty telling time

---

**Has your child had any evaluations of which the school may be unaware:** ☐ Educational ☐ Psychological ☐ Medical ☐ Other _____
**Explain (what, when, by whom):**

S▓▓received a full battery of neuro-psych testing in 2nd grade by Dr. William Stixrud and Associates. S▓▓ school has a copy of the evaluation.

---

**What are your child's interests?**

Video and computer games
Warhammer (hobby figures related to a strategy game)
Animals
Humor (Dave Barry, Monty Python, cartoons, Jon Stewart, etc.)
Reading
Movies
Games & puzzles
Building & taking things apart

**What does your child do well?**

S▓▓ is extremely intelligent. He has a gift for problem-solving, and an intuitive ability to solve puzzles. He has acute verbal gifts and, when relaxed, can be creative, witty, and entertaining. He loves all things computer and excels at programming, mechanics, engineering, and similar challenges.

---

**What do you like best about your child?**

We enjoy S▓▓ off-beat sense of humor, and his delight in wordplay. S▓▓ can be very charming in groups of people he knows well. S▓▓ can be very affectionate and gentle, and has a warm relationship with our two cats.

---

**How do you think the school can help your child?**

We would like to see the school help S▓▓ with his organizational challenges, and help him learn how to manage his schoolwork on his own. We also hope the school can help S▓▓ learn to enjoy school work, and to enjoy being in school. We would like to see S▓▓ develop an understanding for the needs of others--both teachers and students--and to learn how to interact constructively with other members of the school community.

82

DCPS 2003                                                      Page 3 of 4

Student's Name: _____ S███ A█████████ _____    Student ID# _____

| **Is there additional information that you feel will help us to understand your child better?** |
| --- |
| S███ has received multiple diagnoses from mental health professionals, but none seems to have helped in finding the right educational setting for him.  We have been urged to place him in demanding settings that will take advantage of his high intelligence, but he has not learned how to succeed as a person, or as a student.  As a result, he is now approaching adulthood without crucial skills he needs to be productive.  He needs much more intensive attention to his problems, including therapeutic treatment that addresses both his educational and behavioral challenges. |

I understand that this information will be used to help determine whether my child has an educational disability.  This material will be kept in my child's confidential file.

Caroline Newman and Larry Abramson
Name (Printed)

*[signature]*
Signature

Parents
Relationship to Child

1/12/06
Date

Interview: _____
                  Name (Printed)

_____
Signature

_____
Position/Title

_____
Date

**Central Assessment Referral and Evaluations (C.A.R.E.) CENTER**



**Office of Special Education**
**(Located at Shaw Junior High School)**
**925 Rhode Island Avenue, NW**
**Washington, DC 20001**
**(202) 671-0882**



Michael J. Eig and Associates, P.C.
    Attorneys at Law
5454 Wisconsin Avenue
Chevy Chase, Maryland 20815-6938

May 4, 2006

Dear Mr. Eig:

As you are aware and so noted in your letter dated March 13, 2006, Ms. Kathie Thompson and the C.A.R.E. team were prepared to move forward with the eligibility process within the timeline for case completion for S███ A█████████. Ms. Thompson attempted to observe S███ at Georgetown Day School and was informed by the principal at Georgetown Day that S███ was unavailable and had been withdrawn from school. We subsequently found out that S███ was withdrawn on February 27, 2006. In your letter to Ms. Thompson, you indicated "that due to the severity of S████ disability and its recent manifestations, S███ has had to be removed from that school, and is scheduled to begin a therapeutic residential placement at The Grove School in Madison, Connecticut within the next few weeks". In a second letter from you dated 4/17/06, you indicated that S███ began at the Grove School on April 4, 2006. According to IDEA 2004, once S█████ parent's decided to withdraw him from Georgetown Day, and enrolled him in the Grove School, his case has become the obligation of the state of Connecticut.

In an effort to support Mr. Abramson and Ms. Newman, S█████ parents with this transition, the contact person for the Madison School District in Connecticut is JoAnne Panicek, Director of Special Education 1-203-245-6300.

Sincerely,

*Patricia Young*
Patricia Young,
C.A.R.E. Center Director

84

EXHIBIT
SA-3



**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

May 8, 2006

Kathie Thompson
C.A.R.E. Center at Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, D.C. 20001

> Re: S███ A██████
> *via facsimile and first-class mail*

Dear Ms. Thompson:

I am writing in reference to the Multidisciplinary Team Meeting on May 5, 2006, at which DCPS repeated its position stated in the letter from Patricia Young, dated May 4, 2006, that the school system has no legal obligation to provide S██ with services under the IDEA. Instead, DCPS advised the parents that, since S██ is attending The Grove School in Madison, Connecticut, "his case has become the obligation of the state of Connecticut." The school system's position is based on a misunderstanding of the federal law, which I would like to explain.

As you are no doubt aware, the Individuals With Disabilities Education Act of 1997 was recently reauthorized as the Individuals With Disabilities Education Improvement Act of 2004, 20 U.S.C. §§ 1400, *et seq.*, which took effect on July 1, 2005. (The federal regulations have not yet been repromulgated, and continue to implement the 1997 statute. The Department of Education has issued proposed regulations, which are expected to be finalized very soon.) IDEA 2004 discusses and differentiates three categories of children in private schools, who require special education, as follows:

- 20 U.S.C. § 1412 (a)(10)(A) deals with "Children enrolled in private schools by their parents."
- 20 U.S.C. § 1412 (a)(10)(B) deals with "Children placed in, or referred to, private schools by public agencies."
- 20 U.S.C. § 1412 (a)(10)(C) deals with "Payment for education of children enrolled in private schools without consent of or referral by the public agency."

These three categories do not overlap.

85



EXHIBIT

SA-4

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
Page 2
May 8, 2006
Re: S█████ A█████████

The first category, which the law refers to as those children entitled to "Equitable Participation" or "Equitable Services," are children in private school at their parents' expense, who are only seeking services additional to their private school academic services – such as tutoring or speech/language therapy – usually supplied at the end of a school day at a nearby public school. Such a student's right to equitable participation for such services does entail registration in the public schools, as is clarified in the proposed regulations. This category has seen a change in the responsibility of the local educational agency ("LEA"), between IDEA 1997 and IDEA 2004; the new statute recognizes that after-school services provided to private school students at a nearby public school would be most conveniently provided by the LEA in which the *private school is located* than by the LEA where the *child lives*. That change is clarified by the US Department of Education Memorandum dated June 27, 2005, which the MDT team provided to the Abramson family on May 5, 2006.

However, IDEA 2004 enacted no significant changes to the second and third categories. The statute still requires that the LEA in which the child resides is responsible for proposing a FAPE for this child, regardless of whether he or she is placed in private school by the parents or by the school system. (This requirement is echoed in the local regulations: 5 D.C.M.R. § 3002.1(a) requires that "DCPS shall make a free appropriate public education (FAPE) available to each child with a disability, ages three to twenty-two, who resides in, or is a ward of, the District.") Of course, as the IDEA's language concerning the third category makes clear, the LEA would only be responsible for the cost of any private school tuition if it lacks or fails to offer an appropriate public program.

Any LEA that refers parents who are seeking a FAPE (whether or not the parents have placed the child privately) to a different LEA is violating its obligations under the IDEA and seriously confusing its legal duty. We therefore respectfully object to the CARE Center's decision to refer S█████ A█████████ family to the Madison, Connecticut School District, and continue to request that DCPS complete the educational planning process and offer S██ an education appropriate to meet his needs.

If you have any questions regarding this matter, please do not hesitate to contact me.

Sincerely,

Michael Eig

cc:    Dr. Patricia Young, CARE Center Director
       Larry Abramson and Caroline Newman

86

**DISTRICT OF COLUMBIA
PUBLIC SCHOOLS**

Division of Special Education
825 North Capitol Street, N.E., 6th Floor
Washington, D.C. 20002-4232
202-442-4800, fax: 202-442-5518
www.k12.dc.us

May 23, 2006

Michael J. Eig and Associates, P.C.
Attorneys at Law
5454 Wisconsin Avenue
Chevy Chase, Maryland 20815-6938

Re:  S███ A█████████

Dear Mr. Eig:

This is in response to your letter of May 8, 2006 to Kathie Thompson, regarding S███
A█████████, who is parentally placed in a private school located in the Madison
Connecticut School District.   In your correspondence you contend that the D.C. Public
Schools' (DCPS) is responsible for assessing S███ and determining whether he is a child
with a disability eligible for special education services.

It remains DCPS' position that, consistent with 20 U.S.C. § 1412 and OSEP Letter 05-09
to Chief State School Officers, "Obligations of States and Local Education Agencies to
Parentally-Placed Private School Children with Disabilities", June 27, 2005, the Madison
Connecticut School District, the school district in which S███ resides, is responsible for
assessing S███, determining whether he is a child with a disability eligible for special
education services, and, if necessary, drafting an appropriate I.E.P.  If he is determined to
be eligible for such services, DCPS will then be responsible for offering him a placement
in which he can receive a Free Appropriate Public Education, should his parents desire
such a placement.  In this event, please have S███ parents forward a copy of his I.E.P.
and their request for placement to me at the following address: The CARE Center, 925
Rhode Island Ave., NW, Washington, DC  20001.

Sincerely,

*Patricia Young*

Patricia Young
C.A.R.E. Center Director

EXHIBIT
SA-5

87

State Education Agency for the District of Columbia
State Enforcement and Investigation Division (SEID)
Special Education Programs



# Due Process Complaint Disposition

- This form should be used by the parties to notify the Student Hearing Office about important information concerning the outcome of the resolution meeting.
- Please return to the Student Hearing Office of the District of Columbia Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002, Fax number 202/442-5556.

## A. STUDENT AND CASE INFORMATION:

Student Name: S███ A███          Birth Date: ███-91
      First    MI    Last

SHO Case Number: [          ]    (if applicable)

## B. PARENT / GUARDIAN:

Name: Larry                    Abramson
    First              Last

Complete Address: 6419 Barnaby Street, NW
Washington, DC 20015

Phone: [          ]          [          ]          [          ]
   Home         Work or alternative phone no.    Fax No. if applicable

## C. LOCAL EDUCATION AGENCY REPRESENTATIVE:

Full Name: Kymberly Grafton          Title: LEA/CRC

Address: 925 Rhode Island Avenue, NW
Washington, DC 20001

Phone: 202-671-0882          202-673-6557
     Office             Fax

1

SEID DRN Rev'd. 6/14/05



EXHIBIT
SA-6

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

__ PUBLIC        ___DPCS CHARTER        __ LEA CHARTER        ___ NONPUBLIC        _x_ PRIVATE/RELIGIOUS

## RESOLUTION MEETING NOTES

Meeting Confirmation Date: [        ]        Meeting Held: 6-6-06

Student: Se** A********        DOB: **-91        School: Grove School

| PARTICIPANTS (Print Name) | PARTICIPANTS (Sign Name) | POSITION |
|---|---|---|
| Kymberly Grafton | Kymberly Grafton | LEA/CRS |
| Patricia Young | Patricia Young | Dir. C.A.R.E. |
| Haylie Iseman, Esq. | | Attorney |
| Larry Abramson | | Father |
| | | |
| | | |
| | | |
| | | |
| | | |

| | Resolved | X | Unresolved |
|---|---|---|---|

The meeting began with introductions.  The parent's complaint is that DCPS failed to complete educational testing, develop an IEP if eligible and locate an appropriate placement for the student. DCPS attempted to complete the educational testing; however, it was brought to DCPS attention from the school administrator that the student no longer is attending school in Washington, DC.  On May 4 & 23, 2006, Pat Young, Director of the CARE Center wrote a letter to Michael J. Eig, Esq., indicating since the student no longer resides in the District; DCPS has no obligation to the student due to him attending school in the state of Connecticut.  Since he is attending school there, Connecticut would assume this responsibility; should he return to school in the District and is parentally placed and funded at a private and/or religious school, DCPS CARE Center will resume the eligibility/IEP process.  Should he attend a neighborhood school, the neighborhood school would assume responsibility.

As articulated in the parent's letter dated May 8, 2006, the parent's position is that DCPS has a continuing legal obligation to identify all of its students with special needs and to provide each one of FAPE.  The parent is unwilling to accept DCPS offer and will proceed to due process.  This case is unresolved.

_____ The complaint has been resolved and the parties have reached agreement to the satisfaction of the parent / guardian. The due process complaint notice and the request for a due process hearing should be dismissed and withdrawn. The parties are aware that the agreement may be voided by any party within 3 business days of the date the agreement is signed. The parties have agreed to wait at least 3 business days before filing this form with the Student Hearing Office.

__X__ The resolution session was unsuccessful. The case should proceed to a due process hearing.

_____ The resolution session was unsuccessful. The parties have agreed to try mediation.

_____ The parties mutually agree to waive the resolution session and request mediation and the assignment of a mediator to this case.

_____ The parties mutually agree to waive the resolution session and request that this case proceed to a due process hearing on the merits.

_____ The parent has failed to participate in a resolution meeting as required under the law. A due process hearing should not be scheduled until further notice

## J.    Signature and Affirmation:

I affirm that the information provided on this form is true and correct. I also affirm my receipt of the Procedural Safeguards Manual or I have waived my right to receive the Procedural Safeguards Manual.

_____        6/6/06
Signature of Parent/Guardian                     Date

_____        6-6-06
Local Educational Agency Representative          Date

**Mail, fax or deliver this form to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301)657-3843



July 31, 2006

Stephanie Ramjohn-Moore, Esq.
District of Columbia Public Schools
Office of the General Counsel
825 North Capitol Street, NE
Washington, D.C. 20002

Re: S███ A██████████
*via facsimile and first-class mail*

Dear Ms. Ramjohn-Moore:

It has come to my attention that DCPS has contacted the Grove School, seeking some information regarding the program there. I believe that this inquiry regards my client, S███ A██████████. As you know, we are preparing for an upcoming Due Process Hearing on this case. While ee would certainly be willing to share any information from or about Grove School, I would appreciate if you could please clarify the nature and reason for your inquiry, so that my clients can give their informed consent for information to be shared with DCPS.

I look forward to hearing from you.

Sincerely,

Michael J. Eig

cc:     Larry Abramson and Caroline Newman

91



EXHIBIT
SA-7

# William R. Stixrud, Ph.D. and Associates, LLC

## NEUROPSYCHOLOGICAL REEVALUATION

3720 Georgia Avenue
Suite 300
Silver Spring, MD 20910
(301) 565-0534
Fax: (301) 565-2217
www.stixrud.com

| | |
|---|---|
| **NAME:** | S███ A██████ |
| **DOB:** | ███████, 1991 |
| **DATE(S) TESTED:** | JANUARY 26 and 31, 2006 |
| **AGE:** | 15 YEARS, 0 MONTHS |
| **INTERPRETIVE CONFERENCE:** | FEBRUARY 3, 2006 |

### REASON FOR REFERRAL

S██ was seen for reevaluation at the request of his parents, Larry Abramson and Caroline Newman, who are concerned about their son's emotional and psychological well-being and his ability to negotiate the demands of school and social interactions. While he is exceptionally bright, S██ has experienced difficulty with low frustration tolerance, inflexibility, and poor social skills since at least 1st grade, and has also manifested depressive symptomatology. He was evaluated in June 1999 by Elliot Blumenstein, Psy.D., who reported attentional and organizational weaknesses and noted areas of social and emotional vulnerability. The parents indicated that for much of the time following that evaluation, while there were still outstanding issues, S██ generally managed well in a supportive private school environment with therapeutic intervention as needed. In the last year and a half, however, he has struggled to get things done, and his school performance has deteriorated. He has also had increasing difficulty in the emotional arena, as he has become less able to deal with even minor frustration, has acted impulsively, and has become explosive and violent. S██ was hospitalized last year following a suicide attempt in which he took sixteen Tylenol tablets. Approximately two weeks after the evaluation sessions, he was hospitalized a second time following an explosive outburst, at which time he reportedly expressed suicidal thoughts. S██ is currently in treatment with Joseph P. Wilson, L.C.S.W. - C., and is taking medication under the supervision of Lance Clawson, M.D.

### BACKGROUND INFORMATION

**Medical and Developmental History.** The reader is referred to Dr. Blumenstein's report for a discussion of S████ developmental and early academic history. It will be noted here that his birth and early development were generally unremarkable. He is currently taking Wellbutrin and Seroquel for mood regulation and Concerta to address attentional weaknesses. His parents reported that he experiences some sleep problems, including difficulty falling asleep when he is anxious or becomes overly focused on a particular idea or problem, and trouble getting up in the morning. He was further said to be lethargic and to often retreat to his bed in the middle of the day. S███ was also reported to be unusually sensitive to minor pain.

**Cognitive and Academic Functioning.** S██ is a 9th grade student at Georgetown Day School (GDS), a private school that he entered at the beginning of 7th grade. His parents reported that their son has always had problems with written output and has shown an aversion to homework, and they further indicated that his performance in school has been highly inconsistent. However, because he is so quick to grasp concepts and pick up information, S██ was able to earn good

William R. Stixrud, Ph.D.
Robert L. Mapou, Ph.D., A.B.P.P.
Adele C. Green, Ph.D.
Wendy A. Law, Ph.D.
Lisa A. Martin, Ph.D.
Robert F. Chase, Ph.D.
Patricia H. Papero, Ph.D.
Susan W. Hammond, Ph.D.
Susan S. Gerson, Ph.D.
Erika L. Wasserman, Ph.D.
Ellen K. Goldman, Ph.D.
Taruna Ahluvalia, Ph.D.
Adam J. Sowa, Ph.D.
Kimberly L. Glass, Ph.D.
Elaine D. Book, M.ED.
Carol Mannix, M.A.

Neuropsychological
Evaluation

Academic Training

Child and Family
Therapy

School Placement
and Advocacy Services

92

**EXHIBIT**

SA-8

grades up until recently. His ability to do work has declined, and his grades have dropped over the past several months (and are currently reported to be in the "C" to "D" range in most subjects). Ms. Newman and Mr. Abramson noted that while S███ is very creative and can sometimes produce excellent work, he has no concept of how to work through things that are difficult or that hold limited interest for him, and they further indicated that getting him to do homework has been a major, and largely unsuccessful, struggle. In addition, S█████ test grades, which have historically been quite good and have balanced out poor marks in other areas, are no longer consistently strong, due to poor study skills.

**Social/Emotional Functioning**. Mr. Abramson and Ms. Newman reported that, despite his difficulties, S███ can be charming and affectionate. He was further said to be witty and to have an off-beat sense of humor. He uses his excellent technical skills to help others with computer or mechanical problems. At the same time, the parents indicated that S███ has always had problems with social reciprocity and that he has great difficulty seeing situations from any perspective other than his own. He appears to be overwhelmed by the demands of social engagement, as he does things such as turning his chair so that he does not face the person he is talking with, especially if the topic is emotionally charged. He was also reported to be inflexible and to have very restricted interests, notably computer programming and video games. While he has had friends in the past, the parents indicated that, at present, S███ does not initiate social contacts and no one is calling to invite him to join in activities. He was additionally reported to refuse to participate in activities planned by his parents, as, for example, when on vacation, he wants to remain in a hotel room and play video games. It was further said that he is moody and, as previously mentioned, can be explosive and violent. His outbursts reportedly come without warning, and he has physically attacked his father and destroyed property. S███ was also reported to be impulsive and, in addition to the Tylenol overdose, has engaged in other dangerous and suicidal behavior, including lying down in the middle of the street.

Ms. Newman and Mr. Abramson completed the *Child Behavior Checklist (CBCL)* as a formal rating of their son's behavior. Their responses resulted in clinically significant ratings (>97th percentile) on a number of scales and reflected very serious concerns related to anxiety and depression, thought problems, attention problems, and aggressive behavior. Ratings were also elevated (95th percentile) on scales assessing social problems and rule-breaking behavior.

**Teacher Reports**. As noted above, S███ is a 9th grader at GDS, which he entered in 7th grade, having previously attended the Lowell School, a private elementary school (3rd through 6th grade), and Janney Elementary School, a public school in Washington, D.C. (Kindergarten through 2nd grade). A review of his report cards from Lowell indicates that teachers viewed him as a very intelligent and witty child but one who had difficulty with attention and persistence. He was also judged to be below expectations in terms of his ability to work cooperatively with others, to respect others, and to take responsibility for his behavior. These difficulties appeared to have largely resolved by 5th and 6th grades. On his 7th grade report from GDS, S███ generally earned "B's" in both academic and non-academic subjects, and teachers portrayed him as a capable and involved student overall. With the exception of a "C+" in science, he earned "A's" and "B's" for the first quarter of 8th grade. For the 2nd quarter of that year, he earned "B's" in algebra, science, and Spanish, and "C's" in history and English. At the end of the year, and following the suicide attempt and subsequent hospitalization, he posted second semester grades of "B" in both algebra and English, "C+" in history, "C" in Spanish, and "D-" in science. Although his first quarter grades for this year were in the "B" to "C" range, in a written communication at the end of January, teachers indicated that, with the exception of geometry, S█████ grades are in the "C" to "D" range. In their written comments, teachers described him as an imaginative student with an inquiring mind but reported that S███ frequently came to class unprepared, did not turn in homework, and had

RE: S██ A█████████
Page 3

trouble organizing written work. It was also noted that he sometimes disrupted class by playing the part of the class clown, and that he often put little effort into his work.

## PREVIOUS EVALUATIONS.

As discussed above, Dr. Blumenstein administered a neuropsychological evaluation to S██ in 1999. At that time, it was reported that S██ earned a Verbal IQ score of 148, a Performance or nonverbal IQ score of 142, and a Full Scale IQ score of 150 on the *Wechsler Intelligence Scale for Children - Third Edition (WISC-III)*. These scores are all above the 99th percentile and fall in the very superior range. S██ also did very well on supplementary testing, earning above average to superior scores on most measures. However, Dr. Blumenstein reported relative difficulty in the areas of attention and executive functioning, as well as some trouble with the organizational and production aspects of written language. He also indicated that there were concerns about S██ tendency to be easily frustrated and somewhat inflexible, and about problems related to social skills, including trouble getting along with other children and a lack of empathy.

In a summary of his treatment (dated 01-26-06), S██ psychiatrist, Dr. Clawson, reported a diagnosis of Aspergers Disorder, and noted that S██ has "very limited capacity for empathy or the ability to appreciate the perspective of others, being able to see personal and social problems only from his own egocentric point of view." Dr. Clawson further noted S██ increasing difficulty regulating his emotions and behavior, as evidenced by the violent outbursts and dangerous behavior, including the Tylenol overdose discussed above. Dr. Clawson recommended that S██ be placed in a structured school environment that would provide the opportunity to "help him appreciate the utility of working cooperatively with others, even in non preferred tasks, to improve social relational abilities, improve emotional self regulation and frustration tolerance, and improve his organizational abilities as they pertain to his academic work."

S██ therapist, Mr. Wilson, prepared a summary of S██ psychotherapeutic treatment (dated 01-16-06). Mr. Wilson detailed S██ difficulty with emotional, social, and behavioral regulation, the episodes of violence, and the suicidal behaviors and ideation. Mr. Wilson diagnosed Aspergers Disorder, and recommended a school placement that included "small class size, a high staff-student ratio, a therapeutic component (individual, family, and group therapies), as well as a structured behavioral program to address the development of adaptive interpersonal skills." Mr. Wilson additionally stated that S██ "continuing physical aggression towards his parents suggests that the most successful placement would be a residential program."

## TESTS ADMINISTERED

*Wechsler Intelligence Scale for Children - Fourth Edition (WISC-IV); Boston Naming Test; Automatic Verbal Sequencing; Selective Reminding Test; Klove Grooved Pegboard; Rey-Osterrieth Complex Figure; Wisconsin Card Sorting Test (WCST); Integrated Visual and Auditory Continuous Performance Test (IVA); Children's Depression Inventory (CDI); Revised Children's Manifest Anxiety Scale (RCMAS); Child Behavior Checklist; Clinical Interview.*

*Selected subtests* from the *Wechsler Individual Achievement Test - Second Edition (WIAT-II); Woodcock-Johnson Tests of Achievement- Third Edition (WJ-III); WJ-III Tests of Cognitive Ability; Nelson-Denny Reading Test; Test of Language Competence - Expanded Edition (TLC-E); Wide Range*

94

RE: S█████████
Page 4

*Assessment of Memory and Learning - Second Edition (WRAML2); Test of Everyday Attention in Children (TEA-Ch); Oral and Written Language Scales (OWLS).*

## BEHAVIORAL OBSERVATIONS

S███ was pleasant, polite, and cooperative during testing. He was, however, generally quiet and reserved during the initial evaluation session. His mood appeared flat and he was not highly engaged with the examiner. It was later reported that he had not been feeling well that day. While he was observed to be more forthcoming and energetic during his second day of testing, as he talked and joked with the examiners and smiled on occasion, his eye contact was intermittent. S███ put forth good effort during both evaluation sessions, and his attention to task was generally good. In view of his strong cooperation, these test results are presumed to be an accurate estimate of S████ current functioning.

## ASSESSMENT OF GENERAL INTELLECTUAL FUNCTIONING

\*    All scores from cognitive testing are included in the Appendix at the end of this report. The average range for any given score is from the 25th to the 75th percentile, which encompasses the middle half of the population.

On the *WISC-IV*, S███ earned the following composite scores:

| | |
|---|---|
| Verbal Comprehension Index | 144 (99.8th percentile) |
| Perceptual Reasoning Index | 133 (99th percentile) |
| Working Memory Index | 138 (99th percentile) |
| Processing Speed Index | 88 (21st percentile) |
| Full Scale IQ | 135 (99th percentile) |
| General Ability Index | 147 (99.9th percentile) |

The composite scores reflect the following: (a) very superior abstract and more practical reasoning abilities, and very superior ability to define words (VCI); (b) superior ability to identify conceptually-related pictured objects, very superior nonverbal abstract reasoning skills, and superior visual-spatial ability (PRI); (c) very superior ability to manipulate symbolic information held "online" in active working memory (WMI); (d) below average to average visual processing and graphomotor (pencil-and-paper) output speed (PSI). The differences between the PSI score and all other Index scores are highly significant. S████ Full Scale IQ score of 135 falls in the very superior range (99th percentile). His score of 147 on the General Ability Index, a composite measure that is less sensitive to the effects of working memory and processing speed, is at the 99.9th percentile. With the notable exception of the PSI score, S████ scores on the *WISC-IV* are comparable to those reported by Dr. Blumenstein on the earlier edition of this test in 1999. S████ performance on the individual *WISC-IV* subtests is discussed below, in conjunction with his performance on supplementary neuropsychological measures that tap similar cognitive functions.

## VERBAL STRENGTHS AND WEAKNESSES

Testing of **vocabulary** indicated that S████ ability to define increasingly challenging words is outstanding (*WISC-IV Vocabulary* - 99.9th percentile). He provided a number of very complete responses on this measure. His performance was comparable on a supplemental measure of **general**

RE: S████ A█████████
Page 5

**knowledge** (*WISC-IV Information* - 99.9th percentile). Taken together, these findings indicate that S███ is easily able to acquire, retain, and apply verbal knowledge.

Testing revealed strong skills on measures of ability to **understand and remember spoken language**. S█████ score was excellent on a test of listening comprehension that taps vocabulary, syntax or sentence structure, inferencing skill, and ability to interpret idioms (*OWLS Listening Comprehension* subtest - 97th percentile). He scored slightly above average on a test of ability to follow multiple-step directions (*WJ-III Understanding Directions* - 75th percentile). While his performance on this measure is quite strong relative to his age peers, it is below the level of his exceptional skills in a number of areas, and likely reflects at least relative difficulty with attention. S███ scored in the very superior range on a measure of ability to repeat sentences verbatim *(WRAML Sentence Memory* - 98th percentile). He also did quite well on a test that required him to retell orally presented stories, and he performed comparably when asked to repeat the stories after a delay (*WRAML2 Story Memory* and *Story Memory Recall* - both at the 91st percentile). He earned a very superior score for his ability to answer multiple-choice questions about the narratives (*Story Recognition* - 98th percentile).

S████ performance was uneven in the area of **verbal expression/production**. In terms of automatic verbal sequencing, he was easily able to recite the alphabet, the days of the week, and the months of the year. His performance was average for his age level, on the *Boston Naming Test*, a picture naming task that is sensitive to vocabulary and word retrieval, as he identified 56 of 60 items. S███ earned an entirely average score on a measure of oral sentence construction that required him to generate grammatically correct sentences that included three specific words and were appropriate for a given context (*TLC-E Oral Expression* - 50th percentile). While he provided some well-worded sentences (e.g., "Would you rather get popcorn before or after the movie?"), others were somewhat awkward (e.g., "The move will be difficult, but nonetheless we have to go through with it now."). His trouble with this task is suggestive of at least relative difficulty with organization, planning, and self-monitoring. S████ performance on measures of verbal fluency from the *D-KEFS* was somewhat variable. He earned an outstanding score for his ability to rapidly generate words beginning with a specific letter, and scored above average for his ability to quickly name members of categories (*Letter Fluency* - 99.6th percentile; *Category Fluency* - 84th percentile). In contrast, he scored in the average range when asked to alternately name members of two categories (*Category Switching* - 63rd percentile). His relative difficulty with this task is suggestive of executive functioning weaknesses (see discussion below).

S███ earned an outstanding score on a *WISC-IV* measure of short-term **auditory memory** that required him to repeat digit sequences both forward and in reverse order (*Digit Span* - 99th percentile), and performed comparably on a *WISC-IV* subtest that involves reorganizing a mixed series of letters and numbers (*Letter-Number Sequencing* - 98th percentile). He also did well on a test of **deliberate memorization** that involved memorizing a list of words over several trials, as he scored at the 82nd percentile for his ability to "store" the words initially, and at the 91st percentile for his ability to recall them consistently across trials.

S████ performance was exceptional on measures of **verbal concept formation and reasoning**. He earned a very superior score on a *WISC-IV* test of abstract reasoning that involves explaining the conceptual similarity between two things, e.g., *hammer* and *saw* (*WISC-IV Similarities* - 98th percentile), and on a measure of more practical reasoning that requires explaining the "logic of everyday life" (*WISC-IV Comprehension* - 99th percentile). His performance was truly impressive on the *Verbal Analogies* subtest from the *WJ-R*, which requires completing analogies (99.9th percentile).

RE: S███ ██ PA██ ██████
Page 6

Taken together, these findings indicate that S███ possesses outstanding logical and conceptual abilities.

## NONVERBAL STRENGTHS AND WEAKNESSES

Testing also produced very strong scores on measures of **nonverbal reasoning ability**. S███ scored in the superior range on a *WISC-IV* test that required him to identify conceptually-related pictured objects (*Picture Concepts* - 91st percentile). His performance was again outstanding on a measure of ability to solve figural puzzles through the use of pattern completion, analogy, and logic (*WISC-IV Matrix Reasoning* - 99th percentile). He also did exceptionally well on the *Wisconsin Card Sorting Test (WCST)*, a measure of problem-solving ability and flexible thinking that required him to discover the changing rules for classifying a set of cards on the basis of limited feedback from the examiner, as he scored at the 98th percentile for his total accuracy and above the 99th percentile for the flexibility of his responding. Taken in conjunction with his performance on the previously mentioned tests of verbal reasoning, S███ scores on these measures indicate that he is able to demonstrate impressive conceptual abilities in both the verbal and nonverbal domains.

S███ speed was average on the *Klove Grooved Pegboard*, a measure of **manual dexterity**, although it was noted that he dropped one of the pegs with each hand. He scored well below average on a *WISC-IV* test that is sensitive to **graphomotor speed** (*Coding* - 9th percentile). His low score reflects a slow work pace. His performance on this measure has implications for other tasks, such as taking notes or copying information from the board at school, and it is consistent with his history of problems related to written production. S███ earned an average score on a test of visual discrimination that required him to scan rows of designs for identical designs (*WISC-IV Symbol Search* - 50th percentile). His stronger performance on this measure relative to that on the *Coding* subtest likely reflects the fact that the *Symbol Search* subtest makes minimal demands on graphomotor skills.

Testing again revealed uneven skills in the areas of **visual-spatial organization and visual-motor integration**. S███ earned a superior score on a measure of ability to match abstract designs with colored blocks (*WISC-IV Block Design* - 95th percentile). While he was unable to earn credit for a design that was rotated ninety degrees, likely reflecting inattention, his approach to this task was systematic and logical overall. In contrast, Seth struggled to copy a highly complex geometric design (*Rey-Osterrieth Complex Figure [ROCF]*; z = -3.80). His approach to this task was somewhat disorganized and was indicative of poor planning. Problems with planning and organization were also noted when S███ was asked to draw the design from memory 30 minutes later (z = -1.49), as he omitted or distorted a number of design elements.

## ATTENTION AND EXECUTIVE FUNCTIONING

S███ scores on measures of **attention**, while uneven, were indicative of significant challenges in this area. As noted above, he earned an average score on a *WISC-IV* task that is sensitive to visual attention (*Symbol Search* - 50th percentile). He had more trouble, scoring at the low end of the average range, on a test that involved scanning rows of numbers for identical numbers (*WJ-III Visual Matching* - 26th percentile). His performance was highly variable on several measures from the *Test of Everyday Attention in Children*. On the *Sky Search* subtest, which required him to find identical pairs of spaceships, S███ scored above average for his accuracy (84th percentile), but earned a modestly average score for the amount of time it took to find the target items (37th percentile). He had marked difficulty with a test that required him to count sounds on a tape (*Score!*

RE: Seth A████████
Page 7

- 2nd percentile), and scored at the low limit of the average range for his ability to count the sounds while searching for the identical spaceship pairs (*Sky Search DT* - 25th percentile). On the *IVA*, a long and boring computer test, S███ earned an average score for his ability to sustain attention over the course of the test (61st percentile), but scored below average for his overall ability to inhibit impulsive responding (13th percentile). He also earned low scores on measures of the consistency of his responding (Visual and Auditory Consistency - 16th and 17th percentiles, respectively; Visual and Auditory Focus - 14th and 3rd percentiles, respectively). S███ performance on these measures is consistent with the previously diagnosed Attention Deficit Hyperactivity Disorder (ADHD), and with reports from home and school that he is impulsive and demonstrates limited stamina for things that do not hold high interest for him.

S███ performance was also variable on tasks that are sensitive to **executive functioning**, which refers to the mental control processes involved in carrying out goal-directed behavior, including planning, organizing, strategizing, sequencing, holding information in working memory, and flexibly utilizing feedback to guide problem solving and decision-making. As noted above, he earned excellent scores on measures of reasoning and problem-solving, and he additionally demonstrated strong memory skills. At the same time, S███ performance on an oral sentence formulation measure, while average, was quite modest for such a bright young man, and implied trouble with organization and planning. His relative difficulty switching between categories on a verbal fluency measure, and his very weak performance on the *ROCF* were also indicative of organizational weaknesses. However, it is the reports from school and home that provide the strongest indication of very significant weaknesses in the executive domain, as it is clear that S███ is experiencing major difficulty planning, organizing, initiating, and following through on his work and his responsibilities, and that his trouble in this regard is having a truly major impact on his ability to function in school and in the larger world.

## ACHIEVEMENT TEST RESULTS

* Scores from the *WJ-III* and the *Nelson-Denny* are included in the Appendix.

In terms of **reading**, S███ earned excellent scores across the board. He did very well on *WIAT-II* tests of sight word reading and phonetic decoding (*Word Reading* - 91st percentile; *Pseudoword Decoding* - 90th percentile). He performed comparably on a *WJ-III* measure that involves reading short, simple sentences as rapidly as possible (*Reading Fluency* - 94th percentile). In addition, Seth earned outstanding scores on the *WIAT-II Reading Comprehension* subtest, which required him to read short passages and answer open-ended questions, and on the reading comprehension subtest from the *Nelson-Denny*, which involves reading longer passages and answering multiple choice questions (both at the 99th percentile). He finished the latter measure in just under 17 minutes, well within the standard time allotment of 20 minutes.

In the **mathematics domain**, S███ score was excellent on a pencil-and-paper test of computational skill (*WIAT-II Numerical Operations* - 95th percentile), and he also did well on a measure that involved solving applied word problems (*WIAT-II Math Reasoning* - 90th percentile). In contrast, his score was entirely average on a test that involves completing simple problems as rapidly as possible (*WJ-III Math Fluency* - 48th percentile). His modest performance on this measure likely reflects both attentional weaknesses (as this task is inherently less challenging, and thus less engaging) and the slow graphomotor speed discussed above.

RE: S████ A█████████
Page 8

In the **area of written language**, S███ earned an above average score on a test of spelling ability (*WIAT-II Spelling* - 88th percentile). His score was slightly above average on a measure of written expression that involves rapidly writing words that are members of a category, combining two or three short sentences to make one longer and more complex sentence, and writing a persuasive letter (*WIAT-II Written Expression* - 77th percentile). While he lost some credit because his essay was not in the form of a letter, and because he changed the topic, his writing showed a great deal of creativity. His somewhat stronger performance on this measure relative to that on the oral sentence formulation task discussed above likely reflects the fact that the stimulus words on the latter measure impose significant grammatical constraints, and the test items thus require more in the way of planning and organization. S███ also earned a slightly above average score on a structured test that required him to write short, simple sentences incorporating three specified words as rapidly as possible (*WJ-III Writing Fluency* - 77th percentile). S███ printed his responses to all of these measures, and his handwriting, though legible, was somewhat messy.

## PERSONALITY SCREENING

S█████ responses produced average level scores on the *Children's Depression Inventory* and the *Revised Children's Manifest Anxiety Scale* (48th and 56th percentiles, respectively), indicating that he is reporting about the same number of feelings of worry and unhappiness as most of his age-peers. These scores are surprising in view of the difficulties he is currently experiencing, and they are very much at odds with his parents' ratings on the *CBCL*. While these differences almost certainly reflect S█████ limited appreciation of the extent of his current problems, he did report that others are happier than he is and do things more easily than he does. He also reported that "many bad things are (his) fault," and that he "never" does what he is told to. He further indicated that it is hard for him to keep his mind on his schoolwork, and that he has to push himself to do his work. He also indicated that he thinks about killing himself, but would not do it. When asked about this answer, S███ said, "I do not think about killing myself," but added that it was possible he had thought about it in the preceding two weeks. He characterized school as boring, and, while he said that he would like to stay at Georgetown Day School, he indicated that he was not doing well, and further stated that he did not feel compelled to do his homework. He reported that he feels pressured to get better grades and said that he could probably never do well enough to meet the expectations of others. S███ acknowledged conflict with his parents and gave the impression that most of this conflict centered around his school performance. He seemed distressed and uncomfortable when discussing these issues, and his eye contact was intermittent.

Our impression is that S███ is a young man who, despite his very considerable intellectual gifts, views the events in his world in a fairly rigid and circumscribed manner. Moreover, he is uncomfortable in the face of strong emotions, demonstrates very limited insight into his problems, shows limited understanding of the consequences of his behavior for himself and its effect on others, and has not developed coping skills for dealing with frustration or disappointment. While his problems in these areas are clearly related to the previously diagnosed Asperger's Disorder, they also reflect depression, as manifested by the suicidal behavior and ideation, and anxiety, as seen in his tendency to panic and overreact when things do not go as expected. S█████ difficulties have unfortunately reached a crisis point, as evidenced by his impulsive and explosive behavior, which places him at risk for doing serious harm to himself or to others, and which has resulted in two inpatient hospitalizations within the past year. That S███ problems have escalated despite intensive therapeutic intervention and psychiatric treatment indicates that he needs more help and support than can be provided in an outpatient treatment setting. We are thus recommending that S███ be



placed in a residential treatment program for emotionally disturbed adolescents to give him the opportunity to address problem areas in an environment that provides safety and security.

## TEST SUMMARY AND DISCUSSION

S___ performance on the current evaluation demonstrates that he is an extremely gifted young man who possesses exceptional verbal and nonverbal conceptual abilities, and one who is effortlessly able to see patterns and make logical connections. He is also able to absorb information from his environment with remarkable ease, as evidenced by his outstanding funds of vocabulary and factual knowledge and his excellent performance on memory tasks. There is no doubt that S___ is a brilliant young man with a vivid imagination, and the capacity to be creative and to produce exceptional work when he is fully engaged.

At the same time, S___ is an extremely vulnerable youngster who is struggling to keep his head above water both in the school environment and in all other aspects of his life. While he has managed up until recently to navigate the academic milieu and to a lesser extent the social arena, he has become more and more disorganized, unproductive, inflexible, and overwhelmed in the face of increasing demands in all areas --- to the point that he has attempted suicide and engaged in other actions that jeopardized his physical safety and that of those who are close to him. S___ is clearly in a crisis situation, and the stakes are very high. Specific areas of concern are as follows:

### Emotional and Behavioral Issues

While S___ has been given various diagnoses over the past several years, both his current therapist, Joseph P. Wilson, L.C.S.W. - C., and his psychiatrist, Lance D. Clawson, M.D., support a diagnosis of an autism spectrum disorder, specifically Aspergers Disorder. While it is sometimes difficult to separate Aspergers Disorder from the intense interests and self-direction seen in highly gifted individuals, in our judgment, S___ clearly manifests the social deficits and restricted interests that characterize that syndrome, as he demonstrates very limited ability to understand events from any perspective other than his own, is overly focused on the computer activities and video games that seem to provide his only sense of satisfaction, and shows a stunning lack of insight into his own situation. He is also demonstrating signs of anxiety and depression. As discussed above, he is inflexible and emotionally overwhelmed in the face of change, and he has only limited coping skills for dealing with frustration. His behavior, when he feels pressured and pushed to the limit, is impulsive, explosive, and dangerous.

### Attention and Executive Functioning

While much of S___ inflexibility is related to the Aspergers Disorder, his very limited stamina for things that do not hold high interest for him, his disorganization, and his longstanding problems planning, initiating, and producing work are also hallmarks of Attention Deficit Hyperactivity Disorder (ADHD) and an executive functioning disorder. His slow visual processing and his low output speed are also relevant in this regard.

### Academic Functioning

S___ has historically not had any problems with the acquisition of specific academic skills due, in large measure, to his extraordinary intellectual prowess. He has, however, had trouble with the production demands of school for many years. His difficulties in this regard are related to the emotional and behavioral inflexibility, the ADHD, and the executive dysfunction, and are further exacerbated by problems with the mechanical aspects of writing (as evidenced by his slow

RE: S█████ A█████████
Page 10

graphomotor speed). We would also agree with his parents' assessment that S█████ ideas about what constitutes work are extremely immature and underdeveloped, probably because so much has come to him so easily. It is clear that his difficulty with the production aspects of academic learning should be the focus of interventions to help him in this arena.

In conclusion, S███ is an intellectually gifted and creative individual whose ability to cope with the demands of school and everyday living has steadily deteriorated over the course of the past few years. Despite intensive efforts by his parents, his teachers, his therapist, and his psychiatrist, as well as two inpatient psychiatric hospital stays, he continues to struggle and is in a very vulnerable and potentially dangerous situation. As noted above, we believe this to be a crisis situation, and one that requires the therapeutic support and the comprehensive services that can only be found in a residential placement. Specific recommendations are detailed below.

## DIAGNOSES

Attention Deficit Hyperactivity Disorder (ADHD)
Executive Dysfunction
Learning Disability, Not Otherwise Specified (production)
Aspergers Disorder
Dysthymic Disorder
Anxiety Disorder, Not Otherwise Specified

## RECOMMENDATIONS

### Educational placement and supports:

As discussed above, we believe that in order to address his safety and security needs and to teach him the skills that he needs to succeed in school and in life, S████ should be placed in a residential school that offers comprehensive therapeutic services. We feel very strongly that he will be unable to achieve academic success unless the emotional and behavioral issues are addressed concurrently and intensively. S█████ parents should schedule a meeting with representatives of the District of Columbia Public Schools to determine his eligibility for special education services, and to develop an Individualized Education Plan (IEP) that addresses his needs in multiple areas. We are recommending a disability code of Autism (15) to reflect the Aspergers Disorder. We are also recommending an additional code of Serious Emotional Disturbance (06) to reflect the suicidal behavior and S█████ explosive outbursts, as well as a code of Other Health Impairment (08) to reflect the ADHD and the executive dysfunction. S█████ placement should include the following components:

1. **Individual therapy**: We strongly recommend continued individual therapy to help S████ develop effective coping skills and to increase his emotional and cognitive flexibility.

2. **Social skills training**: S█████ program should include therapy to help with the development of social skills. This therapy should focus on building empathy, enhancing relationship skills, and increasing his ability to understand the perspectives of others.

3. **Behavior management**: S█████ program should also include a strong behavior management component, and one that provides clear expectations and guidelines for behavior, with predictable consequences for failure to meet those expectations. The behavior management

RE: S████ A█████████
Page 11

program should also include provisions for supporting and recognizing efforts to behave in a constructive manner.

4.     **Twenty-four hour support/supervision**: S█████ program should provide 24-hour staffing.

5.     **Medication management**: It is essential that S█████ program include ongoing management of his current medication regime, with adjustments as needed.

6.     **Strong academic program**: S█████ will require a strong academic program. He will need a program that is stimulating, and that takes his intellectual brilliance into account. At the same time, it is crucial that his academic program address the organizational and production weaknesses discussed above by teaching him specific organizational strategies and by helping him to develop the work habits he will need to get through school and through life.

7.     **Twelve-month programming**: In view of the severity of S█████ problems in multiple domains, he will require year round programming to address issues related to emotional and behavioral instability and poor academic performance, and to provide him with the continuity and the consistency that he needs.

8.     **Family support and liaison**: S█████ program should provide supportive and therapeutic services to his family, as doing so will enhance his chances for success while in residential treatment, and will help to prepare for his return home.

9.     **Transition services**: Similarly, it will be important for S█████ program to include planning services to support his transition to the home environment at the end of his residential placement. These services may include contact with his current therapist and his psychiatrist, ongoing assessment of his emotional and educational needs, etc.

10.    **Emphasis on promoting success**: While it is clear that S█████ needs a structured environment and significant therapeutic support to help him develop the skills he needs to negotiate life's demands, from our perspective, it is important that his program be designed in such a way as to recognize and nurture his strengths, and to allow him to build on his successes, as doing so will increase his ability to meet other difficult challenges in the future.

If there are any questions about this evaluation or if we can be of help in any way, please feel free to contact us.

*Ellen K. Goldman, Ph.D.*

*William R. Stixrud*

Ellen K. Goldman, Ph.D.
Licensed Psychologist (MD # 1508)

William R. Stixrud, Ph.D.
Licensed Psychologist (MD # 1963)

## APPENDIX

| | |
|---|---|
| **NAME:** | S███ A██████ |
| **DOB:** | ████████, 1991 |
| **DATE(S) TESTED:** | JANUARY 26 and 31, 2006 |
| **AGE:** | 15 YEARS, 0 MONTHS |
| **INTERPRETIVE CONFERENCE:** | FEBRUARY 3, 2006 |

## INTELLIGENCE TEST RESULTS

### *WISC-IV*

| | |
|---|---|
| Verbal Comprehension Index | 144 (99.8th percentile) |
| Perceptual Reasoning Index | 133 (99th percentile) |
| Working Memory Index | 138 (99th percentile) |
| Processing Speed Index | 88 (21st percentile) |
| Full Scale IQ | 135 (99th percentile) |
| General Ability Index | 147 (99.9th percentile) |

The *WISC-IV* subtest scores are reported below (the mean score is 10; the average range extends from 8-12). Scores in parentheses are not included in computation of the Index scores.

| VERBAL COMPREHENSION | Scaled Score | Percentile Rank | PERCEPTUAL REASONING | Scaled Score | Percentile Rank |
|---|---|---|---|---|---|
| Similarities | 16 | 98 | Block Design | 15 | 95 |
| Vocabulary | 19 | 99.9 | Picture Concepts | 14 | 91 |
| Comprehension | 17 | 99 | Matrix Reasoning | 17 | 99 |
| (Information) | (19) | (99.9) | | | |

| WORKING MEMORY INDEX | | | PROCESSING SPEED INDEX | | |
|---|---|---|---|---|---|
| Digit Span | 17 | 99 | Coding | 6 | 9 |
| Letter-Number Sequencing | 16 | 98 | Symbol Search | 10 | 50 |

## SUPPLEMENTARY NEUROPSYCHOLOGICAL TEST RESULTS

| **VERBAL ABILITIES** | Percentile Score or Level of Performance |
|---|---|
| **Understanding and Remembering Spoken Language** | |
| *WJ-III Understanding Directions* | 75th percentile |
| *OWLS Listening Comprehension* | 97th percentile |
| *WRAML Sentence Memory* | 98th percentile |
| *WRAML Story Memory* | 91st percentile |
|     Delay | 91st percentile |
|     Recognition | 98th percentile |
| | |
| **Verbal Production/Expression** | |
| *Boston Naming Test* | average |
| *TLC-E Oral Expression* | 50th percentile |

103

Appendix
Page 2

## Deliberate Memorization
*Selective Reminding Test*
  Long-term storage                    82nd percentile
  Consistent retrieval                 91st percentile

## Concept Formation
*WJ-R Verbal Analogies*

                                       99.9th percentile

## NONVERBAL ABILITIES

### Visual-Motor
*Rey-Osterrieth Complex Figure*
  Copy
  Recall                               z = -3.80
                                       z = -1.49

## ATTENTION/EXECUTIVE FUNCTIONING
*WJ-III Visual Matching*               26th percentile
*Integrated Visual Auditory Continuous Performance Test (IVA)*
  Response Control Quotient            13th percentile
  Attention Quotient                   61st percentile
*D-KEFS*
  Letter Fluency                       99.6th percentile
  Category Fluency                     84th percentile
  Category Switching                   63rd percentile

*WCST*
  Total Accuracy                       98th percentile
  Flexibility of Responding            >99th percentile

## ACHIEVEMENT TEST RESULTS

The results from the *WJ-III* are presented below:

| Achievement Cluster | Standard Score | Percentile Rank for Age | Grade Equivalent |
|---|---|---|---|
| **WIAT-II Reading** | | | |
| *Word Reading* | 134 | 99 | |
| *Reading Comprehension* | 120 | 91 | >12.9 |
| *Pseudoword Reading* | 133 | 99 | >12.9 |
| | 119 | 90 | >12.9 |
| *WJ-III Reading Fluency* | 124 | 94 | >18.0 |
| ***Nelson-Denny Reading Comprehension*** | | | |
| Standard time | — | 99 | — |
| Reading rate | — | 84 | --- |

Appendix
Page 3

| | | | |
|---|---|---|---|
| **WIAT-II Mathematics** | 125 | 95 | |
| *Numerical Operations* | 124 | 95 | >12.9 |
| *Math Reasoning* | 119 | 90 | >12.9 |
| *WJ-III Math Fluency* | 99 | 48 | 9.4 |
| **WIAT-II Written Language** | 117 | 87 | |
| *Spelling* | 118 | 88 | >12.9 |
| *Written Expression* | 111 | 77 | >12.9 |
| *WJ-III Writing Fluency* | 111 | 77 | 13.0 |

## Joseph P. Wilson, L.C.S.W. – C.

### Treatment Summary and Progress Report
### CONFIDENTIAL

PATIENT: S███ A█████████,          DOB:              ██████1991
ADDRESS: ███████████████████          IN TREATMENT:  03/21/2005 - Present
Washington, DC 20015                    AGE:              15.0
PARENT(S): Larry Abramson
Caroline Newman

REASON FOR REFERRAL/EVALUATION:
The patient was referred for treatment following a visit to the emergency room at Suburban
Hospital in Bethesda. At that time, parents reported increasing concerns regarding the return of
suicidal ideation and gestures as well as "out of control" behaviors.

BACKGROUND:
S██ is a fifteen year old, Caucasian male; the only child of an intact union. Both parents
presented at the initial evaluation session and are considered reliable reporters of history. The
immediate background concerning the referral for treatment began in February, 2005. The
parents reported that at that time, S██ had become increasingly overwhelmed with school and
refused to attend. His increasing resistance, out of control behaviors (violence in the home
towards father, property destruction, and irrational statements) culminated with a suicide attempt
and subsequent hospitalization at Children's Hospital. Following treatment at Children's
Hospital, S██ returned home and the parents worked with the school to re-integrate S██ back
into a regular routine of school attendance and compliance with behavioral expectations in the
home. Following continued difficult episodes, the parents had S██ taken to the emergency
room at Suburban Hospital for a psychiatric evaluation due to increasing out of control behaviors
and the suspected return of suicidal ideation and gestures (i.e. lying down in the middle of the
street).

Upon further review of the patient's history, the parents reported that while there had always
been challenges related to school and behavioral expectations and performance, there seemed to
be a fairly long period (fifth grade through mid-eighth grade) of somewhat stable functioning.
They noted that there had "always been concern" regarding S██ working "to his potential".
Additionally, both parents reported S████ difficulty with respect to consistently meeting
behavioral expectations had remained over the years. With the application of different
medications and behavioral therapies/programs used in the home, there were varying degrees of
success in mitigating the symptoms – but never for very long periods of time.

Symptoms described by the parents included irrational thinking (associated with statements S██
made when upset); perseverative or obsessive thinking on a particular topic (usually in response
to parents setting a limit); inability to appropriately express his thoughts/feelings (especially
anger); frequent episodes of withdrawn behaviors/responses to parents; poor to non-existent peer

23316 Bent Arrow Drive  •  Clarksburg  •  Maryland  •  20871
(301) 540-5478

EXHIBIT
SA-9

106

Abramson Report
January 27, 2006

relationships; and an overall difficulty with engaging in interactions without verbal or physical aggression. Additionally, parents reported that S⬛ would frequently act out his anger in a number of ways including threatening to harm himself; running away from the house; or locking his parents out of the house. Overall, the parents reported that S⬛ would frequently get angry if "something didn't go his way." Further, S⬛ would often perceive his parents' attempts to help him work through the situation as evidence they were just trying to "get their way" and would continue to interact with his parents in an adversarial or aggressive manner.

TREATMENT HISTORY:

Mr. and Mrs. Abramson reported that S⬛ had been to several therapists and psychiatrists over the years, with only limited success in meeting treatment goals. Both parents reported some mitigation in symptoms, but noted that it was never for a sustained period of time. Presently, S⬛ sees his psychiatrist, Dr. Lance Clawson, for his psychopharmacological interventions. Presently he is taking Conserta (36 mg); Wellbutrin (400 mg); and Seroquel (100 mg).

COURSE OF CURRENT TREATMENT:

The initial treatment plan focused on three primary goals: 1. Developing appropriate affective-expressive skills; 2. Increasing S⬛ ability to identify and meet stated expectations (at home and at school); and 3. Decreasing instances of angry/violent outbursts at home. Treatment modalities included individual therapy (once weekly) and family therapy sessions as indicated.

After three months of treatment, there had been some progress noted in terms of S⬛ using therapy to effectively address his problems. Establishing a therapeutic rapport with S⬛ was challenging, as S⬛ frequently presented as mistrustful of adults. He stated that his experience at Children's Hospital was extremely uncomfortable and unpleasant, and that to date, he is convinced that no one was "listening to him." Although there were several appointments that S⬛ refused to attend (either because he was angry with me or his parents), ultimately he seemed to respond to the boundaries and limits set in therapy – as well as the "rules" regarding how to interact with the therapist. S⬛ was better able to express his thoughts and feelings and even acknowledge that his functioning was not "his best" at school.

Following the initial three months, S⬛ progress in therapy has been slow and sporadic. There were times when S⬛ presented as willing to talk about himself, his choices, and his actions in terms of taking responsibility; however he was more often apt to describe consequences he had experienced as the result of others' actions, statements, and misperceptions. During treatment, both parents reported only brief periods when symptoms seemed to lessen. These periods were never of any significant length and often ended when the parents would appropriately confront S⬛ about his behaviors. While they worked hard to establish boundaries within the home, S⬛ has consistently resisted, at times engaging in violent outbursts towards his father and property destruction.

Presently, S⬛ has continued to present with the same complaint: that his parents are "the problem" and he continues to suffer because of their choices and actions. He feels powerless to do anything about it, except to make their lives "miserable," without any regard for what is in his own best interest. His inability to make sense of relationships and their associated concepts (i.e. emotional reciprocity; respect for another's point of view; and being able to communicate his thoughts and ideas effectively to others) is an indication that S⬛ suffers from a Pervasive

107    Page 2 of 3

Abramson Report
January 27, 2006

Developmental Disorder; specifically Asperger's Syndrome. He is easily overwhelmed with external expectations in both home and school environments and frequently externalizes and rationalizes his responses to those expectations in an attempt to make sense of the world around him. When his defense mechanisms fail to address the problem, he often acts out his anger and frustration in harmful, sometimes dangerous ways.

## SUMMARY AND RECOMMENDATIONS:

Seth Abramson is a fifteen year old, Caucasian male adolescent with a documented history of behavioral and academic problems since the 2nd grade. Although there have been periods of success since that time (both at school and at home), he has recently experienced extreme difficulty in his ability to function at school (as measured by his academic achievement) and at home (as indicated by his persistent inability to meet expectations as set forth by his parents).

The current state of his symptoms require that a school placement should include accommodations such as small class size, a high staff-student ratio, a therapeutic component (individual, family and group therapies), as well as a structured behavioral program to address the development of adaptive interpersonal skills. Further, his continuing physical aggression towards his parents suggests the most successful placement would be a residential program.

_____

Joseph P. Wilson, MSW
Licensed Certified Social Worker – Clinical
State of Maryland
License Number: 09724

**Lance D. Clawson, M.D.**
**7945 MacArthur Blvd., Suite 221**
**Post Office Box 9**
**Cabin John, Maryland 20818**
Email: lance.clawson@gmail.com

Diplomat: Child & Adolescent Psychiatry
General Psychiatry

Phone:   301-320-3700
Fax:       301-320-3742

January 26, 2006

To Whom It May Concern:

RE: S██ A█████████

  I have been treating S██ A████████ psychiatrically on and off for the past seven years. S██ originally was referred to me for management of Attention Deficit-Hyperactivity Disorder (ICD9: 314.01) and Bipolar Disorder.  It became clear early on that S██ did not suffer from Bipolar Disorder, but does fit the criteria for a Pervasive Developmental Disorder, specifically, Aspergers Disorder (ICD9: 299.80).

  S██ has been in traditional psychotherapy over the years on and off with limited results.  He is an extremely bright young man, so in spite of his social-emotional deficits, he has managed to maintain himself at a prestigious private school.  Of course, as he has progressed into high school, his difficulty in organizing himself and his work, and his difficulties with engaging in homework have led to significant academic difficulties more recently.

  Although he has not had any close friendships, as he has matured, he does consider himself to have friends and seems to enjoy socializing at school. His primary leisure activity is playing computer and video games. S██ has limited appreciation of the impact of his behavior on others.  For instance he has trouble seeing why he should engage in any request or task unless it is something that he would like to do himself.  This is most problematic at home, but has also caused friction at school as well. S██ has little insight into what authority means or how he fits into a social milieu. Commensurate with his Asperger's diagnosis, he has very limited capacity for empathy or the ability to appreciate the perspective of others, being able to see personal and social problems only from his own egocentric point of view.

  When frustrated or feeling overwhelmed with environmental demands, S██ becomes quickly emotionally overwrought, and at home has become very violent when his video games have been taken away on account of his refusal to do school work.  Last year, in the midst of his most difficult period, S██ took a lethal overdose of Tylenol, but was treated in time without medical after effects.  On another occasion he laid in the middle of the road when angered/frustrated. These behaviors are a reflection of his inability to emotionally regulate when frustrated, and his impaired capacity to grasp interpersonal consequences related to his behavior.  In spite of these difficulties, S██ has wanted to remain at his current school, and with great effort, his parents have tried to create limits and structure over the past year that has certainly calmed his outbursts

EXHIBIT

SA-10

overall. Unfortunately, I do not feel that S███ capacity to regulate himself emotionally and socially is sufficient to maintain himself at his very competitive private school. His weak executive skills only make his efforts at managing his workload more stressful for him in his present academic environment.

Medically, S██ has been treated with a number of different medications in an attempt to help him focus on work and self regulate. Trials of risperidone have been marginally helpful, but he is very side effect prone with most medications and so this has not been a good fit. Depakote was not effective, and Trilpetal was too sedating and had limited efficacy as well. Abilify was overly sedating, and his current antipsychotic Seroquel has been helpful in controlling his explosiveness at home, but can only be used in very low doses since he is very sensitive to the sedative properties of that medication as well. S██ has become agitated and hypo manic on both Prozac and Lexapro. The Lexapro was given in an on-off-on-off trial, and it clearly caused him to deteriorate. The foundation of his medication regimen has therefore been Wellbutrin SR (200 mg twice a day) and Concerta (36 mg daily), and with the low dose Seroquel, has improved his overall work output and emotional regulation, but is not enough to keep him fully functional in his current home and school environment.

The challenge for working with S██ will be to help him appreciate the utility of working cooperatively with others, even in non preferred tasks, to improve social relational abilities, improve emotional self regulation and frustration tolerance, and improve his organizational abilities as they pertain to his academic work. This will require a structured, academically challenging, and socially sensitive environment when considering school placements.

Please feel free to contact me if you have any further questions.

Sincerely,

Lance D. Clawson, M.D., F.A.A.C.A.P.

110



**District of Columbia Public Schools**
**Office of Special Education**
The C.A.R.E Center @ Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, DC 20001
(202) 671-8882

**CLASSROOM OBSERVATION**

This observation should focus on problems identified in the referral.

**Part 1:  General Information**

Student's Name: S___ A_____

Student's Date of Birth: _____ / 91    Subject/Area/Class Observed: Graphic Design     Student ID# _____

Teacher: Helen Steinberg                          Teacher/Pupil Ratio: 1:8

**Part 2:  Setting**

Describe Observation Setting: Art Room and Computer Lab

Students were standing around a large table where the teacher was demonstrating what made a good graphic design. Students moved to computer lab to work on individual projects.

**Part 3:  Observation**

Describe the task:

The students were asked to critique graphic designs done by other students. In the computer lab the students had to follow specific instructions and sequences in completing their graphic design project.

Describe the student's performance:

For the critical part of the lesson. S___ was outside the circle, but paying attention not participating in this whole group activity. He appeared unengaged and disinterested. S___ and most interestingly, unaware of what the rest of the students were doing. He was distracting others - talking, joking around and walking around. When the teacher asked S___ to join the others, he still stayed on the periphery of the circle. As other students were responding with appropriate critiques, S___ did not seem to have the form and understand what he was supposed to do or say.

When the class moved to the computer lab the students worked on individual projects at their own computers. From the beginning to the end of class, S___ was not able to follow the task. He chose a design not appropriate for the assignment. He spent a good portion of his time, being stuck. He needed 1:1 help with each step, and in the

EXHIBIT
SA-11

Student's Name: S████ A█████████          Student ID# _____

**Part 4: Rate the Student's Performance**

| | Behavior Not Observed | Significant Problem | Some Problem | No Problem | Strength |
|---|---|---|---|---|---|
| Listening Comprehension | ☐ | ☒ | ☐ | ☐ | ☐ |
| Oral Expression | ☐ | ☐ | ☐ | ☒ | ☐ |
| Basic Reading Skills | ☐ | ☐ | ☐ | ☒ | ☐ |
| Reading Comprehension | ☐ | ☐ | ☐ | ☒ | ☐ |
| Written Expression | ☐ | ☒ | ☐ | ☐ | ☐ |
| Math Calculation (_____ Operation) | ☐ | ☐ | ☐ | ☐ | ☒ |
| Math Reasoning | ☐ | ☐ | ☐ | ☐ | ☒ |
| Discrimination (visual/auditory) | ☐ | ☒ | ☐ | ☐ | ☐ |
| Memory (visual/auditory) | ☐ | ☐ | ☒ | ☐ | ☐ |
| Visual Motor Coordination | ☐ | ☒ | ☐ | ☐ | ☐ |
| Attention | ☐ | ☒ | ☐ | ☐ | ☐ |
| Organization | ☐ | ☒ | ☐ | ☐ | ☐ |
| Activity level | ☐ | ☒ | ☐ | ☐ | ☐ |
| Social Interaction | ☐ | ☒ | ☐ | ☐ | ☐ |
| Work habits | ☐ | ☒ | ☐ | ☐ | ☐ |
| Task completion | ☐ | ☒ | ☐ | ☐ | ☐ |
| Motivation | ☐ | ☒ | ☐ | ☐ | ☐ |
| Speech | ☐ | ☐ | ☐ | ☒ | ☐ |

**Comments:** S████ demonstrated oppositional behavior in this class. He was refusing to follow the teacher's directions. Although he was attempting to do something, he wasn't being productive. S████ distracted the student sitting next to him. However, that student was still able to follow through and complete the task. S████, on the other hand, kept coming up with excuses for why he had to do it his way. At one point he showed complete frustration with the task at hand. When the bell rang, everyone else had either completed the project or was close to it, but S████ had not made any progress at all.

es the classroom teacher feel that the behavior observed is representative of the usual behavior for this student in this class? ✓ Yes ____ No

e of Observation: 1, 23, 06   Start Time: 9:25   End Time: 10:30   Total Observation Time: 65 min.

ervation conducted by: Helen Steinberg

S 2003  112

# Grove School
### A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program



## Admissions

- General Admissions Information
- Tuition Costs
- Directions

## Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Residential Program

**Our *Supervision* Method**

**Our Visitation Schedule**

**Fostering Independence**

**The Daily Routine**

Every effort is expended to make our students independent of our direct supervision by a carefully modulated increase in self-management and through selectively graded responsibilities. The tone of the entire facility is intended to duplicate, as far as possible, a wholesome family situation in the larger context of community.

We also recognize, however, the need to deal with each child where they are, on the basis of his/her individual problems. Therefore, our students are assigned a "check-in status", which designates how often they need to "check in" with staff while they are on campus.

As the student demonstrates more responsibility and accountability the amount of direct supervision is decreased. Eventually students may be given the privilege of going down town by themselves or participate in off-campus employment, etc.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

113


EXHIBIT
SA-12

# Grove School

**A Therapeutic School For Emotionally Fragile Teenagers**

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

## Admissions

- General Admissions Information
- Tuition Costs
- Directions

## Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Residential Program

**Our Supervision Method**

**Our Visitation Schedule**

**Fostering Independence**

**The Daily Routine**

The Grove program is year round, with an average stay of about 2 years. Each year there are four academic vacations, each of about two weeks duration. Students may also visit as often as every other weekend if schoolwork, behavior and family issues are being addressed.

We continue our intensive individualized work during the summer months. We maintain our therapeutic and academic work in the summer session, which is part of one of the four marking periods. The summer session also includes an extensive activities program.

Parents are also welcome to visit their children at Grove. The timing and logistics of the visit are coordinated with the child's "advsior" who is a member of the administrative team and functions much like a guidance councelor in that role.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School
### A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

## Admissions

- General Admissions Information
- Tuition Costs
- Directions

## Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Residential Program

**Our Supervision Method**

**Our Visitation Schedule**

**Fostering Independence**

**The Daily Routine**

At Grove School, fostering student independence is done both formally and informally by staff. Grove School recognizes the importance of helping students become individuals; we also continue to encourage students to be a positive contributor toward the community. Advisors, therapists, dorm staff and other care workers help students gain the skills necessary to be independent and self-reliant.

Steps towards self-reliance are achieved by supporting students in their need for making healthy choices in nutrition and exercise, independent hygiene care, being responsible for their personal space and community areas, as well as establish patterns of healthy choice making.

As students are assisted in being more accountable and responsible their awareness of what independence means increases. Helping students find the balance between self-advocacy and community mindedness becomes the next step in the student's growth. Learning to appropriately utilize resources and developing a strong work ethic are among the many lessons worked.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

http://www.groveschool.org/                                                                    7/20/2006

# Grove School

**A Therapeutic School For Emotionally Fragile Teenagers**

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

## Admissions

- General Admissions Information
- Tuition Costs
- Directions



## Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Residential Program

**Our Supervision Method**

**Our Visitation Schedule**

**Fostering Independence**

**The Daily Routine**

We provide our students with a balanced and structured day that is designed to promote intellectual, social, and emotional growth. The following is a description of our schedule for the average week day. The weekend schedule varies slightly and places more emphasis on activity and social development.

**7:00-8:00: Wake up**
**8:00-8:30: Breakfast/ Community Meeting**
**8:36-11:52 - School**
**11:55-12:25 - Lunch**
**12:30-3:00 - School Continued**
**3:00- 5:00 - First Activities Block:**
**5:00- 5:45 - Dinner/ Community Metting**
**5:45-7:30 - Second Activities Block**
**7:30- 9:00 - Study Hall (Sunday thru Thursday)**
**9:00-10:00 - Causal Time in Dorm**

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School

### A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

## Admissions

- General Admissions Information
- Tuition Costs
- Directions

## Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Academic Program

**Academic Program Overview**

**College Preparatory Curriculum**

**Teacher Team Planning Approach**

**Class Offerings**

We conduct a vigorous, but non-threatening academic program from the upper elementary grades through high school graduation (7-12). We also have a Post Grad Program (PG) for students to start college, hold a job in town, and continue to work on their social and emotional developement. We evaluate each child and design a program appropriate to their individual needs altering their program as changes take place in his/her personality, social development, and academic responsiveness.

Our classes are small, many of them conducted on a tutorial basis. We provide students with an opportunity to utilize the facilities of our reading, mathematics, and computer programs for remedial and developmental purposes.

In addition to the academic program we also offer guitar, drama, drum, piano and other instrumental lessons, along with sculpture, photography, pottery, fine arts, stain glass craft, and a variety of other artistic media, along with yoga, dance, computer science/graphics, and journalism.

We attempt to meet each individual at their functioning level; to utilize his/her interests, and through therapeutic re-education help them achieve academic and personal success.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School

**A Therapeutic School For Emotionally Fragile Teenagers**

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

**Admissions**

- General Admissions Information
- Tuition Costs
- Directions

**Other Info**

- Calendar
- Staff directory
- Employment Opportunities
- Contact us

## Our Academic Program

**Academic Program Overview**

**College Preparatory Curriculum**

**Teacher Team Planning Approach**

**Class Offerings**

Our college preparatory course of studies includes English, Social Studies, Mathematics, Science, Physical Education, Art and electives. Grove School is approved by the Connecticut State Department of Special Education. Students are placed in classes based on their academic level, age and social-emotional development. The student-teacher ratio is about 4:1.

There is a supervised 1 1/2 hour evening study period in the dorms. Students in need of extra academic help may spend additional time in a supervised after-school study hall.

Grove School students participate in SAT and PSAT on-campus preparation courses as well as in programs offered off campus.

Grove School education staff, along with the students, their advisor and therapist, work with parents, clinicians, educational consultants and school systems to find the "best fit" for college, private schools, and public school programs.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School

**A Therapeutic School For Emotionally Fragile Teenagers**

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program



## Admissions

- General Admissions Information
- Tuition Costs
- Directions

## Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Academic Program

**Academic Program Overview**

**College Preparatory Curriculum**

**Teacher Team Planning Approach**

**Class Offerings**

We utilize a team teaching approach across grades 7 through 12. Students are grouped by grade and share the same four teachers in the four content areas of English, Math, Science and Social Studies.

Each team of teachers is provided a joint planning period every day. During these times, teachers set common expectations, discuss their students' progress, and coordinate testing and assignments.

This approach helps students recognize that their teachers are "speaking the same language" as rules and expectations are more consistently applied across the four classes. We believe that teaming teachers greatly improves the level of professional communication and thereby in the long run benefits our students both academically and emotionally.

---

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School

## A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

### Admissions

- General Admissions Information
- Tuition Costs
- Directions

### Other Info

- Calendar
- Staff directory
- Employment Opportunites
- Contact Us

## Our Clinical Program

**Individual Psychotherapy**

**Our Clinical Team Meetings**

**Our Clinical Emphasis**

**Family Therapy**

Individual psychotherapy is a very important piece of the Grove program. At Grove, each child is seen twice a week in individual psychotherapy with one of our clinical staff. The children enjoy a confidential relationship with their therapist and work towards a strong therapeutic alliance which encourages and enables the children to talk about the issues and concerns in their life.

All children also participate in weekly group counseling facilitated by a therapist and an administrator. These groups give the children an opportunity to have their behaviors reflected back to them by their peers in a safe and non-threatening way. It also gives them an opportunity to express themselves in a small group and gain positive experiences in relating more appropriately with their peers. Recently, we began theme groups, where students are placed based on issues which have been problematic for them such as: divorce, adoption, substance or other addictive issues, and life skills, for example.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School
## A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

## Admissions

- General Admissions Information
- Tuition Costs
- Directions

## Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Clinical Program

**Individual Psychotherapy**

**Our Clinical Team Meetings**

**Our Clinical Emphasis**

**Family Therapy**

The student body is administratively and clinically divided into four clinical teams. Each team is comprised of the student's psychiatrist, therapist, advisor, senior administrator and either the principal or mentor teacher.

The purpose of these teams is to meet weekly to discuss the student's various issues and to better coordinate and modify treatment plans and approaches where necessary. By keeping each team's census to approximately 25 students, the team model insures that no student is overlooked and that their issues and performance are reviewed on a regular basis.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School
## A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

### Admissions

- General Admissions Information
- Tuition Costs
- Directions



### Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Clinical Program

**Individual Psychotherapy**

**Our Clinical Team Meetings**

**Our Clinical Emphasis**

**Family Therapy**

Our clinical emphasis is multifocused, including insight-oriented psychotherapy, based on interpersonal relationships, as well as significant counseling in the service of maximizing our students' considerable intellectual abilities. We offer understanding and sympathetic help, with psychiatric and psychological counseling as an integral part of the program.

The Grove School ethos is one of caring acceptance. We are a non-punitive, but controlled environment, with patient and carefully designed assistance in self-management and self-understanding. Each child is seen as an individual and programs are developed accordingly. We stress the development of group living skills within our milieu.

We also recognize, however, the need to deal with each child where they are, on the basis of his/her individual problems. A consistent approach, remedial teaching, individual psychotherapy, group therapy, graded responsibilities, creative work in the arts, and therapeutic recreation are the pathways for our very active and enriched program.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778 Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School

## A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

## Admissions

- General Admissions Information
- Tuition Costs
- Directions

## Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Clinical Program

**Individual Psychotherapy**

**Our Clinical Team Meetings**

**Our Clinical Emphasis**

Family Therapy

Our view at the Grove School is that, since each student is both an individual and a member of a family system, treatment needs to address both their individual issues as well as the family dynamics that are also influencing and shaping those issues.

Therefore, it is expected that every student's family, or at least their parents, will be actively involved in treatment that focuses on both their individual issues as well as others problems that impact the family dynamics.

Family sessions generally occur at least once per month and are preferably done in person at the School; however, in cases of significant distance or other logistical problmes, teleconferences can be arranged.

---

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School
## A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

### Admissions

- General Admissions Information
- Tuition Costs
- Directions

### Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Philosophy

**Our Relationship Approach**

**Our Therapeutic Milieu**

**The Least Restrictive Therapeutic Setting**

**Our Educateur Teaching Approach**

Relationships are the cornerstone of the Grove treatment process. Within our milieu, significant relationships become a consistent, honest reflection of behavior that has been previously symptomatic, or dysfunctional. Many students have difficulty in their ability to relate to others. They may struggle in relation to authority figures, including parents, teachers and other family members.

They also may have difficulty relating to their peers in a socially appropriate manner as well as difficulty sustaining long-term relationships. We take time, care, and effort to establish a safe, predictable, consistent atmosphere where students can feel secure.

The relationships that the students develop with significant adults as well as their peers become one of the primary vehicles for change in their lives. It is through these relationships that the students can begin to explore new options and gain insight into their behavior

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School

## A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

### Admissions

- General Admissions Information
- Tuition Costs
- Directions

### Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Philosophy

**Our Relationship Approach**

**Our Therapeutic Milieu**

**The Least Restrictive Therapeutic Setting**

**Our Educateur Teaching Approach**

The concept of treatment for students at the Grove School is embedded in the concept of therapeutic milieu; that all interactions and all relationships have the potential for being therapeutic, i.e. emotionally corrective.

Since all human interactions are, in fact, a form of communication and occurs whether it is intentional or not, whether it is verbal or behavioral, understanding what is being communicated is one of the primary goals of Grove School's therapeutic community.

Grove provides an environment which is safe and which encourages the individual to tolerate their anxiety as they confront their various fears (eg. rejection, abandonment, anxiety, etc.).

It is not the goal of our milieu to remove a student's anxiety or fearfulness. While that may in fact occur, it is the purpose of this milieu to foster growth, to insist upon the honesty that is required for self-confrontation (which, in turn, forms the basis of self-validation), and to be respectful of the courage that this process requires.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School

**A Therapeutic School For Emotionally Fragile Teenagers**

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program

## Admissions

- General Admissions Information
- Tuition Costs
- Directions

## Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Our Philosophy

**Our Relationship Approach**

**Our Therapeutic Milieu**

**The Least Restrictive Therapeutic Setting**

**Our Educateur Teaching Approach**

Grove School offers a normalizing (non-restrictive) treatment program. It is within this setting that students have the opportunity to begin the treatment process in an atmosphere that provides them with a reasonable and appropriate level of structure to meet their individual needs.

Most significantly, students are given the opportunity to make choices (and mistakes), which are part of the process of personal growth and change. It is through this process that our students are empowered to rely more upon their own internal controls rather than just the external controls of adults and systems.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# Grove School

## A Therapeutic School For Emotionally Fragile Teenagers

Home | Our Philosophy | Academic Info | Residential Info | Clinical Info | Activities Program



### Admissions

- General Admissions Information
- Tuition Costs
- Directions

### Other Info

- Calendar
- Staff directory
- Employment Opportunities
- Contact Us

## Welcome

GROVE SCHOOL is designed to meet the needs of adolescent boys and girls (11 years of age and older) with average or above average intelligence, who have been unsuccessful in making a satisfactory adjustment in their homes, in their schools, or in their social relationships.

The Grove School is located on 90 acres of beautifully wooded land in Madison, Connecticut (population 17,858), a New England shoreline community 20 miles north of New Haven and 50 miles south of Hartford

Grove School is approved by the Connecticut State Department of Education and the Connecticut State Department of Children and Families (DCF).

We are members of the World Federation for Mental Health and The American Academy of Child and Adolescent Psychiatry. We are also an original member of the National Association of Therapeutic Schools and Programs.

Grove School was founded in 1934 by Jess Perlman. In 1955 Dr. J. Sanford Davis took over the operation of Grove School.

Richard L. Chorney became Executive Director in 1986, continuing the programmatic emphasis as a therapeutic boarding school with its unique non-restrictive, relationship oriented, and decidedly clinical approach.

In 2003 Richard L. Chorney became the President and CEO, focusing on program development, quality assurance, and facility enhancement. At that time, Peter J. Chorney became Executive Director focusing on daily operations.

175 Copse Rd. Madison, CT 06443
Ph: 203-245-2778  Fax: 203-245-6098

Staff Login

GroveSchool.org © 2005
Site Designed By: Darren McIntyre

# HEARING OFFICER'S DECISION COVER PAGE

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *Office of Compliance*

David R. Smith, Due Process Hearing Officer
825 North Capitol Street, 8th Floor, N.E.
Washington, DC 20002
(202) 442-5432 (phone); (202) 442-5556(fax)

| | | |
|---|---|---|
| In the Matter of | ) | **IMPARTIAL DUE PROCESS** |
| | ) | |
| C      S      ("Student"), | ) | **HEARING OFFICER'S DECISION** |
| Date of Birth: ▇▇▇▇, 1994 | ) | |
| Petitioner, | ) | **Parents' Motion For Summary Decision** |
| | ) | |
| v. | ) | Attending School: |
| | ) | Ivymount School |
| District of Columbia Public Schools | ) | |
| 825 North Capitol Street, NW | ) | |
| Washington, DC 20002 | ) | |
| ("DCPS" or "District") | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

Counsel for the parents:

Michael J. Eig, Esq.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815

Counsel for DCPS:

Tiffany Puckett, Esq.
Office of the General Counsel
825 North Capitol Street, NE
9th Floor
Washington, D.C. 20002

1



EXHIBIT
SA-13

# INDEX OF NAMES

## C.      S.      V. DCPS

| | |
|---|---|
| Assistant Superintendent, Special Education (or Director) | |
| Special Education Teacher | |
| School Psychologist | |
| Regular Education Teacher | |
| Principal | |
| Speech/Language Therapist | |
| Occupational Therapist | |
| Physical Therapist | |
| Private Psychologist | |
| CHILD AND CHILD'S DCPS ID # or SSN (insert ID # or Case Number on each page of the HOD vice child's name) | |
| Child's Parent(s) (specific relationship) | |
| Child/Parent's Representative | Michael J. Big, Esq. |
| DCPS Representative | Tiffany Puckett, Esq. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

2

**INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400**
**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**IMPARTIAL DUE PROCESS HEARING**

**INTRODUCTION:**

1.       A Due Process Hearing Complaint Notice ("Complaint") was filed on January 13, 2006 contending, among other things, that DCPS had failed to develop an IEP and determine a placement for the student for the 2005-2006 school year.[1] On March 7, 2006, DCPS filed a Motion to Dismiss the Complaint contending that the student did not register with DCPS and that the student had been unilaterally placed by the parents in the Ivymount School in Rockville, Maryland ("Ivymount"). It was DCPS' position that it was not obligated to develop an IEP or determine a placement for the student because she was not registered as a non-attending student. DCPS further asserted that since the student was enrolled in a private school in Maryland, the parents were obligated to register the student with the Local Educational Agency ("LEA") in Montgomery County, Maryland with regard to FAPE.

2.       The Motion to Dismiss of DCPS was denied. Thereafter, the parents requested that the matter be handled by Summary Decision, with the parents filing their "Parents' Motion for Pre-Hearing Summary Decision on March 22, 2006 ("Parents' Motion"). DCPS submitted its "Response to Parents' Pre-Hearing Summary Decision ("DCPS Response") on March 29, 2006 and the parents filing a "Reply to DCPS Response to Parents' Motion for Pre-Hearing Summary Decision" ("Parents' Response") on April 4, 2006.

3.       The issues presented in this matter are as follows:

   a.       Whether no genuine issue of a material fact exists thereby making Summary Decision appropriate?

   b.       Whether the parents provided DCPS with proper documentation to verify residency in the District of Columbia, a pre-requisite to registering the student?

   c.       Whether DCPS was obligated to offer the student FAPE for the 2005-2006 school year?

   d.       Whether Ivymount is an appropriate placement for the student for the 2005-2006 school year?

   e.       Whether the parents should be reimbursed for their unilateral placement of the student at Ivymount for the 2005-2006 school year?

---

[1]       CS-1

## JURISDICTION:

This decision was written pursuant to the *Individuals with Disabilities Education Act* (I.D.E.I.A.), 20 U.S.C. §1400, et. seq. and the *Rules of the Board of Education of the District of Columbia.*

## FINDINGS OF FACT:

1.    Prior to the start of the 2005-2006 school year, the student and her parents lived in Florida. The student had been determined eligible for special education with a diagnosis of Autism.[2] While attending school in Florida, an IEP was developed for the student dated May 21, 2004, which IEP listed the student's primary disability as Autistic with a secondary disability as Language Impaired.[3]

2.    Sometime around August 2005, the parents and the student moved from Florida to Washington, D.C.[4] On August 12, 2005, the parents went to the C.A.R.E. Center at Shaw Junior High School ("Care Center") to register the student as a non-attending student.[5]

3.    At some point prior to August 12, 2005,[6] the student applied for and was accepted into Ivymount located in Montgomery County, Maryland.[7]

4.    When the parents went to the care Center on August 12 2005, they told the Care Center representatives that the student had been accepted at Ivymount. In response to this, the parents were directed by Ms. Cindy Brown, to register the student in Rockville, Maryland in view of he acceptance at Ivymount.[8] Ms. Brown is a clinical social worker and case manager for DCPS at the Care Center.[9] After the parents expressed an interest in a DCPS school placement, the Care Center representatives sent them to the Woodrow Wilson High School ("Wilson") which was the local high school in view of the parents address in the District of Columbia.

5.    On August 17, 2005, the mother went to Wilson to register the student.[10] The mother brought with her the student' Florida IEP. After informing the Care Center staff that the student had an IEP, the mother was told that she had to see Ms. Sonya Lee, the special education coordinator; however, Ms. Lee was not available at the time. Accordingly, the mother was directed to leave the IEP and related documents with Mr. Terry, also in the special education department at Wilson.[11]

---

[2]    Declaration of Mrs. Staros.
[3]    CS-15
[4]    The exact date is not part of the record.
[5]    Declaration of Mrs. Staros
[6]    The exact date is not part of the record
[7]    The Declarations of Mrs. Staros and Ms. Bonnie Beers, Director of Ivymount, do not provide a specific date for the application or the date the student was accepted. However, in view of the language in paragraph 3 of Mrs. Staros' Declaration and paragraph 4 of Ms. Beers' Declaration, it is clear that the student applied for admission prior to attempting registration at the Care Center.
[8]    Declaration of Mrs. Staros
[9]    Declaration of Cindy Brown
[10]    Declaration of Mrs. Staros
[11]    Id.

4

7.    The mother was also directed to meet with Ms. Hattie Willis-Moore at Wilson in order to register the student. Ms. Willis-Moore is the administrative assistant for Wilson and was responsible for incoming registration.[12] The mother provided Ms. Willis-Moore with a completed and signed "Residency Verification/Pre-Registration Form;[13] however, the form was not signed by DCPS. The form did not show an Student ID Number, but the space on the form where the ID was to be inserted was circled and a note was placed on the form stating "to be generated."

8.    The mother also signed a "Annual Student Enrollment Form."[14] At the bottom of the form there is a space for DCPS to sign the heading "For Office Use Only;" however, DCPS did not sign the form.

9.    Attached to the Annual Student Enrollment Form, were a "Home Language Survey," bearing the signature of the parent, a form titled "Release of Student Directory Information School Year 2005-2006," signed by the parent; this form did not require a signature by DCPS. Also attached was a "DC Residency Verification Form." Section "(B)" of this form begins as follows: "Or, in the absence of items listed above, two (2) of the items listed below will suffice as proof of residency in DC. The address and name on each of the below items must be the same." There are four (4) blank lines in this section, two (2) of which have a check mark as follows:

"An unexpired lease of rental agreement with receipts for payment or canceled check for Payment of rent for a period within two (2) months immediately preceding consideration Of residency, for a current DC address at which the student actually resides;

One utility bill (only gas, electric, and water bills are acceptable) with the name of the Person enrolling the student, current DC home address, and with receipt of payment or cancelled check for payment of the bill. The receipt of payment or canceled check must be from a period within the two (2) months immediately preceding consideration of residency."

10.    Under the heading of the "DC Residency Verification Form" is the parenthetical statement "(To be completed by Local School Staff Only)." The form was signed by the mother, but not by a representative of DCPS. The form also contains the address of the student in the District of Columbia, which is the same as that on the Complaint.

11.    While at Wilson, the mother provided DCPS with a statement from PEPCO dated "8/17/05." The statement shows the name of the parents and their address in the District of Columbia, which is the same as that on the DC Residency Verification Form.[15] The PEPCO statement shows that the account was opened on "8/01/05," with no indication of disconnection.

12.    In addition to the statement from PEPCO, the parents provided DCPS with an Apartment Lease reflecting the same address as the above referenced documents and the Complaint and specifying the apartment number. The Lease begins by stating that it was effective June 30, 2005; however, the

---

[12]    Declaration of Ms. Willis-Moore
[13]    CS-7
[14]    CS-10
[15]    CS-9

5

Lease has a notation stating that instead of "July 1, 2005" rent would be due and payable on August 1, 2005.[16] The mother also provided DCPS with a copy of a rental deposit check dated July 5, 2005 pertaining to the apartment reflected in the Lease.[17]

13.    Although Ms. Sonya Lee, the DCPS Special Education Coordinator at Wilson was not available on August 12, 2005, Ms. Lee received information about the student and spoke with the parents about the student attending Ivymount for the 2005-006 school year. However, Ms. Lee did not recall speaking with the parent about the appropriateness of Wilson.[18]

14.    On August 23, 2006, counsel for the parents wrote a letter to Ms. Sonya Lee at Wilson stating that the parents were interested in moving forward with the IEP process.[19] There was no response to this letter. On August 26, 2006, counsel for the parents wrote Ms. Sonya Lee again stating that the parents had determined that Ivymount was the most appropriate placement for the student and had secured her placement there for the stat of the 2005-2006 school year and requested funding from DCPS for the placement.[20] There was no response to this letter.

15.    The student is currently attending Ivymount described by Ms. Bonnie Beers as a "nonpublic day school that specializes in educating students with disabilities, including those meeting the criteria for the federal IDEA eligibility code of Autism."[21]

16.    Ivymount convened an IEP meeting for the student and developed an IEP for her on October 28, 2005. The IEP reflects the student's disability classification as Autism and that she would be in a full-time program with the related service of speech/language therapy.[22] Ms. Beers stated in her Declaration that she was a member of the team at Ivymount that considered the student's application for admission at Ivymount and that the team agreed that the student required a full-time special education program. Ms. Beers states further that a less intensive program would not be appropriate for the student.[23]

**DECISION AND CONCLUSIONS OF LAW:**

1.    This matter is before this Hearing Officer as the result of the parents filing a Motion for Summary Decision contending that DCPS failed to offer the student a Free and Appropriate Public Education ("FAPE") in accordance with 34 C.F.R. §300.300. The Motion was submitted in lieu of proceeding with a Due Process Hearing in accordance with the IDEA that obligates DCPS to ensure that all children with disabilities receive FAPE. This obligation includes identifying, locating and evaluating children in all areas of suspected disabilities 34 C.F.R. §300.125, developing an IEP, 34 C.F.R. §300.340, convening a meeting to develop, review and revise the IEP of a student with a disability, 34 C.F.R. §300.340 and determining an appropriate placement 34 C.F.R. §300.552, et. seq.

---

[16]    CS-12
[17]    Id.
[18]    Declaration of Sonya Lee
[19]    CS-5
[20]    CS-3
[21]    Declaration of Bonnie Beers
[22]    CS-16
[23]    Declaration of Bonnie Beers

2.     A Motion for Summary Judgment, entitles a party to judgment if the pleadings, depositions and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Tao v. Freeh*, 27 F. 3d 635 (D.C. Cir. 1994). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the court of the basis for the motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits which they believe demonstrate the absence of a genuine issue of a material fact. *Coletex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The non-moving party then in response to the motion of the moving party must designate specific facts showing that there is a genuine issue for trial. Id. at 324.

3.     Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself is not sufficient to bar summary judgment. (See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43.(D.C. Cir 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S. Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

4.     If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. 255. Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply ""show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed 2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. At 587, 106 S.Ct. 1348 (citing Fed.R. Civ. P. 5 (e)).

5.     The parents contend in their Motion that they are entitled to judgment as a matter of law because DCPS failed to offer the student an IEP and placement for the 2005-2006 school year. DCPS contends that it was not obligated to provide the student with FAPE because the student was not registered with DCPS and that the parents unilaterally placed the student in a private school in Maryland. DCPS therefore contends that the LEA in Montgomery County, Maryland is responsible for providing the student with FAPE. Based on the record as summarized here, there are no genuine issues of a material fact regarding this student; therefore, it is appropriate to decide this matter based on the disclosures of the parties as supplemented by their respective briefs.

6.     In addition to deciding that this matter can be handled by Summary Decision, there are additional questions that should be answered in order to determine if there has been a denial of FAPE that would entitle the parents to reimbursement for placing the student in Ivymount: whether the parents provided DCPS with proper documentation to verify residency in the District of Columbia, a prerequisite to registering the student and whether DCPS was obligated to offer the student FAPE after being notified by the parents that she was going to be placed by them at Ivymount? An affirmative

answer to these questions would then lead to two additional questions: whether or not Ivymount is an appropriate placement for the student and if so, whether DCPS is obligated to fund the placement. In any event, based on the findings of fact as discussed above, there are no factual disputes as to what happened at the Care Center and at Wilson concerning the parents' attempts to register the student with DCPS.

7.      With regard to verification of residency, the parents moved into the District of Columbia from Florida on or about August 1, 2005. They presented a Lease reflecting their residency that was effective August 1, 2005. and a copy of a cancelled check for the rent deposit on their address in the District of Columbia. The parents also presented a statement from PEPCO stating that they had service as of August 1, 2005. Therefore, the parents could not have presented paid receipts for utilities, etc., since they had just moved into the District of Columbia.

8.      In addition to the above, the parents signed enrollment forms presented to them by the Care Center. A review of these forms shows that all the information that the parents could fill out was completed. However, the sections that require DCPS to complete are blank. Based on the Declarations of Ms. Brown, Ms. Willis-Moore and Ms. Young, it is clear that the enrollment/registration forms were not completed once the parents informed the Care Center of their interest in Ivymount as a placement for their daughter. It is also noted that the same address for the parents and the student appears on all the documents mentioned herein that are used to determine residency. There being no question that the parents reside in the District of Columbia, there is no basis for the process of registration not moving forward to completion. It is clear that the registration process did not go forward because DCPS concluded that it did not have to register the student since she was going to school in Maryland in a private school.

9.      Prior to the enactment of IDEA 2004, an LEA had an obligation for consultation etc. for all parentally placed private school children with disabilities who reside in the LEA'S district, regardless of the private school location.[24] This obligation meant that an LEA had to maintain compliance with the IDEA with regard to privately placed students in multiple jurisdictions, because the private schools that the students would attend were in multiple jurisdictions. With the enactment of IDEA 2004 however, rather than an LEA being required to consult with multiple jurisdictions where private school children were placed, the LEA's responsibility would be restricted to private school children that are "enrolled by their parents in private elementary or secondary schools in the school district served by the local educational agency. 20 U.S.C. §1412 (a)(10)(A)(i).

10.     Guidance by the U.S. Department of Education on June 27, 2005 explains the change:

"Therefore, beginning July 1, 2005, each LEA must conduct child find, determine the proportionate share of Part B funds, and provide equitable services to parentally placed private school children with disabilities who attend private schools located in the LEA *without regard to where the children reside.* This change means that LEAs consult with representatives of the private schools located in the district, thereby eliminating the need for an LEA to contact private school representatives outside their jurisdiction. The change also means that representative of private schools have only one LEA to consult

---

[24]     34 CFR 300.450

8

135

with to ensure that children with disabilities enrolled in their schools can participate in IDEA equitable services." (Emphasis in original)

Memorandum to Chief State School Officers, 43 IDELR 224 (2005)

11.    This change means that an LEA must conduct "child find" activities with respect to children placed in a private school when the private school is in the LEA'S educational district, even though the child does not reside in the LEA's educational district. This "child find" obligation imposed on an LEA by IDEA 2004 is designed to ensure the **equitable participation** of parentally placed private school children with disabilities and to obtain an accurate count of such children. 20 U.S.C. §1412 (a)(10)(A)(ii)(II)

12.    The "child find" requirement referenced above however is different from that requiring an LEA to provide FAPE. **IDEA 2004 did not eliminate the need for an LEA to offer FAPE to all children who reside in the LEA's educational district, even if the child is privately placed by the parents in another jurisdiction.**

**"(C) PAYMENT FOR EDUCATION OF CHILDREN ENROLLED IN PRIVATE SCHOOL WITHOUT CONSENT OF OR REFERAL BY THE PUBLIC AGENCY.-**

**(i) IN GENERAL**.- Subject to subparagraph (A), this part does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parent elected to place the child in such private school or facility.

**(ii) REIMBURSEMENT FOR PRIVATE SCHOOL PLACEMENT.** – If the parents of a child with a disability, who previously received special education ad related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court of a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment."

20 U.S.C. §1412 (a)(10)(C)(i) & (ii).

13.    The key here is to **offer FAPE; i.e. convening a meeting, develop an IEP, determine an appropriate placement, etc.** An LEA, here DCPS, must offer FAPE to all children who reside in the district. A parent may refuse to participate with the LEA or not accept what the LEA offers and then place a child in a private school in another jurisdiction. However, in such a case, they take the chance that they will not be reimbursed for the placement, because reimbursement can be denied.

14.    In her Declaration, Ms. Brown of DCPS states: "DCPS is no longer the LEA for students that are parentally placed in private schools that are outside of the District of Columbia.' Not being the

9

136

LEA for such children however, does not eliminate the obligation of an LEA (DCPS) to offer such children FAPE, although attending a private school in for example Maryland, but who reside in the District of Columbia. By at least offering FAPE, i.e. scheduling a meeting to develop an IEP and determine placement etc., the LEA complies with IDEA 2004 to make FAPE available to students who reside in the District of Columbia.

15.    There is no question here that the parents and the student reside in the District of Columbia; yet, the registration process was not completed based on a mistaken belief that DCPS did not have to offer the student FAPE. With regard to the registration process, it is evident that the parents signed the necessary forms which only required signatures from the appropriate DCPS representative, which was not forthcoming. Therefore, it was not the parents who failed to register the student, but DCPS who failed to complete the process.

16.    With regard to FAPE, in *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. (1982), the Supreme Court provided guidance consisting of a two-part analysis: first, a determination must be made regarding a failure to comply with the procedural requirements of the IDEA; and secondly, whether the individualized educational program developed through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefit.

17.    Based on the Declarations of Mrs. Staros and Ms. Beers, the student is receiving educational benefit at Ivymount that can justify reimbursement to the parents for the placement in view of *Burlington Sch. Comm. V. Dep't of Educ.*, 471 U.S. 359 (1985), *aff'g Town of Burlington v. Dep't of Educ. For the Commonwealth of Mass.*, 736 F.2d 773 (1st Cir. 1984) and *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993), *aff'g* 950 F.2d 156 (4th Cir. 1991).

18.    DCPS argues that it was not required to offer FAPE relying on the lack of registration for the 2005-2006 school year and that the student attends a private school in another jurisdiction. However, this reliance on the part of DCPS is not supportable for the reasons stated above.

19.    The registration requirement of DCPS as contained in 5 DCMR 5000.1 provides:

> All students in District of Columbia Schools must have proof of residency In the District of Columbia or pay tuition. A determination of residency status shall be made annually for each student. The method used to determine residency status shall be consistent across all public schools in the District of Columbia and **shall be crafted to facilitate rather than hinder school enrollment of eligible students.**

**(emphasis added)**

20.    The Rules of the D.C. Board of Education, Section 3030.3 requires that DCPS shall bear the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student. Here, for the reasons stated above, DCPS has not met its burden:

a.      The parents did not delay or hinder the registration process, but DCPS failed to move forward with the registration process upon learning of the student's acceptance and the parents' intention to enroll her there.  The appropriate response on the part of DCPS would have been to move forward and registered the student as non-attending.

b.      With regard to the FAPE, there apparently was some confusion about DCPS' responsibility; again, IDEA did not change the obligation of the LEA in which a student resides to offer FAPE to that student.  Reimbursement for a private placement could then be reduced or denied if a parent does not comply with specific requirements, such as the "notification" requirement prior to placing a student in a private school.  The appropriate response on the part of DCPS here would have been to move forward the parents' August 23, 2005 request to proceed with the IEP process.

21.      Based on the record, Ivymount can meet the student's needs and has an IEP with appropriate goals and objectives, providing the student with educational benefit.

**ORDER:**

The Parents' Motion is GRANTED, DCPS shall place and fund the student at Ivymount for the 2005-2006 school year.

**APPEAL PROCESS:**

This is the final administrative decision in this matter.  Appeals on legal grounds may be made to a court of competent jurisdiction within 90 days of the rendering of this decision.

Date: _5-9-06_

Issued: _5/10/06_

David R. Smith, Esq.
Impartial Hearing Officer

11

138



## UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

### JUN 2 7 2005

| Contact Person: | |
|---|---|
| Name: | JoLeta Reynolds |
| Telephone: | 202-245-7468 |

OSEP 05-09

### MEMORANDUM

TO:         Chief State School Officers

FROM:     Troy R. Justesen
            Acting Director
            Office of Special Education Programs

SUBJECT:  Obligations of States and local educational agencies to parentally-placed private
            school children with disabilities

The obligation of States and local educational agencies (LEAs) to children with disabilities
enrolled by their parents in private elementary schools and secondary schools will change
beginning July 1, 2005, the effective date of these provisions in the Individuals with Disabilities
Education Improvement Act of 2004 (IDEA 2004).  The focus of this memorandum is to provide
guidance to States and LEAs in complying with the following requirements in 20 U.S.C.
1412(a)(10) of IDEA 2004:  (1) regarding the agency responsible for providing equitable special
education and related services to parentally-placed private school children with disabilities, and
(2) determining the proportionate amount of Federal funds to be expended by the LEA for such
children attending private schools located in their district.

IDEA 2004 retains the provision in IDEA that each LEA spend a proportionate amount of the
required subgrants it receives from the State educational agency (SEA) under 20 U.S.C. 1411
and 20 U.S.C. 1419 for special education and related services to children with disabilities
enrolled by their parents in private elementary schools and secondary schools (20 U.S.C.
1412(a)(10)(A)(i)(I)).  However, under IDEA 2004, to calculate the proportionate amount of
Federal Part B funds, the LEA, after timely and meaningful consultation with representatives of
private schools, must conduct a thorough and complete child find process to determine the
number of parentally-placed children with disabilities attending private schools *located in the*



EXHIBIT
SA-14

Page 2

*LEA* [emphasis added] (20 U.S.C. 1412(a)(10)(A)(i)(II)).  In addition, the obligation to spend a proportionate amount to provide services to children with disabilities enrolled by their parents in private schools now refers to children enrolled by their parents in private elementary schools and secondary schools in the LEA.  (20 U.S.C. 1412(a)(10)(A)(i)).  These are significant changes from the current regulations in which the responsibility to conduct child find (34 CFR 300.451) and provide equitable services to parentally-placed private school children rests with *the LEA in which the children reside* [emphasis added] (34 CFR 300.453).

Therefore, beginning July 1, 2005, each LEA must conduct child find, determine the proportionate share of Part B funds, and provide equitable services to parentally-placed private school children with disabilities who attend private schools located in the LEA <u>without regard to where the children reside</u>.  This change means that LEAs consult with representatives of the private schools located in the district, thereby eliminating the need for LEAs to contact private school representatives outside of their jurisdiction.  The change also means that representatives of private schools have only one LEA to consult with to ensure that children with disabilities enrolled in their schools can participate in IDEA equitable services.

The Department recognizes that States and LEAs may not have accurate data at this time to calculate the proportionate amount of Federal funds consistent with the requirements of IDEA 2004.  Therefore, the Secretary is exercising the transition authority under IDEA 2004, which allows the Secretary to take necessary steps for an orderly transition from the current regulatory requirements to the requirements under IDEA 2004 (20 U.S.C. 1400 note) as discussed in the following paragraph:

> The Secretary will allow, <u>for the 2005-06 school year only</u>, States and LEAs to use the best available data to calculate the proportionate amount of their IDEA Part B funds that must be expended on services for parentally-placed private school children with disabilities attending private schools located in their jurisdiction, rather than requiring new child counts of parentally-placed private school children with disabilities by the district of the private school's location.  The State must use the same method across all LEAs within the State.

Please note, that this flexibility does not affect the obligation of States and LEAs to meet the child find requirements in 20 U.S.C. 1412(a)(3) to identify, locate, and evaluate parentally-placed private school children with disabilities attending schools located in their area of jurisdiction (20 U.S.C. 1412(a)(10)(A)(ii)).  Nor does the flexibility affect the obligation of LEAs to expend the proportionate share of funds for services, including direct services, to parentally-placed private school children with disabilities attending schools located in their area of jurisdiction.

The Department wants to stress that States are bound by all other provisions of IDEA 2004, and until the final regulations are issued, the existing regulations that are not inconsistent with IDEA 2004.  For example, IDEA 2004 requires that LEAs, or where appropriate, an SEA, consult with representatives of private schools and representatives of parents of parentally-placed private school children with disabilities regarding:

Page 3

(a) The child find process and how parentally-placed private school children suspected of having a disability can participate equitably, including how parents, teachers, and private school officials will be informed of the process;

(b) The determination of the proportionate amount of Federal funds available to serve parentally-placed private school children with disabilities including the determination of how the amount was calculated;

(c) The consultation process among the LEA, private school officials, and representatives of parents of parentally-placed private school children with disabilities, including how the process will operate throughout the school year to ensure that parentally-placed private school children with disabilities identified through the child find process can meaningfully participate in special education and related services;

(d) How, where, and by whom special education and related services will be provided for parentally-placed private school children with disabilities, including a discussion of types of services, including direct services and alternate service delivery mechanisms; how such services will be apportioned if funds are insufficient to serve all children; and how and when those decisions will be made; and

(e) How, if the LEA disagrees with the views of the private school officials on the provision of services or the types of services, the LEA will provide to the private school officials a written explanation of the reasons why the LEA chose not to provide services directly or through a contract.  (20 U.S.C. 1412(a)(10)(A)(iii))

States and LEAs are expected to comply with these consultation requirements beginning July 1, 2005.

The Department anticipates posting a list of "Frequently Asked Questions" regarding the responsibilities of States and LEAs under IDEA 2004 to serve parentally-placed private school children with disabilities.  Should you have any questions, please contact your State contact in the Office of Special Education Programs at 202-245-7459 or JoLeta Reynolds, Office of Policy and Planning, Office of Special Education and Rehabilitative Services, at 202-245-7468.

cc:    State Directors of Special Education
       Congressional Staff
       Federal Resource Center
       Regional Resource Centers
       Parent Training Centers
       Protection and Advocacy Agencies
       Section 619 Coordinators
       Private School Associations

# Questions and Answers
## On Serving Children With Disabilities
## Placed by Their Parents at Private Schools
### March 2006

The obligation of states and local education agencies (LEAs) to children with disabilities enrolled by their parents in private elementary schools and secondary schools changed on July 1, 2005, the effective date of these provisions in the *Individuals with Disabilities Education Improvement Act of 2004* (Act). Section 612(a)(10)(A)(i)(II) of the Act requires that the LEA, after timely and meaningful consultation with private school representatives, must conduct a thorough and complete child find process to determine the number of parentally-placed children with disabilities attending private schools *located in the LEA* [emphasis added]. In addition, section 612(a)(10)(A)(i) of the Act makes clear that the obligation to spend a proportionate amount to provide services to children with disabilities enrolled by their parents in private schools now refers to children enrolled by their parents in private elementary schools and secondary schools "in the school district served by a local education agency." Because these are significant changes in policy, the Department issued a memorandum to all states on June 27, 2005, informing them of these changes. The purpose of the questions and answers below is to provide additional guidance to states and LEAs in complying with the requirements in Section 612(a)(10) of the Act. We anticipate posting additional questions and answers in the future regarding the responsibilities of states and LEAs to serve parentally placed private school children with disabilities.

The Department wants to stress that the following questions and answers do not address all the provisions in Section 612(a)(10) of the Act. States are bound by all the provisions in the Act and, until the final regulations are in effect, the existing regulations that are not inconsistent with the Act. If there is an inconsistency between the statutory provisions in the Act and the provisions in the current regulations (i.e., the 1999 regulations implementing the Individuals with Disabilities Education Act Amendments of 1997 (*IDEA 97*), the provisions in the Act would supersede those in the current regulations. In addition, the final regulations, which will specify an effective date, will supersede current regulations and any Departmental guidance pertaining to the Act provided prior to the effective date of the final regulations, including the guidance in the questions and answers that follow.

## A.    Consultation With Private School Representatives and Representatives of Parents of Parentally Placed Private School Children With Disabilities

Authority:        The requirements for consultation are in Section 612(a)(10)(A)(i)(II) and 612(a)(10)(A)(iii) through (v) of the Act.

142



EXHIBIT
webber
SA-15

**Question A-1:**    What is consultation?

**Answer:**    Consultation involves discussions between the LEA, private school representatives, and representatives, as defined in the Act, of parents of parentally placed private school children with disabilities on key issues that affect the ability of eligible private school children with disabilities to participate equitably in federally funded special education and related services. (See more on the provision of equitable services in Part C of these questions and answers.) Effective consultation provides a genuine opportunity for all parties to express their views and to have those views considered by the LEA. Successful consultation establishes positive and productive working relationships that make planning easier and ensure that the services provided meet the needs of eligible parentally placed private school children with disabilities.

A unilateral offer of services by an LEA with no opportunity for discussion is not adequate consultation. Only after discussing key issues relating to the provision of special education and related services with all representatives should the LEA make its final decisions with respect to the services to be provided to eligible private school children with disabilities.

**Question A-2:**    What must the consultation process include?

**Answer:**    Section 612(a)(10)(A)(iii) of the Act provides that each LEA must consult, in a timely and meaningful way, with private school representatives and representatives of parents of parentally placed private school children with disabilities during the design and development of special education and related services for parentally-placed private school children. The public agency must consult with private school representatives and representatives of parents of parentally placed private school children with disabilities. The consultation process must include the following:

- The child find process and how parentally placed private school children suspected of having a disability can participate equitably, including how parents, teachers and private school officials will be informed of the process;

- The determination of the proportionate share of federal funds available to serve parentally placed private school children with disabilities, including the determination of how the proportionate share of those funds was calculated;

- How the consultation process among representatives of the agency, private school and of parents of parentally placed private school children will take place, including how the process will operate throughout the school year to ensure that

143

parentally placed private school children with disabilities identified through the child find process can meaningfully participate in special education and related services;

- How, where, and by whom special education and related services will be provided, including a discussion of types of services -including direct services and alternate service-delivery mechanisms, as well as how such services will be apportioned if funds are insufficient to serve all children - and how and when these decisions will be made; and

- How, if the LEA representatives disagree with the views of the private school officials on the provision of services or the types of services whether provided directly or through a contract, the LEA will provide to the private school officials, a written explanation of the reasons why the LEA chose not to adopt the recommendations of the private school officials.

**Question A-3:**    What records on consultation must an LEA maintain?
**Answer:**    When timely and meaningful consultation has occurred, the LEA must obtain a written affirmation signed by the representative of the participating private school. If the representatives do not provide the affirmation with a reasonable period of time, the LEA must forward the documentation of the consultation process to the state education agency (SEA).

**Question A-4:**    Do private school officials have the right to complain?
**Answer:**    A private school official has the right to complain to the SEA that the LEA did not engage in consultation that was meaningful and timely, or did not give due consideration to the views of the private school official. A complaint must provide the basis of the official's belief that the LEA did not comply with the consultation requirements. The LEA must forward to the SEA appropriate documentation. If the private school official is dissatisfied with the decision of the SEA, the official may submit a complaint to the secretary of the U.S. Department of Education providing the basis of the official's belief that the LEA did not comply with the consultation requirements, and the SEA must forward the appropriate documentation to the secretary.

## B.    Child Find and Individual Evaluations

**Authority:**    The requirements for child find and individual evaluations are in Section 612(a)(10)(A)(i)(II) and (V), 612(A)(10)(a)(ii) and 614(a) of the Act.

144

**Question B-1:**   Which LEA is responsible for conducting child find for parentally placed private school children?

**Answer:**   The LEA where the private school is located. Section 612(a)(10)(A)(i)(II) of the Act makes clear that the LEA, after timely and meaningful consultation with private school representatives, must conduct a thorough and complete child find process to determine the number of parentally-placed children with disabilities attending private schools *located in the LEA.* [Note: Under the prior provisions of the IDEA, the responsibility to conduct child find to parentally-placed private school children rested with *the LEA in which the children resided.*]

**Question B-2:**   How does the LEA meet its child find responsibilities to parentally placed private school children?

**Answer:**   The LEA where the private elementary school or secondary school is located has options as to how it ensures its child find responsibilities are met. For example, it may assume the responsibility itself, contract with another public agency or make other arrangements. The Act does not permit parentally placed private school children to be excluded from child find activities.

**Question B-3:**   What is the purpose of child find for parentally placed private school children?

**Answer:**   The child find process for such children must be designed to ensure the equitable participation of parentally placed private school children with disabilities and must ensure an accurate count of these children.

**Question B-4:**   What specific child count information must the LEA maintain and report to the SEA?

**Answer:**   The LEA must maintain in its records and provide to the SEA the number of parentally-placed private school children evaluated, the number of parentally-placed private school children determined to be children with disabilities under Part B of the Act, and the number of children provided equitable services.

**Question B-5:**   Why is it important to identify the number of parentally-placed private school children with disabilities located in the LEA where the private school is located?

**Answer:**   An accurate count of the number of eligible private school children with disabilities enrolled by their parents in private schools located in the LEA is needed to calculate the proportionate share of Part B

funds that the LEA must expend annually for services for parentally-placed private school children with disabilities.

**Question B-6:** Must the child find activities and the evaluation procedures for parentally-placed private school children be similar to the child find activities and evaluation procedures for children enrolled in public schools?

**Answer:** Yes. The child find activities carried out by LEAs for parentally-placed private school children must be similar to activities undertaken for child find for children in public schools. Activities for child find must be completed in a time period comparable to those activities for public school students. This means that LEAs may not delay conducting child find, including individual evaluations, for parentally-placed private school children until after child find for public school children is conducted. In addition, evaluations of all children suspected of having disabilities under Part B of the Act, regardless of whether they are enrolled by their parents in private elementary schools or secondary schools, must be conducted in accordance with the requirements in Section 614(a) of the Act, which describes the procedures for evaluations and reevaluations for all children with disabilities.

**Question B-7:** Can amounts expended for child find, including individual evaluations, be deducted from the required amount of funds to be expended on services for parentally placed private school children with disabilities?

**Answer:** No. There is a distinction under the Act between the obligation to conduct child find activities, including individual evaluations, for parentally placed private school children with disabilities, and the obligation to use an amount of funds equal to a proportionate amount of the federal grant to provide special education and related services to parentally placed private school children with disabilities. The obligation to conduct child find, including individual evaluations, exists independently from the services provision; and the costs of child find activities, such as evaluations, may not be considered in determining whether the LEA has spent an appropriate amount on providing special education and related services to parentally placed private school children with disabilities.

**Question B-8:** In conducting the individual evaluations of suspected children with disabilities enrolled in private schools by their parents, may an LEA exclude children suspected of having certain disabilities, such as those with specific learning disabilities?

**Answer:** No. The LEA where private elementary schools and secondary

146

schools are located must identify and evaluate all children suspected of having a disability as defined under Section 602(3) of the Act. LEAs may not exclude children suspected of having certain disabilities, such as those with specific learning disabilities, from their child find activities. The Department recommends that LEAs and private elementary schools and secondary schools consult on how best to implement the state's evaluation criteria for identifying children with specific learning disabilities enrolled in private schools by their parents.

**Question B-9:**   Which LEA is responsible for ensuring that a reevaluation of each parentally placed private school child with a disability is conducted at least once every three years?

**Answer:**   The LEA where the private elementary school or secondary school is located is responsible for conducting reevaluations of children with disabilities enrolled by their parents in the private elementary schools and secondary schools located within the district.

## C.    Provision of Services

**Authority:**   The requirements for the provision of equitable services are in Section 612(a)(10)(A)(i) and (iii) (V) of the Act, and current 34 CFR §§300.452 through 300.454(a), (b)(4) and (c), and 300.455 through 300.462.

**Question C-1:**   What is the process for making decisions with respect to the services to be provided to eligible parentally placed private school children with disabilities?

**Answer:**   After consultation with private schools representatives and representatives of parents of parentally placed private school children with disabilities, the LEA is responsible for making final decisions about all aspects of the services to be provided to parentally placed private school children with disabilities. However, if the LEA disagrees with the views of the private school officials on the provision of services or the types of services, whether provided directly or through a contract, the LEA must provide to the private school officials a written explanation of the reasons why the LEA chose not to accept the recommendations of the private school officials.

**Question C-2:**   Are there any particular kinds of services or specified amounts of services that must be provided to parentally placed private school children with disabilities under Part B of the Act?

147

**Answer:**  No. Children with disabilities enrolled in private schools by their parents have no individual entitlement to receive some or all of the special education and related services they would receive if enrolled in a public school other than child find, including evaluations. Under the Act, LEAs have the obligation to provide the group of parentally placed private school children with disabilities with equitable participation in the services funded with federal *IDEA* funds.

**Question C-3:**  May an LEA provide additional services to parentally placed private school children in excess of the required federal equitable participation services requirement that is covered by the federal proportionate share?

**Answer:**  Yes. The Act in no way prohibits states or LEAs from spending additional state or local funds to provide special education or related services to parentally-placed private school children with disabilities in excess of those required in Section 612(a)(10)(A) of the Act, consistent with state law or local policy.

**Question C-4:**  Prior to the reauthorization of *IDEA*, if a state were spending more than the federal proportionate share of funds using state funds, then the state would not have to spend any federal dollars on parentally placed private school children. Is this permissible under the Act?

**Answer:**  No. *IDEA 2004* added a "supplement, not supplant" requirement in Section 612(a)(10)(A)(i)(IV) of the Act. This requirement provides that state and local funds may supplement but in no case supplant the proportionate amount of the federal *IDEA* funds required to be expended under this provision.

**Question C-5:**  What is the process for developing a services plan for a parentally placed private school child with a disability?

**Answer:**  Each parentally placed private school child with a disability who has been designated by the LEA in which the private school is located to receive special education or related services must have a services plan. The services plan describes the specific special education or related services that the LEA will provide to the child. The LEA must ensure that a representative of the private school attends each meeting to develop the services plan and, if the representative cannot attend, use other methods to ensure participation by the private school, including individual or conference telephone calls. This provides the opportunity for private school staff to learn more about the child's strengths and needs.

148

**Question C-6:**    What is the difference between an individualized education program (IEP) and a services plan?

**Answer:**    Children with disabilities enrolled in public schools or who are publicly-placed in private schools are entitled to a free appropriate public education (FAPE) and must receive the full range of services under Part B that are determined by the child's IEP team to be necessary to meet the child's individual needs and provide FAPE. The IEPs for these children generally will be more comprehensive than the more limited services plans developed for parentally-placed private school children with disabilities designated to receive services. A services plan should reflect only the services offered to a parentally placed private school child with a disability designated to receive services and must, to the extent appropriate, meet the IEP content requirements described in Section 614(d) of the Act, or, when appropriate, for children aged three through five, the Individual Family Services Plan (IFSP) requirements described in Section 636 (d) of the Act as to the services that are to be provided.

**Question C-7:**    Who provides equitable services to parentally placed private school children with disabilities?

**Answer:**    Equitable services must be provided by employees of a public agency or through contract by the public agency with an individual, association, agency, organization or other entity. An LEA may use Part B funds to make public school personnel available in other than public facilities to the extent necessary to provide equitable services for private school children with disabilities and if those services are not normally provided by the private school. An LEA may use Part B funds to pay for the services of an employee of a private school to provide equitable services if the employee performs the services outside of his or her regular hours of duty and the employee performs the services under public supervision and control.

**Question C-8:**    Where may equitable services be provided to parentally placed private school children with disabilities?

**Answer:**    Services offered to parentally-placed private school children with disabilities may be provided on-site at a child's private school, including a religious school, to the extent consistent with law, or at another location. In the interests of the child, efforts should be made to provide services as near as possible to the child's private school so as not to unduly disrupt the child's education experience. The phrase "extent consistent with law" is statutory, and we interpret it to mean that the provision of services on the premises of a private school takes place in a manner that would not violate the Establishment Clause of the First Amendment to the U.S.

149

Constitution and would not be inconsistent with applicable state constitutions or law.

**Question C-9:**   How is the location where services will be provided to parentally placed private school children with disabilities determined?

**Answer:**   The location of services is one of the subjects discussed during the consultation process among LEA officials, private school representatives, and representatives of parents of parentally placed private school children with disabilities. The public agency makes the final decision, after this consultation process.

**Question C-10:**   May private school officials order or purchase materials and supplies needed for the special education and related services and be reimbursed by an LEA?

**Answer:**   No. Private school officials may not obligate or receive Part B funds. The LEA must control and administer the funds used to provide special education and related services to parentally-placed private school children with disabilities, and maintain title to materials, equipment and property purchased with those funds.

**Question C-11:**   May a public agency place equipment and supplies for equitable services in a private school?

**Answer:**   The public agency may place equipment and supplies in a private school for the period of time needed for the program. The public agency must ensure that equipment and supplies placed in a private school are used only for Part B purposes and can be removed from the private school without remodeling the private school facility. The public agency must remove equipment and supplies from a private school if the equipment and supplies are no longer needed for Part B purposes or if removal is necessary to avoid unauthorized use of the equipment and supplies for other than Part B purposes.

**Question C-12:**   May Part B funds for equitable services be paid directly to a private school?

**Answer:**   No. Part B funds for equitable services may not be paid directly to a private school.

**Question C-13:**   May Part B funds for equitable services be used for repairs, minor remodeling or construction of private school facilities?

**Answer:**   No. Part B funds for equitable services may not be used for repairs, minor remodeling, or construction of private school facilities.

150

## D.    Preschool Children With Disabilities

**Question D-1:**    Do the child find and equitable participation requirements apply to children with disabilities, aged 3 through 5, enrolled by their parents in private elementary schools?

**Answer:**    Yes, under certain conditions. The requirements in Section 612(a)(10) of the Act regarding child find and equitable participation are fully applicable to children with disabilities aged 3 through 5 enrolled by their parents in private elementary schools. A private preschool or day care program is considered an elementary school if it meets the definition of elementary school in Section 602(6) of the Act. The Act defines an elementary school as a nonprofit institutional day or residential school, including a public elementary charter school, that provides elementary education, as determined under state law.

## E.    Out-of-State Students With Disabilities

**Question E-1:**    What is the responsibility of the LEA where the private elementary schools and secondary schools are located to conduct child find activities for parentally placed private school children who reside outside the state?

**Answer:**    Section 612(a)(10)(A)(i) of the Act makes clear that the LEA where the private elementary schools and secondary schools are located is responsible for conducting child find, including individual evaluations, of all parentally-placed private school children suspected of having a disability. This includes children from other states attending private elementary schools and secondary schools located in the LEA.

**Question E-2:**    Who is responsible for determining and paying for services provided to out-of-state parentally placed private school children with disabilities?

**Answer:**    The LEA where the private elementary schools and secondary schools are located, in consultation with private school officials and representatives of parents of parentally placed private school children with disabilities, is responsible for determining and paying for the services to be provided to out-of-state parentally placed private school children with disabilities. These out-of-state children must be included in the group of parentally placed children with disabilities whose needs are considered in determining which parentally placed private school children with disabilities will be served and the types and amounts of services to be provided.

## F.    Miscellaneous Questions

### Offer of a Free Appropriate Public Education (FAPE)

**Question F-1:**  If a parentally placed private school child is identified through the child find process as a child eligible for special education and related services, which LEA is responsible for offering FAPE to a parentally placed private school child with a disability?

**Answer:** If a determination is made that a child has a disability and needs special education and related services, the LEA where the child resides is responsible for making FAPE available to the child. If the parents make clear their intention to keep their child enrolled in the private elementary school or secondary school, the LEA of residence need not develop an IEP for the child.

### Home Schooled Children With Disabilities

**Question F-2:**  Are home schooled children considered parentally placed private school children?

**Answer:** Whether home schooled children with disabilities are considered parentally placed private school children with disabilities is determined by the state. If the state recognizes home schools or home day care as private elementary schools and secondary schools, children with disabilities in those home schools or home day care must be treated in the same way as other parentally placed private school children with disabilities.

### Procedural Safeguards

**Question F-3:**  If the LEA where the private elementary or secondary school is located conducts an individual evaluation on a child and the parents disagree with the evaluation and wish to have an independent educational evaluation (IEE) conducted, to which LEA must the parents bring their request - the LEA where the private school is located, or the LEA where the child resides?

**Answer:** Parents should file the request for an IEE with the LEA that conducted the evaluation with which the parents disagree.



The reauthorized *Individuals with Disabilities Education Act* (IDEA) was signed into law on Dec. 3, 2004, by President George W. Bush. The provisions of the act became effective on July 1, 2005, with the exception of some of the elements pertaining to the definition of a "highly qualified teacher" that took effect upon the signing of the act. This is one in a series of documents, prepared by the Office of Special Education and Rehabilitative Services (OSERS) in the U.S. Department of Education, that covers a variety of high-interest topics and brings together the statutory language related to those topics to support constituents in preparing to implement the new requirements.[1] This document addresses only the changes to the provisions of IDEA regarding children with disabilities enrolled by their parents in private schools that took effect on July 1, 2005. It does not address any changes that may be made by the final regulations.

**IDEA 2004:**

1. **Defines the manner in which services are provided to children enrolled in private schools.**

To the extent consistent with the number and location of children with disabilities in the state who are enrolled by their parents in private elementary schools and secondary schools *in the school district served by a local education agency (LEA)*, provision is made for the participation of those children in the program assisted or carried out under the requirements of Part B by providing for such children special education and related services in accordance with Section 612(a)(10) unless the secretary has arranged for services to those children under Section 612(f). [612(a)(10)(A)(i)]

2. **State and local funds must supplement and not supplant proportionate amount.**

State and local funds may supplement and in no case shall supplant the proportionate amount of federal funds required to be expended under Section 612(a)(10)(A). [612(a)(10)(A)(i)(IV)]

3. **Requires maintenance of records on number of children evaluated and number found eligible as part of child find.**

Each LEA shall maintain in its records and provide to the SEA the number of children evaluated under Section 612(a)(10)(A), the number of children determined to be children with disabilities, and the number of children served under Section 612(a)(10)(A). [612(a)(10)(A)(i)(V)]

---

[1] Topics in this series include: Alignment With the *No Child Left Behind Act*; Changes in Initial Evaluation and Reevaluation; Children Enrolled by Their Parents in Private Schools; Discipline; Disproportionality and Overidentification; Early Intervening Services; Highly Qualified Teachers; Individualized Education Program (IEP) Team Meetings and Changes to the IEP; Individualized Education Program (IEP); Local Funding; National Instructional Materials Accessibility Standard (NIMAS); Part C Amendments in *IDEA 2004*; Part C Option: Age 3 to Kindergarten Age; Procedural Safeguards: Surrogates, Notice and Consent; Procedural Safeguards: Mediation and Resolution Sessions; Procedural Safeguards: Due Process Hearings; Secondary Transition; State Funding; and Statewide and Districtwide Assessments. Documents are available on the OSERS Web site at: www.ed.gov/about/offices/list/osers/index.html.

**4. Adds requirements for the provision of services to this population.**
The provision of services pursuant to Section 612(a)(10) shall be provided by employees of a public agency; or through contract by the public agency with an individual, association, agency, organization, or other entity. [612(a)(10)(A)(vi)]

**5. Adds requirements for control of funds and property.**
The control of funds used to provide special education and related services under Section 612(a)(10), and title to materials, equipment, and property purchased with those funds, shall be in a public agency for the uses and purposes provided in IDEA, and a public agency shall administer the funds and the property. [612(a)(10)(A)(vii)]

**Child Find:**

**6. Requires child find in private schools.**
In calculating the proportionate amount of federal funds, the LEA, after timely and meaningful consultation with representatives of private schools as described in Section 612(a)(10)(A)(iii), shall conduct a thorough and complete child find process to determine the number of parentally placed children with disabilities attending private schools located in the LEA. [612(a)(10)(A)(i)(II)]

**7. Equitable participation.**
The child find process shall be designed to ensure the equitable participation of parentally placed private school children with disabilities and an accurate count of such children. [612(a)(10)(A)(ii)(II)]

**8. Activities.**
In carrying out Section 612(a)(10)(A)(ii) [child find requirements], the LEA, or where applicable, the state education agency (SEA), shall undertake activities similar to those activities undertaken for the agency's public school children. [612(a)(10)(A)(ii)(III)]

**9. Cost.**
The cost of carrying out Section 612(a)(10)(A)(ii) [child find requirements], including individual evaluations, may not be considered in determining whether an LEA has met its obligations under Section 612(a)(10)(A)(i). [612(a)(10)(A)(ii)(IV)]

**10. Completion period.**
Such child find process shall be completed in a time period comparable to that for other students attending public schools in the LEA. [612(a)(10)(A)(ii)(V)]

**Consultation:**

**11. Adds additional consultation requirements.**
To ensure timely and meaningful consultation, an LEA, or where appropriate, an SEA, shall consult with private school representatives and representatives of parents of parentally placed private school children with disabilities during the design and development of special education and related services for the children, including regarding:

154

- The child find process and how parentally placed private school children suspected of having a disability can participate equitably, including how parents, teachers, and private school officials will be informed of the process;
- The determination of the proportionate amount of federal funds available to serve parentally placed private school children with the disabilities under Section 612(a)(10), including the determination of how the amount was calculated;
- The consultation process among the LEA, private school officials, and representatives of parents of parentally placed private school children with disabilities, including how such process will operate throughout the school year to ensure that parentally placed private school children with disabilities identified through the child find process can meaningfully participate in special education and related services;
- How, where, and by whom special education and related services will be provided for parentally placed private school children with disabilities, including a discussion of types of services, including direct services and alternate service delivery mechanisms, how such services will be apportioned if funds are insufficient to serve all children, and how and when these decisions will be made; and
- How, if the LEA disagrees with the views of the private school officials on the provision of services or the types of services, whether provided directly or through a contract, the LEA shall provide to the private school officials a written explanation of the reasons why the LEA chose not to provide services directly or through a contract.

[612(a)(10)(A)(iii)]

**12. Requires written affirmation.**
When timely and meaningful consultation as required by Section 612(a)(10)(A)(iii) has occurred, the LEA shall obtain a written affirmation signed by the representatives of participating private schools, and if such representatives do not provide such affirmation within a reasonable period of time, the LEA shall forward the documentation of the consultation process to the SEA. [612(a)(10)(A)(iv)]

**13. Provides a right to complain to the SEA and appeal to the secretary.**
A private school official shall have the right to submit a complaint to the SEA that the LEA did not engage in consultation that was meaningful and timely, or did not give due consideration to the views of the private school official. [612(a)(10)(A)(v)(I)]

If the private school official wishes to submit a complaint, the official shall provide the basis of the noncompliance with Section 612(a)(10)(A)(iii) by the LEA to the SEA, and the LEA shall forward the appropriate documentation to the SEA. If the private school official is dissatisfied with the decision of the SEA, such official may submit a complaint to the secretary by providing the basis of the noncompliance with Section 612(a)(10)(A)(iii) by the LEA to the secretary, and the SEA shall forward the appropriate documentation to the secretary. [612(a)(10)(A)(v)(II)]

# MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301) 657-3843

August 1, 2006

Stephanie Ramjohn-Moore, Esq.
District of Columbia Public Schools
Office of General Counsel
825 North Capitol Street, NE, 9th Floor
Washington, D.C. 20002

Re: S███ A███████
*via facsimile and first-class mail*

Dear Ms. Ramjohn-Moore:

For the upcoming hearing scheduled for August 8, 2006, we hereby submit the following supplemental exhibits to the Disclosure dated July 31, 2006, copies of which are enclosed:

SA-16    Student Referral form for Special Education Services, 1-3-06;
SA-17    Letter from Mr. Eig to Ms. Thompson, 3-13-06;
SA-18    Letter from Mr. Eig to Ms. Thompson, 4-17-06.

Please do not hesitate to contact me if you have any questions regarding this matter.

Sincerely,

Michael J. Eig

Michael J. Eig

*Enclosures*

cc:    Student Hearing Office
       Larry Abramson and Caroline Newman

156



Office of Sp... r Education
District of Columbia Public Schools
825 North Capital Street, NE, 6th Floor
Washington, DC 20002
(202) 442-4800
(202) 442-5517 or (202) 442-5518 (fax)

**PRIVATE-RELIGIOUS SCHOOL
STUDENT REFERRAL
FOR SPECIAL EDUCATION SERVICES**

Student: ▓▓ Ne▓▓ A▓▓▓▓         Student ID# _____         Grade 9

Race: Caucasian   Sex: M   Date of Birth: ▓▓ / 91   Primary Language: English

Parent/Guardian: Caroline Newman and Larry Abramson   Work Phone: (202) 633-3016 (Caroline) 513-2439 (Larry)

Address: 6419 Barnaby St. NW   Home Phone: (202) 686-9212

City/State/Zip: Washington, DC 20015

DCPS Neighborhood School: Lafayette / Diehl/ Wilson   DCPS School ID#: _____

Private-Religious School: Georgetown Day School   Private-Religious School ID#: _____

Private-Religious School Address: 4200 Davenport St. NW

Principal/Headmaster of Private-Religious School: Peter M. Branch   Phone: (202) 295-6120

Referral Submitted By: _____   Date: ___/___/___

**Summarize the student's educational or learning problem(s) that necessitates this referral.**

S▓▓ is an extremely bright young man, with many cognitive scores in the 99th percentile. Until recently, he has been a good student; however, he has been exhibiting increasing signs of inattention, anxiety, and depression. Recently, these issues have risen to the forefront, and his educational performance has declined significantly in the past 10 months. These disabilities appear to be having a great impact on S▓▓ ability to benefit from instruction.

**Chronological List of Information and Records**

List all documents and date submitted.          ☐ Check here and attach list if more space is needed.

| | Document Name | Date | | Document Name | Date |
|---|---|---|---|---|---|
| 1 | Stixrude & Assoc. Neuro-psychological Evaluation | 16/99 1? | 6 | ERB/Comprehen: Testing Pro 4 | 3/04 |
| 2 | Stanford Achivement Test | 4/98 | 7 | SAT | 4/08/04 |
| 3 | Comprehensive Testing P. III | 4/02 | 8 | | |
| 4 | SSAT | 12/14/02 | 9 | | |
| 5 | ERB/Compr. Test. Prog 4 | 4/03 | 10 | | |

Type of Service(s) Requested: _____

Special or Remedial Service Currently Provided: _____

Student Performance Summary (Code: 1 = Above Average   2 = Average   3 = Below Average)

☐ Reading   ☐ Written/Oral Language   ☐ Mathematics   ☐ Perception/Motor Functioning   ☐ Spelling   ☐ Other

Comments: _____

I have reviewed this application and the information/records specified and authorize their release to the District of Columbia Public Schools for use in the Individualized Education Program (IEP) process to determine the eligibility of my child for special education services. By signing this form, I give DCPS permission to evaluate my child in all areas of suspected disabilities.

Parent/Guardian Signature: *Caroline S Newman    Larry Abram*   Date: 1, 3, 06

◀——————————————————————————————————————————————————————▶

I have reviewed the documentation compiled for this student and authorize transmittal of the records specified.

Principal/Headmaster Signature: _____   Date: _____

Signature and Title of Person Completing This Form: _____   Date: _____
157   157
DCPS 2003

**EXHIBIT**

**SA-16**



**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301)657-3843

March 13, 2006

Kathie Thompson
C.A.R.E. Center at Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, D.C. 20001

Re: S███ A███████
*via facsimile and first-class mail*

Dear Ms. Thompson:

I understand that you have attempted to contact S████ parents to schedule a classroom observation at Georgetown Day School. Due to the severity of S████ disability and its recent manifestations, S███ has had to be removed from that school, and is scheduled to begin a therapeutic residential placement at The Grove School in Madison Connecticut within the next few weeks. As you begin the MDT/IEP process, I am attaching a Neuropsychological Reevaluation that was recently completed by William R. Stixrud, Ph.D. and Associates, as well as a Classroom Observation by Helen Steinberg of GDS. If there is any other information that we can provide, or if you require anything further, please do not hesitate to contact me.

Sincerely,

Michael Eig

*Enclosures*

cc:    Larry Abramson and Caroline Newman

158





**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938

(301) 657-1740
FACSIMILE (301)657-3843



April 17, 2006

Kathie Thompson
C.A.R.E. Center at Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, D.C. 20001

Re: S█ A█████
*via facsimile and first-class mail*

Dear Ms. Thompson:

I am writing to follow-up on my letter of March 13, 2006, to advise that S█ began at The Grove School in Madison Connecticut on April 4, 2006, and as of now, appears to be well-placed there. We will, of course, forward any information that is generated by the Grove placement.

If you require anything further, please do not hesitate to contact me.

Sincerely,

Michael Eig

*Enclosures*

cc:    Larry Abramson and Caroline Newman

159



## MICHAEL J. EIG AND ASSOCIATES, P.C.
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX

**To:**            Stephanie Ramjohn-Moore, Esq.
                   **DCPS - Office of the General Counsel**
**Fax Number:**    202-442-5098
**From:**          Michael J. Eig
**Date:**          August 1, 2006
**Time:**          2:55 pm

**Total Pages:**   5
(including cover)

**Re:**            

**CC:**            Sharon Newsome
                   202-442-5556

5 Day Supplemental Disclosure Statement

160

# MICHAEL J. EIG AND ASSOCIATES, P.C.

**ATTORNEYS AT LAW**
**SUITE 760**
**5454 WISCONSIN AVENUE**
**CHEVY CHASE, MARYLAND 20815-6938**
**(301) 657-1740**

**FACSIMILE (301) 657-3843**

September 11, 2006

Stephanie Ramjohn-Moore, Esq.
District of Columbia Public Schools
Office of the General Counsel
825 North Capitol Street, NE, 9th Floor
Washington D.C. 20002

Re: S█ A█████
*via overnight mail*

Dear Ms. Ramjohn-Moore:

In addition to the documents and witnesses previously disclosed on July 31, 2006 and August 1, 2006 (copies of which are already in the school system's possession), we will be relying upon the following enclosed documents for the upcoming Due Process Hearing scheduled for 9:00 A.M. on September 19, 2006:

|        |                                                          |
|--------|----------------------------------------------------------|
| SA-19  | Official Grade Report for the Academic Year 2005-2006, 5-19-06; |
| SA-20  | Comprehensive Service Plan from Grove School, 6-5-06;    |
| SA-21  | Progress Report from Grove School, 6-21-06.              |

Please be advised that we may also rely on any documents and witnesses disclosed by DCPS, as well as any other documents and witnesses to which DCPS does not object. We will object to any documents or testimony from witnesses not disclosed in a timely manner in accordance to the IDEA and federal regulations.

Sincerely,

Michael J. Eig

*Enclosures*

cc:    Student Hearing Office (*with enclosures*)
       Larry Abramson and Caroline Newman (*with enclosures*)

161



# GROVE SCHOOL
## MADISON CONNECTICUT 06443
### (203) 245-2778

## OFFICIAL GRADE REPORT FOR ACADEMIC YEAR 2005-2006

**STUDENT:** S████  A████████  **GRADE:** 9  **MPE:** 05/19/06

**DOB:** ███/1991  **DOE:** 4/4/2006  **CODE:** *AbraSe* 06014  1P  1C 2

| SUBJECT/TEACHER | 1 | 2 | 3 | 4 | Final | COMMENTS |
|---|---|---|---|---|---|---|
| English 9<br>Lexi Roberts | - | - | B | | | 1,3,15 |
| Game Theory<br>Walton Yoder | | | A | | | |
| General Science<br>Abby Rohr | - | - | B- | | | 1,6,15,22 |
| Geometry<br>Bill Cox | | | A- | | | 1,5,7,12,22 |
| Modern US History<br>Carissa Byrnes | - | - | B | | | 1, 3, 4, 18 |
| PE/Health<br>Jason Snider | - | - | A | | | 20 |
| Spanish I<br>Joel Castillo | | | D | | | 9,22 |

## COMMENT CODES

1. Pleasure to have in class
2. Displays positive organizational & study skills
3. Contributes positively to class environment
4. Exhibits consistent effort in class work
5. Interacts positively with peers
6. Displays consistent self-control
7. Demonstrates consistent problem solving skills
8. Performs well on homework/outside preparation
9. Attends class regularly
10. Seeks assistance appropriately
11. Consistently punctual to class
12. Consistent class participation
13. Exhibits independence and self-monitoring
14. Has shown recent improvement
15. Attempts to stay on task
16. Needs improvement in organizational & study skills
17. Emotional issues interfere in academics
18. More effort required in task completion
19. Needs growth in peer interactions
20. Needs to apply more self-control
21. Improvement needed in problem solving skills
22. More class preparation/homework is required
23. Needs to increase class attendance
24. Needs to expand methods for seeking assistance
25. More attention to punctuality is needed
26. Class participation should be increased
27. Independence and self-monitoring need attention
28. Performs poorly on test and quizzes

**Grading Policy:** Students receive a letter grade for academic achievement as follows:

| A+ 98-100 | A 93-97 | A- 90-92 | B+ 87-89 | B 83-86 | B- 80-82 |
|---|---|---|---|---|---|
| C+ 77-79 | C 73-76 | C- 70-72 | D+ 67-69 | D 63-66 | D- 60-62 |

**NG** = No Grade    **P** = Pass    **ME** = Medical Excuse
**INC** =  Student has not received a grade or credit due to effort/performance or insufficient work. With Principal's approval, the work may be made up within one week of the end of the marking period, and a grade and credit may be given. The student may need to continue the course longer than the normal academic year.

162





**GROVE SCHOOL • 175 COPSE ROAD • MADISON, CONNECTICUT • 06443**
P.O. BOX 646 • (203) 245-2778 • FAX (203) 245-6098 • www.groveschool.org

RICHARD L. CHORNEY
PRESIDENT AND CEO

PETER J. CHORNEY
EXECUTIVE DIRECTOR

KATHY F. KIMMEL
ADMISSIONS DIRECTOR

GEORGE OLSHIN, Ed.D
PRESIDENT, ADVISORY BOARD

June 5, 2006

LEA:

Student:        S█ A█████

Parents:        Carol Newman & Larry Abramson
                6419 Barnaby Street N.W.
                Washington, D.C. 20015

Enclosed is our Comprehensive Service Plan for S█ A█████ for the 2005-2006 academic year at Grove School. Our Comprehensive Service Plan is designed with a format similar to I.E.P.s. The goals and objectives written in this document are aligned with those that accompanied the student to Grove School or as they are related to the student's individual program. They will be evaluated on the dates noted and serve as our communication of the student's progress. We ask that your district use our evaluation to complete your IEP's. Copies of report cards will be mailed to you after each marking period.

Some schools will also schedule a PPT to review the information, develop a new I.E.P. and/or hold Annual Reviews. As you consider planning your annual review, please be mindful that our academic year runs through August 2006.

If you have any questions regarding S█ and his program at Grove School, please contact me.

Please indicate receipt of the document by signing in the space below and returning it in the envelope provided. Thank you.

Sincerely yours,

Robert Ruggiero
Principal

RR/mac

_____        _____        _____
LEA                        Parent/Guardian            Date

163

**EXHIBIT**

SA-20



**GROVE SCHOOL**

**MADISON CONNECTICUT**

# COMPREHENSIVE SERVICE PLAN

## CONTENTS

**SECTION**

A. **PROGRAM OVERVIEW**
1. Treatment Team
2. Reason for Referral/Diagnosis
3. Reports/Assessments Reviewed for CSP
4. Summary of Services
5. Medical Information
6. Programming Issues
7. Monitoring Criteria
8. Strategies

B. **CLINICAL REVIEW**
1. Clinical Report: Presenting Problem(s), Treatment Goal(s) and Evaluation(s)
2. Social/Emotional Goals and Objectives

C. **ADVISOR REVIEW**
1. Goals/Objective to support therapeutic program
   a. Profile Summary of strengths/areas of concern
   b. Behavioral Goals/Objectives
   c. Transition Goals/Objectives
   d. Strategies/Modifications

D. **ACADEMIC PROGRAM**
1. Student Learning Profile Summary
2. Academic Goals/Objectives
3. Strategies/Modifications

E. **ACADEMIC INFORMATION**
1. Course and Credit Check – School System
2. Academic Marking Periods/Course Descriptions

# SECTION A

# PROGRAM OVERVIEW

**GROVE SCHOOL**
Madison, Connecticut

## COMPREHENSIVE SERVICE PLAN

DATE PREPARED:                          May 2006

MID-YEAR PROGRESS REPORT DUE:           November 2006

ANNUAL REVIEW DUE:                      May 2007

ACADEMIC YEAR:                          2005-2006
                                        Current courses change in September 2006 based on passing
                                        grades, completion of course, credits needed to graduate, and
                                        appropriate grade level.

EFFECTIVE CSP YEAR:                     2005-2006

STUDENT:                                S⬛ A⬛⬛⬛⬛⬛

DATE OF BIRTH:                          ⬛⬛/91

DATE OF ADMISSION:                      4/4/06

SEX:                                    M

GRADE AT ADMISSION:                     9th

CURRENT GRADE:                          9th

REFERRAL SOURCE:                        Please refer to "New Admissions" form.

SCHOOL SYSTEM:                          Private-pursuing D.C. funding

PARENT/GUARDIAN NAME:                   Carol Newman & Larry Abramson

ADDRESS:                                6419 Barnaby Street N.W.
                                        Washington, D.C. 20015

TELEPHONE:                              (H) (202) 686-9212        (M/W) (202) 686-9212
                                        (F/W) (202) 513-2439

## I. TREATMENT TEAM

| | |
|---|---|
| THERAPIST: | Nancy Horn, Ph.D. |
| ADVISOR: | Bill Cox |
| PSYCHIATRIST (medication): | Richard Rubin, M.D. |
| EXECUTIVE DIRECTOR: | Peter Chorney, M.S. |
| PRINCIPAL: | Robert Ruggiero |
| ADMISSIONS DIRECTOR: | Kathy Kimmel, MSW. |
| TREATMENT TEAM COORDINATOR: | Bill Cox |
| SPEC. EDUC. COORDINATOR: | Melissa Costanza |
| DORMITORY STAFF: | Ethan Westall |
| TEACHERS: | Bill Cox, Abby Rohr, Lexi Roberts, Derek Chapman, Cara Pasquinelli, Jason Snider, & Walton Yoder |

166

## II. REASON FOR REFERRAL/DIAGNOSIS

Need for the structure and support of residential placement to improve socialization skills; decrease anxiety; alleviate depressive symptoms; learn organizational strategies; learn relaxation/focusing techniques, improve academic functioning; increase self-awareness; increase self-esteem; decrease rigidity; decrease irrational, perseverative and obsessive thinking.

Previous Diagnosis: Asperger's Disorder; mild written language disability
WISC- III: V.I.Q.- 144, P.I.Q.- 133, F.S.I.Q.- 135

## III. REPORTS/ASSESSMENTS REVIEWED FOR COMPREHENSIVE SERVICE PLAN

1. Clinical/Nancy Horn, Ph.D.
2. Advisor/Bill Cox
3. Teacher evaluations:

| | | |
|---|---|---|
| Geometry | - | Bill Cox |
| General Science | - | Abby Rohr |
| English 9 | - | Lexi Roberts |
| World History | - | Derek Chapman |
| Spanish I | - | Cara Pasquinelli |
| PE/Health | - | Jason Snider |
| Game Theory | - | Walton Yoder |

4. Case File

## IV. SUMMARY OF SERVICES

TOTAL HOURS OF INSTRUCTION PER WEEK: 30
TOTAL NUMBER OF DAYS IN SCHOOL YEAR: 207 (September through August)
PSYCHOLOGICAL SERVICES: up to 2 hours (two 45-minute sessions) individualized psychotherapy per week; clinical consultation as needed; weekly group meetings with dormitory peer group and residential administrator; counseling with advisor as needed.
SPECIAL SERVICES: None at present.

## V. MEDICAL INFORMATION

Current medication as of May 15, 2006
Wellbutrin SR 200 mg. 8 a.m. & 9 p.m.
Risperdal 0.5 mg. 8 a.m. & 9 p.m.

167

## VI.  PROGRAMMING ISSUES

None at this time.

## VII.  MONITORING CRITERIA

Progress will be monitored by daily dormitory reports, periodic advisor narratives, and clinical reports.

## VIII.  STRATEGIES

Standard strategies used in the Grove School treatment process include:

1.  Defined expectations, limits and consequences
2.  Daily feedback about performance to student
3.  Verbal cueing or prompting
4.  Provision of successful experiences
5.  Positive role models
6.  Buddy system, peer instruction or tutoring
7.  Supportive and nurturing teacher/student relationships
8.  Positive peer pressure
9.  Criticism or correction given 1:1 when possible, and prefaced with an affirming comment
10. Role playing
11. Values clarification activities
12. Structured and supervised peer group activities
13. Group counseling sessions
14. Individualized psychotherapy sessions
15. Family therapy sessions
16. Administrative/clinical meetings and interventions

168

# SECTION B

# CLINICAL REVIEW

# GROVE SCHOOL -- CLINICAL REPORT

Madison, Connecticut

THERAPIST: Nancy Horn, Ph.D.

DATE: May 2006

SIGNATURE: On file.

STUDENT: S█ A█████

DIAGNOSIS: Asperger's Disorder, ADD, mild written language disability, Depression

Behavioral Severity: 0 = none    1 = slight    2 = mild    3 = moderate    4 = severe
Improvement (over treatment period): 0 = none    1 = slight    2 = mild    3 = marked

| Presenting Problem | Treatment Goal | Treatment Modality | Evaluation Schedule CSP Date: May 2006 | Evaluation Schedule 6 Mo. Review: |
|---|---|---|---|---|
| Depressed or irritable affect, lack of energy, low-interest and motivation. | To normalize depressed affect, low energy, low interest and motivation. | ✓ Individual<br>✓ Family<br>✓ Advisor<br>✓ Advisor On Duty<br>✓ Dorm Staff<br>✓ Group<br>✓ Medication<br>✓ Integrated, multi-modal treatment<br>✓ Teacher/Residential Counselor | Severity: 0  1  2  (3)  4<br><br>Improvement: 0  1  (2)  3<br><br>Comments:  Seth seems less depressed as he has been participating in the program. | Severity: 0  1  2  3  4<br><br>Improvement: 0  1  2  3<br><br>Comments: |
| Lack of insight, understanding, and coping with depressive illness | To understand, accept, and cope with depressive illness | ✓ Individual<br>✓ Family<br>✓ Advisor<br>✓ Advisor On Duty<br>✓ Dorm Staff<br>✓ Group<br>✓ Medication<br>✓ Integrated, multi-modal treatment<br>✓ Teacher/Residential Counselor | Severity: 0  1  2  (3)  4<br><br>Improvement: 0  (1)  2  3<br><br>Comments: | Severity: 0  1  2  3  4<br><br>Improvement: 0  1  2  3<br><br>Comments: |

Page 1

170

| Presenting Problem | Treatment Goal | Treatment Modality | Evaluation Schedule CSP Date: May 2006 | Evaluation Schedule 6 Mo. Review: |
|---|---|---|---|---|
| Marked problems in the delay of gratification. | To learn methods to cope with the intensity of affect and impulsivity and to increase capacity for delay of gratification. | ✓ Individual<br>✓ Family<br>✓ Advisor<br>✓ Advisor On Duty<br>✓ Dorm Staff<br>✓ Group<br>✓ Medication<br>✓ Integrated, multi-modal treatment<br>✓ Teacher/Residential Counselor | Severity: 0  1  2  (3)  4<br>Improvement: 0  (1)  2  3<br>Comments: Seth is dealing with frustration tolerance and trusting the program such that he can have some restriction. | Severity: 0  1  2  3  4<br>Improvement: 0  1  2  3<br>Comments: |
| Projection of blame, denial of responsibility for emotionality, and acting out. | To gain insight into the dynamics of these defenses; to take responsibility for one's emotionality and behavioral acting out. | ✓ Individual<br>✓ Family<br>✓ Advisor<br>✓ Advisor On Duty<br>✓ Dorm Staff<br>✓ Group<br>✓ Medication<br>✓ Integrated, multi-modal treatment<br>✓ Teacher/Residential Counselor | Severity: 0  1  2  3  (4)<br>Improvement: 0  (1)  2  3<br>Comments: | Severity: 0  1  2  3  4<br>Improvement: 0  1  2  3<br>Comments: |
| Physical acting out against adult family members. | To desist from acting out, to resolve issues by non-aggressive means. | ✓ Individual<br>✓ Family<br>✓ Advisor<br>✓ Advisor On Duty<br>✓ Dorm Staff<br>✓ Group<br>✓ Medication<br>✓ Integrated, multi-modal treatment<br>✓ Teacher/Residential Counselor | Severity: 0  1  2  (3)  4<br>Improvement: 0  1  2  3<br>Comments: | Severity: 0  1  2  3  4<br>Improvement: 0  1  2  3<br>Comments: |

Page 2

171

| Presenting Problem | Treatment Goal | Treatment Modality | Evaluation Schedule CSP Date: May 2006 | Evaluation Schedule 6 Mo. Review: |
|---|---|---|---|---|
| Oppositionality, argumentativeness, rebelliousness, refusal of requests of adult authority figures. | To decrease oppositionality, learn to negotiate, compromise, accept reasonable requests of authority figures. | Individual ✓<br>Family ✓<br>Advisor ✓<br>Advisor On Duty ✓<br>Dorm Staff ✓<br>Group ✓<br>Medication<br>Integrated, multi-modal treatment ✓<br>Teacher/Residential Counselor | Severity: 0  1  2  (3)  4<br><br>Improvement: 0  (1)  2  3<br><br>Comments: | Severity: 0  1  2  3  4<br><br>Improvement: 0  1  2  3<br><br>Comments: |
| Problems in communication, insight, and understanding of peers, adults, and parents. | To increase social skills in communication, insight, and understanding of peers, adults, and parents. To build friendships and form meaningful relationships with peers. To learn to trust adults and use them appropriately as resources. | Individual ✓<br>Family ✓<br>Advisor ✓<br>Advisor On Duty ✓<br>Dorm Staff ✓<br>Group ✓<br>Medication<br>Integrated, multi-modal treatment ✓<br>Teacher/Residential Counselor | Severity: 0  1  2  3  (4)<br><br>Improvement: 0  (1)  2  3<br><br>Comments: | Severity: 0  1  2  3  4<br><br>Improvement: 0  1  2  3<br><br>Comments: |
| Conflict, argumentativeness, refusal to accept rules in the family. | To reduce conflict, find and use methods of conflict resolution in the family. | Individual ✓<br>Family ✓<br>Advisor ✓<br>Advisor On Duty ✓<br>Dorm Staff ✓<br>Group ✓<br>Medication<br>Integrated, multi-modal treatment ✓<br>Teacher/Residential Counselor | Severity: 0  1  2  (3)  4<br><br>Improvement: 0  (1)  2  3<br><br>Comments: | Severity: 0  1  2  3  4<br><br>Improvement: 0  1  2  3<br><br>Comments: |

Page 3

172

**GROVE SCHOOL**
Madison, Connecticut

DATE: May 2006

AREA: SOCIAL/EMOTIONAL

NAME: S▮▮A▮▮▮

GOAL: The student will improve social/emotional skills by meeting the objectives listed below.

| OBJECTIVES | PERFORMANCE CRITERIA | EVALUATION PROCEDURES | EVALUATION SCHEDULE | |
|---|---|---|---|---|
| | | | CSP DATE: May 2006 | ANNUAL REVIEW DATE: May 2007 |
| 1. To normalize depressed affect, low energy, low interest and motivation. | Decrease depressed or irritable affect, increase energy, interest and motivation. | Clinical observation as detailed in: Clinical report, Advisor report, teacher observation | Refer to Clinical Report for evaluation of social/emotional goals. | |
| 2. To understand, accept, and cope with depressive illness | Increase insight, understanding, and coping with depressive. | Clinical observation as detailed in: Clinical report, Advisor report, teacher observation | | |
| 3. To learn methods to cope with the intensity of affect and impulsivity and to increase capacity for delay of gratification. | Decrease marked problems in the delay of gratification. | Clinical observation as detailed in: Clinical report, Advisor report, teacher observation | | |
| 4. To gain insight into the dynamics of these defenses; to take responsibility for one's emotionality and behavioral acting out. | Decrease projection of blame, denial of responsibility for emotionality, and acting out. | Clinical observation as detailed in: Clinical report, Advisor report, teacher observation | | |

**SEE SECTION 4 FOR CURRENT STATUS AND CLINICAL REPORT.**

2 - 1

173

**GROVE SCHOOL**
Madison, Connecticut

DATE: May 2006

**AREA: SOCIAL/EMOTIONAL**

NAME: S███ A█████

GOAL: The student will improve social/emotional skills by meeting the objectives listed below.

| OBJECTIVES | PERFORMANCE CRITERIA | EVALUATION PROCEDURES | EVALUATION SCHEDULE | |
|---|---|---|---|---|
| | | | CSP DATE: May 2006 | ANNUAL REVIEW DATE: May 2007 |
| 5.  To desist from acting out, to resolve issues by non-aggressive means. | Decrease physical acting out against adult family members. | Clinical report, Advisor report, teacher observation, home visitation report, and parent feedback | Refer to Clinical Report for evaluation of social/emotional goals. | |
| 6.  To decrease oppositionality, learn to negotiate, compromise, accept reasonable requests of authority figures. | Decrease oppositionality, argumentativeness, rebelliousness, refusal of requests of adult authority figures. | Clinical report, Advisor report, teacher observation, home visitation report, and parent feedback | | |
| 7.  To increase social skills in communication, insight, and understanding of peers, adults, and parents.  To build friendships and form meaningful relationships with peers.  To learn to trust adults and use them appropriately as resources. | Increase communication, insight, and understanding of peers, adults, and parents. | Clinical report, Advisor report, teacher observation, home visitation report, and parent feedback | | |
| 8.  To reduce conflict, find and use methods of conflict resolution in the family. | Decrease conflict, argumentativeness, refusal to accept rules in the family. | Clinical report, Advisor report, teacher observation, home visitation report, and parent feedback | | |

174

# SECTION C

# ADVISOR REVIEW

# GROVE SCHOOL
### Madison, CT

## ADVISORY REPORT
## CONFIDENTIAL INFORMATION

**Student Name: S██h A█████████**
**Advisor Name: Bill Cox**
**DOB: ████/91**
**DOA: 4/4/06**
**Date:  May 2006 – May 2007**
**Goals and Objectives for 2005-2006**


## 1.  STUDENT STRENGTHS & CONCERNS/NEEDS:

| STRENGTHS: | CONCERNS/NEEDS: |
|---|---|
| Very Intelligent | Relationship with parents |
| Good Sense of Humor | Understanding other's perspectives |
| Congenial | Reclusive |


## 2.  SOCIAL/EMOTIONAL GOALS/OBJECTIVES TO SUPPORT THERAPEUTIC PROGRAM:

**Goal #1:** S██h will demonstrate improvement with his ability to communicate successfully with his family in 8 out of 10 situations.

| | Objectives | 5/06 | |
|---|---|---|---|
| 1. | S██h will discuss his relationship with his family with his advisor and therapist | **OP** | |
| 2. | S██h will identify and utilize the skills needed to improve his ability to communicate his thoughts and feelings with his family. | **LP** | |
| 3. | S██h will participate in phone conferences and in-person family meetings as deemed appropriate. | **OP** | |
| 4. | S██h will participate in home visits at least once a month. | **OP** | |
| 5. | S██h will discuss both difficult and positive situations with his family and identify what worked well and what he could do differently. | **LP** | |
| 6. | S██h will work with his advisor and therapist to identify and understand his role within his family. | **LP** | |

EVALUATION PROGRESS KEY:  OM = OBJECTIVE MET, OP = OBJECTIVE IN PROGRES, LP = LIMITED PROGRESS, NI = NOT INTRODUCED

176

# GROVE SCHOOL
### Madison, CT

## ADVISORY REPORT
## CONFIDENTIAL INFORMATION

**Student Name:  S____ A_____**
**Advisor Name:  Bill Cox**
**DOB:** ____/91
**DOA:** 4/4/06
**Date:  May 2006 – May 2007**
**Goals and Objectives for 2005-2006**

## Goal #2: S____ will improve responsible behavior by meeting the short-term objectives below in 8 out of 10 situations.

| | Objectives | 5/06 | |
|---|---|---|---|
| 1. | S____ will accept responsibility for his behaviors. | **OP** | |
| 2. | S____ will accept expected consequences for his behavior. | **OP** | |
| 3. | S____ will accept adult constructive criticism and/or discipline without an emotional outburst. | **OP** | |

EVALUATION PROGRESS KEY:  OM = OBJECTIVE MET, OP = OBJECTIVE IN PROGRES, LP = LIMITED PROGRESS, NI = NOT INTRODUCED

## Goal #3: S____ will eliminate aggressive behaviors by meeting the short-term objectives below in 8 out of 10 situations.

| | Objectives | 5/06 | |
|---|---|---|---|
| 1. | S____ will eliminate verbal and/or physical aggression toward peers. | **OP** | |
| 2. | S____ will control physical responses when angered. | **OP** | |

EVALUATION PROGRESS KEY:  OM = OBJECTIVE MET, OP = OBJECTIVE IN PROGRES, LP = LIMITED PROGRESS, NI = NOT INTRODUCED, NA=NOT APPLICABLE

# GROVE SCHOOL
### Madison, CT

## ADVISORY REPORT
## CONFIDENTIAL INFORMATION

**Student Name: S██ A█████████**
**Advisor Name: Bill Cox**
**DOB:** ████/91
**DOA:** 4/4/06
**Date:  May 2006 – May 2007**
**Goals and Objectives for 2005-2006**

## Goal #4: S███ will demonstrate improvement in self-awareness and self-concept in 8 out of 10 discussions.

| | Objectives | 5/06 | |
|---|---|---|---|
| 1. | S██ will demonstrate a willingness to attempt new or novel experiences. | **LP** | |
| 2. | S██ will identify his own strengths and weaknesses. | **LP** | |
| 3. | S██ will verbalize how self-concept affects aspects of his daily life. | **LP** | |
| 4. | S██ will identify problematic behavior based on perception of self and identify substitute, acceptable behaviors. | **OP** | |
| 5. | S██ will express appreciations for differences of individual rights/opinions/feelings of others. | **OP** | |
| 6. | S██ will reduce irrational thinking and cognitive distortions of events. | **LP** | |

EVALUATION PROGRESS KEY:  OM = OBJECTIVE MET, OP = OBJECTIVE IN PROGRES, LP = LIMITED PROGRESS, NI = NOT INTRODUCED

## Transition Goal #5: S███ will prepare for post-secondary living and education.

| | Objectives | 5/06 | |
|---|---|---|---|
| 1. | S██ will describe his learning style(s) and the accommodations or strategies that help him learn most effectively. | **LP** | |
| 2. | S██ will take the PSAT and SAT's. | **LP** | |
| 3. | With assistance of his advisor, therapist and other pertinent staff, S██ will develop goals beyond high school. | **LP** | |
| 4. | S██ will participate in on campus employment | **LP** | |
| 5. | S██ will participate in extra curricular activities, outdoor education and A.S.T.E.E's (Alternative Site Therapeutic Educational Experiences) as appropriate to facilitate socialization. | **LP** | |

EVALUATION PROGRESS KEY: OM = OBJECTIVE MET, OP = OBJECTIVE IN PROGRESS
LP = LIMITED PROGRESS, NI = NOT INTRODUCED, NA = NOT APPLICABLE TO THIS SUBJECT AREA

178

# GROVE SCHOOL
### Madison, CT

## ADVISORY REPORT
## CONFIDENTIAL INFORMATION

**Student Name:** S██ A█████████

**Advisor Name:** Bill Cox

**DOB:** ████91

**DOA:** 4/4/06

## Date: May 2006 – May 2007
**Goals and Objectives for 2005-2006**

## COMMENTS:

**May 2006:** S████ first two months at Grove School for the most part have gone by fairly smoothly. He was involved in a physical altercation with a peer within his first few weeks of being here, but since then has been on task. His primary difficulties revolve around his relationship with his parents. He has been extremely hostile in family sessions and often blames them for just about everything that he does not like in his life. Despite this, S██ seems to have made a smooth transition into the program and is actively using therapy and is developing a strong relationship with his advisor.

# SECTION D

# ACADEMIC PROGRAM

# GROVE SCHOOL
**Madison, CT**

## LEARNING PROFILE
## CONFIDENTIAL INFORMATION

**Student Name:** S█████ A█████████
**Advisor Name:** Bill Cox
**DOB:** ████/91
**DOA:** 4/4/06
**Date:** May 06 - May 07
**Goals and Objectives for 2005-2006**

## 1.  TEST DATA

1/06- WISC-IV:  Verbal Comprehension Index- 144, Perceptual Reasoning Index- 133, Working Memory Index- 138, Processing Speed Index- 88, Full Scale IQ- 135

## 2.  ACADEMIC/LEARNING ISSUES:

Diagnoses as reported by the Neuropsychological Evaluation completed by Ellen K. Goldman, Ph.D.
Attention Deficit Hyperactivity Disorder, Executive Dysfunction, Learning Disability, NOS, Asperger's Disorder, Dysthymic Disorder, Anxiety Disorder, NOS

## 3.  STUDENT STRENGTHS & CONCERNS/NEEDS:

### STRENGTHS:                                        CONCERNS/NEEDS:

| STRENGTHS | CONCERNS/NEEDS |
|---|---|
| Academic abilities | Attention |
| Vocabulary | Organization and Planning |
| Creative | |
| Listening comprehension | |

# GROVE SCHOOL
### Madison, CT

# LEARNING PROFILE
## CONFIDENTIAL INFORMATION

**Student Name:** S███ A█████████

**Advisor Name:** Bill Cox

**DOB:** ██/91

**DOA:** 4/4/06

**Date:** May 06 - May 07

**Goals and Objectives for 2005-2006**

## 4. GOALS/OBJECTIVES TO SUPPORT ACADEMIC PROGRAM:

### Goal #1: S███ will improve his ability to attend to class.

| | Objectives | 5/06 | |
|---|---|---|---|
| 1. | S██ will remain on task for a period of 20 minutes with no more than 2 teacher prompts 80% of the time. | **LP** | |
| 2. | S██ will comply with no more than 2 teacher prompts to regain focus back to task 80% of the time. | **LP** | |
| 3. | S██ will exhibit appropriate behaviors to enhance listening skills (posture, eye contact) 80% of the time. | **LP/OP** | |
| 4. | S██ will ignore classroom disruptions 80% of the time. | **LP** | |
| 5. | S██ will utilize a variety of study skills techniques to understand subject matter (i.e., memory strategies, problem-solving techniques etc.) 80% of the time. | **LP/OP** | |
| 6. | When taking a test, S██ will systematically preview test to allot time for completion 80% of the time. | **LP** | |
| 7. | S██ will identify and use clue words in test questions 80% of the time. | **LP/OP** | |

EVALUATION PROGRESS KEY: OM = OBJECTIVE MET, OP = OBJECTIVE IN PROGRESS
LP = LIMITED PROGRESS, NI = NOT INTRODUCED, NA = NOT APPLICABLE TO THIS SUBJECT AREA

### Goal #2: S███ will improve his organizational skills.

| | Objectives | 5/06 | |
|---|---|---|---|
| 1. | S██ will come to class prepared by bringing the necessary materials required for the day (i.e., pencil, notebook, planner etc.) 80% of the time. | **LP** | |
| 2. | S██ will write down his assignments in an appropriate planner 90% of the time. | **LP** | |
| 3. | S██ will with decreasing teacher assistance break down long-term assignments into manageable parts 80% of the time. | **LP** | |
| 4. | S██ will complete and turn-in class work and homework assignments within the given time frame 80% of the time. | **LP** | |

EVALUATION PROGRESS KEY: OM = OBJECTIVE MET, OP = OBJECTIVE IN PROGRESS
LP = LIMITED PROGRESS, NI = NOT INTRODUCED, NA = NOT APPLICABLE TO THIS SUBJECT AREA

# GROVE SCHOOL
**Madison, CT**

## LEARNING PROFILE
## CONFIDENTIAL INFORMATION

**Student Name:** S███ A████████

**Advisor Name:** Bill Cox

**DOB:** ████/91

**DOA:** 4/4/06

**Date:** May 06 - May 07

**Goals and Objectives for 2005-2006**

## Goal #3: S███ will improve his social skills in the classroom.

| | Objectives | 5/06 | |
|---|---|---|---|
| 1. | S██ will work cooperatively on classroom assignments with his peers 4 out of 5 times. | **LP/OP** | |
| 2. | S██ will refrain from making inappropriate comments to peers 80% of the time. | **LP** | |
| 3. | S██ will initiate and respond appropriately to conversations with peers 80% of the time. | **LP** | |
| 4. | S██ will refrain from getting involved in peer issues that do not concern him 80% of the time. | **LP** | |

EVALUATION PROGRESS KEY: OM = OBJECTIVE MET, OP = OBJECTIVE IN PROGRESS
LP = LIMITED PROGRESS, NI = NOT INTRODUCED, NA = NOT APPLICABLE TO THIS SUBJECT AREA

## 5. STRATEGIES/RECOMMENDATIONS:

| | |
|---|---|
| Provide clear expectations and guidelines for behavior | Predictable consequences for failure to meet expectations |
| Slower processing speed will affect his ability to copy notes in a timely manner. Provide a copy of notes for him, or outlines with a limited amount of writing S██ would need to complete. | Utilize preferential seating to increase attention, if needed |
| Assist him in breaking down assignments into manageable parts. | |

## COMMENTS:

May 2006: S██ has made somewhat of an adequate adjustment to the educational program at Grove School. He is a bright, young man who does not always work to his academic potential. His teachers report that S██ needs to improve his focus in class. He needs several verbal prompts during a class period to assist him back to task. S██ has shown some difficulty with his peers relations. He will often make inappropriate comments towards his peers. S██ needs to improve his organizational skills and ability to complete homework assignments. These areas will be of focus during the next review period.

# SECTION E

# ACADEMIC INFORMATION



**GROVE SCHOOL**
**Madison, Connecticut**

**STUDENT:  S̶e̶t̶h̶ A̶l̶▬▬▬▬**                          --- Grade--- 9

## Grove School Academic Marking Periods for 2005-2006

MARKING PERIOD 1: 9/7/05 – 11/17/05

MARKING PERIOD 2: 11/18/05 – 2/22/06

MARKING PERIOD 3: 2/23/06 – 5/19/06

MARKING PERIOD 4: 5/22/06 – 8/18/06

## <u>Course Overviews:</u>

### <u>PHYSICAL EDUCATION</u>

Student will gain an increased appreciation for team and individualized sports as appropriate choices for lifetime recreation and leisure activity.

### <u>NINTH GRADE ENGLISH-INTRODUCTION TO LITERATURE</u>

Ninth grade English begins to prepare the student for a post-high school future.  The basic skills of grammar and mechanics are reviewed and mastered.  Emphasis is placed on literary modalities and composition skills.

### <u>GEOMETRY</u>

Geometry is a study of the physical qualities of multidimensional figures.  In this course an emphasis is placed on problem solving, experimentation and reasoning by using definitions, postulates and theorems to prove other theorems regarding congruency, similarity and relationships.

8 - 1



**GROVE SCHOOL**
**Madison, Connecticut**

## WORLD HISTORY

World History traces the key events from ancient times to the present. Units include Prehistoric Times, the Peoples of the Near East, India and China, The Greeks, The Romans, The Middle Ages, Revolution and Change, Napoleonic Europe, Industrialization, World War I, World War II and the Modern World. Emphasis is placed on identifying contributions to the development of human civilization as made by European and non-European cultures.

## GENERAL SCIENCE

The student will gain knowledge of the basic areas of physical science through reading, discussion and laboratory exercises, so that he will have a basis for understanding modern issues of scientific experimentation and discovery.

## SPANISH

This is a beginning course, which stresses listening, speaking, reading, writing, and cultural skills. Vocabulary, conversation practice, and culture are reinforced with multimedia materials. The curriculum is focused on listening and speaking.

## GAME THEORY

This class is a survey into theories and practices behind a variety of games. It will incorporate probabilities etc. behind numerous games and contests including election principles, Chess, casino games etc.



# GROVE SCHOOL
## MADISON CONNECTICUT 06443
### (203) 245-2778

## PROGRESS REPORT: June 21, 2006

**STUDENT:** S██  A█████                                    **GRADE:**    9

**DOB:** ███/1991          **DOE:**    4/4/2006          **CODE:**  AbraSe 06014

| SUBJECT/COMMENTS | TEACHER | GRADE |
|---|---|---|
| **Geometry** | Bill Cox | B- |
| S██ is doing well but needs to improve homework output. | | |
| **General Science** | Abby Rohr | A |
| S██ has done very well this marking period. S██ excels on projects and tests. Would like to see S██ improve on his participation skills. | | |
| **English 9** | Lexi Roberts | F |
| S██ is struggling with completing larger assignments. He has a paper that is currently two weeks late and a test that has not been completed. S██ is currently in danger of failing this term if he does not complete these assignments. | | |
| **Modern US History** | Carissa Byrnes | C- |
| S██ is quiet and need to turn work in more consistently | | |
| **Spanish I** | Joel Castillo | F |
| S██ is working on turning in his homework in a timely manner.  S██ needs to increase his work habits inside the classroom as well. | | |
| **PE/Health** | Jason Snider | B- |
| doing ok in class but can be out on control at times | | |
| **Game Theory** | Walton Yoder | A |
| S██ continued his great work in game theory after the chess unit. | | |

**Grading Policy:** Students receive a letter grade for academic achievement as follows:

| A+ 98-100 | A 93-97 | A- 90-92 | B+ 87-89 | B 83-86 | B- 80-82 |
|---|---|---|---|---|---|
| C+ 77-79 | C 73-76 | C- 70-72 | D+ 67-69 | D 63-66 | D- 60-62 |

**NG** = No Grade      **P** = Pass      **ME** = Medical Excuse

**INC** =   Student has not received a grade or credit due to effort/performance or insufficient work. With Principal work may be made up within one week of the end of the marking period, and a grade and credit may be given. may need to continue the course longer than the normal academic year.

**EXHIBIT**

SA-21

2006 AUG -7 AM 8: 25
DC PUBLIC
SCHOOL SYSTEM

IN THE MATTER OF

S█████ A████████,

\* \* \* \* \* \* \*

**BEFORE AN IMPARTIAL HEARING OFFICER OF THE DISTRICT OF COLUMBIA OFFICE OF STUDENT HEARINGS**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PARENTS' MOTION FOR SUMMARY DECISION

S██ A███████, by and through his parents, Larry Abramson and Caroline Newman ("the parents"), respectfully moves this administrative body for summary decision. More specifically, S██ and his parents request an order under the Individuals With Disabilities Education Improvement Act, 20 U.S.C. §§ 1400, *et seq.* ("IDEA"), requiring the District of Columbia Public Schools ("DCPS" or "the school system"), to provide a free appropriate public education ("FAPE") to S██ by placing and funding him at The Grove School ("Grove") in Madison, Connecticut, retroactive to his enrollment there on April 4, 2006. Because there is no genuine issue as to any material fact in the record, and because this family is entitled to judgment as a matter of law, it is respectfully submitted that summary decision should be granted and that DCPS should be ordered to place and fund S██ at Grove.

### I.    FACTUAL SUMMARY.

S███is a fifteen-year old young man who is extremely bright, with many cognitive scores in the 99th percentile, who has been diagnosed with Asperger's Syndrome, and who has a history of attention deficit hyperactivity disorder and emotional and behavioral difficulties, that have increased significantly over the past year. Exhibits SA-8, SA-9, and SA-10. Until February or March, 2006, S██ attended Georgetown Day School, within the District of Columbia. (His

1

AUG.04.2006 16:59 30165738843    MICHAEL J BIG & ASSOCIATES    #4573 P.003/011

numerous and sporadic absences, and his hospitalization, make his official withdrawal date a bit unclear.) *See* Declaration of Larry Abramson and Caroline Newman at ¶3 (attached).

On January 4, 2006, the parents went to the District of Columbia Public Schools ("DCPS") to register S██ as a non-attending DCPS student. Exhibit SA-16. They did so by going to the C.A.R.E. Center at 925 Rhode Island Avenue, NW, and bringing documents to evidence the family's residency in the District. They also brought with them a number of S██ evaluative and educational documents, in order to give DCPS an opportunity to understand the educational challenges posed by his disabilities. *See* Declaration of Mr. Abramson and Ms. Newman at ¶4.

Upon the parents' approaching the staff at the C.A.R.E. Center, DCPS permitted them to register S██ as a non-attending DCPS student, and gave them a number of other forms to complete, including many to be completed by S██ teachers at Georgetown Day School. The parents were diligent about obtaining all additional information that DCPS requested, and provided it to DCPS as requested. *See* Declaration of Mr. Abramson and Ms. Newman at ¶5. On January 18, 2006, the C.A.R.E. Center staff convened a formal Multidisciplinary Team Meeting ("MDT Meeting") with the parents, to discuss IDEA eligibility and services for S██. At that time, DCPS requested that the parents re-submit their initial request for a determination of IDEA eligibility, and they did so. DCPS did not complete the IDEA's educational planning process on this date. *See* Declaration of Mr. Abramson and Ms. Newman at ¶6.

In February or March, 2006, S██ had to be permanently removed from the Georgetown Day School. The parents advised DCPS of S██ immediate need for an alternative change in placement from Georgetown Day School. *See* Exhibit SA-17; Declaration of Mr. Abramson and

2

AUG.04.2006 16:59    MICHAEL J EIG & ASSOCIATES    #4573 P.004/011

Ms. Newman at ¶7. On April 4, 2006, S████parent enrolled him in a therapeutic residential placement at Grove in Madison, Connecticut. They advised DCPS of this new placement. *See* Exhibit SA-18; Declaration of Mr. Abramson and Ms. Newman at ¶8.

On May 5, 2006, DCPS convened a second MDT Meeting, which the parents attended. However, the MDT team declined to continue any further with the IDEA process, explaining that S███ was no longer the responsibility of DCPS, since he was by then attending a private school outside of DCPS. The C.A.R.E. Center staff informed the family that they would instead have to register S███ within the school system of the county in which Grove is located. *See* Exhibits SA-3, SA-5 and SA-6; Declaration of Mr. Abramson and Ms. Newman at ¶9.

We now respectfully request that summary decision be granted, as there are no factual disputes, and because this family is entitled to judgment as a matter of law.

## II.    ARGUMENT.

### A.    DCPS Denied S███ a FAPE By Refusing to Consider His Special Education Needs.

#### 1.    The IDEA requires DCPS to Provide S███ with a FAPE.

The school system argues that pursuant to the IDEA, the local education agency ("LEA") in which the student's private school is *located* is responsible for providing a FAPE to the student, regardless of where the student resides. Thus, DCPS argues that it is not responsible for providing S███ with a FAPE because he is currently enrolled at Grove located out of the District of Columbia. This position is based on a misunderstanding of the law. Both federal and local law provide that an LEA "shall make a free appropriate public education available to each child with a disability, ages three to twenty-two, *who reside in*, or is a ward of, the District."

3

AUG.04.2006 17:00 301657384 3    MICHAEL J EIG & ASSOCIATES    #4573 P.005/011

5 D.C.M.R. § 3002.1(a) (emphasis added). In addition, the IDEA's child-find provision requires

that:

> All children with disabilities *residing in the State*, including . . .
> children with disabilities attending private schools, regardless of
> the severity of their disabilities, and who are in need of special
> education and related services, are identified, located, and
> evaluated and a practical method is developed and implemented to
> determine which children with disabilities are currently receiving
> needed education and related services.

20 U.S.C. § 1412(a)(3)(A)  (emphasis added). The federal and local law are explicit – DCPS has

a responsibility to provide a FAPE to all disabled children residing within the District of

Columbia, regardless of where they attend school. By failing to consider S▬▬special

education needs and offer him a program and placement, DCPS denied him a FAPE.

    2. **Section 1412(a)(10) Deals With the Provision of Equitable Services to Parentally Placed Students and Does Not Affect the LEA Responsibility to Provide FAPE to Students Who Reside in its Jurisdiction.**

    The school system's argument is based upon a misunderstanding of Section 1412(a)(10)

of the IDEA. Section 1412(a)(10)(A) of the IDEA refers to children[1] whose parents have

enrolled them in a private school. Typically, these students enroll in religious schools and/or

small independent schools and are entitled to what are referred to as *equitable services*, 20

U.S.C. §1412(a)(10)(A)(vi). The "equitable services" provision of the IDEA requires that each

LEA spend a proportionate amount of the required subgrants that it receives for special education

---

[1]    The IDEA identifies three categories of children in private schools: 1) those students
enrolled in private schools by their parents; 2) those students placed in, or referred to, private
schools by public agencies; and 3) parents seeking reimbursement for "education of children
enrolled in private schools without consent of or referral by the public agency." 20 U.S.C. §
1412 (a)(10)(A) - (C)

<div align="center">4</div>

191

services on students whose parents have placed them in private schools. *See United States Department of Education, Office of Special Education and Rehabilitative Services, Memorandum to Chief State School Officers* (June 27, 2005) (disclosed as Exhibit SA-14). Under the re-authorized IDEA, the LEA in which each child attends school is responsible for providing him or her with equitable services, and must provide these services within the LEA's jurisdiction. This change to the IDEA is logical, since it is more efficient for a child to receive (and for an LEA to provide) such limited after-school or during-school services in the same geographic area in which the child is located during the school day (as opposed to traveling during or after school, just to receive limited services). In addition, this change allows private schools the ease of having just one LEA with which to consult to ensure that children in their schools can participate in IDEA equitable services. *Id.*

This section of the IDEA is clearly not intended to deal with a child, such as S█, whose parent wishes to enroll him in the public school system in order to receive a determination of his eligibility for special education, and an offer of an appropriate educational program and placement.[2] Such a student remains entitled to the full panoply of individualized services contemplated in Section 1412(a)(1)-(9), and, if so placed by DCPS, to the continuing protections of 1412(a)(10)(B), *et seq.*

The United States Department of Education, Office of Special Education has issued Questions and Answers on this precise issue. Question F-1 reads:

---

[2]    The fact that S█ is already enrolled in and attending Grove makes no difference. As a resident of the District, and a student whose disabilities qualify him for services under the IDEA, he is still entitled to a FAPE, which DCPS is responsible for providing.

> **Question:** If a parentally placed private school child is identified through the child find process as a child eligible for special education and related services, which LEA is responsible for offering FAPE to a parentally placed private school child with as disability?
>
> **Answer:** If a determination is made that a child has a disability and needs special education and related services, the *LEA where the child resides is responsible for making FAPE available to the child.*

*See Questions and Answers On Serving Children With Disabilities Placed by Their Parents at Private Schools*, Question F-1 (2006), http://www.ed.gov./policy/speced /guid/idea/faq-parent-placed.doc (emphasis added) (disclosed as Exhibit SA-15). Therefore, the responsibility for identifying privately placed children for the purpose of providing them equitable services is unrelated to the school system's responsibility to provide a FAPE to each disabled student who resides in the District.

Finally, the District has already addressed this very issue in *C.S. v. District of Columbia Pub. Sch.,* Hearing Officer's Determination (May 9, 2006) (attached). In that case, DCPS refused to complete the registration process for C.S. because she was already attending a private special education school located in Montgomery County, Maryland. DCPS made the same argument as it does here – that the LEA in which the private school was located was responsible for providing C.S. with special education services. While the Hearing Officer acknowledge the change to the IDEA, he ultimately rejected DCPS' argument and found that, **"IDEA 2004 did not eliminate the need for an LEA to offer FAPE to all children who reside in the LEA's educational district, even if the child is privately placed by the parents in another jurisdiction."** *C.S.* at 9. The Hearing Officer found that by failing to properly register this

6

student, DCPS denied her a FAPE, so he ordered DCPS to place and fund her at Ivymount

School, the private school she was attending. The *C.S.* case is on all fours with the current case.

Accordingly, the Hearing Officer should order DCPS to place and fund S█ at Grove.

### B.     When a Student Has Been Denied a FAPE, the Funding of a "Proper" Parental Placement is the Appropriate Relief.

The school system's failure to consider S█ special education needs and offer him a

program and placement resulted in a denial of a FAPE, so leads directly to the determination of

whether the parents have identified a placement that provides him with educational benefit. The

proper analysis in such an inquiry is found in *Burlington Sch. Comm. v. Dep't of Educ.*, 471 U.S.

359 (1985) and *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

In *Burlington*, the Supreme Court explained that, "parents who disagree with the

proposed [educational program] are faced with a choice: go along with the [proposed program] to

the detriment of their child if it turns out to be inappropriate or pay for what they consider to be

the appropriate placement." 471 U.S. at 370. To avoid compromising a child's right to a FAPE,

the Court concluded that if "a court determined that a private placement desired by the parents

was *proper* under the Act and that [a proposed] placement in a public school was inappropriate,"

the IDEA authorizes "retroactive reimbursement to parents." *Id.* (Emphasis added). This result

is necessary because, "[t]he Act was intended to give handicapped children both an appropriate

education and a free one; it should not be interpreted to defeat one or the other of those

objectives." *Id.*

In *Carter*, the Supreme Court reaffirmed its ruling in *Burlington* and explained that,

"public educational authorities who want to avoid reimbursing parents for the private education

of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice." 510 U.S. at 13.

The test of whether a parental placement is "proper under the Act" is whether "the education provided by the private school is *reasonably calculated to enable the child to receive educational benefits*.'" *Carter v. Florence County Sch. Dist. Four*, 950 F.2d 156, 163 (4th Cir. 1984) (emphasis added) (quoting *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)). It is crucial to distinguish the standard of "properness" required of parental placements from that of "appropriateness" required of school system placements. Parental placements are held to a less strict standard, because "it hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place." *Carter*, 950 F.2d at 164.

The Supreme Court in *Carter* specifically considered whether, "parents are barred from reimbursement because the private school in which [their child is] enrolled did not meet the [IDEA] definition of a 'free appropriate public education.'" 510 U.S. at 13. The Court held "that they are not, because [the IDEA's] requirements cannot be read as applying to parental placements." Thus, any determination of S████ placement at Grove must apply this more lenient standard of "properness."

**C.    Grove is an Appropriate Placement for S███.**

In point of fact, the somewhat less stringent standards in *Burlington* and *Carter* need not be consulted in this matter. Knowing that S███ would suffer educational and emotional detriment

8

if not placed appropriately, the parents unilaterally enrolled him at Grove on April 4, 2006. As the court stated in *Gerstmyer v. Howard County Pub. Sch.*, 850 F. Supp. 361 (D. Md. 1994), by securing an appropriate placement for their son, Mr. Abramson and Ms. Newman merely acted as would "any reasonably prudent family who could afford to do so..." 850 F. Supp. at 365. They stepped in for the school system, since it failed to offer any placement as required under 34 C.F.R. §§ 300.1 and 300.552.

The undisputed and unrebutted evidence demonstrates that S███'s placement at Grove meets the standard of "properness." At Grove, S██ receives full-time special education in a highly structured, specialized, and therapy-integrated setting. Grove has developed an individualized program for him that includes goals and objectives imperative to his educational success. It simply cannot be disputed that S██ is receiving significant educational benefit at Grove and is making academic progress. Grove is the proper placement for him and anything less restrictive would not be appropriate to meet his needs.

III.    CONCLUSION.

S██ and his parents seek an administrative order placing him at Grove, retroactive to his enrollment there on April 4, 2006. Summary decision is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Accordingly, the parents' pre-hearing motion for summary decision should be granted.

9

Respectfully Submitted,

Michael J. Eig

Michael J. Eig
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for Seth Abramson and his parents

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via facsimile and mailed, first-class postage prepaid, to Stephanie Ramjohn-Moore, Esq., counsel for DCPS, on August 4, 2006.

Michael J. Eig (for Michael Eig)

10

|  | * |  |
|---|---|---|
|  | * |  |
| IN THE MATTER OF | * | BEFORE AN IMPARTIAL HEARING |
|  | * | OFFICER OF THE |
| S███ A█████████ | * | DISTRICT OF COLUMBIA OFFICE OF |
|  | * | STUDENT HEARINGS |
|  | * |  |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF LARRY ABRAMSON AND CAROLINE NEWMAN

Larry Abramson and Caroline Newman declare and say as follows:

1.      We are the father and mother of S██ A███████. We make this declaration at the request of and for use by the attorneys representing our family in special education matters for S███. The matters discussed herein are from our personal knowledge.

2.      We and our son are all residents of the District of Columbia.

3.      S██ is a fifteen-year old young man who is extremely bright, with many cognitive scores in the 99th percentile, who has been diagnosed with Asperger's Syndrome, and who has a history of attention deficit hyperactivity disorder and emotional and behavioral difficulties, that have increased significantly over the past year.  Until February or March, 2006, S██ attended Georgetown Day School, within the District of Columbia.  (His numerous and sporadic absences, and his hospitalization make his official withdrawal date a bit unclear.)

4.      On January 4, 2006, Caroline went to the District of Columbia Public Schools ("DCPS") to register S██ as a non-attending DCPS student.  She did so by going to the C.A.R.E.

Page 1 of 3

Center at 925 Rhode Island Avenue, NW, and bringing documents to evidence our family's

residency in the District. She also brought with her a number of S███ evaluative and

educational documents, in order to give DCPS an opportunity to understand the educational

challenges posed by his disabilities.

5.       Upon our approaching the staff at the C.A.R.E. Center, DCPS permitted us to

register S███ as a non-attending DCPS student, and gave us a number of other forms to complete,

including many to be completed by S███ teachers at Georgetown Day School. We were diligent

about obtaining all additional information that DCPS requested, and we provided it to DCPS as

requested.

6.       On January 18, 2006, the C.A.R.E. Center staff convened a formal

Multidisciplinary Team Meeting ("MDT Meeting") with us, to discuss IDEA eligibility and

services for S███. At that time, DCPS requested that we re-submit our initial request for a

determination of IDEA eligibility, and we did so. DCPS did not complete the IDEA's

educational planning process on this date.

7.       In March, 2006, S███ had to be removed from the Georgetown Day School. We

advised DCPS of S███ immediate need for an alternative change in placement from

Georgetown Day School.

8.       On April 4, 2006, we enrolled S███ in a therapeutic residential placement at The

Grove School in Madison Connecticut. We advised DCPS of this new placement.

9.       On May 5, 2006, DCPS convened a second MDT Meeting, which we attended.

However, the MDT team declined to continue any further with the IDEA process, explaining that

S███ was no longer the responsibility of DCPS, since he was by then attending a private school

<div align="center">Page 2 of 3</div>

199

outside of DCPS. The C.A.R.E. Center staff informed us that we would instead have to register

Seth within the school system of the county in which The Grove School is located.

**WE DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on ___8/4/06___

Larry Abramson

Executed on ___8/3/06___

Caroline Newman

Page 3 of 3

**MICHAEL J. EIG AND ASSOCIATES, P.C.**
ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815
—
(301) 657-1740
FACSIMILE (301) 657-3843

August 4, 2006

Sharon Newsome
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: S■■ A■■■■■■
*by facsimile & first-class mail*

Dear Ms. Newsome:

Enclosed please find a copy of the Parents' Motion for Summary Decision in the above-named student's case. We are scheduled for a due process hearing in this matter on August 8, 2006. I would ask that you please forward this for the Hearing Officer's consideration. Thank you.

Sincerely,

Michael J. Eig

*Enclosure*

cc:   Stephanie Ramjohn-Moore, Esq.
      Larry Abramson & Caroline Newman

2006 AUG -7  AM 8: 25
DC PUBLIC
SCHOOL SYSTEM

201

## MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX

| | |
|---|---|
| **To:** | Sharon Newsome<br>**DCPS Student Hearing Office** |
| **Fax Number:** | (202) 442-5556 |
| **From:** | Michael Eig |
| **Date:** | August 4, 2006 |
| **Time:** | 4:47 pm |
| **Total Pages:**<br>(including cover) | **15** |
| **Re:** | S█ A█████  |
| **CC:** | Stephanie Ramjohn-Moore, Esq.<br>202-442-5098 |

2006 AUG -7 AM 8: 25
DC PUBLIC
SCHOOL SYSTEM

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

AUG.04.2006 16:59 3016573843    MICHAEL J EIG & ASSOCIATES    #4573 P.001/011

S█████ A████████                          *
DOB: 0██████/91                           *
                                          *
                       v.                 *
**DISTRICT OF COLUMBIA**                   *
**PUBLIC SCHOOLS**                         *
                                          *
                                          *
                                          *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

The District of Columbia Public Schools, (DCPS), by its Attorney-Advisor,

Stephanie Ramjohn Moore, moves to oppose any motion for summary decision in this

matter by Parents' counsel because the Individuals with Disabilities Act as Reauthorized

2004, (IDEA) provides that special education services must be delivered by the LEA in

the jurisdiction in which the eligible student attends private school.

### I. SUMMARY OF FACTS

S██ A████████ (the student) attended Georgetown Day School, which "offers an

educational program that fosters a love of learning while providing serious instruction in

the academic disciplines, the arts, and physical education and athletics," until February

27, 2006.

On January 4, 2006, Caroline Newman, (Parent/Mother) registered the student at

the Central Assessment Referral and Evaluation Center (C.A.R.E. Center) to begin

assessment for special education services. The student did not accompany his mother to

the C.A.R.E. Center for registration.

After the Parent registered the student, the C.A.R.E. Center team contacted

Georgetown Day School to schedule a time to observe the student in February 2006. The

C.A.R.E Center was advised the student had been withdrawn from Georgetown Day School on February 27, 2006.

Parents never notified the C.A.R.E. Center of the withdrawal.

By letter dated March 13, 2006, Michael Eig, counsel for parents advised DCPS that the student was no longer attending Georgetown Day School and had been unilaterally placed by his parents at the Grove School in Connecticut.

By letter dated May, 4, 2006, Patricia Young, Director of the C.A.R.E. Center advised Mr. Eig that since the student was removed from school in the District of Columbia, and was currently attending school in Madison County, Connecticut, the LEA in Madison County would be responsible for providing special education services to the student and provided contact information for Joanne Panicek, Director of Special Education in Madison County, Connecticut. {Attachment A}  Furthermore, at a Multi-Disciplinary Team meeting on May 5, 2006, DCPS again advised parents that DCPS was not obligated to provide student with service under IDEA.

Ms. Young again reiterated the position of DCPS to Mr. Eig by letter dated May 23, 2006, that if the student returned to the District with an Individualized Educational Plan, DCPS would provide services to him.  {Attachment B}

Mr. Eig then filed a Due Process Hearing complaint on May 23, 2006 alleging that DCPS incorrectly applied IDEA denying the student a free and appropriate public education. {Attachment C}

## II. STATEMENT OF THE LAW

The Reauthorization of the Individuals with Disabilities Education Act of 2004, **specifically** provides under § 612 (a) (10) (C) (i) that the LEA is not required to pay for the cost of education including special education and related services of a child with a disability at a private school or facility if that agency made a free and appropriate public education available to the child and the parents elected to place the child in such private school or facility.

Further, comments to the recently published Federal Regulations of IDEA 2004 provide that "the revisions to the Act in 2004 significantly changed the obligation of States and LEAs to children with disabilities enrolled by their parents in private elementary schools and secondary schools. §612 (a)(10)(A) of the Act now requires LEAS in which the private schools are located, *rather than the LEA's* in which (emphasis added) the parents of such children reside, to conduct child find and provide equitable services to parentally-placed private school children with disabilities."...In addition, the obligation of the LEA to spend a proportionate amount of funds to provide services to children with disabilities enrolled by their parents in private schools is now based on the total number of children with disabilities who are enrolled in private schools located in the LEA *whether or not* the children and their parents reside in the LEA. (emphasis added) ...§ 612(a)(10)(A)(i)(II) of the Act provides that the LEA where the private elementary schools and secondary schools are located after timely and meaningful consultation with the private school representatives, is responsible for conducting the child find process to determine the number of parentally-placed children with disabilities

attending private schools located in the LEA. We believe this responsibility includes child find for children who reside in other states but who attend private elementary and secondary schools located in the LEA, because section 612 (a) (10) (A) (i) (II) of the Act is clear about which LEA is responsible for child find and the Act does not provide an exception for children who reside in one State and attend private elementary and secondary schools in other States." {Attachment D}

Further, in accordance with the reauthorized Individuals with Disabilities Act of 2004, on July 27, 2006, Superintendent Clifford Janey, Ed.D issued Superintendent's Directive 303.1 which states in part "Consistent with the Individuals with Disabilities Education Improvement Act (IDEA) 2004, a parent requesting consideration of special education eligibility or a change in services should contact the Local Education Agency in the state where the school is located. (OSEP Letter 05-09 to the Chief State School Officers 'Obligations of States and local education agencies to parentally-placed private school children with disabilities.' June 27, 2005)" {Attachment E}

## III. ARGUMENT

### A. THE STUDENT DOES NOT ATTEND SCHOOL IN THE DISTRICT OF COLUMBIA AND THE LOCAL EDUCATION AGENCY WHERE HE CURRENTLY ATTENDS SCHOOL SHOULD PROVIDE SPECIAL EDUCATION SERVICES IF HE IS DETERMINED ELIGIBLE.

The student attended Georgetown Day school from a very early age through age 15. The student has never been identified as a student in need of special education and related services. In January 2006, The student's parents registered him at the C.A.R.E. Center and began the process for having The student was never found eligible for Special Education and related services by DCPS. The student was never evaluated by DCPS

because he was parentally-placed at a Madison, Connecticut school (the Grove School).

The student currently lives at the Grove School campus and has not been home to

complete the DCPS evaluation process. In accordance with IDEA 2004, if student is

determined eligible for special education services, then he should receive such services

from the Madison County School District after "timely and meaningful consultation"

with the Grove School.

### B. DCPS HAD NO OBLIGATION TO EVALUATE THE STUDENT

Mr. Eig contends that because The student's parents reside in the District of Columbia

that the Local Education Agency should fund The student's placement at the Grove

School because of a "failure" of DCPS to provide The student with special education and

related services.  DCPS has 120-days to fully evaluate the student and determine

eligibility in accordance with § 38-2501 of the D.C. Code. When the Parent registered

The student at the C.A.R.E. Center on January 4, 2006, DCPS began the process and

contacted Georgetown Day school in an attempt to schedule assessments. Upon notifying

the school of their intention to evaluate the student, DCPS C.A.R.E. Center was advised

the student was no longer attending Georgetown Day school and had been withdrawn on

February 27, 2006. By correspondence dated March 13, 2006, Michael Eig confirmed

this information. In accordance with §612(a)(10)(A)(i)(II) since The student did not

remain in the District of Columbia, DCPS is no longer obligated to determine eligibility

and provide special education and related services should The student be found eligible.

Therefore, assuming arguendo that DCPS did have an obligation to evaluate the student,

DCPS did in fact try to evaluate the student but the student was withdrawn from

Georgetown Day School and unilaterally placed in a private school outside of the jurisdiction of DCPS prior to the expiration of the 120 days.

Based on the information provided in this opposition, it is the request of the District of Columbia that this matter dismissed with prejudice as there is no material issue or law or fact in controversy. The reauthorization is clear and should be followed implicitly without exception.

Respectfully submitted,

Stephanie Ramjohn Moore
Attorney Advisor

cc:    Michael J. Eig, Esquire
       Fax # 301-657-3843

208

**Central Assessment Referral and Evaluations (C.A.R.E.) CENTER**



**Office of Special Education**
**(Located at Shaw Junior High School)**
925 Rhode Island Avenue, NW
Washington, DC 20001
(202) 671-0882



Michael J. Eig and Associates, P.C.
        Attorneys at Law
5454 Wisconsin Avenue
Chevy Chase, Maryland 20815-6938

May 4, 2006

Dear Mr. Eig:

As you are aware and so noted in your letter dated March 13, 2006, Ms. Kathie Thompson and the C.A.R.E. team were prepared to move forward with the eligibility process within the timeline for case completion for S██ A██████, Ms. Thompson attempted to observe S██ at Georgetown Day School and was informed by the principal at Georgetown Day that S██ was unavailable and had been withdrawn from school. We subsequently found out that S██ was withdrawn on February 27, 2006. In your letter to Ms. Thompson, you indicated "that due to the severity of S███ disability and its recent manifestations, S██ has had to be removed from that school, and is scheduled to begin a therapeutic residential placement at The Grove School in Madison, Connecticut within the next few weeks". In a second letter from you dated 4/17/06, you indicated that S██ began at the Grove School on April 4, 2006. According to IDEA 2004, once S███ parent's decided to withdraw him from Georgetown Day, and enrolled him in the Grove School, his case has become the obligation of the state of Connecticut.

In an effort to support Mr. Abramson and Ms. Newman, S███ parents with this transition, the contact person for the Madison School District in Connecticut is JoAnne Panicek, Director of Special Education 1-203-245-6300.

Sincerely,

*Patricia Young*
Patricia Young
C.A.R.E. Center Director





**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

**Division of Special Education**
825 North Capitol Street, N.E., 6th Floor
Washington, D.C. 20002-4232
202-442-4800, fax: 202-442-5518
www.k12.dc.us

May 23, 2006

Michael J. Eig and Associates, P.C.
Attorneys at Law
5454 Wisconsin Avenue
Chevy Chase, Maryland 20815-6938

Re: S██ A█████

Dear Mr. Eig:

This is in response to your letter of May 8, 2006 to Kathie Thompson, regarding S██ A█████, who is parentally placed in a private school located in the Madison Connecticut School District.   In your correspondence you contend that the D.C. Public Schools' (DCPS) is responsible for assessing S██ and determining whether he is a child with a disability eligible for special education services.

It remains DCPS' position that, consistent with 20 U.S.C. § 1412 and OSEP Letter 05-09 to Chief State School Officers, "Obligations of States and Local Education Agencies to Parentally-Placed Private School Children with Disabilities", June 27, 2005, the Madison Connecticut School District, the school district in which S██ resides, is responsible for assessing S██, determining whether he is a child with a disability eligible for special education services, and, if necessary, drafting an appropriate I.E.P.  If he is determined to be eligible for such services, DCPS will then be responsible for offering him a placement in which he can receive a Free Appropriate Public Education, should his parents desire such a placement.  In this event, please have S██ parents forward a copy of his I.E.P. and their request for placement to me at the following address: The CARE Center, 925 Rhode Island Ave., NW, Washington, DC 20001.

Sincerely,

*Patricia Young*

Patricia Young
C.A.R.E. Center Director

210



# MICHAEL J. EIG AND ASSOCIATES, P.C.

**ATTORNEYS AT LAW**
**SUITE 760**
**5454 WISCONSIN AVENUE**
**CHEVY CHASE, MARYLAND 20815-6938**

(301) 657-1740
FACSIMILE (301) 657-3843

May 23, 2006

Sharon Newsome
District of Columbia Public Schools
Student Hearing Office
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: S██ A███████
*via facsimile & first-class mail*

Dear Ms. Newsome:

Enclosed please find a due process hearing request for the above-named student. Please do not hesitate to contact me if you have questions regarding this matter.

Sincerely,

Michael J. Eig

Michael J. Eig

*Enclosure*

cc:    Larry Abramson and Caroline Newman



211

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



# Due Process Complaint Notice

The form is used to give notice of a due process complaint to the District of Columbia Public Schools, District of Columbia Public Charter School (DCPS or LEA) and/or parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.   INFORMATION ABOUT THE STUDENT:

Student Name: ~~S___ Al_____~~ _____ Birth Date: _____ 1991

Address: _____

Home School: __ Wilson High School _____

Present School of Attendance: _The Grove School_____

Is this a charter school? NO _____   (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student: Larry Abramson and Caroline Newman

Address (if different from the student's above): _____ same as above ____

Phone/Contact Number: ____ see below ____   Fax Number (if applicable): ____ see below ____

SEID DPCN Rev'd 9/30/05

212

**B.    Individual Making the Complaint/Request for Due Process Hearing:**

Name:  Larry Abramson and Caroline Newman

Complete Address: _____ same as above _____

_____

Phone: (h)  see below   (w)  see below   (Fax)  see below   (e-mail) _____

Relationship to the Student:

☒  Parent          ☐  Legal Guardian          ☐  Parent Surrogate

☐  Self/Student    ☐  Local Education Agency (LEA)  ☐  Parent Advocate

**C.    Legal Representative/Attorney (if applicable):**

Name:  Michael J. Eig

Address: _____ Michael J. Eig and Associates, P.C. _____

_____ 5454 Wisconsin Avenue, Suite 760, Chevy Chase, Maryland 20815

Phone: (w) 301-657-1740   (Fax) 301-657-3843   (e-mail) _____

Will attorney / legal representative attend the resolution session?  ☒ Yes      ☐ No

**D.    Complaint Made Against (check all that apply):**

☒  DCPS school (name of the school if different from page one) _____
☐  Charter school (name of the charter school if different from page one) _____
☐  Non-public school or residential treatment facility (name) _____
☐  Parent

**E.    Resolution Session Between Parent and LEA:**

I understand that it is my right to have a resolution session to resolve this complaint.  I also understand that I
may voluntarily waive this right if I choose.  (Note: All parties must agree to waive the resolution session to
avoid having this meeting.)

☒    I wish to waive the Resolution Session.

**E.    Mediation Process:**

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to
the parent.  Both parties can request mediation as an alternative to the Resolution Session.  Mediation is also
available prior to a due process hearing, but mediation may not be used to deny or delay a parent's right to a
hearing on parent's due process complaint. Please check all that apply:

☐    I am requesting mediation as an alternative to the resolution session meeting.
☐    I am requesting mediation services only.
☐    I do not wish to use a mediator at this time.

## G.    Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.        What is the nature of the problem, including the facts related to the problem, that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

S⬛ is a fifteen-year old young man who is extremely bright, with many cognitive scores in the 99th percentile, who has been diagnosed with Asperger's Syndrome, and who has a history of attention deficit hyperactivity disorder and behavior difficulties. Until recently, he has been a good student, however, he has been exhibiting increasing signs of inattention, anxiety and depression. As the 2005-06 school year progressed, these issues have risen to the forefront, having a great impact on S⬛ ability to benefit from his instruction, and causing his educational performance to decline precipitously over the course of a few months. Until March, 2006, S⬛ attended Georgetown Day School, but due to the severity of his disability and its recent manifestations, he had to be removed. His parents were, at the time, in the middle stages of the initial IDEA eligibility determination process with DCPS, having registered S⬛ as a non-attending DCPS student in January, 2006. The parents advised DCPS of S⬛ immediate need for a change in placement from Georgetown Day, and that they were working to identify an alternative. On April 4, 2006, they enrolled S⬛ at a therapeutic residential placement at The Grove School in Madison Connecticut, and advised DCPS of this new placement.

Subsequently, DCPS scheduled a Multidisciplinary Team ("MDT") Meeting for May 5, 2006. The parents agreed to attend, in the hope of completing the eligibility determination process and developing an educational program for their son. However, on May 4, 2006, the day before the MDT meeting, the parents, through counsel, received a letter from Patricia Young. By this letter, DCPS stated its position that the school system has no legal obligation to provide S⬛ with services under the IDEA. Instead, DCPS advised the parents that, since S⬛ is attending a school outside the District, "his case has become the obligation of the state of Connecticut." DCPS repeated this position at the MDT Meeting on May 5, 2006.

The school system's position is based on a misunderstanding of the federal law. The IDEA, which was re-authorized in 2004, discusses and differentiates three categories of children in private schools, who require special education. The parents advised DCPS of their position with respect to these categories, as follows:

- 20 U.S.C. § 1412 (a)(10)(A) deals with "Children enrolled in private schools by their parents."
- 20 U.S.C. § 1412 (a)(10)(B) deals with "Children placed in, or referred to, private schools by public agencies."
- 20 U.S.C. § 1412 (a)(10)(C) deals with "Payment for education of children enrolled in private schools without consent of or referral by the public agency."

The three categories do not overlap.

The first category, which the law refers to as those children entitled to "Equitable Participation" or "Equitable Services," are children in private school at their parents' expense, who are only seeking services additional to their private school academic services -- such as tutoring or speech/language therapy -- usually supplied at the end of a school day at a nearby public school. Such a student's right to equitable participation for such services

does entail registration in the public schools, as is clarified in the proposed regulations. This category has seen a change in the responsibility of the local educational agency ("LEA"), between IDEA 1997 and IDEA 2004; the new statute recognizes that after-school services provided to private school students at a nearby public school would be most conveniently provided by the LEA in which the *private school is located* than by the LEA where the *child lives*. That change is clarified by the US Department of Education Memorandum dated June 27, 2005, which the MDT team provided to the Abramson family on May 5, 2006.

However, the re-authorized 2004 IDEA enacted no significant changes to the second and third categories. The statute still requires that the LEA in which the child resides is responsible for proposing a FAPE for this child, regardless of whether he or she is placed in private school by the parents or by the school system. (This requirement is echoed in the local regulations: 5 D.C.M.R. § 3002.1(a) requires that "DCPS shall make a free appropriate public education (FAPE) available to each child with a disability, ages three to twenty-two, who resides in, or is a ward of, the District.") Of course, as the IDEA's language concerning the third category makes clear, the LEA would only be responsible for the cost of any private school tuition if it lacks or fails to offer an appropriate public program.

Thus, by referring S██ A████████ family to the Madison, Connecticut School District, DCPS violated its obligations under the IDEA. The parents so advised DCPS, and formally requested that DCPS complete the educational planning process and offer S██an education appropriate to meet his needs. DCPS never responded to this request.

> To the extent known to you at this time, how can this problem be resolved?

As a remedy for this failure, the parents request that S██ be placed and funded at The Grove School in Madison, Connecticut, retroactive his enrollment on April 4, 2006.

> Issues presented:

See above.

## H.  Estimated amount of time needed for the hearing:   1 day

Note:   In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing. Please indicate if you believe more that two hours will be needed.

## I.  Accommodations and Assistance Needed:

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)   N/A
- Special Communication (please describe the type)   N/A
- Special Accommodations for Disability (please be specific)   N/A
- Other   N/A

**J.** **Waiver of Procedural Safeguards:**

☐    I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

**K.** **Parent Signature and Affirmation:**

I affirm that the information provided on this form is true and correct.

_____
Signature of Parent or Guardian                                    Date

**L.** **Signature of Attorney/Legal Representative:**

_____    5-23-06
Legal Representative / Advocate                                    Date

**M.** **Signature of LEA Representative (if hearing requested by LEA):**

_____
Representative of LEA                                             Date

Mail, fax or deliver this complaint notice to:
State Enforcement and Investigation Division
For Special Education Programs (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8th Floor
Washington, DC 20002
Fax number: 202/442-5556

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
OFFICE OF ACADEMIC SERVICES

**RESOLUTION MEETING CONFIRMATION**
**(RMC)**

_ PUBLIC          ___DPCS CHARTER          __ LEA CHARTER          _ _ NONPUBLIC          __ PRIVATE/RELIGIOUS

S██ A█████████
**Student**

█████████, 1991
**DOB**

**The Grove School**
**School**

**Dear Ms. Caroline Newman & Mr. Larry Abramson:**
Parent/Guardian

Pursuant to the Individuals With Disabilities Education Improvement Act of 2004 § 615 (f)(1)(B), this is a confirmation of your meeting to discuss your pending due process complaint and the facts that support it. The goal of the resolution meeting is to discuss the complaint and provide an opportunity for DCPS to resolve it. The IDEA 2004 provides that prior to an impartial due process hearing a resolution meeting must be held within 15 (fifteen) days of your filing your complaint. The resolution meeting must include the local education agency, DCPS and the parent of the child.

Therefore, your participation is required by IDEA 2004 and essential in an attempt to resolve your concerns. The District of Columbia Public Schools hopes that you will make every effort to attend this meeting. As previously stated, the resolution meeting is required prior to a due process hearing. Please be advised that failure to attend this meeting may result in a waiver of your right to due process hearing.

**The date, time and place of the meeting are printed below.**

**June 6, 2006**

Date

**9:00 am**

Time

**The Care Center @ Shaw**
**925 Rhode Island Avenue, N.W.,**
**Washington, D.C. 20001**
**(202) 442-5509 or 671-0882**

<u>**Mrs. Gina F. Scales-Johnson**</u>
**May 30, 2006**
Sent By

RMC Letter of Confirmation to the Parent
2d-14-05

217

<u>Discussion</u>:  The Department intends the term "training," as used in §300.119, to have its generally accepted meaning. Training is generally agreed to be any activity used to enhance one's skill or knowledge to acquire, maintain, and advance knowledge, skills, and abilities.  Given the general understanding of the term "training," we do not believe it is necessary to regulate on this matter.

<u>Changes</u>:  None.

<u>Children in Private Schools</u>

<u>Children With Disabilities Enrolled by Their Parents in</u>

<u>Private Schools</u>

<u>General comments</u>

<u>Comment</u>:  Many comments were received regarding the parentally-placed private school children with disabilities requirements in §§300.130 through 300.144.  Many commenters supported the changes to the regulations and believed the regulations simplify the processes for both private schools and public schools. Numerous commenters, however, expressed concern regarding the implementation of the private school requirements.

Many of the commenters expressed concern with the requirement that the LEAs where private elementary schools and secondary schools are located are now responsible for child find, individual evaluations, and the provision of



services for children with disabilities enrolled by their parents in private schools located in the LEA. These commenters described the private school provisions in the Act and the NPRM as burdensome and difficult to understand.

Discussion: The revisions to the Act in 2004 significantly changed the obligation of States and LEAs to children with disabilities enrolled by their parents in private elementary schools and secondary schools. Section 612(a)(10)(A) of the Act now requires LEAs in which the private schools are located, rather than the LEAs in which the parents of such children reside, to conduct child find and provide equitable services to parentally-placed private school children with disabilities.

The Act provides that, in calculating the proportionate amount of Federal funds under Part B of the Act that must be spent on parentally-placed private school children with disabilities, the LEAs where the private schools are located, after timely and meaningful consultation with representatives of private elementary schools and secondary schools and representatives of parents of parentally-placed private school children with disabilities, must conduct a thorough and complete child find process to determine the number of parentally-placed children with disabilities attending private elementary

219                        295

schools and secondary schools located in the LEAs.  In addition, the obligation of the LEA to spend a proportionate amount of funds to provide services to children with disabilities enrolled by their parents in private schools is now based on the total number of children with disabilities who are enrolled in private schools located in the LEA whether or not the children and their parents reside in the LEA.

We believe these regulations and the additional clarification provided in our responses to comments on §§300.130 through 300.144 will help States and LEAs to better understand their obligations in serving children with disabilities placed by their parents in private elementary schools and secondary schools.  In addition, the Department has provided additional guidance on implementing the parentally-placed private school requirements on the Department's Web site.  We also are including in these regulations Appendix B to Part 300—Proportionate Share Calculation to assist LEAs in calculating the proportionate amount of Part B funds that they must expend on parentally-placed private school children with disabilities attending private elementary schools and secondary schools located in the LEA.

Changes:  We have added a reference to Appendix B in §300.133(b).

Comment:  Several commenters expressed concern that §§300.130 through 300.144 include requirements that go beyond the Act and recommended that any requirement beyond what is statutory be removed from these regulations.

Discussion:  In general, the regulations track the language in section 612(a)(10)(A) of the Act regarding children enrolled in private schools by their parents.  However, we determined that including clarification of the statutory language on parentally-placed private school children with disabilities in these regulations would be helpful.  The volume of comments received concerning this topic confirm the need to regulate in order to clarify the statutory language and to help ensure compliance with the requirements of the Act.

Changes:  None.

Comment:  Some commenters requested that the regulations provide flexibility to States to provide services to parentally-placed private school children with disabilities beyond what they would be able to do with the proportionate share required under the Act.  A few of these commenters requested that those States already providing an individual entitlement to special education and related services or

221                                   297

providing a full range of special education services to parentally-placed private school children be deemed to have met the requirements in §§300.130 through 300.144 and be permitted to continue the State's current practices.  One commenter specifically recommended allowing States that provide additional rights or services to parentally-placed private school children with disabilities (including FAPE under section 612 of the Act and the procedural safeguards under section 615 of the Act), the option of requesting that the Secretary consider alternate compliance with these requirements that would include evidence and supporting documentation of alternate procedures under State law to meet all the requirements in §§300.130 through 300.144.

A few commenters requested that the child find and equitable participation requirements should not apply in States with dual enrollment provisions where children with disabilities who are parentally-placed in private elementary schools or secondary schools are also enrolled in public schools for special education and have IEPs and retain their due process rights.

Discussion:  The Act in no way prohibits States or LEAs from spending additional State or local funds to provide special education or related services for parentally-placed private school children with disabilities in excess of

those required in §300.133 and section 612(a)(10)(A) of the Act, consistent with State law or administrative procedures. The Act, however, does not provide the Secretary with the authority to waive, in whole or in part, the parentally-placed private school requirements in §§300.130 through 300.144 for States or LEAs that spend State or local funds to provide special education or related services beyond those required under Part B of the Act. The Secretary, therefore, cannot consider alternative compliance with the parentally-placed private school provisions in the Act and these regulations or consider States and LEAs that use State and local funds to provide services to parentally-placed private school children with disabilities beyond the required proportionate share of Federal Part B funds, including providing FAPE to such children, to have met the statutory and regulatory requirements governing parentally-placed private school children with disabilities. States and LEAs must meet the requirements in the Act and these regulations.

With regard to the comment requesting that the child find and equitable participation requirements for parentally-placed private school children with disabilities not apply in States with dual enrollment, there is no exception in the Act to the child find and equitable

participation requirements of section 612(a)(10)(A) for States that permit dual enrollment of a child at a parent's discretion. Therefore, there is no basis to regulate to provide such an exception. It would be a matter of State or local discretion to decide whether to have a dual enrollment policy and, if established, how it would be implemented. Whether dual enrollment alters the rights of parentally-placed private school children with disabilities under State law is a State matter. There is nothing, however, in Part B of the Act that would prohibit a State from requiring dual enrollment as a condition for a parentally-placed private school child with a disability to be eligible for services from a public agency. As long as States and LEAs meet the requirements in §§300.130 through 300.144, the local policy covering enrollment is a matter of State and local discretion.

Changes: None.

Comment: Several commenters expressed concern regarding the applicability of the child find and equitable participation requirements in §§300.130 through 300.144 for children with disabilities who reside in one State and are enrolled by their parents in private elementary schools or secondary schools located in another State. These commenters recommended that the regulations clarify whether

the LEA in the State where the private elementary school or secondary school is located or the LEA in the State where the child resides is responsible for conducting child find (including individual evaluations and reevaluations), and providing and paying for equitable services for children who are enrolled by their parents in private elementary schools or secondary schools.

Discussion:   Section 612(a)(10)(A)(i)(II) of the Act provides that the LEA where the private elementary schools and secondary schools are located, after timely and meaningful consultation with private school representatives, is responsible for conducting the child find process to determine the number of parentally-placed children with disabilities attending private schools located in the LEA.  We believe this responsibility includes child find for children who reside in other States but who attend private elementary schools and secondary schools located in the LEA, because section 612(a)(10)(A)(i)(II) of the Act is clear about which LEA is responsible for child find and the Act does not provide an exception for children who reside in one State and attend private elementary schools and secondary schools in other States.

Under section 612(a)(10)(A)(i) of the Act, the LEA where the private elementary schools and secondary schools are located, in consultation with private school officials and representatives of parents of parentally-placed private school children with disabilities, also is responsible for determining and paying for the services to be provided to parentally-placed private school children with disabilities.  We believe this responsibility extends to children from other States who are enrolled in a private school located in the LEA, because section 612(a)(10)(A)(i) of the Act clarifies that the LEA where the private schools are located is responsible for spending a proportionate amount of its Federal Part B funds on special education and related services for children enrolled by their parents in the private schools located in the LEA.  The Act does not provide an exception for out-of-State children with disabilities attending a private school located in the LEA and, therefore, out-of-State children with disabilities must be included in the group of parentally-placed children with disabilities whose needs are considered in determining which parentally-placed private school children with disabilities will be served and the types and amounts of services to be provided.

Changes:  We have added a new paragraph (f) to §300.131 clarifying that each LEA where private, including religious, elementary schools and secondary schools are located must, in carrying out the child find requirements in this section, include parentally-placed private school children who reside in the State other than where the private schools they attend are located.

Comment:  A few commenters recommended the regulations clarify the LEA's obligation under §§300.130 through 300.144 regarding child find and equitable participation for children from other countries enrolled in private elementary schools and secondary schools by their parents.

Discussion:  The obligation to consider children with disabilities for equitable services extends to all children with disabilities in the State who are enrolled by their parents in private schools within each LEA's jurisdiction.

Changes:  None.

Comment:  Several commenters recommended the regulations clarify the applicability of the child find and equitable participation requirements in §§300.130 through 300.144 for children with disabilities, aged three through five, enrolled by their parents in private preschools or day care programs.  Many commenters recommended the regulations clarify that preschool children with disabilities should be

303

counted in determining the proportionate share of funds available to serve children enrolled in private elementary schools by their parents.

Discussion:  If a private preschool or day care program is considered an elementary school, as defined in §300.13, the child find and equitable services participation requirements in §§300.130 through 300.144, consistent with section 612(a)(10) of the Act, apply to children with disabilities aged three through five enrolled by their parents in such programs.  Section 300.13, consistent with section 602(6) of the Act, defines an elementary school as a nonprofit institutional day or residential school, including a public elementary charter school, which provides elementary education, as determined under State law.  We believe it is important to clarify in the regulations that children aged three through five are considered parentally-placed private school children with disabilities enrolled in private elementary schools only if they are enrolled in private schools that meet the definition of elementary school in §300.13.

Changes:  We have added a new §300.133(a)(2)(ii) to clarify that children aged three through five are considered to be parentally-placed private school children with disabilities enrolled by their parents in private, including religious,

228                                    304

elementary schools, if they are enrolled in a private school that meets the definition of elementary school in §300.13.

Definition of parentally-placed private school children with disabilities (§300.130)

Comment:  A few commenters recommended removing "or facilities" from the definition of parentally-placed private school children because it is not defined in the Act or the regulations.  Another commenter recommended including a definition of "facilities."

Discussion:  Under section 612(a)(10)(A) of the Act, the obligation to conduct child find and provide equitable services extends to children who are enrolled by their parents in private elementary schools and secondary schools.  This obligation also applies to children who have been enrolled by their parents in private facilities if those facilities are elementary schools or secondary schools, as defined in subpart A of the regulations.  Because facilities that meet the definition of elementary school or secondary school are covered under this section, we believe it is important to retain the reference to facilities in these regulations.  We will, however, revise §300.130 to clarify that children with disabilities who are enrolled by their parents in facilities that meet the

definition of <u>elementary school</u> in §300.13 or <u>secondary</u>
<u>school</u> in new §300.36 (proposed §300.35) would be
considered parentally-placed private school children with
disabilities.

<u>Changes</u>:  Section 300.130 has been revised to clarify that
parentally-placed private school children with disabilities
means children with disabilities enrolled by their parents
in private, including religious, schools or facilities that
meet the definition of an <u>elementary school</u> in §300.13 or
<u>secondary school</u> in §300.36.

<u>Child find for parentally-placed private school children</u>
<u>with disabilities (§300.131)</u>

<u>Comment</u>:  A few commenters recommended permitting the LEA
where private schools are located to request reimbursement
from the LEA where the child resides for the cost of
conducting an individual evaluation, as may be required
under the child find requirements in §300.131.

One commenter recommended that the LEA where private
schools are located be responsible for locating and
identifying children with disabilities enrolled by their
parents in private schools and the LEA where the children
reside be responsible for conducting individual
evaluations.

230                              306

Discussion:  Section 300.131, consistent with section 612(a)(10)(A)(i) of the Act, requires that the LEA where private elementary schools and secondary schools in which the child is enrolled are located, not the LEA where the child resides, is responsible for conducting child find, including an individual evaluation for a child with a disability enrolled by the child's parent in a private elementary school or secondary school located in the LEA. The Act specifies that the LEA where the private schools are located is responsible for conducting both the child find process and the initial evaluation.  Therefore, the LEA where private schools are located may not seek reimbursement from the LEA of residence for the cost of conducting the evaluation or to request that the LEA of residence conduct the evaluation.  However, the LEA where the private elementary school or secondary school is located has options as to how it meets its responsibilities.  For example, the LEA may assume the responsibility itself, contract with another public agency (including the public agency of residence), or make other arrangements.

Changes:  None.

Comment:  One commenter recommended permitting a parent who enrolled a child in a private elementary school or

secondary school the option of not participating in child find required under §300.131.

Discussion: New §300.300(e)(4) clarifies that parents who enroll their children in private elementary schools and secondary schools have the option of not participating in an LEA's child find activities required under §300.131. As noted in the Analysis of Comments and Changes section for subpart D, once parents opt out of the public schools, States and school districts do not have the same interest in requiring parents to agree to the evaluation of their children as they do for children enrolled in public schools, in light of the public agencies' obligation to educate public school children with disabilities. We further indicate in the discussion of subpart D that we have added new §300.300(e)(4) (proposed §300.300(d)) to clarify that if the parent of a child who is home schooled or placed in a private school by the child's parent at the parent's own expense does not provide consent for an initial evaluation or reevaluation, the public agency may not use the due process procedures in section 615 of the Act and the public agency is not required to consider the child for equitable services.

Changes: None.

Comment:   Several commenters recommended permitting amounts expended for child find, including individual evaluations, to be deducted from the required amount of funds to be expended on equitable services for parentally-placed private school children with disabilities.

Discussion:   The requested changes would be inconsistent with the Act.   There is a distinction under the Act between the obligation to conduct child find activities, including individual evaluations, for parentally-placed private school children with disabilities, and the obligation to use an amount of funds equal to a proportionate amount of the Federal Part B grant flowing to LEAs to provide special education and related services to parentally-placed private school children with disabilities.   The obligation to conduct child find for parentally-placed private school children, including individual evaluations, is independent of the services provision.   Further, §300.131(d), consistent with section 612(a)(10)(A)(ii)(IV) of the Act, clarifies that the costs of child find activities for parentally-placed private school children, including individual evaluations, may not be considered in determining whether the LEA has spent an appropriate amount on providing special education and related services to

233                          309

parentally-placed private school children with disabilities.

Changes:  None.

Comment:  One commenter requested clarifying whether an LEA may exclude children suspected of having certain disabilities, such as those with specific learning disabilities, in conducting individual evaluations of suspected children with disabilities enrolled in private schools by their parents.

Discussion:  The LEA where the private elementary schools and secondary schools are located must identify and evaluate all children suspected of having disabilities as defined under section 602(3) of the Act.  LEAs may not exclude children suspected of having certain disabilities, such as those with specific learning disabilities, from their child find activities.  The Department recommends that LEAs and private elementary schools and secondary schools consult on how best to implement the State's evaluation criteria and the requirements under this part for identifying children with specific learning disabilities enrolled in private schools by their parents. This is explained in more detail in the discussion of comments under §300.307.

Changes:  None.

234                                310

Comment:  A few commenters expressed concern that parents who place their children in private elementary schools and secondary schools outside the district of residence, and who are determined by the LEA where the private schools are located, through its child find process, to be children with disabilities eligible for special education and related services, would have no knowledge of the special education and related services available for their children if they choose to attend a public school in their district of residence.  A few commenters suggested clarifying the obligation of the LEA where the private school is located to provide the district of residence the results of an evaluation and eligibility determination of the parentally-placed private school child.

A few commenters recommended that the parent of a child with a disability identified through the child find process in §300.131 be provided with information regarding an appropriate educational program for the child.

Discussion:  The Act is silent on the obligation of officials of the LEA where private elementary schools and secondary schools are located to share personally identifiable information, such as individual evaluation information, with officials of the LEA of the parent's residence.  We believe that the LEA where the private

311

schools are located has an obligation to protect the
privacy of children placed in private schools by their
parents.  We believe that when a parentally-placed private
school child is evaluated and identified as a child with a
disability by the LEA in which the private school is
located, parental consent should be required before such
personally identifiable information is released to
officials of the LEA of the parent's residence.  Therefore,
we are adding a new paragraph (b)(3) to §300.622 to make
this clear.  We explain this revision in more detail in the
discussion of comments under §300.622.

We believe the regulations adequately ensure that
parents of children enrolled in private schools by their
parents, who are identified as children with disabilities
through the child find process, receive information
regarding an appropriate educational program for their
children.  Section 300.138(b) provides that each
parentally-placed private school child with a disability
who has been designated to receive equitable services must
have a services plan that describes the specific education
and related services that the LEA where the private school
is located has determined it will make available to the
child and the services plan must, to the extent
appropriate, meet the IEP content, development, review and

revision requirements described in section 614(d) of the Act, or, when appropriate, for children aged three through five, the IFSP requirements described in section 636(d) of the Act as to the services that are to be provided.

Furthermore, the LEA where the private school is located must, pursuant to §300.504(a) and section 615(d) of the Act, provide the parent a copy of the procedural safeguards notice upon conducting the initial evaluation.

Changes: We have added a new paragraph (b)(3) to §300.622 to require parental consent for the disclosure of records of parentally-placed private school children between LEAs.

Comment: A few commenters stated that §300.131 does not address which LEA has the responsibility for reevaluations.

Discussion: The LEA where the private schools are located is responsible for conducting reevaluations of children with disabilities enrolled by their parents in private elementary schools and secondary schools located within the LEA. Reevaluation is a part of the LEA's child find responsibility for parentally-placed private school children under section 612(a)(10)(A) of the Act.

Changes: None.

Comment: One commenter expressed concern that the regulations permit a parent to request an evaluation from the LEA of residence at the same time the child is being

evaluated by the LEA where the private elementary school or secondary school is located, resulting in two LEAs simultaneously conducting evaluations of the same child.

Discussion:  We recognize that there could be times when parents request that their parentally-placed child be evaluated by different LEAs if the child is attending a private school that is not in the LEA in which they reside. For example, because most States generally allocate the responsibility for making FAPE available to the LEA in which the child's parents reside, and that could be a different LEA from the LEA in which the child's private school is located, parents could ask two different LEAs to evaluate their child for different purposes at the same time.  Although there is nothing in this part that would prohibit parents from requesting that their child be evaluated by the LEA responsible for FAPE for purposes of having a program of FAPE made available to the child at the same time that the parents have requested that the LEA where the private school is located evaluate their child for purposes of considering the child for equitable services, we do not encourage this practice.  We note that new §300.622(b)(4) requires parental consent for the release of information about parentally-placed private school children between LEAs; therefore, as a practical

matter, one LEA may not know that a parent also requested
an evaluation from another LEA.  However, we do not believe
that the child's best interests would be well-served if the
parents requested evaluations of their child by the
resident school district and the LEA where the private
school is located, even though these evaluations are
conducted for different purposes.  A practice of subjecting
a child to repeated testing by separate LEAs in close
proximity of time may not be the most effective or
desirable way of ensuring that the evaluation is a
meaningful measure of whether a child has a disability or
of providing an appropriate assessment of the child's
educational needs.

Changes:  None.

Comment:  Some commenters requested the regulations clarify
which LEA (the LEA of residence or the LEA where the
private elementary schools or secondary schools are
located) is responsible for offering FAPE to children
identified through child find under §300.131 so that
parents can make an informed decision regarding their
children's education.



Discussion:  If a determination is made by the LEA where
the private school is located that a child needs special
education and related services, the LEA where the child

resides is responsible for making FAPE available to the child.  If the parent makes clear his or her intention to keep the child enrolled in the private elementary school or secondary school located in another LEA, the LEA where the child resides need not make FAPE available to the child. We do not believe that a change to the regulations is necessary, as §300.201 already clarifies that the district of residence is responsible for making FAPE available to the child.  Accordingly, the district in which the private elementary or secondary school is located is not responsible for making FAPE available to a child residing in another district.

Changes:  None.

Comment:  One commenter requested clarification of the term "activities similar" in §300.131(c).  Another commenter recommended clarifying that these activities include, but are not limited to, activities relating to evaluations and reevaluations.  One commenter requested that children with disabilities parentally-placed in private schools be identified and evaluated as quickly as possible.

Discussion:  Section 300.131(c), consistent with section 612(a)(10)(A)(ii)(III) of the Act, requires that, in carrying out child find for parentally-placed private school children, SEAs and LEAs must undertake activities

similar to those activities undertaken for their publicly enrolled or publicly-placed children. This would generally include, but is not limited to, such activities as widely distributing informational brochures, providing regular public service announcements, staffing exhibits at health fairs and other community activities, and creating direct liaisons with private schools. Activities for child find must be completed in a time period comparable to those activities for public school children. This means that LEAs must conduct child find activities, including individual evaluations, for parentally-placed private school children within a reasonable period of time and without undue delay, and may not wait until after child find for public school children is conducted. In addition, evaluations of all children suspected of having disabilities under Part B of the Act, regardless of whether they are enrolled by their parents in private elementary schools or secondary schools, must be conducted in accordance with the requirements in §§300.300 through 300.311, consistent with section 614(a) through (c) of the Act, which describes the procedures for evaluations and reevaluations for all children with disabilities. We believe the phrase "activities similar" is understood by

SEAs and LEAs and, therefore, it is not necessary to regulate on the meaning of the phrase.

Changes:  None.

Provision of services for parentally-placed private school children with disabilities--basic requirement (§300.132)

Comment:  Several commenters expressed confusion regarding which LEA is responsible for paying for the equitable services provided to a parentally-placed private elementary school or secondary school child, the district of the child's residence or the LEA where the private school is located.

Discussion:  We believe §300.133, consistent with section 612(a)(10)(A) of the Act, is sufficiently clear that the LEA where the private elementary schools and secondary schools are located is responsible for paying for the equitable services provided to a parentally-placed private elementary school or secondary school child.  These provisions provide that the LEA where the private elementary and secondary schools are located must spend a proportionate amount of its Federal funds available under Part B of the Act for services for children with disabilities enrolled by their parents in private elementary schools and secondary schools located in the

242                         318

(b)  Disseminate copies of applicable standards to each private school and facility to which a public agency has referred or placed a child with a disability; and

(c)  Provide an opportunity for those private schools and facilities to participate in the development and revision of State standards that apply to them.

(Approved by the Office of Management and Budget under control number 1820-0030)

(Authority:  20 U.S.C. 1412(a)(10)(B))

Children With Disabilities Enrolled by Their Parents in Private Schools When FAPE is at Issue

§300.148  Placement of children by parents when FAPE is at issue.

(a)  General.  This part does not require an LEA to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made FAPE available to the child and the parents elected to place the child in a private school or facility.  However, the public agency must include that child in the population whose needs are addressed consistent with §§300.131 through 300.144.

(b)  Disagreements about FAPE.  Disagreements between the parents and a public agency regarding the availability

of a program appropriate for the child, and the question of financial reimbursement, are subject to the due process procedures in §§300.504 through 300.520.

(c)  Reimbursement for private school placement.  If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private preschool, elementary school, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate. A parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the SEA and LEAs.

(d)  Limitation on reimbursement.  The cost of reimbursement described in paragraph (c) of this section may be reduced or denied--

(1)  If--

(i)  At the most recent IEP Team meeting that the parents attended prior to removal of the child from the

public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide FAPE to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

(ii)  At least ten (10) business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in paragraph (d)(1)(i) of this section;

(2)  If, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in §300.503(a)(1), of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for the evaluation; or

(3)  Upon a judicial finding of unreasonableness with respect to actions taken by the parents.

(e)  Exception.  Notwithstanding the notice requirement in paragraph (d)(1) of this section, the cost of reimbursement--

(1)  Must not be reduced or denied for failure to provide the notice if--

(i)   The school prevented the parents from providing the notice;

(ii)   The parents had not received notice, pursuant to §300.504, of the notice requirement in paragraph (d)(1) of this section; or

(iii)   Compliance with paragraph (d)(1) of this section would likely result in physical harm to the child; and

(2)   May, in the discretion of the court or a hearing officer, not be reduced or denied for failure to provide this notice if--

(i)   The parents are not literate or cannot write in English; or

(ii)   Compliance with paragraph (d)(1) of this section would likely result in serious emotional harm to the child. (Approved by the Office of Management and Budget under control number 1820-0030)

(Authority:   20 U.S.C. 1412(a)(10)(C))

SEA Responsibility for General Supervision and Implementation of Procedural Safeguards

§300.149   SEA responsibility for general supervision.

(a)   The SEA is responsible for ensuring--

(1)   That the requirements of this part are carried out; and

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**REGISTRATION AND REFERRAL OF NON-ATTENDING STUDENTS AND WARDS**

# DIRECTIVE
## D 303.1

| RESPONSIBLE OFFICE: | AUTHORITY: |
|---|---|
| **Office of Special Education** | Title 5, DCMR; § 3004 ( 2003) |
| | HISTORY: |
| | None |

Superintendent's Signature    Date: August 1, 2005

As outlined below, this directive sets out the procedures for the referral to determine Special Education eligibility of students who are wards of the District of Columbia or who are non-attending DCPS students.

Pursuant to 5 DCMR 3004.1, if the child to be referred is a ward of D.C. or otherwise does not attend a D.C. public school and the parent, guardian or authorized representative ("parent", as defined in Title 5 DCMR, Section 3001) does not register the child to attend a D.C. public school at the time the referral is made, this referral shall be submitted by the parent, to a site designated by the Superintendent, as indicated below, on a form to be supplied to the parent by that site at the time of the parent's request.

I.  Referrals for students who are wards of the District:

    a.  Students who are wards of the District of Columbia and attending a DC Public School or are enrolling in a DC Public School at the time of referral:

        i.  Referrals are made to the school the child attends or is enrolling in.

        ii.  Referrals are to be made by the parent.  Social workers do not have the authority to authorize consideration of special education.

        iii.  A Multi-disciplinary Team (MDT) meeting must be held to determine if the child requires an assessment and if so, identifies the assessments to be completed. The parent must be invited to be involved in the meeting.

        iv.  If the MDT has no reasonable basis for suspecting that the student has a disability, they may determine that no assessments are necessary.  If that is the determination of the MDT, the parent must be notified in writing if the school declines to evaluate the student.

    b.  Students who are wards of the District but are living outside DC and attending public school (and three to five year olds not yet attending school) in another jurisdiction:

        i.  Referrals are made to the jurisdiction of residence according to the relevant procedures in that jurisdiction.

247



D 303.1                                                                    D 303.1

**District of Columbia Public Schools**

    ii.  If the school staff in the residing jurisdiction has educational concerns about the student, they should contact the parent and the DCPS representative to schedule an MDT meeting to discuss their concerns and to determine interventions to address the concerns.

        1.  If the MDT determines that no assessments are necessary, this information and the rationale must be shared with the parent.

        2.  To the extent possible the parent must be involved in the decisions to assess or to change a student's placement.

II.    Students attending a private or religious school located in the District of Columbia, not funded by DCPS, and three to five year olds not yet attending school:

The parent may request consideration of special education eligibility or a change in services by contacting the Central Assessment Referral and Evaluation (CARE) Center at Shaw Junior High School and following procedures outlined by the CARE Center.

III.    Students attending a private or religious school located outside of the District of Columbia, not funded by DCPS:

Consistent with the Individuals with Disabilities Education Improvement Act (IDEA) 2004, a parent requesting consideration of special education eligibility or a change in services should contact the Local Education Agency in the state where the school is located. (OSEP Letter 05-09 to Chief State School Officers, "Obligations of States and local educational agencies to parentally-placed private school children with disabilities", June 27, 2005.)

| | |
|---|---|
| IN THE MATTER OF | BEFORE AN IMPARTIAL HEARING |
| | OFFICER OF THE |
| | DISTRICT OF COLUMBIA OFFICE OF |
| S████ A████████ | STUDENT HEARINGS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## REPLY TO DCPS OPPOSITION TO
## PARENTS' MOTION FOR SUMMARY DECISION

We have very little that need be said in response to the school system's opposition to our motion for summary decision. As we understand it, DCPS takes the position that any parent who is seeking a FAPE from the District of Columbia, and who has had to place their disabled child in a private school outside of the District in order to receive the services deemed necessary for that FAPE, has to turn to the Local Educational Agency where the private school is located in order to seek services. It makes no difference to DCPS that the IDEA does not state this, that the United States Department of Education does not state this, and that decisions from the Student Hearing Officer do not state this. We pointed all of that out in our earlier submission.

Now, DCPS points to questions and answers under the new federal regulations to demonstrate that all of our authorities above are wrong. The problem is that the questions and answers that DCPS points to unquestionably support us, not them. This is really getting a bit absurd, as we now demonstrate.

DCPS submits pages 313 and 314 of comments, which are attached here as Exhibit 1 (so that the Hearing Officer can easily focus in on them). At page 314, the United States Department of Education states, in part, ". . . parents could ask two different LEAs to evaluate their child for different purposes at the same time." As everybody else except the District of Columbia Public

1

Schools understands, those two purposes would be (1) to provide an extra "equitable service" to a privately-place child in a parochial school, or (2) to seek provision of a FAPE to a child by having the LEA of residence pay for special education tuition in a private school. In the first case, the LEA in which the private school is located would now be responsible for providing services. In the second case – the case here – the LEA of residence remains responsible.

There is nothing more to this analysis. DCPS just does not understand what everybody else with knowledge and authority is telling it. It had the absolute obligation to provide a FAPE to S████; its failure now leads to a tuition award for the family.

Respectfully Submitted,

Michael J. Eig
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for S████ A████████ and his parents

*********************************************************************************
**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via facsimile and mailed, first-class postage prepaid, to Stephanie Ramjohn-Moore, Esq., counsel for DCPS, on August 16, 2006.

Michael J. Eig

2

revision requirements described in section 614(d) of the
Act, or, when appropriate, for children aged three through
five, the IFSP requirements described in section 636(d) of
the Act as to the services that are to be provided.

Furthermore, the LEA where the private school is
located must, pursuant to §300.504(a) and section 615(d) of
the Act, provide the parent a copy of the procedural
safeguards notice upon conducting the initial evaluation.

Changes:  We have added a new paragraph (b)(3) to §300.622
to require parental consent for the disclosure of records
of parentally-placed private school children between LEAs.

Comment:  A few commenters stated that §300.131 does not
address which LEA has the responsibility for reevaluations.

Discussion:  The LEA where the private schools are located
is responsible for conducting reevaluations of children
with disabilities enrolled by their parents in private
elementary schools and secondary schools located within the
LEA.  Reevaluation is a part of the LEA's child find
responsibility for parentally-placed private school
children under section 612(a)(10)(A) of the Act.

Changes:  None.

Comment:  One commenter expressed concern that the
regulations permit a parent to request an evaluation from
the LEA of residence at the same time the child is being

313

Exhibit

1

251

evaluated by the LEA where the private elementary school or secondary school is located, resulting in two LEAs simultaneously conducting evaluations of the same child.

**Discussion:** We recognize that there could be times when parents request that their parentally-placed child be evaluated by different LEAs if the child is attending a private school that is not in the LEA in which they reside. For example, because most States generally allocate the responsibility for making FAPE available to the LEA in which the child's parents reside, and that could be a different LEA from the LEA in which the child's private school is located, parents could ask two different LEAs to evaluate their child for different purposes at the same time. Although there is nothing in this part that would prohibit parents from requesting that their child be evaluated by the LEA responsible for FAPE for purposes of having a program of FAPE made available to the child at the same time that the parents have requested that the LEA where the private school is located evaluate their child for purposes of considering the child for equitable services, we do not encourage this practice. We note that new §300.622(b)(4) requires parental consent for the release of information about parentally-placed private school children between LEAs; therefore, as a practical

314

## MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815

(301) 657-1740
FACSIMILE (301) 657-3843

August 16, 2006

Coles Ruff, Esq.
Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, D.C. 20002

Re: S██te A███████
*by facsimile & first-class mail*

Dear Mr. Ruff:

Enclosed please find a copy of our Reply the DCPS Opposition to Parents' Motion for Summary Decision in the above-named student's case

Thank you.

Sincerely,

Michael J. Eig

Enclosure

cc:    Stephanie Ramjohn-Moore, Esq.
Larry Abramson & Caroline Newman

253

### MICHAEL J. EIG AND ASSOCIATES, P.C.

ATTORNEYS AT LAW
SUITE 760
5454 WISCONSIN AVENUE
CHEVY CHASE, MARYLAND 20815-6938
(301) 657-1740

FACSIMILE (301) 657-3843

# FAX

**To:**              Coles Ruff, Esq.

**Fax Number:**      (202) 442-5556
**From:**            Michael J Eig
**Date:**            August 16, 2006
**Time:**            4:49 pm

**Total Pages:**     6
(including cover)

**Re:**              S██ A████████ 

**CC:**              Stephanie Ramjohn-Moore, Esq.
                     (202) 442-5098/97

This facsimile contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us at (301) 657-1740 and ask to speak with the sender. Also, we would appreciate your forwarding the document back to us and destroying it. Thank you.

254

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF PUBLIC SCHOOLS

OFFICE OF STUDENT HEARINGS

--------------------------x
IN THE MATTER OF:            :
                            :
S███ A█████████             :
--------------------------x

Washington, D.C.

Tuesday, August 8, 2006

The above-entitled matter came on
for hearing, pursuant to notice.

BEFORE:

COLES RUFF,
Hearing Officer

APPEARANCES:

On Behalf of the Student/Parent:

MICHAEL EIG, ESQ.

On Behalf of the D.C. Public Schools:

STEPHANIE RAMJOHN-MOORE, ESQ.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        (202) 234-4433

P-R-O-C-E-E-D-I-N-G-S

HEARING OFFICER RUFF: Today's date is August 8th, 2006. I'm Coles Ruff, independent Hearing Officer. This is an administrative hearing conducted under the Individuals with Disabilities Education Improvement Act. This is in the matter of S██ A██████. S█████ date of birth is -- where is it cited.

MR. ABRAMSON: J██████████, 1991.

HEARING OFFICER RUFF: J█████████ ███, 1991. Home is --

MR. EIG: He's home schooled. Theodore Wilson.

HEARING OFFICER RUFF: Has he ever -- but he's never gone to a --

MR. EIG: He's --

HEARING OFFICER RUFF: Okay, but he was registered with the care center. Okay, could you all identify yourselves, please?

MS. RAMJOHN-MOORE: Stephanie Ramjohn-Moore, Attorney Advisor, District of Columbia Public Schools. Good morning.

MR. EIG: Good morning, Mr. Ralph

Michael Eig on behalf of S███ and his parents.

 MR. ABRAMSON: Larry Abramson, S██████ father.

 MS. NEWMAN: And Caroline Newman, S█████ mother.

 MR. EIG: And can I just note because Mr. Abramson just reminded me that to go back far enough S███ was in Channing (phonetic) kindergarten through second.

 HEARING OFFICER RUFF: Kindergarten through second.

 MR. EIG: But since then, he hasn't been.

 HEARING OFFICER RUFF: He hasn't been, all right. The disclosure submitted by Mr. Eig include a witness list and 18 documents; is that correct?

 MR. EIG: Yes.

 HEARING OFFICER RUFF: Were those received by DCPS, Ms. Moore?

 MS. RAMJOHN-MOORE: DCPS only -- does not object to the documents that were received on the disclosure date of July 31st, 2006 and that would be documents 1 through

15.  We object to any further documents that were submitted after the five-day disclosure.

HEARING OFFICER RUFF:  Okay.

MR. EIG:  Those would be I think what she refers to are the ones attached the motion.

HEARING OFFICER RUFF:  I don't know.  You dated these August 1st.  "For the upcoming hearing scheduled for the 8th." we hereby submit the following supplemental exhibits".  I'll note that they are a student referral form for special education services 1306.

MR. EIG:  I'm sorry, Ms. Moore?

MS. RAMJOHN-MOORE:  They're after the five-day disclosure period.  The rule is very clear that documents that are to be used at the hearing in conjunction with your case are supposed to be disclosed to the other attorney five days prior to the hearing date.

HEARING OFFICER RUFF:  Okay, well, what I'll do since I already know that there's a preliminary motion, let me hold

that in abeyance. At least the 15 are admitted at this point.

MR. EIG: Fine, and I can just question. I feel eight minus 1 is seven days and --

MS. RAMJOHN-MOORE: It's business days.

MR. EIG: Yes.

MS. RAMJOHN-MOORE: And I'm sure Mr. Eig is aware of that. And I have not had the opportunity to share these documents with my witnesses, since they were given to me beyond the five-day disclosure period and we would object to them being entered into the record.

MR. EIG: Okay, but it's --

HEARING OFFICER RUFF: Wait a minute. I can only hear one person at a time.

MR. EIG: I'm sorry. They're not beyond the five-day rule. I've been disclosing five-day -- if there was a holiday in there, I don't remember. I'm not aware of one, that's five days. What am I missing? Really.

HEARING OFFICER RUFF:  Okay, let me count, let me count.  Okay, it was filed -- it was dated, stamped in, August 2nd,

MR. EIG:  Stamped in with whom?

HEARING OFFICER RUFF:  At DCPS.

MR. EIG:  Well, I can --

HEARING OFFICER RUFF:  I assume that's to the hearing office.  I don't know what --

MR. EIG:  Yeah, that's to the -- they were faxed on the 1st and they were faxed during business hours and we can certainly get a fax receipt if that can --

HEARING OFFICER RUFF:  So the 4th was Friday.  If you sent it on the 1st, what would that have been, Tuesday?

MR. EIG:  Yeah, and we can --

HEARING OFFICER RUFF:  Tuesday, Friday would be three, Monday --

MR. EIG:  It's five day, I'm sorry,  five, you either count the first day or you count the last day.  You don't count them both.  And five days and you'll see this in 99 percent of every hearing that's ever been done under the IDEA going back 30

years, they're sent out seven calendar days unless there's a holiday in there, which some people forget sometimes, and that's five working days, but it has to be received that day.    You know, you cannot like overnight it.    So if we did that, like I say, I was out of town, then there might be some claim.

So I -- for the life of me, I don't understand how that isn't five days. And I would ask, respectfully, if indeed it's going to become important, that it be explained how that isn't five days.

HEARING   OFFICER   RUFF:    Okay, well, I don't think I need to decide it at this moment, but let me deal with the -- put that aside. I've heard your argument that it is five days.

MR.   EIG:    That's   right.   And you'll also note that theirs was sent out on August 1st.

HEARING OFFICER RUFF:  I'm sorry?

MR.  EIG:   Theirs was sent out on August 1st.  I don't think --

MS.  RAMJOHN-MOORE:    That's   not

correct, Mr. Ruff.  As you can see, I have a

confirmation fax receipt and I also took the

liberty --

HEARING OFFICER RUFF:  It's dated

August 1st.

MR. EIG:  It's dated August 1st.

MS.  RAMJOHN-MOORE:      -- of

scanning the documents for Mr. Eig.  They

were not received in our office until August

2nd, the other documents that he's referring

to that are beyond the five-day period.  The

date of my disclosure is the date that the

five-day -- five days were there.

MR. EIG:  August 1st.

MS. RAMJOHN-MOORE:  August 1st,

that is correct.  Mr. Eig's documents were

not sent until after business hours August

1st, if, in fact, they were sent August 1st.

I believe they're just dated August 1st.

They were stamped in August 2nd into the

Office of General Counsel.

MR. EIG:  There's a fax on top of

this thing that shows when they were sent.

And if, indeed, it's important, I'll get my

office to show --

MS. RAMJOHN-MOORE: It is absolutely important.

HEARING OFFICER RUFF: Okay. Well, why --

MR. EIG: I'd rather have the Judge tell me that.

HEARING OFFICER RUFF: Why don't you provide that and I'll make a decision on that later. It's not even -- we're not even clear that they are relevant, I mean, that they are material. So --

MR. EIG: That's right, you're absolutely right.

HEARING OFFICER RUFF: Okay, preliminary matters, let's --

MR. EIG: I object to all of hers.

HEARING OFFICER RUFF: I'm sorry?

MR. EIG: I object to all of hers.

HEARING OFFICER RUFF: On what basis?

MR. EIG: That they're dated the same day. Okay, I'd better just hold -- I'd just better hold off on that right now.

That's the reason I'm saying that.

HEARING OFFICER RUFF:    The objection is noted.

MR. EIG:   That's all.

HEARING OFFICER RUFF:   Okay, but to indicate what they are, there's a witness list and there are seven documents. The date I see on the disclosure statement is August 1st.   All right, okay, let's deal with these preliminary matters.   I note that there's a motion for summary decision, but you had a preliminary matter, Ms. Moore?

MS. RAMJOHN-MOORE:   Yes, I have two other matters.   This matter should not go forward because if you take the liberty to read the continuance and the documents that are attached, I've also taken the liberty of making another copy.   This is a copy for -- the communication between myself and Mr. Eig's office was that the matter was originally scheduled for July 21st.   At Mr. Eig's request, DCPS agreed to a continuance.

Mr. Eig, this is what I'm showing Mr. Ruff.

MR. EIG:   That's different than

264

what we --

MS. RAMJOHN-MOORE:  I just wanted to give it to you.  And at that time, if you read along with the various e-mails that began June 27th from Sarah Massey, who is a legal assistant in Mr. Eig's office, they requested the continuance and then offered certain dates; August 7th through 10th, August 28th through September 1st and some time after September 6th.

Then July 5th, the DCPS responded after speaking with their witnesses and concluded that August 8th or 9th, 2006 would be good for DCPS to go forward.  On July 11th, Ms. Massey wrote to me and stated that there was a miscommunication.  She was unable to attend the August 8th hearing.  Do we mind if we switch it to August 9th.  Please advise.

I agreed with that and secured my witnesses for August 9th.  I even received a communication from Mr. Eig's office dated July 12th saying, "Unfortunately there was a miscommunication and due to witness unavailability, we can no longer attend the

above-referenced student's due process hearing currently scheduled for August 8th. We hereby request a continuance, moving the due process hearing to August 9th. I have contacted and spoken to opposing counsel on this matter and DCPS is unopposed to our request". So I'm thinking the entire time the matter is now going forward on August 9[th].

I secure my witnesses for that date. Then on July 19th, I get a communication from Ms. Massey; "Stephanie, I am getting ready to fax you a copy of the letter pertaining to S███████ due process hearing request. We have agreed to keep the August 8[th] date as well as the newly assigned date of August 16[th]. Mr. Eig spoke with David Smith this afternoon and Mr. Smith wanted to be sure that you were able to reserve the Office of General Counsel conference room in which to hold the hearing. Please advise".

I wrote back, "I am not in agreement and was not advised of any such agreement. I have given Mr. Eig the

266

professional courtesy of agreeing to the initial continuance of August 8th, then his letter of July 12th, requesting a continuance to August 9th, which was the subsequent change of date. The General Counsel conference room is not available at the disposal of attorneys, OGC or otherwise and I was not informed of any meeting on August 16th, 2006 and will not be available".

There must have been some sort of ex parte communication between Mr. Eig and Mr. Smith. I was not advised of it and I told him that I would not be available for those dates. I secured my witnesses for the date of August 9th.

MR. EIG: Let me interrupt you. I don't have what she's reading from.

MS. RAMJOHN-MOORE: It is dated July 19th and it's part of the packet that I made a copy of. It's behind the July 12th letter. It's right there.

MR. EIG: This?

MS. RAMJOHN-MOORE: What does that date say?

MR. EIG: This is from Sarah.

Date is July 11th and then this is from you saying -- this is July 10th.

    MS. RAMJOHN-MOORE:  Mr. Ruff --

    MR. EIG:  Okay, thank you.  I just don't have this.  Thank you.

    MS. RAMJOHN-MOORE:  Uh-huh.  In accordance with my witness' unavailability, I filed for a continuance after repeated tries to try to get her -- she's a 10-month employee, she's not a year-round employee. She's unavailable.  I contact the care center, other persons that are familiar with the case but have not worked on it intimately.  They were not available.  So I'm thinking, since I afforded Mr. Eig the professional courtesy of continuing the matter, then it should be afforded to me the same courtesy.  But instead here was are, I find myself in a due process hearing without any witnesses.

    HEARING OFFICER RUFF:  Did you make a request of Mr. Eig of a date other than today?

    MS. RAMJOHN-MOORE:  Mr. Eig was not available.

MR. EIG:  (Inaudible)

HEARING OFFICER RUFF:  Go ahead.

MS. RAMJOHN-MOORE:  At the time that I filed the request I could not reach anyone at Mr. Eig's office.

HEARING OFFICER RUFF:  So what request did you file?  Did you file it with the Student Hearing Office?

MS. RAMJOHN-MOORE:  Yes, sir.

MR. EIG:  It was denied on July 31st.

HEARING OFFICER RUFF:  Oh, that's this.

MR. EIG:  It was denied on July 31st.  My office has a copy of it.  She hasn't given you that.

MS. RAMJOHN-MOORE:  Right.  I was getting to it.

MR. EIG:  It's already been denied.

HEARING OFFICER RUFF:  Okay, from Mr. Smith, it was?

MR. EIG:  Yeah.

HEARING OFFICER RUFF:  Do you have a copy of that?

MR. EIG:  It's in my office.

HEARING OFFICER RUFF:  Oh, okay.

MR. EIG:  It was --

MS. RAMJOHN-MOORE:  DCPS did not get a copy of Mr. Smith's denial, Mr. Ruff.

MR. EIG:  I've got it somewhere.

MS. RAMJOHN-MOORE:  But I think it's quite, you know, funny how DCPS was earnest in its availability or obtaining availability of witnesses and has been forthright and courteous to Mr. Eig but we have not been afforded the same courtesy.

MR. EIG:  Can I address this?

HEARING OFFICER RUFF:  Yes, go ahead.

MR. EIG:  I wasn't really involved in it.  I called Mr. Ramjohn-Moore yesterday to talk about how we're going forward, asked about how she wants to handle the motion that we filed on Friday, okay, what witnesses she had.  She never mentioned a single thing that she's told you this morning and that was less than 24 hours ago.

And if we're talking about courtesy, you don't try to sandbag attorneys

that way and bring people down here and say that I had a big problem. She never mentioned that to me. All I know is that there was a definite confusion generated by my office, by witnesses availability between the 8th and the 9th. She said she was available on both days. I never have seen and I'm looking right now, Mr. Ramjohn-Moore ever saying in any of these e-mails that she wasn't available today. Courtesy, she pointed that out where she said she wasn't available. The way it came out with me communicating to her when Mr. Smith was obviously on another matter with counsel and he asked me about this continuance request --

HEARING OFFICER RUFF: Another matter with Ms. Moore?

MR. EIG: No, with another case over the phone, okay, over the phone. And he told me that if you go ahead on today's date but he hadn't confirmed that he had the space to do it and would I mind calling her and -- that's where that came up, I was the messenger. Please don't -- you know, I had

271

no ex parte communication.  Mr. Price was on the phone, okay.  It wasn't his case, okay, that's all that was.

Okay, I wasn't attempting to -- he brought it up.  I wasn't trying to go around behind his back, but all I'm saying is that in the two weeks that I was away on vacation the last two weeks, I am unaware of her unavailability of a witness for today and if  -- she said she couldn't get in touch with my office.  That's ridiculous. There are no messages, and I can bring people down for that.  And we have electronic voice mail.  We have everything everybody else has.  But even if she had done that, why didn't she mention it yesterday that she had any kind of problem. All she told me yesterday was -- I said, "How many witnesses", she said, "One".

And then what she then said was, "And that witness was available, you know, back on the July date and I haven't even gotten in touch with her, I've got to try to find her".  That's what she told me yesterday over the phone.  And if she had

272

told me yesterday, "I'm having a witness problem, you know. I can't -- you know, this is a real problem", look I've filed a motion. It's dispositive, as we all know, if indeed we're right, and I was just calling her originally to say, "Do you want a week or so to respond to this, and then it will either get resolved or we'll come back and do a hearing".

I discussed that with my clients, by the way, okay, which is exactly what we would have agreed to yesterday. You know, I'm always tempted not to suggest that at the present time in view of the fact that I was flat out sandbagged yesterday. I called her, asked what she wanted to do. She said, she'd see me tomorrow.

She didn't say anything about a continuance, which had already been denied. I didn't know that she didn't know it had been denied. Okay, I believe that she knew it was denied. You don't seem to have it in your file as well.

HEARING OFFICER RUFF: I haven't found it yet.

MR. EIG: And, you know, the bottom line is, if, indeed, she has no witnesses and if indeed, we filed this dispositive motion, why are we wasting your time, her time and certainly my client's time. I've got three experts on call -- on hold this morning. I guess -- I just -- she says she has something else. So those are the facts. Could you hold that in abeyance and see if there's something else that she has, because I want to address it all at once?

HEARING OFFICER RUFF: Okay, well, we'll just second that.

MS. RAMJOHN-MOORE: I would like to address with Mr. Eig just said. What happened on our phone call yesterday, Mr. Eig asked me how many witnesses did I have. I said, "Mr. Eig, I'm not certain but I know that I have one because I'm not certain of what's going to transpire as I was not given an opportunity to continue the matter as you were," and that's what I said to him.

And perhaps, he may have mentioned something about, "Oh, did you get

my motion". I said, "Yes". "Well, are you going to be able to address it"? I said, "I'll address it", and that was the extent of the phone call. He said, "I'll see you tomorrow." I said, "I'll see you tomorrow". I had no communication with the Student Hearing Office regarding y continuance. I had no idea it had been denied but I assumed that I had not heard anything, that I was to go forward. That's why I disclosed on the date of disclosure. That's why I prepared my documents and my law and I was ready to come prepared for a hearing because that's my job.

I don't have to discuss every aspect of my case with Mr. Eig. We didn't talk about every aspect of the case. That's just what happened. This whole matter, the confusion all came from Mr. Eig's office as documented by the e-mail and letters that I have presented to the Hearing Officer.

HEARING OFFICER RUFF: Okay, what was your second matter?

MS. RAMJOHN-MOORE: This -- I'm prepared to orally address Mr. Eig's

opposition and then submit later in writing what I'm going to submit today orally in response to his motion. Under the --

HEARING OFFICER RUFF: Wait, I don't need the response yet. That's just your second matter.

MS. RAMJOHN-MOORE: That's my third issue, yes. The matter should not go forward as a matter of law, because the substantive issue is that DCPS under the IDEA is correct in its finding that the LEA in which the student resides handles the matters of special education services.

HEARING OFFICER RUFF: Okay. So let's deal with the underlying issue and see if there are some --

MR. EIG: May I proceed? We'll deal with --

HEARING OFFICER RUFF: Yes, uh-huh.

MR. EIG: I would be opposed to her addressing it orally and then bring something in writing only because it drags it out. I have no opposition to her addressing it in writing and then having a

very expeditiously said oral argument.  Even other parties, you know, may be included in that as well.  That's the way we do it. You can't do it the other way because there's a problem, the only way of briefing it is that, you know.  If she does an oral argument and then submits something and if we don't like that, it just drags on forever.

So that's the reason why 100 percent of the time it's done the other way around. So I would ask that she be given -- that she suggests how long she needs to respond to our motion and then we set right now an oral argument date and I have no opposition, as well, to having that as a date that we would -- if you find that it can't go  on summary decision, if we can give witnesses and we just do it during the day.

You know, I don't want this to drag out.

HEARING OFFICER RUFF:  Okay. That sounds reasonable.  Question, though, let me see if I can clarify what facts are

disputed here because I would really need to know since you are alleging that there is no disputed fact.

MR. EIG:  Of material fact.

HEARING   OFFICER   RUFF:      Of material fact.

MR. EIG:   There are issues of fact.  There are a lot of issues of fact about what Stephanie just said about our phone call yesterday but it's not important.

HEARING OFFICER RUFF:   It's not important.

MR. EIG:   Okay, all right, and I'll talk to her about that another time.

MS.   RAMJOHN-MOORE:      Please address me as Ms. Ramjohn-Moore.

MR. RHEA:  I apologize for that.

MS. RAMJOHN-MOORE:  Thank you.

MR. EIG:   And I apologize for that.

HEARING OFFICER RUFF:   Okay, Mr. Eig.

MR. EIG:  I'm sorry.

HEARING OFFICER RUFF:   Address me, please, not to her directly.

MR. EIG:  I'm sorry, yes, sir.

HEARING OFFICER RUFF:  Thank you.

MR. EIG:  That is correct.  There is no -- well, you see in the declaration --

HEARING OFFICER RUFF:  I'm looking in the declaration.

MR. EIG:  -- Mr. Abramson, says -- that's what we say happened.

HEARING OFFICER RUFF:  Well, let me go through these facts and I'll just read them.

MR. EIG:  Okay.

HEARING OFFICER RUFF:  S███, a 15-year old young man, is extremely bright with any cognitive scores in the 99th percentile.  He's been diagnosed with asperger syndrome.  Is there -- I know that there was a neuro-psychological that was done.

MR. EIG:  Yeah, you'll see documents that will day that but I don't know if Ms. Ramjohn-Moore has actually the ability right now to agree or disagree to these allegations.  I just don't know.  If she does, then that's (inaudible).

HEARING OFFICER RUFF:    What do
you say?

MS. RAMJOHN-MOORE:    I don't have
the ability as a lawyer to agree to a
diagnosis of asperger syndrome.    So we may
continue with the complaint.

MR. EIG:    Although I applaud your
effort to try to narrow the issues, I think
we have to give her time for her to respond
because as you well know, in responding to a
Motion for Summary Judgment, the opposing
party is the one that has to say
(inaudible).

HEARING OFFICER RUFF:    Okay, all
right, are you agreeable to that?    That
seems to meet your requirement for a
continuance. So, I'll go get a -- I'll go
get a date is what I'll get.    Is your
preference to --

MR. EIG:    Yeah, well, let's go
off the record and talk about it.

(Discussion held off the record.)

HEARING OFFICER RUFF:    Okay,
we're back on the record.    Go ahead, Ms.
Moore.

MS. RAMJOHN-MOORE:  Mr. Ruff, you requested the MDT notes from May 5th, 2006. Because you kept referring to them as MDT notes, I wasn't sure what you were speaking of.  DCPS has enclosed in its DCPS 02 resolution meeting notes from May 5th, 2006 and  I think that's what Mr. Eig is referring to as well.  If you would like to look at DCPS 02, I think that is the one and the same meeting note he's referring to.

MR. EIG:  No, this is -- okay, this is the resolution meeting.  (Inaudible) What we were referring to is --

HEARING OFFICER RUFF:  June 6th.

MR. EIG:  -- is in May.  I think that (inaudible) for resolution and whatever it is, we're going to submit it.  So I think -- I'm not sure that it's actually really that important but that's for the Hearing Officer to decide but I'll get them -- but that's from the resolution meeting.

MS. RAMJOHN-MOORE:  Is June the 6th, okay.

MR. EIG:  Okay, so -- since we're on the record, Mr. Ruff can I just confirm

281

that what we talked about off the record was
that DC will respond in writing to us by --

        HEARING OFFICER RUFF:  The close
of business on the 11th of August.

        MR. EIG:  Yes, sir.  We will then
have a chance to reply by the 16th, reply by
the 16th?

        HEARING OFFICER RUFF:  Yes.

        MR.  EIG:     Obviously,  any
disclosure of documents as it would only be
-- the only thing that we can think of,
whatever it is,  within the 5-day --

        HEARING OFFICER RUFF:  Five-day
is  the  21st.    Well,  I  mean,  whatever
documents you have, as long as you submit
them with your reply, that would be okay.

        MS. RAMJOHN-MOORE:  Uh-huh.

        MR. EIG:  With the reply.  Okay.
And then the argument will be -- which is a
bifurcation that you mentioned (inaudible) -
-

        HEARING OFFICER RUFF:  Exactly.

        MR. EIG:  -- will be at 9:00 a.m.
on the 21st of August.

        HEARING OFFICER RUFF:  Yes.

MR. EIG: (Inaudible). We'll talk to them and make sure they're available. And then (inaudible) the parties -- I notice we go out for September 19th, for the whole day at 9:00 a.m.

HEARING OFFICER RUFF: Yes, all day, starting at 9:00 a.m. I assume from the previous request for continuance that you've waived the 75-day, yes, okay. Great. Okay, unless there's anything else, we are adjourned for the day.

MR. EIG: Thank you very much.

HEARING OFFICER RUFF: You're welcome, enjoy your vacation.

(Whereupon, the hearing in the above-entitled matter concluded.)

8151  9:00 A

# ATTENDANCE SHEET

| STUDENT'S NAME: | ~~[redacted]~~ | /91 |
| --- | --- | --- |
| HEARING DATE: | August 8, 2006 | home school: ? |

| PRINTED NAME | ON BEHALF OF DCPS OR STUDENT | TITLE |
| --- | --- | --- |
| Stephanie Ramjohn Moore | DCPS | Attorney Advisor |
| Michael J. Eig | Student | Counsel for Student |
| Larry Abramson | Student | Father |
| Caroline Newman | Student | Mother |

Coles Ruff

284

Impartial Hearing Officer

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF PUBLIC SCHOOLS

OFFICE OF STUDENT HEARINGS


```
--------------------------x
IN THE MATTER OF:          :
                           :
S███ A██████████           :
--------------------------x
```

Washington, D.C.

Thursday, August 21, 2006


The above-entitled matter came on
for hearing, pursuant to notice.


BEFORE:

COLES RUFF,
Hearing Officer


APPEARANCES:

On Behalf of the Student/Parent:

MICHAEL EIG, ESQ.

On Behalf of the D.C. Public Schools:

STEPHANIE RAMJOHN-MOORE, ESQ.

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    (202) 234-4433

P-R-O-C-E-E-D-I-N-G-S

HEARING OFFICER RUFF: Okay, good morning. Today's date is August 21st, 2006. I'm Coles Ruff, independent Hearing Officer. This is an administrative due process hearing conducted under the Individuals with Disabilities Education Act. This is in the matter of S███ A█████. This matter was continued so that we could have oral argument today on the parent's Motion for Summary Decision and DCPS' opposition to that motion. Could you all identify yourselves, please, Ms. Moore first?

MS. RAMJOHN-MOORE: Stephanie Ramjohn-Moore, Attorney-Advisor, District of Columbia Public Schools.

MR. EIG: Michael Eig, Counsel for S███. I have his parents on the phone as well. Please speak up and identify yourself.

MR. ABRAMSON: Larry Abramson, Father.

MS. NEWMAN: And Caroline Newman, Mother.

HEARING OFFICER RUFF: Okay, great. Okay, I have read both the Motion in Opposition and then the Response to the Opposition. Now, one thing that I did not look at prior to this morning that I'm reviewing now is the OSEP (phonetic) letter to the Chief State School Offices. So actually, I'm not going to belabor the -- this matter while I look that over, but I will read it also. I didn't have it with me when I was reviewing this over the weekend.

But just in general, why don't I allow you to make your oral argument Mr. Eig, and then I'll have Ms. Ramjohn-Moore make her response on the record?

MR. EIG: Fine, and thank you very much, Mr. Ruff. And thank you for this opportunity to sort of summarize what we put

in writing and this will be brief.  By the way, the -- looking at the OSEP letter, is, I think, going to really underscore what I'm about to say.  You will -- what this issue revolves around is whether, indeed, there has been a change in the IDEA which requires the parent of a child who is placed in a private school outside of the LEA's jurisdiction in this case, placing a child outside of the District of Columbia by the parent, to go through the LEA in which the private school is located as opposed to their LEA of residence, in this case that would be up in Madison, Connecticut where S⬛⬛⬛ is, in order to seek the provision of a free appropriate public education to the child from the District of Columbia, the school of residence.

There is no question, of course, that District of Columbia law requires that the District of Columbia provide education and an appropriate special education of a child qualified to all of its residents, that's DC and there can't be any argument about that.  What the District of Columbia is arguing is that the law has been changed as of 2004 requiring that you go through a different process maybe to get -- we can't tell exactly in the end who they think has to provide the free appropriate public education but they say you've got to go through the LEA where the private school is located.

They're wrong and they're so wrong that we dated Mr. Smith's decision earlier today, but they're wrong because it's illogical but more importantly now as of last Monday, a week ago today, we know they're wrong because the United States Department of Education, the same people that are referred to in the OSEP area, has issued its final regulations redoing the regulations in a very voluminous way with all of its comments, questions and comments,

and there is a question and a comment that actually they provided you themselves, I think with the draft version of, because it was only on a draft version that they submitted it, that I have in front of me right now that answers this question 100 percent.

I refer you to -- and I can give you -- I don't think we have the Federal Register in this form when we filed, I don't remember, but we'll give you the pages in case, in fax, after we're off here today.

HEARING OFFICER RUFF:    Do you have it with you now?

MR. EIG:  Yes, I do.

HEARING OFFICER RUFF:    If you could cite the page number, I have it.

MR. RHEA:    Oh, great,  84 CFR, Parts 300 and 301, these are the new regulations issued last Monday, August 14th and if you'll please turn to page 46593, 46593, a wonderful commentary on what this country is all about.

HEARING OFFICER RUFF:  46593.

MR. EIG:  46593.

HEARING OFFICER RUFF:    I have that page.

MR. EIG:  All right, if you will notice, in the left-hand column, in the very middle of the page, comment, "One commentor expressed concern that the regulations permit a parent to request" -- do you see that?

HEARING OFFICER RUFF:  Yes.

MR. EIG:  -- "an eval" -- I'm going to read it because certainly my clients don't have this.  "Permit a parent to request an evaluation from the LEA of residence at the same time the child is being evaluated by the LEA where the private elementary school or secondary school is located,    resulting    in    two    LEAs simultaneously conducting evaluations of the same child."

The discussion starts out with, "We recognize that there could be times when parents request that their parentally placed child be evaluated by different LEAs if the child is attending a private school that is not in the LEA in which they reside. For example", and this is where we get here, "Because most states generally allocate the responsibility for making STAP available to the LEA in which the child's parents reside", that's of course, in the case in the District of Columbia and that could be a different LEA from the LEA in which the child's private school is located, parents could ask two different LEAs to evaluate their child for different purposes at the same time".

I pause to underscore "for different purposes at the same time". They will explain. Although there is nothing in this part that would prohibit parents from requesting that the child be evaluated by the LEA responsible for FAPE (phonetic), for purposes of having a program of FAPE made available to the child", stopping again, that's exactly what you'll see in the record what we have asked for in this case. We have asked that he be placed there to provide a Free Appropriate Public Education, "FAPE made available at the same time that the parents have requested that the LEA where the private school is located evaluate their child for purposes of considering the child for equitable services, we are unclear as a practice".

We have never requested that, as we've been trying to explain, that S████ be made available for equitable services which are very clearly set out in these very same regulations and in the statute and those services for kids in non-special education, private schools receiving non-IEP, not STAP but maybe a session of speech language therapy or maybe a special education

resource hour at the end of the day. That's what equitable services are very clearly defined as and that's what the change is all about. "But we do not encourage this practice", and then they go on to say that, "We note that the new section that talks about the need for parental consent". Okay, and the problem is that one LEA may not know that there are two assessors going over.

They go on to the top of the next column, "However, we do not believe that the child's best interests would be well-observed if the parents requested evaluations for their child by the resident school district and the LEA where the private school is located even though these evaluations are conducted for different purposes." Once again, they're noting the difference between asking for a STAP and asking for equitable services.

"A practice of subjecting a child to repeated testing by separate LEAs in close proximity of time may not be the most effective or desirable way of insuring that th evaluation is a meaningful measure of whether this child has a disability or of providing an appropriate assessment of the child's educational needs".

This is as on point as you can find. What the District of Columbia is repeatedly in this case confusing is the request for a privately placed child for equitable services with a request for FAPE. There are different parts of the statute, there are different parts of these regulations, and we've -- and they've also been instructed in Mr. Smith's decision before he even had these regulations to rely upon, as to the difference.

If the Abramsons wanted equitable services, in other words, the child was up there in Connecticut and they wanted, you know, a provision of some equitable services at the end of the private school day, of

course, they should be required to go
through Connecticut because how is the
District of Columbia going to provide the
services, you know, with the kid, you know,
that far away?

If, on the other hand, the child
is a child where FAPE is at issue and those
regulations are of course, in a different
part of the regulations, they are found if
you turn over quickly to 46599 --

HEARING OFFICER RUFF: Okay.

MR. EIG: Place -- in the middle
column, top, "Placement of children by
parents when FAPE is at issue," this is what
we're doing and as I just pointed out, we
could go for both. We have the right, as I
just explained. However, the reason they
don't encourage it is because why do that?
And you should make it clear what you're
asking for so you know who's responsible.
In this case, we went to the District of
Columbia because they're clearly responsible
for residents of the District of Columbia
when FAPE is at issue and that's what we did
and those are the regulations that control.

There's nothing else here. This
is not difficult and I would also note that
you're not going to find any decisions or
interpretations anywhere else in this
country contradicting this because it's that
clear. So, we're not going to argue the
rest of it, the reimbursement issue. We
think that we've documented that as well as
we can in our papers.

That's all I have to say.

HEARING OFFICER RUFF: Okay, Ms.
Moore.

MS. RAMJOHN-MOORE: Mr. Ruff, I
think that --

MR. EIG: Can I ask Ms. Moore to
speak up just because of the phone
connection or get closer to the -- you know,
whatever.

HEARING OFFICER RUFF: Okay, just

291

a moment, let me rearrange the phone.

MR. EIG:  I apologize for interrupting.

HEARING OFFICER RUFF:  No problem.

MS. RAMJOHN-MOORE:  Mr. Ruff. I think it is important that the District point out a couple of things prior to getting to Mr. Eig's point of the new regulation.

MR. EIG:  I can hardly hear her. I don't know how my clients are doing.

MS. RAMJOHN-MOORE:  Mr. Ruff.

HEARING OFFICER RUFF:  Okay, I'll get the phone as close as I can.

MR. EIG:  Okay, I can hear.  I can hear every word, it's just that it was faint.

HEARING OFFICER RUFF:  Okay.

MS. RAMJOHN-MOORE:  Mr. Ruff, I think it is important that the District of Columbia point out some very important issues at hand here before we even address Mr. Eig's opposition, his oral opposition here today.  First of all, the District of Columbia had S███ register in January of 2006.  And at that time, the team at the Care Center determined that they would contact the school in which he attended, Georgetown Day, to observe the child and to evaluate him.  Upon contacting Georgetown, they were told that the student no longer attended Georgetown Day and this was February 27th, 2006, so I can give you a time line.

They heard nothing further from either the parents or Mr. Eig until March 13th, 2006 by letter of Mr. Eig, he informed the Care Center of the same facts, that the student no longer attended Georgetown Day and that the student was, in fact, attending the Groves School in Madison County Connecticut.

At this time, the care center

292

team informed Mr. Eig and as well as the parents that since the student was no longer attending the District of Columbia school, he had to obtain services or be identified because this child has not been identified at all from the LEA which services the county in which he goes to school. Under the new law this is the mandate that we have been given.

Upon receiving that information, Mr. Eig files the due process hearing stating that we have it wrong, the District has it wrong. We're not reading the law correctly. This student must be serviced by the LEA in which his parents reside in which he resides.

If this child is not made available, Mr. Ruff, the Congress and the writers of this new legislation couldn't have possibly wanted the LEA where the parents reside to give services or to find the child eligible if the child is not available to the school system. That would be patently unfair and I think that Mr. Eig's statement kind of glossed over what the commentors were really talking. So I'd like to go back and visit this.

What brought about that discussion that Mr. Eig was reading about was a comment made here on page 313 of My Opposition for Motion of Summary Judgment. It says that one commentor expressed concern that the regulations permit a parent to request an evaluation from the LEA of residence at the same time the child is being evaluated by the LEA where the private elementary school or secondary school is located resulting in two LEAs simultaneously conducting evaluations of the same child.

The discussion is, we recognize that there are times when parents request that their parentally placed child be evaluated by different LEAs if the child is attending a private school that is not the

LEA in which they reside.   "For example, because most states generally allocate the responsibility for making FAPE available to the LEA which the child's parents reside, and that could be a different LEA from the LEA in which the child's private school is located.    Parents could ask two different LEAs to evaluate their child for different purposes at the same time.   Although there is nothing in this part that would prohibit parents from requesting that their child be evaluated by the LEA responsible for FAPE for the purposes of having a program of FAPE made available to the child at the same time that the parents have requested that the LEA where the private school is located evaluate their child for purposes of considering the child for equitable services.   We do not encourage this practice."

You can't gloss over that and say that you know, it's possible and they can do it, but we not encourage this practice is what the writers of this very statute are saying and this is why.   Because the child is A, not available.   This child has never been found eligible for special education services in the District of Columbia.   He may have very well been found eligible in Connecticut but he's not here for us to provide any services, to provide FAPE, an Free and Appropriate Public Education. There has been no failure on the part of the District of Columbia.   We have 120 days to timely evaluate a student.   He was not made available to the District of Columbia to complete the process.

Thereby, we could not offer a school to provide services to him because he was not here to complete the process. Again, it would be patently unfair to expect the District of Columbia to make FAPE available to a student who is not available. We note the note 300.622(b)(4) requires parental consent for the release of

294

information about parentally place private
school children between LEAs.   Therefore, as
a practical matter, one LEA may not know
that the parent has also requested an
evaluation from another LEA.   They're making
the case as to why this is not encouraged.
However, we do not believe that the child's
best interests would be well-served if the
parents requested evaluations of their child
by the resident school district and the LEA
where the private school is located, even
though these evaluations are conducted for
different purposes.

They're saying right here we do
not believe that the child's best interests
would be well-served and they go onto
explain why.   A practice of subjecting a
child to repeated testing by separate LEAs
in close proximity of time, may not be the
most effective or desirable way of insuring
that the evaluation is a meaningful measure
of whether a child has   disability or
providing an appropriate assessment of the
child's education needs.   It's right there.
Mr. Eig just read from it, why they do not
encourage this practice.   We've been told by
Mr. Eig in his complaint for hearing that
S███ is emotionally fragile.   I have
literature in Mr. Eig's disclosure about the
Grove School being for emotional fragile
students.   Does the Hearing Officer actually
believe that it would be in the best
interest for S███ A████████ to be tested by
two different LEAs at the same time trying
to figure out what and if at all the student
has a disability?   I don't think so.   It's
absolutely in controversy with the law.

It is not correct.   It is not a
correct assumption to be made here today
that the LEA in which the child has not been
made available is responsible for providing
a FAPE.   This student has not been found
eligible for special education services.
It's as simple as that.

295

HEARING OFFICER RUFF:  Mr. Eig.

MR. EIG:    Yeah,  I  can  do  it briefly.

HEARING OFFICER RUFF:  Well, wait a minute, before you do that, let me clarify some facts so that it's clear or there is no dispute about the facts.

MR. EIG:  Okay.

HEARING OFFICER RUFF:   The date that S████ was registered at the Care Center is January what is that 4th?

MS. RAMJOHN-MOORE:  Yes.

MR. EIG:  4th, January 4th, 2006.

HEARING   OFFICER  RUFF:    Okay. Now, there is a -- now he was attending Georgetown Day at that time and did so under February 27th?

MR.   EIG:    He   really   wasn't attending.   When was he -- if I can -- if you  want,  either  parent,  when  was  he officially withdrawn if you remember?

MS.  NEWMAN:    Well,  as  you indicated in your letter, he was refusing to go to school so that clouded the issue --

MR. EIG:  Right.

MS. NEWMAN:  -- as to when he was admitted into the psychiatric ward.

MR. RHEA:   Which was -- do you remember when Caroline?

MS.  NEWMAN:    I  believe  it's February 11th.

MR. EIG:  Yeah, I just want to make it clear, Mr. Ruff, that it wasn't -- he was withdrawn later but he hadn't been attending school for a long time and then he was psychiatrically hospitalized.

HEARING OFFICER RUFF:  Okay, he was officially withdrawn, was that February 27th?

MR. EIG:  It's either the 11th -- I'm sorry, Caroline.

MS. NEWMAN:  I'm sorry, he was admitted to the Psychiatric Institute of Washington, I think on the 11th.

296

MR. EIG: Okay, some time after February 11th, shortly after February 11th, we'll say after he was hospitalized, Mr. Ruff.

HEARING OFFICER RUFF: Okay, and then we have a letter dated March 13th, '06 from you informing DCPS that he had been withdrawn from Georgetown Day, right?

MR. EIG: Yeah, correct, and also, you know, advising them -- well, the letter speaks for itself.

HEARING OFFICER RUFF: Okay, and then he enrolled -- he was enrolled in Groves School, what was that, April?

MR. EIG: Once again, parents, April 4th, I believe.

MS. NEWMAN: April 4th.

MR. RHEA: April 4th, and Ms. Newman, you wanted to clarify just one other point?

MS. NEWMAN: Yes, I did. I'm recalling that I believe S███ official withdrawal date is the end of the month of February so February 27th, 28th.

MR. EIG: That makes sense, so it was towards the end of the month, we believe that he was officially withdrawn from GDS. He began Groves School on April 4th, 2006.

HEARING OFFICER RUFF: Okay, great. Now, question, I note in the record -- now, I assume if I haven't already done so, if I didn't do so prior, admit all the disclosures.

MR. EIG: I believe you did, sir.

MS. RAMJOHN-MOORE: Yes, yes.

HEARING OFFICER RUFF: I'm sure I would have, there's a neuropsychological evaluation dated March 10th.

MR. EIG: Yes.

HEARING OFFICER RUFF: Was that ever provided to DCPS prior to the disclosure?

MR. EIG: Yeah. Hold on. The answer is, I believe so. I'm trying to see

if I can prove that.

   MS. RAMJOHN-MOORE:  I don't think so.

   MR. EIG:  So you know?

   MS. RAMJOHN-MOORE:  No.

   HEARING OFFICER RUFF:  Okay, she doesn't think so, so that doesn't seem like that's going to be a verifiable fact at least today.

   MR. EIG:  Yeah, unless I see something which I think I might be looking at right now, but as of right now, unless I can show you where we get it, the answer is no.

   HEARING OFFICER RUFF:  Okay.  So then it's my understanding that other than the correspondence, your letter in March, the correspondence from DCPS in May and --

   MR. EIG:  My response on May 8th.

   HEARING OFFICER RUFF:  -- May 8th, right.

   MR. EIG:  And as I say their response back to me on May 23rd, SA-5.

   HEARING OFFICER RUFF:  Right, and that's the date you filed the complaint, right?

   MR. EIG:  That sounds like what it was.

   HEARING OFFICER RUFF:  Okay, and then the only other meeting was you had was the resolution meeting.  Now, was that -- now in some documents that's referenced as an MDT.

   MR. EIG:  Yes.

   HEARING OFFICER RUFF:  Is that correct?

   MR. EIG:  Right, the -- yeah, we refer to that in the correspondence.  There was an MTD.

   HEARING OFFICER RUFF:  Yeah, but there was only one meeting and that was the June 6th meeting; is that right?

   MR. EIG:  No, there was a prior meeting, if you'd just give me a moment.

MS. RAMJOHN-MOORE:    Remember in our last time together, Mr. Eig said he would provide a copy of the --

MR. EIG:    Yeah, and I couldn't find -- she's absolutely right and I couldn't find the --

HEARING OFFICER RUFF:    The notes.

MR. EIG:    -- the notes but once again, there was a prior meeting, if you'd just give me a moment.

HEARING OFFICER RUFF:    Yeah, because I'm also wondering if the neuropsych was ever, you know, really discussed by --

MR. EIG:    Well, the neuropsych was -- no, I can tell you that.    The neuropsych was never discussed.    We had the discussion, for example, during dispute resolution.    The school system's response, consistent with their correspondence here, is that, "It's not our responsibility", and that Connecticut, I mean, that's what they have been saying.

HEARING OFFICER RUFF:    Okay, all right.

MR. EIG:    The way I wanted to begin the response is, and can I do that now?

HEARING OFFICER RUFF:    Yes, go ahead.

MR. EIG:    Okay, is to say that, you know, here's what's clear; the school system has said and Ms. Ramjohn-Moore just very clearly said this, has said since they found out that S____ wasn't going to GDS any more, which officially happened in the end of February Ms. Newman thinks, let's just take the end of February because that's sort of safe, they have been telling us, telling my clients, and they've been very clear about this; don't come to us with any request for evaluation or define the child eligible.

She's absolutely right, they never found the child eligible, but it's not

because of a lack of effort on our part, it's because they refused to proceed with the process. They said, "Go to Connecticut", okay. So to hold against the -- S█████ parents the fact that S███ hasn't been found eligible is, you know, the equivalent of in indeed, we were rendering our legal argument, awarding, rewarding DCPS for illegally stopping the process.

In other words, we're asking you, Mr. Ruff, to look at these documents that are in the record, of course and to find that he's clearly eligible. We supported it with more than that neuropsych. His treating therapist, Dr. Clawson (phonetic) is on record here as well. And so you know, we're seeking that determination of eligibility by you which we understand is a necessity in order for him to receive funding. We don't question that, but you can't use as a reason for not giving the Abramsons their tuition reimbursement if, indeed, they are entitled to it, for other reasons, the fact he hasn't been found eligible, DCPS didn't -- refused to go through the process.

So the only question I would respectfully suggest or certainly the threshold question is were they justified in stopping the process? Well, I've just heard two reasons, I believe, from school system counselor as to why they're justified. One is that the S███ has been unavailable, which is wrong, but we'll get back to that in a moment and you'll see nothing in this record that says that he's unavailable or the parents say he's not available. It's sort of hard for the parents to make a child available for evaluation either in Connecticut, down here or anywhere when the school systems is saying, "We don't want to evaluate him", no, I'm sorry, "We won't evaluate him".

So one is that he's unavailable

and two, is that the people that wrote the regulation were discouraging the practice of going through the process in both LEAs. They say you can, so we know we legally can but they discourage it. Let's take the second one first.

She said that I glossed over something. What she keeps glossing over is the important point, and that's the reason I stopped the two times I read it in that comment. The evaluations, either by Connecticut or by DC, would be for different purposes. We've set this forth very clearly. It's the basis of Mr. Smith's decision as well, in our pleading and you can't miss it. And she's just voluntarily electing to keep not dealing with this. There's one section of the law that says privately placed children that want equitable services. Equitable serves are defined in the statute and in the regulations as adjunct services to a privately placed child in an elementary or secondary school which are specifically not an IEP, they're not entitled to an IEP it says in the regs. They're not entitled to the provision of a free appropriate public education.

What they are entitled to is to be identified as needing these lesser ancillary services and then the school system has to provide them and now the school system where the private school is located is the one that has to provide them and logically we all know why. That's one purpose. The other purpose which is spelled out in the statute and spelled out in the regulations and spelled out in Mr. Smith's decision, is where FAPE is at issue and there is no question, there's no argument that that's exactly what this case is. The Abramsons enrolled him for purposes of receiving a FAPE, that's that January 4th, 2006 enrollment and that's what they began

301

systemly saying through their request, through the correspondence, through the due process hearing request and through all these papers. They need for this very disturbed young man a free appropriate public education, not equitable services.

So even though you can do it for both purposes and go through jurisdictions, the Abramsons can't. They have to go through DC because that's where FAPE is at issue. And it's the District of Columbia that's going to be responsible to provide him a free appropriate public education. That's what the regulation clearly says and you can't get away from it.

Now, as far as well, it's unfair because he's unavailable; well, I've been doing this since 1975, the year that the IDEA, as the EHA was passed and every year we get a number of kids who are, because of the severity of the disability of the urgent nature or for whatever the circumstances, are not physically right here in the District of Columbia. They may just be in, you know, a neighboring county or they may be far away because of the severity of their disability. This is the first time in that 30 some years and I challenge DC counsel right now to come up with a single reported decision, even an administrative law decision, that's fine with me even though they don't have precedential value, that says that a child who is geographically somewhere else is therefore, by definition unavailable.

We know the District of Columbia Public Schools on occasion travel there but I'm not suggesting they go through that trouble. There are evaluations as we've just been talking about that they have refused to review from people here who they could talk to. There's always the possibility that -- and I'm saying in this case, if asked we would have seriously done

everything we could to bring S████ down for an evaluation. Why not? If we could to that, you know, if they had asked -- you know, he's not unavailable, he's just untouchable as far as the school system is concerned because they don't want to go through the process.

There's nothing in this record that says he's unavailable. And if the District of Columbia Public Schools went through the process, found him eligible as he so clearly is for special ed, and determined that they have an appropriate placement in a less restrictive setting than Grove School, there's nothing in this record that says these parents wouldn't have considered that, a private or public day therapeutic placement. His needs, as you can see in the neurological and Dr. Clawson's report, are very intense, so it would have to be one heck of a program but by refusing to go through the process on the mistaken belief that someone in Connecticut has to do it, is not equivalent to saying the kid's unavailable. Once again, they're just wrong.

So we would ask you to find that they have the responsibility under the statute, under the regulations and they stopped the process and that, therefore, these parents are entitled to a determination from you, Mr. Ruff, if you can make that determination, based on the record, of course, we understand that if you don't have it, you can't make that determination, but we believe it's not difficult for you to make that determination based upon the comprehensive evaluation and the therapist's statement, to find him eligible for special education services as an emotionally impaired student and to find that he is receiving significant benefit, as the record unquestionably says from Grove and to therefore, order tuition

reimbursement. At the same time, it would be very appropriate, we would respectfully suggest, for you to order the District of Columbia Public Schools to re-institute their process while they're funding this placement to go through the full IEP process, which they have not done, and with the cooperation of the parents, of course, to find out if he should continue on at Grove or if they have something that they can suggest once they've finished the process.

But please do not reward them for their violation of the law based upon a good faith or otherwise misunderstanding of the law.

HEARING OFFICER RUFF: Okay, let me ask some specific questions. First, with regard to the statute itself; 20 USC 1412(a)(10) is -- now there are three different sections of that --

MR. EIG: Yes.

HEARING OFFICER RUFF: -- portions of that section of (a), (b) and (c). Now, (a) seems to reference the equitable services is that right?

MR. EIG: Yes, sir, that's correct.

HEARING OFFICER RUFF: Okay, now you are maintaining that (c), that 412(a)(10)(c) is what is applicable and there has been no change in that section in the reauthorization.

MR. EIG: That is correct, but not only that, there are -- what I want to point out is that the equitable services, the Section (a) --

HEARING OFFICER RUFF: Yes.

MR. EIG: -- predated the changes in the law as well. In other words, this separation -- and by the way, in between the two -- in between is where the school system places the child in a private school, that's the (b).

304

HEARING OFFICER RUFF:  Right.

MR. EIG:  But in between this division between equitable services and fairly placed where FAPE is at issue has been there for many, many years.  The only difference now which is that logical difference is for the equitable services shoving responsibility onto the other LEA.

HEARING OFFICER RUFF:  Okay, so that's the distinction.

MR. EIG:  That's the only change.

HEARING OFFICER RUFF:  Okay. Okay, Ms. Ramjohn-Moore, do you have any other argument or interpretation in terms of the code sections?

MS. RAMJOHN-MOORE:  I think that the code is clear.

HEARING OFFICER RUFF:  Okay.

MS. RAMJOHN-MOORE:  The student has not been found eligible for services. Regardless of what Mr. Eig was saying, he does not attend school in the District of Columbia.  S██ has not been made available to evaluate.  When the Care Center called --

HEARING OFFICER RUFF:  Okay, wait a minute, I just want -- let me reference what the --

MS. RAMJOHN-MOORE:  Sure.

HEARING OFFICER RUFF:  Now, in her attachment to the opposition for the motion, she's attached what is page 295. Now, I assume there's a corresponding page out of the Federal Register from which this --

MR. EIG:  Right, that's exactly right.  I mean, everything that Ms. Moore attached to her thing is now the exact same words here in the CFR.

HEARING OFFICER RUFF:  Okay, now, I'm looking at what is page 295 in the attachment she submitted.

MR. EIG:  I've got that.

HEARING OFFICER RUFF:  I'm not certain which page that is.

MR. EIG:  Well, fine, we can go to it.  Where she did the star?

HEARING OFFICER RUFF:  Yeah, where she did the star, 295, Section 612, which is 1412(a)(10)(a) of the Act now requires LEAs in which the private schools are located rather than the LEAs in which the parents of such children reside to conduct child find and provide equitable services to parentally placed private school children with disabilities.

MR. EIG:  I agree with that.

HEARING OFFICER RUFF:  Now, there are two things, you know, child find, it's my understanding from what Ms. Moore has been arguing and what she's submitted is that the child find obligations or that reference to child find obligations is the eligibility determination.

MS. RAMJOHN-MOORE:  Absolutely.

HEARING OFFICER RUFF:  Is that what you're saying?

MS. RAMJOHN-MOORE:  Absolutely, sir.

MR. EIG:  Well, she's wrong, and she's wrong because one, of what I just -- she read it to you, too, by the way, the discussion where they say to begin with, you can do it through both places, okay?  In other words, it's legal to do that and she's saying no, I mean, but she's reading the United States Department of Education saying, you can do it but then they go further to explain what she doesn't pick up on here, which is simple.    It's    for two different purposes.  Child find which is to identify a child.  You don't have to do that, by the way when the parents bring the child to you.  So the child find doesn't even apply here, but child find for equitable services is under (a)(10)(a). Child find for kids where FAPE is at issue would be under the whole statute which is the LEA's responsibility where the residence

is.

But once again, child find is not the same as evaluating.   Child find is taking -- as I'm sure you're aware, is just taking steps to identify kids possibly in need of special education and then to start the evaluation process.

Well, once again, in this case, that's irrelevant.  The Abramson's brought the child to the District of Columbia and registered him on January 4th.  There's no child find.   Child find is over at that point.             HEARING  OFFICER  RUFF: Ms. Moore, do you have a response?

MS.  RAMJOHN-MOORE:    I  would disagree, child find is absolutely not over because he has yet to have been identified. He has yet -- you can't just locate and begin evaluations and not identify.   The school system has not had an opportunity.

HEARING OFFICER RUFF:  Okay, now --

MR.  EIG:   And I'm sorry, Ms. Moore, I won't read it but please read the paragraph after her star and you'll see that this  is  talking  just  about  equitable services.

HEARING OFFICER RUFF:  Okay, now I do have -- do you have the OSEP letter with you?

MR. EIG:   She attached that to it.

MS. RAMJOHN-MOORE:   That's in my disclosure.

MR.  EIG:    Oh,  it's  in  your disclosure,  thanks.     Hold  on.    Her disclosure.

MS. RAMJOHN-MOORE:  Three.

MR. EIG:  I'm getting there.  And which number is it?

MS. RAMJOHN-MOORE:  DCPS 3.

MR. EIG:  Thank you.  I'm there.

HEARING OFFICER RUFF:   Okay, and this  memorandum indicates, "The obligation

307

of states and local educational agencies to children with disabilities enrolled by their parents in private elementary and secondary schools will change beginning July 1, '05, the effective date of these provisions. The focus of this memorandum is to provide guidance to states and LEAs in complying with the following requirements of 20 USC 412 (a)(10); one, regarding the agency responsibility for providing equitable special education and related services to parentally placed private school children with disabilities, and two; determining a proportionate amount of federal funds to be expended by the LEA for such children attending private schools located in their district".

MR. EIG:  Mr. Ruff?

HEARING OFFICER RUFF:  Yes.

MR. EIG:    That says it all.   I mean, I hadn't even focused on that before. They're telling you what the change is, as I've been saying all along, is regarding the agency responsible for providing equitable special education related, and the proportionate amount of federal funds to be expended, proportionate amount of funds are only applicable, of course in equitable situations because when FAPE is at issue, proportionate has nothing to do with it. You know, you have to provide the full service.   I mean, that says it all right there.

MS. RAMJOHN-MOORE:    But keep reading the second paragraph.

MR. EIG:    Go right ahead. Please, please.

HEARING OFFICER RUFF:    "IDEA 04 retains the provision in IDEA that each LEA spend a proportionate amount of the required sub-grants it receives from the state educational agency under 20 USC 1411 and 1419 for special education related services to children with disabilities enrolled by

their parents in private elementary and
secondary schools. However, under" --

MR. EIG:  Sir?

HEARING OFFICER RUFF:  Yes.

MR. EIG:  The cite is what is
actually the important thing before you go
on. You'll notice that everything else in
this memorandum is an (a)(10)(a) discussion.
That's -- I interrupted, I apologize. For
the cite, (a)(10)(a).

HEARING OFFICER RUFF:  Yes.

MR. EIG:  As you'll start
noticing, everything else is equitable -- is
for equitable services, not the (a)(10)(c)
that we're under.

HEARING OFFICER RUFF:  Okay.

MR. EIG:  I apologize for the
interruption.

HEARING OFFICER RUFF:  No
problem. So I mean, what else do you want
to point out either --

MS. RAMJOHN-MOORE:  But you can't
get to (c) until you go through (a). (a),
(b) and (c) it's sequential. It's not --

MR. EIG:  The --

MS. RAMJOHN-MOORE:  The child is
not there. He's not --

MR. EIG:  I'm sorry, (b) has to
do with children that are placed in private
schools by public agencies. So what she
just told you is that in order to get to
provision of services, you first have to
have your child placed in a private school
by a public agency. That's what (b) is.
That's absurd. I apologize for the strong
language but that's absurd. She's playing
with this stuff, and we deserve much better
than that.

MS. RAMJOHN-MOORE:  If you could
continue reading, Mr. Ruff, I think the
letter explains itself.

MS. RAMJOHN-MOORE:  Why don't you
point out to me what you mean?

MS. RAMJOHN-MOORE:  "However,

309

under IDEA 2004, to calculate the proportion amount of Federal Part B funds, the LEA, after timely and meaningful consultation with representatives of the private schools, must conduct a thorough and complete child find process to determine the number of parentally placed children with disabilities attending private school located in the LEA.

In addition, the obligation to spend a proportionate amount to provide services to children with disabilities enrolled by their parents in private schools now refers to children enrolled by their parents in private elementary schools and secondary schools in the LEA. These are significant changes from the current regulations in which the responsibility to conduct child find and provide equitable services to parentally placed private school children rests with the LEA in which the children reside."

MR. EIG:  I agree with everything she just said and --

HEARING OFFICER RUFF:  Okay, so the distinction you're making is that this reference to child find obligations is related to equitable services to the LEA where the child is in school.

MR. EIG:  That is the significant change they speak of.  It only applies to children seeking equitable services.  It's absolutely clear.  There's nothing that indicates otherwise.  Every cite says that. Common sense says that.  The specific question and response that we just read to you -- that we both just read to you at the beginning of that says it and I'm --

HEARING OFFICER RUFF:  Okay, well, from the OSEP letter, then the next thing I want to turn to is the superintendent's directive, which seems to be -- which seems to have been motivated by the OSEP letter.  So do you have a copy of that?

MR. EIG:    Yeah, that's also in the disclosure, is it not or is it --

MS. RAMJOHN-MOORE:    That's in my opposition.

MR. EIG:    Opposition, okay, thank you, I've got stacks here.

MS. RAMJOHN-MOORE:    Attachment E.

MR. EIG:    Attachment what?  Is it Attachment at the end?

MS. RAMJOHN-MOORE:    It's E.

HEARING OFFICER RUFF:    Yeah, it is the last one.

MR. EIG:    I got it, got it, yeah. And having read this, we certainly agree that this was the response to the OSEP letter, it's pretty clear.

HEARING OFFICER RUFF:    Yes, so I guess the only pertinent part here, I presume is the last --

MS. RAMJOHN-MOORE:    That last page.

HEARING OFFICER RUFF:    -- paragraph on the second page.

MR. EIG:    Correct.

HEARING OFFICER RUFF:    "Students attending a private or religious school located outside the District of Columbia not funded by DCPS consistent with the Individual's Disabilities Education Improvement Act of 2004 apparently pressed in consideration of special education of the ability of change in services to contact the LEA and state where the school is located, OSEP Letter 5-9, Obligations.

MR. EIG:    Yeah.

HEARING OFFICER RUFF:    Okay, so --

MR. EIG:    That's wrong.  There's no argument that's what it says and that's just as we can see, flat out wrong.  It's right for students seeking equitable services.  It's clearly wrong for students seeking FAPE and  as the statutes have told us a number of times now.  So we'd better

correct them.

        HEARING OFFICER RUFF:    Then lastly, I want to discuss --

        MS. RAMJOHN-MOORE:   I would just like to point out to the Hearing Officer --

        HEARING OFFICER RUFF:   I'm sorry, go ahead.

        MS. RAMJOHN-MOORE:   -- that in my opposition, page 314 of the comment section, the commentors make it clear that FAPE is what they're referring to as well.  It's not just the equitable services.   It's FAPE. It's 314 that we -- both Mr. Eig and I read from.  It talks about a free and appropriate public education and it also talk about on the page I initially was reading from, page 295, that they're referring to child find. Also in the OSEP letter, they're referring to child find, in the superintendent's directive, they're all referring to child find.  So you can't get to the parentally placed private school, you cannot get to a finding that DCPS failed a student until we finish the child find process, but we haven't been able to finish the child find process because S████ attends an LEA in Madison County, Connecticut.

        MR. EIG:   That's -- well, I won't go back over it.

        HEARING OFFICER RUFF:   Okay.

        MR. EIG:   It clearly says on 314 that there are different purposes.  You can ask for both purposes, the two evaluations. They don't encourage it because you should ask -- you should go to the jurisdiction that has what you -- you know, what you're seeking, either equitable services or FAPE. That's what they're telling you and we did that and DC said, "No".

        HEARING OFFICER RUFF:   Okay, next I want to turn to the decision that -- without disclosing any identity here, this --

        MR. EIG:   What are the initials?

HEARING OFFICER RUFF:    -- is a decision from May 9th, '06 in which I think the exact issue was argued.

MR. EIG:    That is correct, and that's RSA 13.

HEARING OFFICER RUFF:  Yes.

MR. EIG:  Yes.

HEARING OFFICER RUFF:  Were there facts that were -- significant facts that were distinguishable here?

MR. EIG:  The only thing that I'd point out to you -- I don't believe there's anything of significance.  The only thing that I would point out to you is that in this case, the District refused to -- it refused to do it when the kid was living at home in the District of Columbia, by the way, and was attending Ivy Mount (phonetic), you know, out of Montgomery County.  So I just want to point out that there's a misunderstanding.  There are violations, their practice has nothing to do with availability as she's been saying.  That kid was unquestionably available and they said, "No, we're not going to do it as well," and besides that, it's the exact same thing.

MS. RAMJOHN-MOORE:    May I respond?

HEARING OFFICER RUFF:    Yes, go ahead.

MS. RAMJOHN-MOORE:  I think the biggest distinction, Hearing Officer Ruff, is that the date of the hearing, what happened, I guess it would be April, because the HOD was issued in May.

MR. EIG:    Yes, it's a May decision and an April --

MS. RAMJOHN-MOORE:    I think that's the biggest distinction, that the final regulations had not been issued at this point.  So Mr. -- who was the hearing officer, Mr. Smith had -- did not have that to reference.  So I think that's the biggest distinction.

Also, this case, I'm not very familiar with it, but it's quite different in that the student was not registered, you know, as he was not registered at all and I think that the agreement that DCPS has with the private and religious schools that certain steps have to be taken in order for a child to be brought around to be given FAPE from the District of Columbia and part of that is registering your student with the Care Center and that had not been done in this case.

MR. EIG: Yeah, can I point out, there are three real quick thing that I would want to point out from the CS decision that Ms. Moore just brought to mind. Number one, it's true that the regulations weren't out. It was the statute that the regulations interpret certainly was and Mr. Smith, to his credit, interpreted the statute exactly as the feds have now interpreted the regulations because the second point I would point out, is that when you read his decision, and you read the comment that we both have read you about the two different purposes and the two different statutes, you know, it tracks word for word.

It wasn't hard for Mr. Smith to understand this. It wasn't hard for the United States Department of Education to understand it. It appears that it is hard — — there has been a problem with the superintendent in view of that memo that he issued because, you know, it's misleading in that last paragraph. So in other words, yes, the regulations weren't out. Now the regulations nail this thing down.

And the third point because you first started about how the fact that S█████ hadn't been found eligible because he wasn't inputted into the process. Interestingly, that's the same thing with CF. She hadn't been found eligible because she was from out of state and moved in, not been found

eligible so we submitted documentation and he certainly found her eligible because we had sufficient documentation and Ms. Moore is absolutely right.  In this case, they didn't even let her register.  It wasn't that we didn't try.  We tried, they went back and forth between the Care Center and their local high school, back and forth like a ping pong ball with me on the phone in CF's case and they never even let her register.  And they weren't rewarded for that.

So I would ask you not to rule with them for not putting S▆▆ through the process.  Very much --

HEARING OFFICER RUFF:  Okay, now this decision was issued May 10th.

MS. RAMJOHN-MOORE:  Uh-huh.

HEARING OFFICER RUFF:  Do you know if this decision has been appealed?

MR. EIG:  The decision was not appealed.  The decision --

MS. RAMJOHN-MOORE:  I don't know.

MR. EIG:  The child was placed and funded by the District of Columbia at -- voluntarily.

HEARING OFFICER RUFF:  Okay, because I'm reading the conclusion here.  This is the last page of the order with regard to FAPE.  There apparently was some confusion about DPCS' responsibility again.  "IDEA did not change the obligation of an LEA in which the student resides of the FAPE for that student".

MR. EIG:  Correct.

HEARING OFFICER RUFF:  So, I mean, is there a dispute that the student resides in the District of Columbia?

MR. EIG:  Of course not.

MS. RAMJOHN-MOORE:  No, but the comments of the Register make it clear that it would not be -- FAPE is not to be made available by the LEA in which the student resides where the school is located, and it

says so in the comments that I read.

MR. EIG:    It says the exact opposite.  I mean, it --

MS. RAMJOHN-MOORE:    That's not true.  Page 314.

MR. EIG:    That's going back --

HEARING OFFICER RUFF:    Okay, relax, Mr. --

MR. EIG:    I'm sorry, I'm sorry.  But what I hear over and over again when they say there are two different purposes, there are two different LEAs.   One's for equitable services, one is for FAPE, and they say you can delineate it or you can go to the one where you're really -- you know, what you're seeking for.   To hear her keep saying the opposite is frustrating.    I apologize for raising my voice but people are all across the country on this teleconference.

HEARING OFFICER RUFF:    Okay, Ms. Moore, go ahead.

MS. RAMJOHN-MOORE:    Mr. Ruff, that conclusion is absurd.  How can a FAPE be made available to a student that does not attend school in the district?  How can you offer a free and appropriate public education to someone that doesn't live here, who goes to school in Madison County, Connecticut.   That's ridiculous.

MR. EIG:    I have nothing to say in response to that.

HEARING OFFICER RUFF:    Okay, now lastly then or prospectively depending on how -- right now, if I were to not rule in your favor and decide this matter for summary decision, we are scheduled on --

MR. EIG:    Yes, sir.

HEARING OFFICER RUFF:       -- September 19th to proceed with hearing, right?

MR. EIG:    Absolutely.

MS. RAMJOHN-MOORE:    Yes, uh-huh.

HEARING OFFICER RUFF:    Okay, so,

now, when does -- if I should determine that the student needs to be evaluated --

MR. EIG:  Yes, sir.

HEARING OFFICER RUFF:  -- what is the possibility of the student being made available to DCPS for that purpose?

MR. EIG:  We will make him available as best we can.  I will not commit the parents right now to producing him down here if that's what DC insists upon, which has not been the case in three decades of my practice with them, but if that's what they insisted up and you said that, we would see if that's possible and we'd see real quick.

I mean, you know, we'd have to check with Grove, quite honestly, bottom line.

HEARING OFFICER RUFF:  Okay, is he at Grove now?

MR. EIG:  Yes, sir.  He's been at Grove since April 4th.

HEARING OFFICER RUFF:  He's not left Grove since April 4th?

MR. EIG:  Has he had any off-campus visits with you guys?

MR. ABRAMSON:  Yes.

MR. EIG: When's the last time?

MS. NEWMAN:  Well, currently, he has two breaks during the summer of two-weeks length and this is the second one.

MR. EIG:  Is he -- which place, you guys are in different places.  Where is he now?

MR. ABRAMSON:  He's with us in California right now visiting family, but he's not scheduled to --

MR. EIG:  Return till when?

MR. ABRAMSON:  He returns after -- on Labor Day and he's not scheduled to come home again until Thanksgiving.

MR. EIG:  Thanksgiving, right. And so do you take him right back to Connecticut on your current plans or were you coming through the District?

317

MR. ABRAMSON:    Well, I mean, we're basically taking him right back to Connecticut.

MR. EIG:    Okay.    That's the practicality of it all, but we'd do whatever we could in -- consistent with whatever you would find in the order, Mr. Ruff.

HEARING OFFICER RUFF:    Okay, anything else before we adjourn?

MR. EIG:    I'm sorry.    Well, yeah, can I just underscore one thing in view of what the parents have said?

HEARING OFFICER RUFF:    Yes.

MR. EIG:    He's been available if someone would have asked.    In other words, he can leave Connecticut, that's all.

HEARING OFFICER RUFF:    Ms. Moore, anything else?

MR. EIG:    Yes, sir.

MS. RAMJOHN-MOORE:    I have nothing further, Mr. Ruff.

MR. EIG:    Thank you very much.

HEARING OFFICER RUFF:    Thank you all very much.    We are adjourned.

MR. EIG:    Parents, hang up, I'll call you back and we can talk, how's that? Thank you again, sir.

HEARING OFFICER RUFF:    You're welcome, bye, bye.

(Whereupon, the above-entitled matter concluded.)


8151    9:00 A

# ATTENDANCE SHEET

| STUDENT'S NAME: | ~~Sarah At~~ |  |
| --- | --- | --- |
| HEARING DATE: | August 21, 2006 |  |

| PRINTED NAME | ON BEHALF OF DCPS OR STUDENT | TITLE |
| --- | --- | --- |
| Michal Eig | Parent | via phone |
| Stephanie Langston Moore | DCPS | in person |
| Parents | via phone | |

Oral argument on motion for summary decision & opposition thereto.

319